1

2                    IN THE UNITED STATES DISTRICT COURT

3                      FOR THE DISTRICT OF PUERTO RICO

4                                   -oOo-

5     THE UNITED STATES OF AMERICA,    )
                                       )
6             Plaintiff,               )    Case No. 3:21-CR-00161-PAD
                                       )
7     -vs-                             )
                                       )
8     FELIX VERDEJO-SANCHEZ,           )
                                       )
9             Defendant.               )
      _____ )
10
             TRANSCRIPT OF JURY TRIAL - DAY THREE - A.M. SESSION
11        HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
               UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
12                        THURSDAY, JUNE 22, 2023
      _____
13
                          A P P E A R A N C E S
14
      FOR THE UNITED STATES OF AMERICA:
15
      AUSA Jonathan L. Gottfried &
16    AUSA Jeanette M. Collazo-Ortiz

17    FOR THE DEFENDANT:

18    Jason Gonzalez-Delgado, Esq. &
      Gabriela Jose Cintron-Colon, Esq.
19
      COURT INTERPRETERS:
20
      Carlos Ravelo &
21    Lynmar Vera

22    GOVERNMENT INTERPRETER:

23    Jose Luis Rosado

24

25

```
 1                         I N D E X

 2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

 3   KEILA ORTIZ-RIVERA

 4   Cross-Examination (Continued) by Ms. Cintron-Colon:   11

 5   ANGELINE ORTIZ-FALU

 6   Direct Examination by Ms. Collazo-Ortiz:             29

 7   BERELIZ RODRIGUEZ-ORTIZ

 8   Direct Examination by Ms. Collazo-Ortiz:             36

 9   HIBITS:                                         PAGE:

10   Government Exhibit No. 18                             57

11   Government Exhibit No. 15                             71

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       (Proceedings commenced at 8:54 a.m.)

2                             -oOo-

3       (Whereupon the following proceedings were had in open court

4        without the presence of the jury.)

5               THE COURT:  How many cases do we have on calendar

6    this morning?

7               THE COURTROOM DEPUTY CLERK:  We have only one case,

8    Your Honor.

9               THE COURT:  Call the case.

10              THE COURTROOM DEPUTY CLERK:  Criminal Case Number

11   21-161, the United States of America against Felix

12   Verdejo-Sanchez, for third day of jury trial.  On behalf of the

13   government are Assistant U.S. Attorneys Jonathan Gottfried and

14   Jeanette Collazo, and on behalf of the defendant are Attorneys

15   Jason Gonzalez and Gabriela Cintron.

16              The defendant is present in the courtroom, and he's

17   being assisted by a certified court interpreter.

18              THE COURT:  Thank you.

19              Would counsel identify themselves?

20              MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  This

21   is AUSA Jeanette Collazo for the United States.  We are ready

22   to proceed.

23              THE COURT:  Good morning, ma'am.

24              MR. GOTTFRIED:  Good morning, Your Honor.  This is

25   AUSA Jonathan Gottfried.

1                    THE COURT:  Good morning, sir.

2                    MS. CINTRON-COLON:  Good morning, Judge.  Gabriela

3      Cintron-Colon on behalf of Felix Verdejo-Sanchez.

4                    My cocounsel Jason Gonzalez, stepped out for a second

5      right before Your Honor came into the room, but he should be

6      here in a couple of moments.

7                    THE COURT:  All right.  Good morning, ma'am.

8                    Would the interpreter introduce himself?

9                    THE INTERPRETER:  Good morning, Your Honor.  This is

10     Lynmar Vera, the court interpreter.

11                    THE COURT:  Good morning, ma'am.

12                    Is there any housekeeping we need to go over before

13     calling the jury in?

14                    MS. CINTRON-COLON:  I believe so, Your Honor.  Should

15     we go now, or do we wait for cocounsel?

16                    THE COURT:  Let's start, and as soon as Mr. Gonzalez

17     comes in, he will join us sidebar.

18                    MS. CINTRON-COLON:  No problem.

19          (Sidebar conference commenced.)

20                    MR. GONZALEZ-DELGADO:  Good morning.

21                    THE COURT:  Good morning.

22                    All right.  By my account, we have a motion for

23     reconsideration before the Court having to do with the Court's

24     ruling that an expression by Mr. Verdejo to the effect that,

25     more or less, he wanted or would like to have a child with Ms.

1    Keishla Rodriguez is not admissible, at least not by way of the

2    testimony of the witness.

3            So I'll yield the floor to Mr. Gonzalez, or, ma'am,

4    you.  Whatever works for you works for me.

5            MR. GONZALEZ-DELGADO:  Your Honor, this -- the

6    government started their opening statement saying that the

7    motive for Mr. Verdejo to bring -- to kill the victim was

8    because he didn't want to have a baby.

9            THE COURT:  I said that yesterday.

10            MR. GONZALEZ-DELGADO:  Yes, sir.

11            There is a statement that Ms. Keila Rodriguez -- not

12    Keila Rodriguez, Keila Ortiz, told the police officer in an

13    interview, in which she said --

14            THE COURT:  Wait there.  I have not heard from the

15    police officer.

16            MR. GONZALEZ-DELGADO:  Uh-huh.

17            THE COURT:  I do not know whether that police officer

18    will be presented during the trial.

19            MR. GONZALEZ-DELGADO:  But --

20            THE COURT:  If during the trial that police officer

21    were to testify, and during his testimony he were to describe

22    the interview with the witness, that, in my mind, may present a

23    different scenario.

24            MR. GONZALEZ-DELGADO:  Even if the witness is --

25            THE COURT:  It's a different scenario.  But now we're

1    talking about the witness, the first witness.  So focus on

2    that.

3              MR. GONZALEZ-DELGADO:  The first witness is the one

4    who proffers that to the police officer.  She says that she

5    heard Felix Verdejo say that he wanted to have a baby with her.

6              That's not brought for the truth of the matter.  It

7    is brought for, to impeach the prior witness's credibility.

8    She said, and the government has stated, that he did not want

9    to have the baby.  The government, in their direct examination,

10   brought that information and those statements to the jury,

11   saying that he did -- that he killed her because he did not

12   want to have a baby with her.

13             THE COURT:  I know.  I know.  I said that at the

14   outset yesterday when I was questioning Ms. Collazo --

15             Right?

16             -- Ms. Collazo here in sidebar with respect to her

17   objection.  Now, I know that.

18             But at the end of the day, what I'm seeing is a

19   self-serving statement made out of court by Mr. Verdejo with

20   respect to that particular matter.  And as I read the rules,

21   only your opponent would be able, at least with respect to this

22   witness, to bring that in.

23             MR. GONZALEZ-DELGADO:  Because it's not brought for

24   the truth of the matter.

25             THE COURT:  No.

1        One at a time.

2        MS. CINTRON-COLON:  If it were being brought for the

3   truth of the matter, Your Honor, that would definitely call for

4   a state of mind.  And she cannot know if what he was saying or

5   thinking was, in fact, true or not.  Therefore, that's why

6   we're stating that it's not being brought for the truth of the

7   matter, just for the effect that it had on her because she is

8   the one who listened to it, and then she related to the police

9   when she was interviewed about this.

10       Regardless, this is a statement that, or a

11  declaration, or something that was said, about a year or months

12  before this case, the circumstances surrounding this case even

13  occurred.  That's why it's our, part of our argument that it's

14  not a self-serving statement.  And in that same line, it's part

15  of, it supports the theory of defense.  And some --

16       THE COURT:  Well, I know -- I've heard the basics.

17  Let me hear from the other side.

18       Ms. Collazo?

19       MS. COLLAZO-ORTIZ:  Your Honor, we, our position is

20  that it's inadmissible hearsay because it's an out-of-court

21  statement by the defendant.  There is no exception that

22  applies.  It's not being offered by the opposing party.  It's

23  being offered by the defense.

24       And this is not impeachment because the witness

25  cannot be impeached on the basis of what someone else said one

1    year before she was interviewed.  Again, it's also not effect

2    on listener because this is something she may have heard one or

3    two years before she was even interviewed.  There is no effect

4    that is relevant, that that statement had, that is relevant to

5    any of the matters before the Court.

6            So the only relevance would be for the truth of the

7    matter.  And that's an impermissible purpose because it would

8    be hearsay.

9            MR. GONZALEZ-DELGADO:  Your Honor, just a little --

10           THE COURT:  Yes.

11           MR. GONZALEZ-DELGADO:  The government is saying that,

12   since it was said a year before, it had nothing to do with,

13   with the case.  But the thing is, it made such an impression on

14   her, that a year after, in the first interview she has with the

15   police officer, that's the first thing she says.

16           THE COURT:  But you're talking about police officers.

17           Wait.  One at a time.

18           You're talking about police officers.  I haven't

19   heard from the police officers.  Let's see whether that occurs,

20   and if that occurs, what happens.

21           MR. GONZALEZ-DELGADO:  I'm not talking about police

22   officers.  I'm saying a statement that the witness, who is

23   actually testifying, made to a police officer.  I can, I can

24   ask her or I can ask the police officer or I can ask both.

25   Because she's the one who made the statement.  It's not

1    somebody else.

2            And I'm not bringing it in for the truth of the

3    matter.  I'm just bringing it in because it's an inconsistent

4    statement that she made to a police officer for something that

5    she stated to the jury that, at the time that he -- the events

6    were happening, she says that Felix did not want to have the

7    baby, and that's the reason for the murder.  But at the same

8    time, she remembered that a year before, or time before, Felix

9    had said exactly the opposite of it.

10           So it's to impeach her with her statement.  And the

11   case that we're using, the Fifth Circuit case, and I'm going to

12   go slow with the numbers.  It's *U.S. versus St. Junius*, 739

13   F.3d 193, Fifth Circuit case, at 2013:

14           Statements introduced to impeach a witness are not

15   hearsay.  The Fifth Circuit held that the trial court did not

16   err in admitting the evidence because the testimony was not

17   offered for the truth of the matter asserted, but rather to

18   impeach the witness's credibility.

19           The other case that goes to this matter is *United*

20   *States versus Parry*, 649 F.2d 292, Fifth Circuit case, 1981,

21   that says:

22           Statements that the defendant was aware of the

23   existence of some fact are not hearsay.

24           This is a fact -- or a statement that he made.  And

25   it says:

1         The Fifth Circuit noted that using an out-of-court
2    utterance as circumstantial evidence of the declarant's
3    knowledge of the existence of some fact, rather than as
4    testimonial evidence of the truth of the matter asserted, does
5    not offend the hearsay rule.  The Court reversed the conviction
6    and remanded the case.
7         THE COURT:  I heard your point.  Anything else?
8         MR. GOTTFRIED:  Only if the Court is inclined to --
9    just briefly.
10        First of all, the statement was made to an FBI agent
11   and memorialized in a 302.
12        Secondly, defense counsel is saying that it's
13   relevant because, during the opening statement, we discussed
14   the motive for the murder.  Arguing that Verdejo wanted to have
15   a child is being admitted for the truth of the matter asserted
16   in order to rebut that.
17        With respect to the idea that somehow being admitted
18   for impeachment what she may have said a year earlier to an FBI
19   agent as to what Felix Verdejo may have said to her a year
20   earlier does not impeach whether or not on April 29th, 2021,
21   her perception was that, or she understood that Keishla told
22   her that Felix Verdejo did not want to have a child.  There is
23   no impeachment value to that.
24        THE COURT:  Okay.  I've heard all parties.  I'm not
25   persuaded that I should change my ruling.  So the government's

```
 1    objection is sustained.  Your points, however, are preserved.
 2              Now, shall we bring in the witness?
 3              MS. COLLAZO-ORTIZ:  Yes, Your Honor.
 4              THE COURT:  Okay.  And you are going to finalize your
 5    cross at that time?
 6              MS. CINTRON-COLON:  Yes, sir.  That is my intention.
 7              THE COURT:  Okay.  Very well.
 8         (Sidebar conference concluded.)
 9              THE COURT:  So let's bring the jury in.
10         (Whereupon the following proceedings were had in open court
11         in the presence of the jury.)
12              THE COURT:  Good morning.  Welcome to the court.
13    Please take a seat.
14              Ms. Ortiz, good morning.
15              THE WITNESS:  Good morning.
16              THE COURT:  Ma'am, I remind you you are under oath.
17              Do you understand?
18              THE WITNESS:  Yes.
19              THE COURT:  All right.  Go ahead.
20              MS. CINTRON-COLON:  Permission to question the
21    witness, Your Honor.
22              THE COURT:  Go ahead.
23                            CROSS-EXAMINATION
24                                (Continued)
25    BY MS. CINTRON-COLON:
```

1    Q    Good morning, Ms. Ortiz.

2    A    Good morning.

3    Q    Yesterday, in the afternoon, I asked you if you, after you

4    did not hear from your daughter, you also called Miguelito, and

5    you answered yes; is that correct?

6    A    Yes.

7    Q    And you called Miguelito because he knew Keishla?

8    A    Yes.

9    Q    And because they had communication?

10   A    I'm sorry?

11   Q    And you called him because he and Keishla communicated

12   with each other?

13   A    No.

14   Q    And they had a relationship?

15   A    I'm sorry?

16   Q    And they had a relationship?

17        MR. GOTTFRIED:  Objection, Your Honor, beyond the

18   scope.

19        THE COURT:  Wait.

20        THE WITNESS:  No.

21        THE COURT:  Wait.  Okay.  Let's disregard everything

22   having to do with the last question that counsel posed.

23        Counsel?

24        MS. CINTRON-COLON:  Yes, sir.

25        THE COURT:  You may ask again.  I do not want people

1    talking at the same time, because if that happens, the reporter

2    is not able to secure an accurate transcript of the

3    proceedings.

4            So go ahead.

5            MS. CINTRON-COLON:  Understood.  Thank you.  I have

6    no more questions, Your Honor.

7            THE COURT:  Mr. Gottfried?

8            MS. COLLAZO-ORTIZ:  Nothing on redirect, Your Honor.

9            THE COURT:  I do not have any questions for the

10   witness.

11           Ms. Ortiz, thank you for your testimony.  You are

12   free to go.

13       (Witness excused.)

14           MS. COLLAZO-ORTIZ:  Your Honor, the government calls

15   Angeline Ortiz to the stand.

16           THE COURT:  All right.

17           THE COURTROOM DEPUTY CLERK:  Ms. Ortiz, good morning.

18           THE WITNESS:  Good morning.

19           THE COURTROOM DEPUTY CLERK:  Please raise your right

20   hand.

21       (Witness sworn.)

22           THE COURTROOM DEPUTY CLERK:  So help you God.

23           MS. CINTRON-COLON:  Before we begin, Your Honor, may

24   we approach briefly?

25           THE COURT:  Yes.

```
 1          (Sidebar conference commenced.)

 2          MS. CINTRON-COLON:  Your Honor, we noticed that Ms.

 3   Ortiz is in the courtroom.  We understand that she has already

 4   testified on behalf of the government.

 5          However, we have prepared a subpoena for her.  We

 6   intend to serve it today, as soon as we get a break, get it to

 7   the Clerk's Office so that we can get it stamped and serve it

 8   to her through the Marshal's Service.

 9          Therefore, we want this to be noted.  So we are

10   requesting that she not be allowed to remain in the courtroom

11   as she's going to be called as a witness for the defense at the

12   end of the trial.

13          Here's the subpoena.  We just have to get it signed

14   by the Clerk's.

15          THE COURT:  Did you show that to your opponent?

16          MS. CINTRON-COLON:  No.  I literally just brought it.

17          MR. GONZALEZ-DELGADO:  Since this is part of the

18   defense, we weren't expecting to have to do it.  But since she

19   stay, she sat down in court for the, for the --

20          THE COURT:  Remaining of the government's case.

21          MR. GONZALEZ-DELGADO:  For the purity of the process,

22   we would prefer that she be withdrawn from court so that her

23   testimony may not be tainted by anything that other witnesses

24   may, may say.

25          MR. GOTTFRIED:  Your Honor, it's a difficult
```

1    situation because it's her daughter who was murdered, and she

2    was expecting to sit through this.  She sees Verdejo's family

3    and friends sitting in the audience every single day.  And

4    defense is now telling us, when she was expecting to sit, that

5    she should not be allowed to listen to the testimony, so it

6    places her in a very difficult situation.

7            Defense has had an opportunity to cross-examine her

8    thoroughly.  And so the concern is that, this is kind of adding

9    insult to injury to kind of try and kick her out of the

10   courtroom, when she was expecting for months to have the

11   opportunity to sit through and hear the evidence.

12           MS. COLLAZO-ORTIZ:  And it also --

13           THE COURT:  Anything else?

14           MR. GOTTFRIED:  No.

15           MS. COLLAZO-ORTIZ:  It also should be noted, Your

16   Honor, that Ms. Ortiz testified as to the facts that she has

17   firsthand knowledge of, and so to the extent that the purpose

18   of calling her would be to try to introduce otherwise

19   inadmissible evidence, we just want to know what the good-faith

20   basis would be so that this is not a tactic to exclude the

21   victim's mother from the courtroom.

22           She has already been amply crossed.  So if she is

23   being excluded for some other purpose, we need to be sure that

24   it's for a proper purpose and not for an attempt to introduce

25   otherwise inadmissible evidence, such as hearsay.

```
 1              MR. GONZALEZ-DELGADO:  We do not have to present --
 2    inform the government of what the defense, we might be
 3    presenting, be.  None of the facts have to be --
 4              THE COURT:  Okay.  I agree with that so far.  So I'm
 5    going to ask Mr. Gottfried and Ms. Collazo to go to your table.
 6    But I want to have a word with both of you.
 7              MR. GONZALEZ-DELGADO:  Yes, sir.  And there is
 8    another thing, Your Honor.
 9              THE COURT:  Yes.
10              MR. GONZALEZ-DELGADO:  It's true that Mr. Verdejo's
11    family is here, but that doesn't -- you know, they're not
12    accused.  They're not witnesses in this case.
13              And we would respectfully request, Your Honor, that
14    since Ms. Keila Rodriguez and her family are being allowed to
15    listen to the translations, we would respectfully request that
16    Mr. Verdejo's mother, at least, have a headset so that she can
17    understand the proceedings.  She does not speak English.
18              And yesterday she was, every time we'd have a, a
19    recess, we'd have to explain to her in Spanish what had
20    happened during the case.  So we're just asking for the same
21    treatment for his mother regarding the headsets, Your Honor.
22              THE COURT:  I understand that.  But I'm curious as to
23    why the matter was not brought by way of housekeeping.
24              MR. GONZALEZ-DELGADO:  Because we didn't know until
25    yesterday.  At the end of the, of the day, she pointed it out.
```

 1      I have not seen Ms. Keila Ortiz in court because I'm not

 2      looking back, and I didn't see her family with the headsets.

 3              It's just that, at the end of the day, when we were

 4      talking outside, she brought that up to me.  I said:  It's no

 5      problem; I'll just inform the Court.

 6              THE COURT:  We'll do, but during a recess.

 7              MR. GONZALEZ-DELGADO:  And you want to talk to us.

 8          (Sealed ex-parte sidebar conference commenced.)

 9          (Sealed ex-parte sidebar conference concluded.)

10          (Sealed transcript filed separately.)

11              (Sidebar conference commenced.)

12              THE COURT:  Okay.  I'm granting the defendant's

13      request.  What I will ask you both is to talk to Ms. Ortiz and

14      explain that she's been subpoenaed -- well, she hasn't been yet

15      subpoenaed -- she will be subpoenaed.

16              MR. GONZALEZ-DELGADO:  Until she's subpoenaed, I have

17      no --

18              THE COURT:  I'm trusting counsels' word that she will

19      be served with a subpoena.

20              MS. CINTRON-COLON:  We intend to do that.

21              THE COURT:  So far, she hasn't received a subpoena.

22      And explain to her that, under these circumstances, she needs

23      to go out of the courtroom.  It's not easy but --

24              MR. GOTTFRIED:  Your Honor --

25              THE COURT:  -- she has to go out.

1          MR. GOTTFRIED:  We'll explain that based on defense

2     counsels' position to subpoena her, that she cannot attend the

3     trial of the murder of her daughter.  We will relay that

4     message to her.

5          THE COURT:  Yes.

6       (Sidebar conference concluded.)

7          MR. GOTTFRIED:  Your Honor, may we approach one more

8     time?

9       (Sidebar conference commenced.)

10          MR. GOTTFRIED:  Your Honor, I don't want to be in the

11     position of having seen in the courtroom telling her that

12     defense counsel is, based on defense counsels' strategy, that

13     she has to leave.  I don't know, frankly, what her response

14     will be in front of the jury and in front of the press.

15          If there is a way to ask the jury just to step out

16     for a minute or for her to be brought up and we can explain to

17     the Court.  I'm just, frankly, worried about her reaction.  So,

18     again, this was, the understanding was that she'd be able to

19     attend.  She's been relying upon that, and I just worry what

20     she might say.

21          MS. CINTRON-COLON:  We don't disagree, Your Honor.

22     We actually think it would be a reasonable --

23          MR. GOTTFRIED:  If you want, I can try to ask her to

24     step outside now and just try to --

25          THE COURT:  I can ask the jury to go out for the

1    duration, but this is a public trial.  This is a public trial.

2    I am not going to exclude the public or exclude the media.

3            MR. GOTTFRIED:  Understood.  Just the jury, if that

4    would be possible.

5        (Sidebar conference concluded.)

6            THE COURT:  Ladies and gentlemen, there is a matter

7    that I need to take care of, and I'm going to ask you to go to

8    the jury room.  I will call back as soon as we finalize doing

9    what we need to do.

10           Remember, do not talk amongst yourselves with respect

11   to your impressions of the case or of the evidence in the case.

12   Avoid reports about the case, and do not conduct any research

13   with respect to the case, the matters in the case or the

14   persons involved in the case.

15           I'm looking forward to seeing you all back in the

16   courtroom as soon as we finalize doing what we need to do.

17       (Whereupon the following proceedings were had in open court

18       without the presence of the jury.)

19           THE COURT:  You may take a seat.

20           Mr. Gottfried, Mr. Gonzalez, counsel, approach again.

21       (Sidebar conference commenced.)

22           THE COURT:  Okay.  I'm not going to go into the

23   details of what Mr. Gonzalez told me.  Well, they both told me.

24   I'm referring to "them both" as Mr. Gonzalez.

25           Their main point is the opportunity to cross-examine

1    the witness in more detail.  I'm not going to go into details.

2    That's something they proffered, and I listened to them.  And

3    that remains confidential.

4            But that's the choice.  And I think it's your choice.

5    Again, not your choice, the government's choice.  If you want

6    her in the courtroom for the duration of the trial, at least

7    the government's part of the trial, then you need to open up to

8    cross-examination.

9            MR. GONZALEZ-DELGADO:  If we're allowed to -- I mean,

10   I'm just going to proffer.  If we were allowed to do the

11   cross-examination that we were planning on, it's maybe half an

12   hour more --

13           MS. CINTRON-COLON:  It would be a short testimony.

14           MR. GONZALEZ-DELGADO:  -- then we would be willing to

15   avoid the subpoena, and she could stay in court.  But if we're

16   not allowed to ask the questions that we believe that she can

17   answer that are fundamental to our theory of defense, we're

18   going to have to subpoena her, and she's going to miss the

19   trial.

20           THE COURT:  Okay.  I'm not going to put you on the

21   spot right now.  You can check with -- discuss this among

22   yourselves, with your colleagues on the government's side, with

23   case agent, if you believe that's what should be done.  Then

24   tell me what you have in mind, what the solution is.

25           MR. GOTTFRIED:  Your Honor, I can tell you now that,

1    given that defense counsel never subpoenaed her until this, and

2    still has not subpoenaed her, I have questions about the

3    reasons for doing this.  Nonetheless, I think that the

4    objections we made regarding the scope of their

5    cross-examinations was accurate.

6         To the extent they have a good-faith basis for

7    calling her, they can do so on their case in chief.  But we're

8    not going to sit her again for half an hour to be subject to

9    questions that we believe are improper.

10         THE COURT:  Okay.  Now let me hear from the witness.

11    I want her brought here.  She can step to the other side.

12         (Sidebar conference commenced with Keila Ortiz-Rivera.)

13         THE COURT:  Ms. Ortiz, good morning again.

14         THE WITNESS:  Good morning.

15         THE COURT:  The reason I decided to ask you to step

16    to the sidebar is to let you know that defense counsel will be

17    subpoenaing you to be a witness when their turn comes to

18    present evidence.  That being the case, I cannot allow you to

19    be in the courtroom, just like you will not see any other

20    witness in the courtroom, individuals, persons who have not

21    testified.  And I wanted to tell you this personally.

22         THE WITNESS:  I do not understand.  Can I speak?

23         THE COURT:  Go ahead.

24         THE WITNESS:  So that means that I cannot be here

25    while the other people are testifying?  Is that it?

```
 1                    THE COURT:  Until you come again and testify again.
 2                    THE WITNESS:  I still do not understand.
 3                    THE COURT:  What is it that you do not understand,
 4      ma'am?
 5                    THE WITNESS:  So I have to get out of the trial until
 6      the other people testify, and then I come to declare again?
 7                    THE COURT:  Yes, ma'am.
 8                    THE WITNESS:  May I say something?
 9                    THE COURT:  Go ahead.
10                    THE WITNESS:  I believe it's not fair, because as a
11      mother, I'm here to do justice by my daughter and my godson.
12                    THE COURT:  I understand, ma'am.  I understand it is
13      not easy.  It is difficult.
14                    THE WITNESS:  So just to understand, I go out, and
15      then I will -- while the witness is testifying, and then I come
16      back, just to be clear.
17                    THE COURT:  Yes, ma'am, when your turn comes to
18      testify again.  Thank you, ma'am.
19          (Keila Ortiz-Rivera excused from sidebar conference.)
20                    MR. GONZALEZ-DELGADO:  Your Honor, we have the
21      subpoena prepared.  We're just waiting for the marshals, who
22      stepped out a second to --
23                    THE COURT:  Don't serve her in the courtroom.
24                    MR. GONZALEZ-DELGADO:  Of course not.  It's just that
25      we have to give it to a marshal.
```

```
 1                    THE COURT:  Wait some time, and then do it.
 2                    MR. GONZALEZ-DELGADO:  We will, Your Honor.  Thank
 3      you.
 4           (Sidebar conference concluded.)
 5                    MS. COLLAZO-ORTIZ:  Your Honor, may I step outside
 6      for a minute?
 7                    THE COURT:  Yes, ma'am.
 8                    MR. GOTTFRIED:  Your Honor, can we just make a
 9      comment on the record when the Court is ready?
10                    THE COURT:  Yes.  Go ahead.
11                    MR. GOTTFRIED:  Your Honor, to the extent that there
12      are other witnesses whom the defense plans on issuing subpoenas
13      to, when they have not notified us of and whom we have to
14      exclude from the trial, we would respectfully ask that they do
15      so as soon as possible so that we can take matters and we can
16      address those with the witnesses.
17                    MR. GONZALEZ-DELGADO:  Can we approach so that we can
18      argue this?
19           (Sidebar conference commenced.)
20                    THE COURT:  Okay.  At the outset, let me say that
21      what Mr. Gottfried proposed sounds reasonable.
22                    MR. GONZALEZ-DELGADO:  But the problem is --
23                    THE COURT:  You do not know.
24                    MR. GONZALEZ-DELGADO:  I do not know because I don't
25      know how far the government or the Court is going to allow us
```

```
1     to do the cross-examination.  If there is, if there are
2     witnesses that we have specific questions that we want to ask,
3     if we're not allowed for the reasons that the Court grants
4     their objections or, or if they don't object and we're allowed
5     to do that, we don't need to subpoena.
6               MS. CINTRON-COLON:  That go to our theory of defense.
7               MR. GONZALEZ-DELGADO:  That go to our theory of the
8     defense, we have no problems or we have no need to subpoena
9     them.  But like with this witness, we had some questions that
10    we wanted to ask, we were not allowed, so we don't have another
11    -- we don't have --
12              I'm thinking in Spanish.  And I'm literally
13    translating as I speak.
14              We don't have any other way of doing it, other than
15    having the subpoenas prepared, in case something happens.
16    There are no -- the witness that is sitting here right now, we
17    have -- we don't have any issues with her, as long as it's the
18    evidence that we believe she's going to say.
19              The other witnesses that they have presented or --
20              MS. CINTRON-COLON:  Announced.
21              MR. GONZALEZ-DELGADO:  -- announced to the Court,
22    they are -- we don't think that we need to subpoena them.
23    There are some witnesses they did exclude, and they are not
24    here in Court.  And some of those witnesses may be subpoenaed.
25    But they're not in court, and they're not going to be here.  We
```

1     can proffer that they're police officers and experts --

2               MS. CINTRON-COLON:  And forensics.

3               MR. GONZALEZ-DELGADO:  -- and forensic experts that,

4     if they don't bring them in, we might.  We might subpoena them,

5     but they're not in court.  So right now, I don't think that is

6     an issue.  If we do see somebody that is here that might, we

7     might subpoena, we will inform the Court.

8               MR. GOTTFRIED:  And what we would ask is that there

9     is no guarantee that the government will call any particular

10    witness.  We have issued subpoenas to witnesses.

11              But to the extent that defense counsel is counting on

12    us to call a witness, and, therefore, is not issuing a

13    subpoena, what we would ask is for them to identify which

14    witnesses they intend to call, regardless of whether or not we

15    will call them.  Because to the extent that they were hoping

16    that they would call Ms. Keila, and, therefore, they didn't

17    issue a subpoena to her, that created this, this issue.

18              MR. GONZALEZ-DELGADO:  But we don't have to prove the

19    case.  They're the ones that have to prove the case, Your

20    Honor.

21              THE COURT:  I know.  But we are in a juncture where

22    we are dealing with an extraordinary circumstance, and that's

23    why I think that what they're proposing is reasonable.  I'm not

24    saying I'm going to grant what he's asking for.

25              MR. GONZALEZ-DELGADO:  But it depends on the

1    witnesses.

2              THE COURT:  My first impression is that it is

3    reasonable.

4              MR. GONZALEZ-DELGADO:  And it all depends on the

5    witnesses that they call, Your Honor.  The ball's in their

6    court.  I can't foresee -- they won't even tell me who

7    tomorrow's witness is.  So I can't, I can't know, and I can't

8    read their minds to know that the witness that's coming

9    tomorrow is coming here, that he's going -- what he's going to

10   testify and how far the scope of their testimony is going to

11   be, if it includes what we believe should be part of their

12   testimony.

13             So I can't, I can't answer that question, Your Honor.

14   And now with this proffer that the government is saying that

15   even though they announce those --

16             I think there are 35 witnesses?

17             MS. CINTRON-COLON:  About, more or less, like 30.

18             MR. GONZALEZ-DELGADO:  -- like 30 witnesses to the

19   jury, if now they're saying there is no guarantee they'll call

20   all of them --

21             THE COURT:  That's always the case.

22             MR. GONZALEZ-DELGADO:  I know.  I know.  But why do I

23   have to announce my witnesses if I don't know?

24             THE COURT:  Listen, I understand.  I also understand

25   this is not a civil trial.  The rules are different.

1          So under these circumstances, Mr. Gottfried, I will

2     have to deny your request.  As we move along, let's move along

3     step-by-step.

4               MR. GOTTFRIED:  Yes, Your Honor.

5               THE COURT:  And step-by-step, we will take a fresh

6     look at this.  Why?  Because this is not an ordinary situation.

7               MR. GONZALEZ-DELGADO:  Yes, sir.

8               THE COURT:  Okay.  Where is your client?

9               MS. CINTRON-COLON:  There he is.  Bringing him out

10    now.

11              THE COURT:  Okay.

12              MR. GOTTFRIED:  And the witness is on the stand.

13              MS. CINTRON-COLON:  May we step aside for a second to

14    talk to the marshals so we can give them the subpoena to serve

15    outside?

16              THE COURT:  The what?

17              MS. CINTRON-COLON:  May we step outside for a second

18    to give the subpoena to the marshals outside, faraway, so they

19    can serve the witness?

20              THE COURT:  You did not give that subpoena to Mr.

21    Matos?

22              MR. GONZALEZ-DELGADO:  Oh, no.  He got it signed at

23    the Clerk's Office, but he did not subpoena.

24              MS. CINTRON-COLON:  We believed it would be improper

25    to have him --

 1                THE COURT:  And you want to subpoena her right now.

 2                MS. CINTRON-COLON:  Outside, faraway from the public,

 3      Your Honor.

 4                THE COURT:  Who's going to do that?

 5                MS. CINTRON-COLON:  The marshals.  That's why we were

 6      waiting for them to come back outside.  And we would talk to

 7      them outside so that no press or any public hears what we're

 8      going to ask the marshals to subpoena.

 9                THE COURT:  Okay.  Go ahead.  I'll give you five

10      minutes.

11                MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

12          (Sidebar conference concluded.)

13          (Whereupon the following proceedings were had in open court

14           without the presence of the jury.)

15                THE COURT:  Are we ready to call the jury in?

16                MR. GOTTFRIED:  The government's ready, Your Honor.

17                MR. GONZALEZ-DELGADO:  Yes, Your Honor.

18          (Whereupon the following proceedings were had in open court

19           in the presence of the jury.)

20                THE COURT:  Welcome back to the courtroom.  Please

21      take a seat.

22                MS. COLLAZO-ORTIZ:  May it please the Court?

23                THE COURT:  Go ahead.

24                MS. COLLAZO-ORTIZ:  I believe the witness was already

25      sworn in.

```
 1                 THE COURT:  Correct.
 2                      ANGELINE ORTIZ-FALU,
 3          called as a witness on behalf of the Plaintiff,
 4               having been previously duly sworn,
 5              was examined and testified as follows:
 6                      DIRECT EXAMINATION
 7   BY MS. COLLAZO-ORTIZ:
 8   Q    Good morning, ma'am.  Can you please tell us your full
 9   name?
10   A    Angeline Ortiz-Falu.
11   Q    How old are you?
12   A    37.
13   Q    And what is your occupation?
14   A    I work for the Public Housing Administration.
15   Q    And let me ask you:  Do you know a person by the name of
16   Keishla Rodriguez-Ortiz?
17   A    Yes.
18   Q    How did you know her?
19   A    She was my stepdaughter.
20   Q    What do you mean, she was your stepdaughter?
21   A    I was with her father during the period between October
22   2015 until April 2019.
23   Q    And do you know the members of the family?
24   A    Yes.
25   Q    And how would you describe your relationship with Keishla?
```

1    A    Friendship.

2    Q    Okay.  And did that relationship continue after your

3    relationship with her father ended?

4    A    Yes.

5    Q    Do you keep in touch with anyone else from the family?

6    A    Yes.

7    Q    With who?

8    A    Bereliz.

9    Q    And how often would you see Keishla?

10   A    Weekly.

11   Q    For what purpose?

12   A    To socialize.  We went out to socialize.

13   Q    And how was your communication with her?

14   A    Excellent.

15   Q    And during those interactions, did you ever find out if

16   Keishla was seeing anyone in 2021?

17   A    Yes.

18   Q    Who was she seeing in April of 2021?

19   A    Felix.

20   Q    Who is Felix?

21   A    Do I have to point at him?

22   Q    If the person you call "Felix" is here today, yes, point

23   him out.

24   A    It's him.

25              MS. COLLAZO-ORTIZ:  Let the record show that the

 1    witness has identified the defendant.

 2              THE COURT:  What, what is the color of the person's,

 3    what is the color of the shirt the person you pointed to?

 4              THE WITNESS:  Mint green.

 5              THE COURT:  What's your request, ma'am?

 6              MS. COLLAZO-ORTIZ:  We ask the record to reflect that

 7    the witness has identified the defendant.

 8              THE COURT:  The record will so reflect.

 9    BY MS. COLLAZO-ORTIZ:

10    Q    And as part of your relationship with Keishla, do you know

11    how long that Keishla had been seeing Mr. Felix Verdejo?

12    A    Over 10 years.

13    Q    And how often would you see them together?

14    A    Let's say, monthly.

15    Q    And where would you see them together?

16    A    At her house; and twice we went out to eat, and he came

17    over; and at my house a month before.

18    Q    What do you mean that you would go out, and he would show?

19    A    I'm sorry?

20    Q    You said twice you had gone out, and he had showed up; is

21    that right?

22    A    Yes.

23    Q    What happened in those occasions?

24    A    According to her, they had had an argument, and just

25    nothing.  I mean, we were eating, and he arrived.

1    Q    And what happened when he arrived?

2    A    Nothing.  He sat down with us, we ate and that.  And then

3    after that, each one left.  He left with her, and I went to my

4    home.

5    Q    And when you say that you saw them together at your house,

6    what happened that time?

7    A    Nothing.  I had invited her to eat.  She arrived with him,

8    and nothing really happened.  We sat down, we ate, and after

9    that, they left.

10   Q    And over the course of those interactions that you had

11   with them, how would you describe their relationship?

12   A    A little bit toxic.

13   Q    What does that mean?

14   A    He was always on her all the time.

15   Q    On her how?

16   A    On top of her all the time, like, hugging her and kissing

17   her.  He was always on top of her, like he wouldn't allow her

18   to breathe, as we say.

19   Q    And how did they speak to each other?

20   A    A little bit with lewd words.

21   Q    What kind of lewd words?

22   A    Can I say them?

23   Q    Yes.

24   A    Nothing.  I mean, I wouldn't dare.

25              THE COURT:  I'm lost.  What did she say, the witness?

```
 1                THE INTERPRETER:  This is the interpreter.  The
 2     witness is:  I don't know; I wouldn't be able to say them.
 3                THE COURT:  Okay.
 4     BY MS. COLLAZO-ORTIZ:
 5     Q    You mean, you wouldn't be able to say them because you're
 6     uncomfortable?
 7     A    Yes.
 8     Q    Well, I would ask you to make an effort and advise you
 9     that it's okay for you to say them in court in response to the
10     question that I'm making.
11     A    Okay.
12     Q    So how did Mr. Verdejo refer to Keishla in those
13     interactions?
14     A    Horny, a whore.
15     Q    And as part of your interactions with Keishla, do you know
16     if she wanted to have kids?
17     A    Yes.
18     Q    How do you know that?
19     A    She mentioned it to me.
20     Q    How did she seem when she was talking about that topic?
21     A    Full of illusion.
22     Q    When was the last time that you spoke to Keishla?
23     A    The day before, April 28th.
24     Q    And where was Keishla at that time?
25     A    At her house.
```

```
 1    Q    Around what time was that communication?

 2    A    Between 1:00, between 1:00 and 2:00, I believe.

 3    Q    And what was the purpose of that communication?

 4    A    I had a little dog, and I was going to bring it over to

 5    her the next day so that she would groom him.

 6    Q    And what was the result of that communication on April

 7    28th?

 8              THE INTERPRETER:  I'm sorry, Counsel.  Could you

 9    repeat that?

10    BY MS. COLLAZO-ORTIZ:

11    Q    What was the result of that communication on April 28th?

12    A    We agreed to bring the dog over the next day, at 8:30 in

13    the morning.

14    Q    To take the dog where?

15    A    To her job.

16    Q    And where is that located?

17    A    On Campo Rico Avenue.

18    Q    Do you know what time she started working in the morning?

19    A    At 8:30.

20    Q    And then what happened on April 29th, 2021, in the

21    morning?

22    A    I went there at around 9:00 in the morning, and I saw that

23    her car was not there.  But I decided to get out of the car

24    even so.  And I brought the dog over, and I gave it to her

25    boss.
```

1          And when I entered, the female owner, and then the

2    male owner, they came out, and they talked to me.  And I asked

3    them about her, and they said that they were concerned because

4    she had not come to work and that was not common.

5    Q    Okay.  And after you went in and Keishla was not there,

6    what did you do?

7    A    I went out to my car, but I couldn't remain calm.  Usually

8    I'm the kind of person who just keeps on going and doesn't

9    call.  But I had a feeling, and I started calling her.

10   Q    How many times did you call her?

11   A    About four or five times.

12   Q    Did you manage to get a hold of her?

13   A    No.

14   Q    And what did you do?

15   A    I called Bereliz, because I live in the same place, to

16   verify if she had overslept because it was not usual for her to

17   be late.  And Bereliz agreed to go down to verify, and after

18   that, she called me and told me that she was not there.

19   Q    And why did you think of calling Bereliz?

20   A    Because they live in the same place.  Because they're

21   sisters, because they live in the same place, to verify, to

22   verify if she had overslept, if something had happened.

23   Q    And was it normal for Keishla not to pick up your calls?

24   A    No.

25              MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

```
 1              MR. GONZALEZ-DELGADO:  We have no questions, Your
 2    Honor.
 3              THE COURT:  All right.  I do not have questions for
 4    the witness.
 5              Ms. Ortiz, thank you for your testimony.  You are
 6    free to go.
 7              THE WITNESS:  Thank you.
 8         (Witness excused.)
 9              MS. COLLAZO-ORTIZ:  Your Honor, the government calls
10    Bereliz Rodriguez-Ortiz.
11              THE COURTROOM DEPUTY CLERK:  Ms. Rodriguez-Ortiz,
12    good morning.  Please raise your right hand.
13         (Witness sworn.)
14              THE COURTROOM DEPUTY CLERK:  So help you godson.  You
15    may take a seat.
16                    BERELIZ RODRIGUEZ-ORTIZ,
17         called as a witness on behalf of the Plaintiff,
18              having been previously duly sworn,
19              was examined and testified as follows:
20                       DIRECT EXAMINATION
21    BY MS. COLLAZO-ORTIZ:
22    Q    Good morning.  Can you please state your full name for the
23    record?
24    A    Bereliz Nicole Rodriguez-Ortiz.
25    Q    And what is your age?
```

```
 1    A    28.

 2    Q    Do you have any nicknames?

 3    A    Tita.

 4    Q    What are the names of your parents?

 5    A    Jose Rodriguez and Keila Ortiz.

 6    Q    And how many siblings do you have?

 7    A    Two.

 8    Q    What are their names?

 9    A    Jonathan Roman and Keishla Rodriguez.

10    Q    And who is older?

11    A    Jonathan.

12    Q    And then, after Jonathan, who is the next one?

13    A    Keishla.

14    Q    Did Keishla have any nicknames?

15    A    Madlane.

16    Q    And how old was she in 2021?

17    A    27 years of age.

18    Q    How often did you speak to her back in 2021?

19    A    Daily.

20    Q    How many times in a day?

21    A    Three to four times a day.

22    Q    And what would you talk about?

23    A    Whether she had come out of work, if she had already

24    cooked, and to pick up my child from school.

25    Q    And where did she live?
```

```
 1   A   Villa Esperanza.

 2   Q   And where is that located?

 3   A   San Juan, Cupey.

 4   Q   And where did you live?

 5   A   Villa Esperanza.

 6   Q   Okay.  What did Keishla do for a living?

 7   A   She worked at a grooming.

 8   Q   Doing what?

 9   A   Cutting dogs' hairs.

10   Q   And where is that located?

11   A   Carolina, on Campo Rico Avenue.

12   Q   And what would she normally wear to work?

13   A   I'm sorry?

14   Q   What would she normally wear to work?

15   A   Blue scrubs.

16   Q   Did she have any tattoos?

17   A   Yes.

18   Q   Where did she have a tattoo?

19   A   Under her neck, on the back of her neck.

20   Q   And what kind of tattoo was it?

21   A   She had a diamond.

22   Q   Do you know what the meaning of that tattoo was?

23   A   Yes.

24   Q   What was it?

25   A   She got it for a person.
```

```
1   Q    For who?

2   A    That person had the nickname "El Diamonte," the diamond.

3   Q    And who is that person?

4   A    Felix Verdejo.

5   Q    Have you seen Mr. Felix Verdejo here in court today?

6   A    No.

7   Q    Can you please look around the courtroom, and let me know

8   if he's here?

9   A    Yes, he's here.

10  Q    Can you please tell us what he's wearing and where he is

11  located?

12  A    Felix Jomar Verdejo-Sanchez.  He has a gray shirt.

13            MS. COLLAZO-ORTIZ:  We ask the record to reflect that

14  the witness has pointed and identified the defendant.

15            THE COURT:  The record will so reflect.

16  BY MS. COLLAZO-ORTIZ:

17  Q    And how long had Keishla had this tattoo of a diamond?

18  A    It had been five years.

19  Q    Let me ask you:  You mentioned previously you had a child

20  that you pick up from school, right?

21  A    Yes.

22  Q    What is the name of your child?

23  A    Alex Anthony.

24  Q    And how old is he?

25  A    11.
```

1    Q    And who are his godson parents?

2    A    Keishla and Felix.

3    Q    When is Alex's birthday?

4    A    May 1st.

5    Q    And in 2021, did you have plans to celebrate Alex's

6    birthday on May 1st?

7    A    Yes.

8    Q    Where were you going to celebrate it?

9    A    At a restaurant in Condado called "Chloe."

10    Q    And who was invited to that?

11    A    The family.

12    Q    Who in the family?

13              THE INTERPRETER:  I'm sorry?

14    BY MS. COLLAZO-ORTIZ:

15    Q    Who in the family?

16    A    My father, my brother, Keishla, friends, including Felix.

17    Q    How long have you known Felix?

18    A    It had been 15 years.

19    Q    And how do you know him?

20    A    At the Manuel A. Perez Public Housing Project.

21    Q    Okay.  And how did you meet him?

22    A    Through my husband and Keishla.

23    Q    How do you mean, through your husband and Keishla?

24    A    My husband and Felix moved to the Manuel A. Perez Public

25    Housing Project.  We all studied at the same school, and they

```
 1    moved just behind where we were residing at the time.  And
 2    that's how we got to know all of us --
 3              THE INTERPRETER:  Correction.
 4              THE WITNESS:  And that's how we got to meet, all of
 5    us.
 6    BY MS. COLLAZO-ORTIZ:
 7    Q    Is there any relationship between Felix and your husband?
 8    A    They grew up as cousins.
 9    Q    What is your husband's name?
10    A    Junior Zabala.
11    Q    And what does Felix -- what did Felix do for a living?
12    A    Boxing.
13    Q    And do you know where he lived?
14    A    Gladiolas.
15    Q    When was that?
16    A    Before they moved to the Manuel A. Perez Housing Project.
17    Q    Okay.  But in 2021, where was he living?
18    A    San Jose.
19    Q    In what location in San Jose?
20    A    Rio Piedras, San Juan.
21    Q    And who did he live with?
22    A    With his family:  his wife and his daughter.
23    Q    And do you know the name of the wife?
24    A    Eliz Marie.
25    Q    Had you met Eliz at anytime?
```

```
1    A    Yes.

2    Q    How do you know Eliz?

3    A    I'm sorry?

4    Q    How did you know her?

5    A    We were friends in school.

6    Q    Are you still friends?

7    A    Yes.

8    Q    And so you mentioned previously that you met Felix while

9    you were in school.  Since then, how often will you see Felix?

10   A    Mostly, every day in school.

11   Q    Okay.  But in the years after you finished school, how

12   often will you see him?

13   A    Two, three times a month, approximately.

14   Q    And where would you see him?

15   A    When he came to the housing project.

16   Q    What housing project?

17   A    Manuel A. Perez.

18   Q    Okay.  And in around April 2021, how often will you see

19   Felix?

20   A    Three times, twice a month, the same.  I didn't see him

21   often.

22   Q    You did see him often, or you didn't see him often?

23   A    Yes, yes, I saw him often.

24   Q    And where would you see him around April of 2021?

25   A    At Keishla's house.
```

```
 1    Q    And where was Keishla's house?

 2    A    Villa Esperanza.

 3    Q    And what was he doing when you saw him?

 4    A    He would arrive at her house, at Keishla's house.  And I

 5    would pick up my son, and I left.  I would leave.  I wouldn't

 6    stay.

 7    Q    Why would you leave?

 8    A    Not to stay there.  I would just leave.  I would greet

 9    him.  Maybe I would socialize a little bit.  But, again, I

10    would leave.

11    Q    Okay.  And in the time that you spent with Keishla and

12    Felix, how would you describe their relationship?

13    A    With lack of respect.

14    Q    What do you mean?

15    A    They didn't treat each other well.

16    Q    How did Felix treat Keishla?

17    A    Speaking bad words to her, disrespecting her, didn't treat

18    each other well.  He didn't treat her well.

19    Q    And how would you describe the nature of the relationship?

20    A    It wasn't right.  It wasn't a healthy relationship.

21    Q    Why not?

22    A    Just no.  It was, he was always disrespectful towards her.

23    Q    And how often would they go out in public?

24    A    There were a few of the times they went out in public.

25    They always saw each other at her house.
```

```
 1    Q    And who knew about this relationship?

 2    A    My family, including his family, Felix's family.

 3    Q    And how do you know that Felix's family knew?

 4    A    I had communication with one of his sisters, and it was my

 5    understanding that, Keishla told me that his mom knew that they

 6    were still together.

 7    Q    How would you describe your mother, Keila's, relationship

 8    with Felix prior to April 2021?

 9    A    As if he were just another son-in-law, Keishla's partner.

10    Q    And how would you describe your father's relationship to

11    Felix?

12    A    The same, in the same manner.

13         MS. COLLAZO-ORTIZ:  I'm going to publish what has

14    been previously admitted as Exhibit 14.

15         THE COURT:  Go ahead.

16    BY MS. COLLAZO-ORTIZ:

17    Q    Can you please explain what is depicted on what was

18    previously marked as Exhibit 14?

19    A    I took that picture.

20    Q    Where did you take that picture?

21    A    That was in Pinones, picking up my mother from the

22    airport.

23    Q    And why were you at Pinones?

24    A    Keishla, my son and I, we went to pick up my mother at the

25    airport.  And we stopped in Pinones to eat something, and Felix
```

1    arrived there.

2    Q    Do you remember Keishla's phone number?

3    A    No.

4    Q    Would she change numbers frequently?

5    A    She changed -- she didn't change it frequently, but she

6    had changed it about twice.

7    Q    And do you know why she would change it?

8          MR. GONZALEZ-DELGADO:  Objection, Your Honor,

9    relevance.

10          THE COURT:  Overruled.

11   BY MS. COLLAZO-ORTIZ:

12   Q    Do you know why she would change it?

13          MR. GONZALEZ-DELGADO:  Your Honor, the government's

14   asking for state of mind, objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  The last time she changed it so that he

17   wouldn't have her phone number.

18   BY MS. COLLAZO-ORTIZ:

19   Q    And do you remember what happened after she changed her

20   number?

21   A    Felix would call my husband to ask for her phone number.

22   Q    Let me ask you:  In 2021, what vehicle did Keishla drive?

23   A    Kia Forte.

24   Q    What color?

25   A    Gray.

1    Q    And what car did, or vehicle, did Felix drive?

2    A    A black Dodge Durango.

3    Q    Did Keishla have any social media?

4    A    No.

5    Q    Why not?

6         MR. GONZALEZ-DELGADO:  Objection, Your Honor, to the

7    question.  I don't know if this is -- objection, Your Honor,

8    calls for state of mind of a witness.

9         THE COURT:  Overruled.

10        THE WITNESS:  He didn't allow her to have any social

11   media.

12   BY MS. COLLAZO-ORTIZ:

13   Q    Okay.  I'm going to turn your attention --

14        MR. GONZALEZ-DELGADO:  Objection, Your Honor, move to

15   strike.  It's hearsay.

16        THE COURT:  Overruled.

17   BY MS. COLLAZO-ORTIZ:

18   Q    I'm going to turn your attention to April 28th, 2021.  Do

19   you remember talking to Keishla on Wednesday, April 28th?

20   A    Yes.

21   Q    When was that first time that you talked to Keishla that

22   Wednesday?

23   A    At 11:00 a.m.

24   Q    And what happened that time -- strike that.

25        Where were you when you talked to Keishla?

```
 1   A    At my home in Villa Esperanza.
 2   Q    And was that conversation by phone, in person, or how was
 3   it?
 4   A    In person.
 5   Q    Okay.  Can you explain what happened?  How did that come
 6   about?
 7   A    She went to my house to bring me the paper for her
 8   pregnancy test.
 9   Q    And how did she seem when she brought you the pregnancy
10   test?
11   A    She was very happy.
12   Q    And what happened when she brought you the pregnancy test?
13   A    She gave it to me.  I congratulated her.
14   Q    And what happened after that?
15   A    I went to work, and she stayed with my son because it was
16   her day off.
17   Q    Okay.  What is your son's name again?
18   A    Alex Anthony.
19   Q    Okay.  And did you see her again that day, Wednesday,
20   April 28th?
21   A    Yes.
22   Q    Where did you see her?
23   A    At her house.
24   Q    At what time was that?
25   A    11:30 to 12:00, approximately.
```

```
 1    Q    And why were you at her house?

 2    A    I was picking up Alex because I had come out of work.

 3    Q    And so is it correct that Alex was with Keishla since

 4    11:00 a.m. until about midnight that day?

 5    A    That's correct, yes.

 6    Q    Okay.  And what did you do when you were at her house?

 7    A    I went to her bathroom.

 8    Q    And what happened in the bathroom, or what did you see in

 9    the bathroom?

10    A    Two pregnancy tests in the sink.

11    Q    And after you went to the bathroom, what happened?

12    A    I went out to her.  She told me that she was sleepy, that

13    tomorrow we would talk.  I grabbed Alex, and I left.

14    Q    Did you see her again?

15    A    No.

16    Q    What happened the morning of April 29th?

17    A    I received a call from a friend.

18    Q    What is her name?

19    A    Angeline.

20    Q    Okay.  What happened in that call?

21    A    Angeline told me that she had gone to Keishla's job, and

22    that she arrived there, and that Keishla had not arrived there.

23    Q    And what do you do upon receiving that call?

24    A    I called my mother.

25    Q    Why did you call your mother?
```

```
 1    A    Because they talked every morning before Keishla went to
 2    work.  They talked every morning, and I wanted to call her
 3    because I knew that she had already talked to Keishla.
 4    Q    Was it normal for her not to show up at work as scheduled?
 5    A    No.
 6    Q    Okay.  And what happened when you called your mother?
 7    A    I told her that Keishla had not arrived at work.
 8    Q    Okay.  And what happened after you told her that?
 9    A    My mom told me that she was going to meet Felix, with
10    Felix, to give him the test; that maybe they were at Keishla's
11    house.  And after that, I proceeded to go to Keishla's house.
12    Q    And what do you do once you got to Keishla's house?
13    A    I'm sorry?
14    Q    What do you do upon getting to Keishla's house?
15    A    I opened the gate, and I went to the bathroom.  The tests
16    were not there, the pregnancy tests.
17    Q    Was Keishla there?
18    A    No.
19    Q    What did you notice from the apartment?
20    A    That she had left in a rush.  Because she had a gate at
21    her house to keep the animals in the living room, and they were
22    out loose.  And that was not normal.
23              MR. GONZALEZ-DELGADO:  Objection, Your Honor, calls
24    for speculation.
25              THE COURT:  Overruled.
```

```
 1    BY MS. COLLAZO-ORTIZ:

 2    Q    And after you checked the apartment, what did you do?

 3    A    While I was walking to my house, I called my mother, and I

 4    told her that she was not in her apartment, and that the

 5    pregnancy tests were also not there.

 6    Q    How did your mother react?

 7    A    My mother was calm at the time.

 8    Q    Okay.  What happened after that call?

 9    A    When I went up to my house, I told my husband to call

10    Felix and ask him about Keishla.

11    Q    Why did you tell him to call Felix?

12    A    Because my mother told me that she was going to be with

13    him.  When I called my mother, she told me that they should be

14    at her house because she was going to give him the pregnancy

15    tests.

16    Q    And what happened after you asked your husband to make

17    that call?

18    A    I'm sorry?

19    Q    What happened after you asked your husband to make that

20    call?

21    A    He talked to Felix.  And then he hung up, and he told me

22    that Felix told him that he didn't know about her.  I did not

23    remain calm.

24                 MR. GONZALEZ-DELGADO:  Your Honor, may we approach?

25                 THE COURT:  Yes.
```

1          (Sidebar conference commenced.)

2          MR. GONZALEZ-DELGADO:  Your Honor, I'm renewing

3     yesterday's objection as to this being hearsay.  Even though

4     Junior Zabala has been mentioned as one of the witnesses that

5     has been mentioned as a potential witness in this case, I want

6     the Court to hold into abeyance the statements that she made

7     that Junior Zabala allegedly made.  Because if the government

8     does not bring in that witness, this is all hearsay.

9          MS. COLLAZO-ORTIZ:  We're not going into the content

10    of that conversation, just its effect on listener what she did

11    next after Junior told her this.  That's the -- we're not going

12    to go further into any statements.

13         MR. GONZALEZ-DELGADO:  The statement, as is, is

14    hearsay.  If they don't bring in the witness to testify, we're

15    going to ask the Court to, this statement and other statements,

16    if those witnesses do not come in, to be stricken from the

17    record.

18         MR. GOTTFRIED:  Your Honor, respectfully, it's

19    completely irrelevant to the hearsay question, whether or not

20    the witness testifies.  Maybe that's a confrontation clause

21    question, but hearsay question, completely irrelevant.

22         The hearsay analysis is whether or not it's an

23    out-of-court statement admitted for the truth of the matter

24    asserted.  Here, it's not.  Junior Zabala's statement goes to

25    why this witness took a particular action.

 1                Whether or not it's true or not doesn't matter.

 2    She's simply explaining why she took an action.  Therefore,

 3    it's not hearsay.  Whether Junior testifies or not is

 4    completely irrelevant to the hearsay analysis.

 5                MR. GONZALEZ-DELGADO:  Your Honor, it's basic

 6    hearsay.  This isn't a codefendant.  This isn't a

 7    co-conspirator.  This is an individual who is making a

 8    statement to the witness, allegedly making a statement to the

 9    witness, to go to the truth of the matter that he actually

10    spoke with Felix and that Felix was the person on the other end

11    of the phone call.

12                THE COURT:  Objection overruled.

13        (Sidebar conference concluded.)

14    BY MS. COLLAZO-ORTIZ:

15    Q    So, Ms. Ortiz -- I'm sorry, Ms. Rodriguez, after Junior

16    made that call that you asked him to make, what did you do

17    next?

18    A    I called my mom to tell her that Felix had told my husband

19    that he didn't know about her.

20                MR. GONZALEZ-DELGADO:  Objection as to hearsay, Your

21    Honor.

22                THE COURT:  Overruled.

23    BY MS. COLLAZO-ORTIZ:

24    Q    And why did you call your mom?

25    A    To tell her that Felix said that he didn't know about her.

1           MR. GONZALEZ-DELGADO:  Objection under 602.

2           THE COURT:  Overruled.

3    BY MS. COLLAZO-ORTIZ:

4    Q    And what happened when you called your mom?

5    A    My mother became desperate.  She started yelling that it

6    was impossible, to call him in the same line with her.

7    Q    And did you -- what did you do with that request from your

8    mom?

9    A    I kept my mother on the line, and I called Felix.  I

10   joined the calls.

11   Q    And who was on that call then?

12   A    My mother, Felix and I.

13   Q    And how do you know it was Felix on the line?

14   A    I have talked to him on the phone before, and I had his

15   phone number on my phone.  And I called him directly.

16   Q    Okay.  And can you please tell us what happened in that

17   call?

18   A    My mother started asking him where Keishla was.

19   Q    And what was Felix's response?

20   A    That he didn't know about her.

21   Q    Okay.  And what happened then?

22   A    She started yelling at him, telling him that he was lying;

23   that Keishla had just hung up with her, and she told her:  Mom,

24   I have to hang up because I'm on my way to meeting him.

25   Q    Okay.  And how did that call end?

1    A    My mother told him that she was coming to Puerto Rico to

2    look for Keishla.

3    Q    And what happened after the call?

4    A    Felix returned the call to me.

5    Q    How do you know it was Felix?

6    A    He called me from his phone.

7    Q    And what happened in that call?

8    A    That he didn't know about her; that my mom was coming to

9    Puerto Rico to, to go to the police, and I told him:  Tell me

10   where she is so that my mother doesn't come to Puerto Rico.

11   And he told me that he didn't know.

12   Q    Okay.  And how did he seem in that call?

13   A    Calm.

14   Q    Did he show any concern for Keishla?

15   A    Nothing.

16   Q    And what happened after that call?

17   A    Approximately one hour, he contacted me.  He called me.

18   Q    Okay.  And what happened after that call?

19        Let me withdraw that question.

20        Let me ask you:  Did you speak with Felix again that

21   day?

22   A    Yes.

23   Q    What did you talk about?

24   A    That Eliz Marie communicated with me not to tell her that

25   he was going to go live with Keishla.

```
 1   Q    In this third call, did Mr. Verdejo show any concern for

 2   Keishla?

 3   A    No.

 4   Q    What did he say?

 5   A    He just told me:  In any case, you let me know.

 6   Q    And after these calls happened, what did you do?

 7   A    I went to work.

 8   Q    Okay.  And until what time do you work?

 9   A    I started work at 3:00, and by 4:00, I was already out.

10   Q    Why?

11   A    My mom was already arriving in Puerto Rico.

12   Q    And so since 9:00 a.m., when you got the call from

13   Angeline, until that time around 3:00 or 4:00 p.m., had you

14   heard back from Keishla?

15   A    No.  And during the day when I was at work, I kept calling

16   her, and she never answered.

17   Q    Was that normal?

18   A    Not at all.

19   Q    Did there come a time where the phone stopped ringing?

20            MR. GONZALEZ-DELGADO:  Objection, leading, Your

21   Honor.

22            THE COURT:  Rephrase.

23   BY MS. COLLAZO-ORTIZ:

24   Q    What happened during your attempts to reach Keishla?

25            THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat
```

1     that?

2     BY MS. COLLAZO-ORTIZ:

3     Q     What happened during your attempts that day to reach

4     Keishla?

5     A     By 10:00 in the morning, her phone stopped ringing and

6     receiving messages.

7     Q     Okay.  So you -- what time did your mother arrive?

8     A     4:00, almost 5:00.

9     Q     And what did you do, or what happened when she arrived?

10    A     We went directly to Villa Esperanza, to Keishla's

11    apartment.

12    Q     Did you go anywhere else?

13    A     We went to a nearby abortion clinic.

14    Q     Okay.  Did you go anywhere else?

15    A     No.

16    Q     Okay.  So after going to the abortion clinic and to her

17    house, what did you do?

18    A     At around 5:00, or already 6:00, we went to the Caimito

19    Police Precinct.

20    Q     And what happened at the Caimito Police Precinct?

21    A     We informed them that she had disappeared; that she did

22    not get to her job.

23    Q     What information did the police ask you?

24    A     They asked us for pictures, her name, whether it was

25    normal for her not to arrive at work, whether she had a

1    partner, if she was going to meet somebody, whether we knew who

2    was the last person that she could have been with.

3    Q    And what did you tell them about the last person she could

4    have been with?

5    A    We told them that the last person that she was going to

6    meet, that she told my mother that she was going to meet, was

7    Felix.

8            MS. COLLAZO-ORTIZ:  Asking to approach with

9    Government ID 18.

10            THE COURT:  Go ahead.

11   BY MS. COLLAZO-ORTIZ:

12   Q    Do you recognize what I have provided to you as ID 18?

13   A    Yes.

14   Q    Why do you recognize it?

15   A    Because that is a picture that I provided the police so

16   that they could identify her.

17   Q    And is that a fair and accurate copy of the photo that you

18   provided to the police on April 29th?

19   A    Yes.

20            MS. COLLAZO-ORTIZ:  Your Honor, we ask that ID 18 be

21   admitted as Exhibit 18.

22            MR. GONZALEZ-DELGADO:  No objection, Your Honor.

23            THE COURT:  Without objection, so ordered.  This

24   would be Government's Exhibit 18.

25            (Exhibit No. 18 admitted into evidence.)

58

```
 1              THE COURT:  You may publish.
 2   BY MS. COLLAZO-ORTIZ:
 3   Q    Can you please explain what is depicted on Exhibit 18?
 4   A    Keishla.  I'm next to her.  We were at my grandfather's
 5   house, as it was customary on Sundays.  We took that picture.
 6              THE COURT:  At this point, let's take a short recess.
 7              Ladies and gentlemen, let's take a 10, 15-minute
 8   recess.  Remember, do not talk about your impressions of the
 9   case or of the evidence.  Do not view, read or hear reports,
10   comments or articles about the case.  Do not conduct any
11   research about the case, the matters in the case or the
12   individuals involved in the case.
13              With this, I look forward to seeing you all back in
14   the courtroom in about 10 or 15 minutes.
15       (Whereupon the following proceedings were had in open court
16          without the presence of the jury.)
17              THE COURT:  Ma'am, we're going to be on a short 10 or
18   15-minute break.  You do not have to stay where you are.  You
19   may step down, stretch your legs, walk around, do what you need
20   to do.
21              You may interact with people, but do not talk about
22   this case or your testimony.  And please do not review any
23   documents related to this case.
24              Understood?
25              THE WITNESS:  Yes.
```

```
 1                    THE COURT:  Thank you.
 2                    All right.  We'll be back in about 10 or 15 minutes
 3          minutes.
 4          (Whereupon a recess was taken at 11:00 a.m., until 11:21
 5           a.m.)
 6          (Whereupon the following proceedings were had in open court
 7             without the presence of the jury.)
 8                    THE COURT:  All set to call the jury in?
 9                    MR. GOTTFRIED:  Yes, Your Honor.
10                    MR. GONZALEZ-DELGADO:  Yes, Your Honor.
11                    THE COURT:  Let's bring the jury in.
12          (Whereupon the following proceedings were had in open court
13              in the presence of the jury.)
14                    THE COURT:  Welcome back to the courtroom.  Please
15          take a seat.
16                    MS. COLLAZO-ORTIZ:  May it please the Court?
17                    THE COURT:  Go ahead.
18          BY MS. COLLAZO-ORTIZ:
19          Q    Ms. Rodriguez, before the break, you were explaining to us
20          what happened at the Caimito precinct.  Can you please tell us,
21          after being at the Caimito precinct, what do you do next?
22          A    After the Caimito Police Precinct, they quickly sent us to
23          the general police headquarters.
24          Q    And what happened at the headquarters?
25          A    We were also interviewed.
```

1    Q    What did they ask you?

2    A    Again, Keishla's information, in detail what they talked

3    about when they talked in the morning, with whom she was going

4    to meet.

5    Q    Okay.  And what did you tell them?

6    A    That she had not arrived at her work.

7    Q    Did they ask you if she was seeing anyone?

8    A    Yes.

9    Q    And what did you tell them?

10   A    That she was.  That in the morning, the last thing that

11   she told my mom was that she was going to meet with Felix to

12   give him the tests.

13   Q    Did they ask you about any other relationships she may

14   have?

15   A    Yes.

16   Q    Okay.  And what did you tell them?

17   A    That she had been married to Marcelino; that they had

18   divorced.

19   Q    How long ago had they been divorced?

20   A    Seven or eight years, approximately.

21   Q    And what was the nature of Keishla's relationship with

22   Marcelino in 2021?

23   A    They had little communication.

24   Q    Where did Marcelino reside?

25   A    I don't know.

1    Q    Do you know if it was Puerto Rico?

2              MS. CINTRON-COLON:  Objection, Your Honor, leading,

3    asked and answered as well.  She said she doesn't know.

4              THE COURT:  Overruled.

5              THE WITNESS:  It wasn't here in Puerto Rico.

6    BY MS. COLLAZO-ORTIZ:

7    Q    Okay.  Did you provide any other information about prior

8    relationships that Keishla had?

9    A    Yes.

10   Q    What other information?

11   A    She had been in a relationship for about one or two years

12   with Ivan Santana.

13   Q    And how long ago was that?

14   A    About four years ago.

15   Q    And what was the nature of the relationship between Ivan

16   and Keishla in April of 2021?

17   A    As friends.

18   Q    And while they were together, what was the relationship

19   like?

20   A    Very beautiful.

21   Q    And why do you mention Ivan and Marcelino to the officers?

22   A    Because they were the people that she had had a

23   relationship as partners with.

24   Q    Okay.  And in April of 2021, who was in a relationship

25   with Keishla?

```
 1    A    I'm sorry?

 2    Q    Okay.  In April of 2021, who was Keishla in a relationship

 3    with?

 4    A    With Felix.

 5    Q    And so what happened after you were interviewed at the

 6    police headquarters?

 7    A    We went home to wait.

 8    Q    Okay.  Before, before leaving, do you know who else was

 9    interviewed at the police headquarters?

10    A    No.

11    Q    Okay.  Did you go anywhere with the police officers that

12    night?

13    A    I'm sorry?

14    Q    Did you go anywhere with the police officers that night?

15    A    Yes.

16    Q    Where do you go?

17    A    We went by her work site, and after that, we went by

18    Ivan's house, with the police.

19    Q    What happened at Ivan's house?

20    A    The police went to his house, and they had communication

21    with him.  They interviewed him at his house.

22    Q    Okay.  And after that, do you go anywhere else?

23    A    We went by Eliz Marie's house.

24    Q    And what happened there?

25    A    The police went down to her, and they talked to her.
```

1    Q    Do you know -- and you previously said that you were

2    friends with Eliz Marie.  Do you know who she lived with there?

3    A    With her daughter and with Felix.

4    Q    Okay.  And so then after you visited these locations, what

5    happened?

6    A    My mother and I went to my house to wait for any news from

7    Keishla.

8    Q    Okay.  I'm going to call your attention now to May 1st,

9    2021.  What can you tell us happened on that day?

10   A    That day we were already awake since early.  I thought

11   that at anytime she would come because it was my son's, Alex's,

12   birthday.  We received a call from the general headquarters and

13   for the family to go there.

14   Q    And after you received that call, what do you do?

15   A    We all went to the police headquarters.  They put us in a

16   room, and they told us that a female had turned up in the San

17   Jose Lagoon.  And we went to the scene.

18   Q    Where did you go?

19   A    We went to my grandmother's house, who lived close to the

20   lagoon, and a friend of the family took us to the scene.  We

21   got on a small boat, my father, my mother and uncle, my

22   husband, and two friends of my father's.  We all got on a small

23   boat, and we went to where Keishla was.

24   Q    Okay.  What do you see when you were on the boat?

25   A    Her floating on the water.

1    Q    How do you know it was her?

2    A    Because of the uniform.

3    Q    What about the uniform?

4    A    A blue scrub with little animals, little dogs and kittens,

5    the shirt.

6    Q    Okay.  And after you were at the lagoon in the boat, what

7    happened next?

8    A    We went to Forensic Sciences.

9    Q    For what?

10   A    To identify her body.

11   Q    And what do you do about -- I'm sorry.  What do you do

12   after going to Forensics?

13   A    After my mother and my father identified the body, we went

14   to my house to say happy birthday to Alex.

15   Q    Turning your attention now to May 2nd, 2021.  What

16   happened that Sunday, May 2nd?

17   A    I did not understand.  Could you please repeat the

18   question?

19   Q    What happened on Sunday, May 2nd?

20   A    With my father and my husband, we went to Forensic

21   Sciences so that they would give us Keishla's belongings, her

22   stuff.

23   Q    And what happened after you went to the Institute of

24   Forensic Sciences?

25   A    After they gave us her belongings, we went, we were

```
 1    waiting for the document so that we could start making the
 2    funeral arrangements.  We went to the funeral home, and before
 3    we got out of the car, my husband received a call from Felix.
 4    Q    Okay.  What happened after your husband received that
 5    call?
 6    A    My husband told him that he could not take his call, and
 7    he hung up.  And my husband told me and my father that Felix
 8    had called, had just called, and me and my father were like:
 9    How can that be?  And then he proceeded to return his call.
10              MR. GONZALEZ-DELGADO:  Objection, Your Honor, hearsay
11    and move to strike.
12              THE COURT:  Overruled.
13    BY MS. COLLAZO-ORTIZ:
14    Q    And what happened or -- I'm sorry.  Strike that.
15              What number did Felix call from?
16              MS. CINTRON-COLON:  Objection, Your Honor, 602.
17              THE COURT:  Overruled.
18              THE WITNESS:  From a number that wasn't his.
19    BY MS. COLLAZO-ORTIZ:
20    Q    Okay.  And what happened --
21              MR. GONZALEZ-DELGADO:  Objection under 602, Your
22    Honor.
23              THE COURT:  Overruled.
24    BY MS. COLLAZO-ORTIZ:
25    Q    What happened when your husband called him back?
```

```
1    A    My husband was asking him what happened, why he was

2    denying, he was saying that he didn't know about her, that he

3    had nothing to do with it.

4    Q    And what were --

5              MR. GONZALEZ-DELGADO:  Objection under 801, Your

6    Honor.

7              THE COURT:  Overruled.

8    BY MS. COLLAZO-ORTIZ:

9    Q    And what were you doing while that call was happening?

10   A    I recorded the phone call from my cell phone.

11   Q    Why did you decide to record it?

12   A    To see what he said, to have it recorded.

13   Q    And who did you hear in the other side of the phone?

14   A    Felix.

15   Q    And how do you know that was Felix?

16   A    I recognize his voice.  On several occasions, I've spoken

17   to him.

18   Q    And how did Felix's voice sound at that time?

19   A    Scared.

20             MS. COLLAZO-ORTIZ:  Your Honor, permission to

21   approach with Government ID 15.

22             THE COURT:  Yes.  Well, did you show that to your

23   opponent?

24             MR. GONZALEZ-DELGADO:  She did, Your Honor.

25             MS. COLLAZO-ORTIZ:  Yes, Your Honor.
```

 1              THE COURT:  All right.  Permission granted.

 2    BY MS. COLLAZO-ORTIZ:

 3    Q    Ms. Rodriguez, do you recognize what I have just given you

 4    as ID 15?

 5    A    Yes.

 6    Q    How do you recognize it?

 7    A    Because the call that I recorded is here, and it's signed

 8    by me.

 9    Q    And before signing that, did you review the contents

10    before signing it?

11    A    Yes.

12    Q    And are the contents of that CD a true and accurate

13    representation of some of the portions of that call?

14    A    Yes.

15              MS. COLLAZO-ORTIZ:  Your Honor, we move to admit ID

16    15 as Exhibit 15.

17              MR. GONZALEZ-DELGADO:  We request to approach, Your

18    Honor.

19        (Sidebar conference commenced.)

20              MR. GONZALEZ-DELGADO:  Your Honor, we're renewing our

21    objections.  We're renewing our objections to the redacted

22    recordings of -- we're renewing our objection to the CD that's

23    going to be played; that it is heavily-redacted conversation

24    that the witness has stated that she recorded the day of May

25    2nd of Mr. Verdejo.  We filed motions in Dockets 457 and 490.

1          We request that the Court allow the completeness of

2    the, of the conversation.  We are proffering, and we are

3    submitting, a full copy of the transcript of the translation

4    that was certified and provided by the government.  The phone

5    call participants are Junior Zabala, Felix Verdejo-Sanchez, an

6    unknown female, who just testified that she was the one who

7    recorded it, and there are two unknown males in addition.

8          The transcript consists of seven -- six pages,

9    instead of the limited documents that have been presented by

10   the government that we believe only -- they intend to redact

11   and present only two pages, Your Honor.  It's under the rule of

12   completeness, Your Honor.

13          MR. GOTTFRIED:  Your Honor, this has been --

14          Anything else?

15          MR. GONZALEZ-DELGADO:  No, no.

16          MR. GOTTFRIED:  This has been thoroughly briefed.

17   The Court has ruled on it.  We have nothing further to add to

18   what we've briefed.

19          MS. COLLAZO-ORTIZ:  The full transcript is on the

20   docket also.

21          MS. CINTRON-COLON:  Your Honor, one other thing, and

22   the government's opposition, or their motion to admit these

23   translation, is shortened version of the conversation.  The

24   main -- one of the arguments was that these were allegedly

25   self-serving statements from defendant so they were

1    inadmissible hearsay.

2              However, their own witness, who is just testifying as

3    to having recorded this conversation, has stated some portions

4    of that conversation that specifically say that Mr. Verdejo was

5    saying:  I did not do this; I have nothing to do with this.

6    And that is part of the portions that are in the whole

7    conversation that provide context and should be, be completely

8    presented to the jury.

9              So their own witness has been saying the statements

10   that Mr. Verdejo said in the conversation, which now, in the

11   exhibits and the translations that they want to present in the

12   transcripts, are excluded.  So in order for the jury to

13   actually have the complete picture and understand the context

14   and the circumstances under which Mr. Verdejo said the things

15   that he said, which were just testified by the witness, they

16   need the entirety of the transcript and the entirety of the

17   conversation, Your Honor.

18             MR. GONZALEZ-DELGADO:  Because it would lead to

19   confusion to the jury because they might believe that there is

20   another conversation that was recorded that was not presented

21   to them.  Because, like Sister Counsel has just stated, this

22   witness testified as to what she heard on the conversation that

23   the jury will not hear in the heavily-redacted conversation

24   that the government intends to produce in the next couple of

25   minutes.

```
 1              THE COURT:  You were going to say something?

 2              MS. COLLAZO-ORTIZ:  No, Your Honor.  The other

 3    portions are still inadmissible hearsay.  They are defendant's

 4    own statements they're seeking to introduce.  They are not

 5    opposing party statements and are not admissible under any

 6    rule.

 7              The Court has already ruled on that.  And we stand by

 8    our response filed on the papers.

 9              THE COURT:  The objection is overruled.  I mean, Mr.

10    Gonzalez's request is overruled.

11              Now, with this, and I'm referring to some pages that

12    Mr. Gonzalez has in his hands, my recollection of the motion

13    cycle was -- that information is already on the docket?

14              MR. GONZALEZ-DELGADO:  Yes.

15              MS. COLLAZO-ORTIZ:  Yes, Your Honor.  We filed the

16    complete transcript and the proposed portions.

17              THE COURT:  Right.  So there is no need to include

18    that again on the docket.  This is my ruling, but your

19    objection is preserved.

20              MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

21         (Sidebar conference concluded.)

22              MS. COLLAZO-ORTIZ:  Your Honor, we renew our request

23    that ID 15 be marked and admitted as Exhibit 15.

24              THE COURT:  The request is granted.  ID 15 will be

25    the Government's Exhibit 15.
```

1          (Exhibit No. 15 admitted into evidence.)

2              MS. COLLAZO-ORTIZ:  And we ask permission to publish.

3              THE COURT:  Publish.

4              Before you publish, let me see the exhibit.

5          (Sidebar conference commenced.)

6              THE COURT:  Mr. Gonzalez, approach.

7              Okay.  This is in Spanish.

8              MS. COLLAZO-ORTIZ:  No, Your Honor.  There is

9      Spanish-language recordings, and we have the certified

10     translations as well.

11             THE COURT:  Did you give the jury the certified

12     translations?

13             MS. COLLAZO-ORTIZ:  We will be playing them and

14     publishing -- we're publishing the translation simultaneous to

15     the Spanish audio.

16             THE COURT:  Elaborate on that.

17             MS. COLLAZO-ORTIZ:  We will be -- these are

18     video-recordings of the phone, so it's one phone recording the

19     screen of the other, with the audio.

20             THE COURT:  Right.

21             MS. COLLAZO-ORTIZ:  And so for each individual

22     portion, transcript and translation has been prepared.  So

23     simultaneously, as we are playing a video portion, we will be

24     showing the English-language translation, which is part of the

25     exhibit as well.

1          MR. GOTTFRIED:  And we would ask, for the record,

2     that the interpreter read the translation into the record, the

3     certified translation.

4          THE COURT:  Okay.  No problem.

5          MR. GOTTFRIED:  Thank you.

6          THE COURT:  The thing is, if that had not been

7     contemplated, it would not be possible to use this today.

8          MR. GOTTFRIED:  Yes, Your Honor.

9          THE COURT:  You understand?

10          MR. GONZALEZ-DELGADO:  Yes, sir.

11          MS. COLLAZO-ORTIZ:  Thank you, Your Honor.

12     (Sidebar conference concluded.)

13          MS. COLLAZO-ORTIZ:  Your Honor, to clarify, this

14     exhibit has within it eight files.  And to clarify, 15A is the

15     audio, is an audio-recording, with 15E being its certified

16     English translation.  15B is an audio-recording, with F being

17     the certified English translation.

18          And then C is a recording, with G being the

19     corresponding English translation.  And, finally, the fourth

20     clip is Exhibit D, with -- I'm sorry, 15D, with 15H being the

21     corresponding English translation.

22          And we are going to be publishing 15A, along with the

23     English translation for that clip.

24          THE COURT:  Noted.

25     (Audio-recording played.)

```
 1                    THE COURT:  Wait.  Wait.  Start again.
 2              (Audio-recording played.)
 3                    MS. COLLAZO-ORTIZ:  Are we ready, Your Honor?
 4                    THE COURT:  Go ahead.
 5                    MS. COLLAZO-ORTIZ:  Can we please play Exhibit 15A?
 6              (Audio-recording played.)
 7                    THE INTERPRETER:  Why does your car appear
 8         everywhere, mother-fucker, in, in the Teodoro?
 9                    I passed by, um, I, I, I passed by, normal.
10                    MS. COLLAZO-ORTIZ:  We ask that Exhibit 15B be
11         published.
12                    I'm sorry.  Strike that.
13         BY MS. COLLAZO-ORTIZ:
14         Q    Before, before we continue, Ms. Rodriguez, can you please
15         identify for the record the voices on that recording that we
16         just played?
17         A    Junior and Felix.
18         Q    And which -- what is Junior asking about?
19         A    He was telling him that his vehicle shows up at the
20         Teodoro.
21         Q    Whose vehicle?
22         A    Felix's vehicle.
23         Q    And what did Felix respond to that?
24         A    That he passed by the Teodoro normally.
25                    MS. COLLAZO-ORTIZ:  Your Honor, would it be possible
```

 1    to play 15A again, just because it's so short, to make sure we

 2    play it completely?

 3              MR. GONZALEZ-DELGADO:  Objection, Your Honor.  It's

 4    already --

 5              THE COURT:  Wait.  What?

 6              MR. GONZALEZ-DELGADO:  Objection, Your Honor.  The

 7    jury already heard, and it's admitted into evidence.  It will

 8    be provided to them.

 9              THE COURT:  I will allow it.

10              MS. COLLAZO-ORTIZ:  Okay.  Can we please publish 15A

11    and 15E again?

12         (Audio-recording played.)

13              THE COURT:  Okay.  Move ahead.

14              MS. COLLAZO-ORTIZ:  Okay.  Turning now we ask to

15    publish Exhibit 15B, with the corresponding translation, which

16    is 15F.

17         (Audio-recording played.)

18              THE INTERPRETER:  She was going to meet you that day

19    during the morning, mother-fucker.

20              She was, yeah, but we didn't.  We didn't manage to

21    see each other because I left the track late, and she had to go

22    to work.  And then, well, we could -- we didn't meet.

23    BY MS. COLLAZO-ORTIZ:

24    Q    Who was talking just now in Exhibit 15B?

25    A    Junior and Felix.

1           MS. COLLAZO-ORTIZ:  We now ask that Exhibit 15C be

2      published, along with the translation, which is 15G.

3           THE COURT:  Go ahead.

4      (Audio-recording played.)

5           THE INTERPRETER:  I trusted you until these days,

6      mother-fucker, that Madlane is missing, mother-fucker.  You got

7      her pregnant.  She said it was yours.  I was -- I was very

8      happy, mother-fucker.  And I even told her, I even told her

9      that if you didn't want to give it your surname, not to give

10     it, that we would take care of her over here, and we would

11     provide.

12           I didn't talk to her about it.  I didn't,

13     conversation like that about, about me, telling her not to put

14     my surname, or something like that.  Whatever.  Don't worry.

15     I'll talk to you when, when we can.  I don't know.

16     BY MS. COLLAZO-ORTIZ:

17     Q    Ms. Rodriguez, who were the voices that we just heard?

18     A    Junior and Felix.

19           MS. COLLAZO-ORTIZ:  We ask now to publish 15D, along

20     with the translation, which is 15H.

21           THE COURT:  Go ahead.

22     (Audio-recording played.)

23           THE INTERPRETER:  But when was the last time you

24     talked to her?  When was the last time you contacted her?

25           The day before.  I never threatened her, never in my

```
1     life in the, in the call.  The calls are there, there in the

2     registry.  There may be.  They're there.  There is no doubt

3     about that.  Everything is there.

4               But --

5               In the phones.

6               The night before, but the press says that you, that

7     day in the morning -- that is what is being said in the press,

8     in social media.

9               We agreed to meet.  We agreed to meet.  But I didn't

10    manage to see her.

11              Then you had contact with her during the morning,

12    mother-fucker, or did you agree to meet during -- when did you

13    agree to see each other?

14              Don't worry, my love.  Don't worry.  We'll talk in

15    person because we can't be talking like this nonsense through

16    here either.

17    BY MS. COLLAZO-ORTIZ:

18    Q    Ms. Rodriguez, who are the voices that we heard on Exhibit

19    15D and the transcript?

20    A    Junior and Felix.

21              MS. COLLAZO-ORTIZ:  May I have a minute, Your Honor?

22              THE COURT:  Yes.

23    BY MS. COLLAZO-ORTIZ:

24    Q    Ms. Rodriguez, based on your 15 years of knowing Felix,

25    what was your impression of what you heard in that call?
```

1    A    He wanted Junior to go see him to try to convince him that

2    it wasn't him.

3                MR. GONZALEZ-DELGADO:  Objection, calls for state of

4    mind, Your Honor.

5                THE COURT:  Overruled.

6    BY MS. COLLAZO-ORTIZ:

7    Q    And what, what opinion do you reach after that call?

8                MR. GONZALEZ-DELGADO:  Objection, Your Honor.  She's

9    not an expert.

10                THE COURT:  Overruled, 701.

11                MR. GONZALEZ-DELGADO:  She's asking for an opinion.

12                THE COURT:  701, check.  Overruled.

13                Go ahead.

14                THE INTERPRETER:  This is the interpreter.  Can you

15    please repeat the question?

16    BY MS. COLLAZO-ORTIZ:

17    Q    After hearing that call that you recorded, what was your

18    opinion on what happened in that call?

19    A    Junior told me that it was he; that he knew Felix; that he

20    was a liar; that he was not answering any of what Junior was

21    asking him; that he was trying and evading all of Junior's

22    questions.

23                MR. GONZALEZ-DELGADO:  Objection, Your Honor, under

24    hearsay, and under 701, it does not comply with subsections

25    (a), (b) or (c).

```
1                    THE COURT:  Overruled.

2                    MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

3                    THE COURT:  All right.  Sidebar.

4              (Sidebar conference commenced.)

5                    THE COURT:  Where is Mr. Gonzalez?

6                    MR. GONZALEZ-DELGADO:  Here.

7                    THE COURT:  I'm sorry.

8                    I assume you are going, or she, is going to

9        cross-examine the witness?

10                   MR. GONZALEZ-DELGADO:  Yes, sir.

11                   MS. CINTRON-COLON:  Yes, sir.

12                   THE COURT:  It's about, what, 10 after noontime?

13                   MS. CINTRON-COLON:  Yes, sir.

14                   THE COURT:  Let's take a lunch recess at this point.

15       We'll return at 1:30.

16                   MR. GONZALEZ-DELGADO:  Yes, sir.

17                   THE COURT:  At that point, you can go ahead.

18                   MR. GOTTFRIED:  1:30, Your Honor?

19                   THE COURT:  Yes.  Would that work for you all?

20                   MS. COLLAZO-ORTIZ:  Yes, Your Honor.

21                   MS. CINTRON-COLON:  Yes, Your Honor.

22                   MR. GONZALEZ-DELGADO:  Yes, Your Honor.

23                   MR. GOTTFRIED:  Yes.

24                   THE COURT:  Okay.

25             (Sidebar conference concluded.)
```

1              THE COURT:  Ladies and gentlemen, it's about 10

2      minutes after noontime.  Let's take a lunch recess at this

3      point.

4              During the recess, remember, do not talk about your

5      impressions of the case or of the evidence.  Do not view, read

6      or hear reports, comments or articles about the case.  Do not

7      conduct any research about the case, the matters in the case or

8      the individuals involved in the case.

9              We'll be back around 1:30 p.m., so you have

10     sufficient time to stretch your legs and have lunch and so

11     forth.  Within this in mind, I look forward to seeing you all

12     back at 1:30 p.m.

13        (Whereupon the following proceedings were had in open court

14           without the presence of the jury.)

15             THE COURT:  Ma'am, we're going to take a one hour 15

16     minute, more or less, lunch recess.  We should be back around

17     1:30 p.m.

18             You do not have to stay here.  You can walk around.

19     You can go out.  You can interact with family.  You can

20     interact with members of the prosecution team.

21             What you cannot do, ma'am, is talk about this case.

22             Do you understand?

23             THE WITNESS:  Yes.

24             THE COURT:  And you should not read articles or

25     documents related to this case, or pictures related to this

```
1    case.

2              Do you understand?

3              THE WITNESS:  Yes.

4              THE COURT:  All right.  With this, we'll be back in

5    the courtroom around 1:30 p.m.

6        (Whereupon a recess was taken at 12:12 p.m., until 1:34

7        p.m.)

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    UNITED STATES DISTRICT COURT )
                                  )  ss.
2    DISTRICT OF PUERTO RICO      )

3

4                       REPORTER'S CERTIFICATE

5

6         I, CINDY LEE BROWN, RPR, Federal Official Court

7    Reporter for the United States District Court for the District

8    of Puerto Rico, appointed pursuant to the provisions of Title

9    28, United States Code, Section 753, do hereby certify that the

10   foregoing is a true and correct computer-aided transcript of

11   proceedings had in the within-entitled and numbered cause on

12   the date herein set forth; and I do further certify that the

13   foregoing transcript has been prepared by me or under my

14   direction.

15

16        Dated this 24th day of June, 2023.

17

18

19                            /s/ Cindy Lee Brown

20                            _____
                              CINDY LEE BROWN, RPR, Federal
                              Official Court Reporter
21                            150 Carlos Chardon, Room 150
                              San Juan, PR  00918
22                            (787) 772-3478

23

24

25
```