1

2                    IN THE UNITED STATES DISTRICT COURT

3                      FOR THE DISTRICT OF PUERTO RICO

4                                  -oOo-

5       THE UNITED STATES OF AMERICA,    )
                                         )
6              Plaintiff,                )   Case No. 3:21-CR-00161-PAD
                                         )
7       -vs-                             )
                                         )
8       FELIX VERDEJO-SANCHEZ,           )
                                         )
9              Defendant.                )
        _____  )

10
               TRANSCRIPT OF JURY TRIAL - DAY THREE - P.M. SESSION
11          HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
                 UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
12                       THURSDAY, JUNE 22, 2023

13      _____

14                        A P P E A R A N C E S

15      FOR THE UNITED STATES OF AMERICA:

16      AUSA Jonathan L. Gottfried &
        AUSA Jeanette M. Collazo-Ortiz

17      FOR THE DEFENDANT:

18      Jason Gonzalez-Delgado, Esq. &
        Gabriela Jose Cintron-Colon, Esq.

19
        COURT INTERPRETERS:

20
        Carlos Ravelo &

21      Lynmar Vera

22      GOVERNMENT INTERPRETER:

23      Jose Luis Rosado

24

25

```
 1                        I N D E X

 2   WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:        PAGE:

 3   BERELIZ RODRIGUEZ-ORTIZ

 4   Cross-Examination by Ms. Cintron-Colon:               16

 5   Redirect Examination by Ms. Collazo-Ortiz:            47

 6   DAVID RUIZ-BERRIOS:

 7   Direct Examination by Ms. Collazo-Ortiz:              57

 8   Cross-Examination by Mr. Gonzalez-Delgado:            69

 9   MAYRA CRUZ-CARMONA

10   Direct Examination by Ms. Collazo-Ortiz:              72

11   EXHIBITS:                                           PAGE:

12   Government Exhibit No. 17                             61

13   Government Exhibit No. 149                            78

14   Government Exhibit No. 150                            78

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings commenced at 1:34 p.m.)

 2                              -oOo-

 3          (Whereupon the following proceedings were had in open court

 4          without the presence of the jury.)

 5                  THE COURT:  Counsel, sidebar.

 6          (Sidebar conference commenced.)

 7                  THE COURT:  Okay.  During the lunch recess, the

 8  government filed a motion for reconsideration regarding the

 9  presence of victims at trial.  It was filed at Docket Number

10  576.

11                  Did you receive the motion?

12                  MS. CINTRON-COLON:  I have not reviewed it, Your

13  Honor.  We were preparing for cross.  I haven't seen it.

14                  THE COURT:  I'm going to provide a recess for you to

15  review it.

16                  MS. CINTRON-COLON:  Okay.

17                  THE COURT:  And come back, and we'll discuss this.

18  As I always do, I want to put my cards on the table.  I'm

19  inclined to grant the motion.  So when you are reviewing the

20  motion, bear that in mind.

21                  MS. CINTRON-COLON:  Yes, sir.

22                  THE COURT:  Okay?

23                  MR. GONZALEZ-DELGADO:  Yes, sir.

24                  THE COURT:  Very well.

25                  Part of the authorities the government referred me to
```

1    has to do with a ruling by Judge Besosa in the *Spagnoletti*

2    case.  So I must assume that you are familiar with that ruling

3    --

4                THE COURT:  Very.

5                THE COURT:  -- and with the arguments that were made

6    pro and con in that context, so I'll grant a 15-minute recess

7    based on that, assume familiarity with the issue.  And we'll

8    return, and let me know what you think.  We'll take it from

9    there.

10               MR. GONZALEZ-DELGADO:  Yes, sir.

11               MS. CINTRON-COLON:  Yes, sir.

12          (Sidebar conference concluded.)

13          (Whereupon a recess was taken at 1:36 p.m., until 1:52

14           p.m.)

15          (Whereupon the following proceedings were had in open court

16           without the presence of the jury.)

17               THE COURT:  Take a seat.

18               Sidebar.

19          (Sidebar conference commenced.)

20               THE COURT:  Mr. Gonzalez?

21               Ma'am?

22               MS. CINTRON-COLON:  Yes, sir.

23               First, so we have two arguments.  The first one is

24    that -- sorry, I was running -- that we do not think that the,

25    this motion meets the criteria necessary for a motion for

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

1    reconsideration to be granted, inasmuch as there has been --

2              THE COURT:  Skip that.

3              MS. CINTRON-COLON:  Well, what is -- we found from

4    the First Circuit is that the presentation of a previously

5    unpled and underdeveloped argument in a motion for

6    reconsideration does not cure the original omission.  This is

7    *Iverson versus City of Boston*, 452 F.3d 94, at page 104, First

8    Circuit, 2006.

9              THE COURT:  City of Boston.

10             MS. CINTRON-COLON:  It's a First Circuit case, yes.

11             THE COURT:  That's not a criminal case involving a

12   victim.

13             MS. CINTRON-COLON:  But, Your Honor --

14             THE COURT:  Right?

15             MS. CINTRON-COLON:  That is true.

16             THE COURT:  Skip that.  I understand the argument,

17   but disagree with it.

18             MS. CINTRON-COLON:  Okay.  Our second part of the

19   argument.

20             MR. GONZALEZ-DELGADO:  We have to go into the theory

21   of defense, and I'd request that this part be ex-parte, Your

22   Honor.

23             THE COURT:  No.

24             MR. GONZALEZ-DELGADO:  The problem is, I am not in a

25   position to --

```
 1                    THE COURT:  Well, before you go ahead, this morning I
 2      heard you and your colleague ex-parte on what you had in mind
 3      in calling Ms. Keila Ortiz as a witness.  So they're not aware,
 4      Mr. Gottfried is not aware, Ms. Collazo is not aware, of what
 5      you told me.  And that has been sealed, and it will remain
 6      sealed for the remaining of the trial.
 7                    MR. GONZALEZ-DELGADO:  Uh-huh.
 8                    THE COURT:  Based on what I saw and heard of this
 9      witness and what you related to me --
10                    MR. GONZALEZ-DELGADO:  That's different from what I
11      would be presenting for this argument, Your Honor.
12                    THE COURT:  Okay.  Well --
13                    MR. GONZALEZ-DELGADO:  Because it's a different
14      situation.
15                    THE COURT:  A different situation.
16                    MR. GONZALEZ-DELGADO:  Yes.
17                    THE COURT:  Okay.  I'll hear you ex-parte and decide
18      whether it should be shared with them.
19                    MR. GONZALEZ-DELGADO:  Yes, Your Honor.  No problem.
20          (Sealed ex-parte sidebar conference commenced.)
21          (Sealed ex-parte sidebar conference concluded.)
22          (Sealed transcript filed separately.)
23          (Sidebar conference commenced.)
24                    THE COURT:  Is there anything you wish to add, Mr.
25      Gottfried?
```

1           MR. GOTTFRIED:  Yes.  I mean, the government doesn't
2      know what, obviously, what happened at the ex-parte hearing.
3           THE COURT:  And I will not share that with the
4      government.
5           MR. GOTTFRIED:  Understood.
6           THE COURT:  Go ahead.
7           MR. GOTTFRIED:  The question is not whether or not
8      this witness has relevant information, and that I assume is
9      what was the subject of the defense theory as to why she's
10     relevant.  Under the statute, that's not the relevant question,
11     right?
12          So we have Rule 615, which is what the Court, I
13     understand, based its ruling to exclude the witness from, which
14     the rule of evidence provides that, if she's going to testify
15     later, for the sake of the process, she's going to be excluded.
16     But Congress has also decided that this Rule of Criminal
17     Procedure 60(a)(2), as well as the Crime Victims' Rights Act,
18     that gives the victim clear rights to be present, unless the
19     defense can demonstrate by clear and convincing evidence that
20     she will alter her testimony.
21          Now, this is a witness who defense has repeatedly
22     cited law enforcement reports, our interviews with her, so her
23     statements have been recorded by law enforcement in 302s on
24     multiple occasions.  In addition, she has testified under oath
25     here on the same subject, and she's been subject to

1     cross-examination.

2              So her testimony, her recollection regarding the

3     events, her personal information regarding the subject of this

4     case, has been memorialized time and time again.  To the extent

5     that she materially alters any of that, defense has ample

6     ammunition to cross-examine her, whether it be the transcript

7     here, 302s from the FBI or the police reports that they're

8     referring to.

9              And they can also cross-examine her indicating that

10    she has been present throughout the trial and somehow

11    materially altered it.  So that they would still be able to do.

12             But I have not heard or seen anything from the

13    defense that would rise to the level of clear and convincing

14    evidence that this witness would materially alter her

15    testimony.

16             THE COURT:  Okay.  This morning I heard arguments on

17    why Ms. Keila Ortiz should be excluded after having been

18    announced as a defense witness, so to speak.  In other words,

19    Mr. Gonzalez indicated that she would be subpoenaed to testify

20    when, their phase of the case.  Based on the arguments raised

21    at that point, I decided to exclude her from the courtroom.

22             Having looked at this anew; that is, in light of the

23    motion that was filed at Docket 576, what Mr. Gonzalez shared

24    with me ex-parte, and what you have said, Mr. Gottfried, based

25    on the authorities cited in the motion, I'm granting the

1    motion.  So Ms. Ortiz may return to the courtroom.  I do not

2    find by clear and convincing evidence that her testimony would

3    be materially altered by her presence in the courtroom.

4           Now, the request you've made is what I would describe

5    at incremental.  Even though the title of the motion refers to

6    victims, what you want the Court to do is to allow the presence

7    of any family members of the victim after they've testified in

8    the government's case in chief and been subject to

9    cross-examination.

10          We will follow that rule.  I will call that the

11   "step-by-step rule."  So this is not an open invitation to have

12   them in the courtroom because that's not what you've requested.

13          MR. GOTTFRIED:  Correct, Your Honor.

14          THE COURT:  Okay.  So with this in mind, your request

15   is granted.  The Court is reconsidering the previous ruling,

16   and 576 goes in.  You may coordinate to have them back in the

17   courtroom.

18          MR. GONZALEZ-DELGADO:  Your Honor, before we leave,

19   if I'm not mistaken, when the Court recessed at noon, there was

20   an, instructions given to the witness that she could not go

21   into social media, if I'm not mistaken.

22          THE COURT:  I did not mention social media.  But did

23   she go to social media?

24          MR. GONZALEZ-DELGADO:  She was posting on social

25   media.

```
 1              THE COURT:  What did she say?

 2              MS. CINTRON-COLON:  I am looking for it so I can show

 3      the Court, but I can proffer it was a couple of pictures

 4      stating, basically repeating her initial two sentences in the

 5      case, stating what her name is and who she is, the sister and

 6      her relationship to Keishla, which in itself, is not

 7      necessarily prejudicial.

 8              However, the intensive media coverage that has been

 9      surrounding this case, as we have numerous times elicited to

10      the Court, is very present on social media.  Our concern is the

11      exposure of, to all of the media, the news reports, the

12      outlets, the comments, the postings on social media that have

13      been occurring, that are literally popping up as you open your

14      screens, that she's certainly exposed to and whether or not she

15      was actually going into the news or social media postings on

16      comments about this.

17              Because, well, we all know that she has been very

18      vocal about this case, which is not saying that it's -- she has

19      a freedom of speech.  We understand this.  But at this stage of

20      the trial, where she is literally halfway of testifying, being

21      subject to cross-examination in the afternoon, is extremely

22      worrisome for us, the exposure that she would have had being in

23      different social media platforms, which are Instagram and

24      Facebook, because the posts were made on both social media

25      accounts.
```

```
 1              THE COURT:  Okay.  Let me say in response to what
 2    you've said, you all heard what I instructed her to do or not
 3    to do, or what I told her she may do or not do.  I did not
 4    receive a request to be more specific with respect to posting
 5    anything on social media.  From this point, I'll do it.
 6              I would have used that request in an affirmative
 7    manner to warn her not to do it.  I did tell the jurors not to
 8    do that.  But there is no problem with jurors, so far as I can
 9    see.  The problem is her.
10              So given that I did not specifically warn her along
11    those lines, I see no reason to reprimand her, if that's what
12    you are asking me to do.
13              MR. GONZALEZ-DELGADO:  Actually, no, Your Honor.
14    We're just informing the Court --
15              THE COURT:  To be aware.
16              MR. GONZALEZ-DELGADO:  -- to be aware, because we had
17    no idea that this was happening.  We received a text message
18    saying:  Look at what's happening right now.
19              And when we looked and we saw that it was seven
20    minutes ago, it was right after her testimony, I had no idea
21    that she was going to do that.  I wasn't looking for it.  But
22    it's something that might happen.
23              And we don't want the jury to go home on Friday,
24    Saturday, Sunday, and then something happens, and somebody
25    tells the juror:  Listen, wasn't this from your case?  And it's
```

1    something that one of the witnesses might be posting their

2    opinions, and we don't want that to influence the jury in any

3    way.

4         MS. COLLAZO-ORTIZ:  That's different because the jury

5    was instructed not to go on social media.

6         MR. GONZALEZ-DELGADO:  Yes.  But we know it's

7    happened.

8         MS. COLLAZO-ORTIZ:  They will follow that rule.

9         THE COURT:  Again, what it was that she did?  She

10    posted something saying:  I'm Keishla's sister?

11         MS. CINTRON-COLON:  Basically, she was quoting

12    herself as she was beginning her testimony, saying:  Please

13    state your name.  And she keeps quoting:  My name is Bereliz

14    Rodriguez-Ortiz; I am the younger sister of Keishla

15    Rodriguez-Ortiz.

16         Basically, that's the caption of one of the pictures.

17    There's a whole post.  I don't have internet right now, but

18    that was the gist of it, which, again, in and of itself, is not

19    an issue because it's not exactly part of the testimony.

20    However, it does let the public know, and she has literally

21    more than 30,000 followers on social media, that she's

22    testifying today, which is --

23         THE COURT:  It's media.  It's no secret.

24         MS. CINTRON-COLON:  Of course.  But it is a little

25    worrisome for us that she might have been in contact with,

1    communicating on social media or with the press, and we just
2    wanted to make the Court aware.  We're not explicitly asking
3    for a reprimand, like Your Honor said.  But, yes, we agree
4    that, and prospectively to other witnesses, that would be a
5    viable instruction in between testimonies.
6        THE COURT:  In the event there is a recess, I will
7    include that as part of my warnings to her.
8        MR. GONZALEZ-DELGADO:  What we'd request, Your Honor,
9    is just that she did not post until the end of the trial.  And
10    the reason is, if she's going to be sitting in court every day
11    listening to the testimonies, and she's going to be posting her
12    point of view.  We don't want the jury to do something.
13        And in the *Spagnoletti* case, the 15-647, there was a
14    juror who was actually posting and, and, and investigating the
15    social media of the attorneys and the prosecutor.  And if it
16    wasn't for Assistant U.S. Attorney Conner, who volunteered the
17    information, we had no idea.
18        THE COURT:  Okay.  We'll go into that specific
19    request at the end of the day.
20        MR. GONZALEZ-DELGADO:  Okay.
21        THE COURT:  Mr. Gottfried, you were going to say
22    something?
23        MR. GOTTFRIED:  No.  Just, Your Honor, we have no
24    knowledge of any Instagram post.  We haven't seen it.  We're
25    not aware of her posting anything.

1          MS. CINTRON-COLON:  I personally saw it.  That's why
2    I'm bringing it forward.
3          MR. GOTTFRIED:  Okay.  I understood.  Also, I
4    understand we will address this later.  We will be opposed to,
5    essentially, a gag order on the family members.
6          THE COURT:  On a former witness.
7          MR. GOTTFRIED:  On a former witness.  But we'll
8    address that at the end of the day.
9          THE COURT:  At the end of the day.
10          MS. CINTRON-COLON:  Sure.
11          THE COURT:  So you wanted to -- you are going to
12    bring in --
13          MR. GOTTFRIED:  I don't know where she is, but we'll
14    let her know that she can come back in.  I don't know if she
15    went back home or if she's here or where she is right now.
16          MS. CINTRON-COLON:  I have a suggestion that if she's
17    still here and she wants to come in, could that be done out of
18    the presence of the jury now?  Because of, like you said when
19    she was going out, it was an unpredictable reaction.
20          THE COURT:  She went out.  The jury was not here.
21          MS. CINTRON-COLON:  Exactly.  That's exactly why I'm
22    asking that it could be done exactly the same way because she
23    was crying and hugging people, which is understandable.  I'm
24    not saying there was anything wrong done.  But it was out of
25    the presence of the jury, and that is exactly what we would ask

1    that occur again when she's coming in.

2              THE COURT:  I don't know where she is.

3              MS. COLLAZO-ORTIZ:  We don't know where she is.  I'm

4    not sure how long it would take her to get back.  In any case,

5    it shouldn't be anything of note.  Witnesses can come in and

6    out of the courtroom at anytime.

7              MR. GONZALEZ-DELGADO:  She has a Victim Rights helper

8    assistant.

9              MR. GOTTFRIED:  I don't know where she is, honestly,

10   if she went back home or if she's at Plaza.  I have no idea.

11             MS. CINTRON-COLON:  That's fine.

12             THE COURT:  Okay.  We'll take it step-by-step.

13        (Sidebar conference concluded.)

14             THE COURT:  Let's bring the jury in.

15        (Whereupon the following proceedings were had in open court

16        in the presence of the jury.)

17             THE COURT:  Ladies and gentlemen, welcome back to the

18   courtroom.  Please take a seat.

19             Thank you for your patience.  We were dealing with a

20   housekeeping matter that needed to be tended to before going

21   ahead.  So that's why you were asked to remain more than I had

22   anticipated in the jury room.  But now we are back in the

23   courtroom, and that's a good thing.

24             So with this, go ahead.

25             MS. CINTRON-COLON:  Yes, Your Honor.  Permission to

1    talk to the witness.

2              THE COURT:  Go ahead.

3                     BERELIZ RODRIGUEZ-ORTIZ,

4         called as a witness on behalf of the Plaintiff,

5                having been previously duly sworn,

6       resumed the stand, was examined and testified as follows:

7                       CROSS-EXAMINATION

8    BY MS. CINTRON-COLON:

9    Q    Good afternoon, Ms. Rodriguez.  I'm going to be asking you

10   a couple of questions regarding what you testified earlier

11   today in the morning.  Most of these questions can be answered

12   with a yes or no.

13             Do you understand?

14   A    I do.  I do.

15   Q    Ms. Ortiz, this morning you told Sister Counsel that on

16   April 29th, 2021, you were interviewed by Puerto Rico Police;

17   is that right?

18   A    Yes.

19   Q    And the police asked you about relationship, sentimental

20   relationship, that Keishla had or could have had?

21   A    Yes.

22   Q    And you mentioned the name Ivan; is that correct?

23   A    Yes.

24   Q    And you stated that Keishla had a couple-of-years'

25   relationship with Ivan about four years before April of 2021,

1    right?

2    A    Yes.

3    Q    And you also stated that Keishla's relationship with Ivan

4    was a beautiful relationship, correct?

5    A    Yes.

6    Q    So Keishla and Ivan never had any problems?

7    A    No.

8    Q    And they remained friends up until April of 2021?

9    A    Yes.

10    Q    You also mentioned that you told police about a man named

11    Marcelino, correct?

12    A    Yes.

13    Q    And that would be Marcelino Perez, correct?

14    A    Yes.

15    Q    Who is also known as "Malpica?"

16          THE INTERPRETER:  Counsel, this is the interpreter.

17    If you could speak into the --

18          MS. CINTRON-COLON:  Yes, sir.  Sorry.

19    BY MS. CINTRON-COLON:

20    Q    Who is also known as "Malpica?"

21    A    Yes.

22    Q    And when you were telling police -- scratch that.

23          And on that day, you told Marcelino physically abused

24    Keishla?

25    A    No.

1    Q    Ms. Rodriguez, do you remember being interviewed by Puerto

2    Rico Police on April 29th of 2021?  Is that correct?

3    A    Yes.

4    Q    And you remember that you were asked about Keishla's

5    boyfriends, and you mentioned Marcelino Perez?

6    A    Yes.

7    Q    And during that interview, you noticed that the police

8    agents were taking notes, correct?

9    A    Yes.

10   Q    When interview -- during the interview, at any moment, the

11   police showed you the notes that they were writing, correct?

12             THE INTERPRETER:  I'm sorry, Counsel.  Can you please

13   repeat that?

14             MS. CINTRON-COLON:  Yes, sir.

15   BY MS. CINTRON-COLON:

16   Q    During this interview with the police, they showed you the

17   notes that they were writing, correct?

18   A    No.

19   Q    I ask you, Ms. Rodriguez, if while you were preparing for

20   your testimony in this case with the prosecution, you reviewed

21   notes of your interviews with the Puerto Rico Police.

22   A    I'm sorry?

23   Q    When you were preparing with the prosecutors for your

24   testimony today in this case, the prosecution showed you notes

25   of your interview with the Puerto Rico Police, correct?

1    A    No.

2    Q    And you were interviewed by the prosecutors in this case

3    again on May 10th of 2021, correct?

4    A    I do not remember.

5    Q    Can you please explain to us or tell us what documents, if

6    any, you used to prepare for your testimony today in this case?

7    A    I'm sorry?

8    Q    Can you please explain to us or tell us, what documents

9    did you review in preparation for your testimony here today?

10   A    I prepared myself with everything that happened that day

11   with the truth.

12   Q    Did you review any documents in that process?

13   A    Yes.

14   Q    Can you please tell us which documents you examined or

15   reviewed in that process?

16   A    The call, the call between Felix and Junior.

17   Q    What else did you use to prepare?  What other documents

18   did you use to prepare for this hearing today?

19   A    None other, just that one, and with all the truth since

20   day one.

21          MR. GONZALEZ-DELGADO:  I'm sorry.  I didn't let him

22   finish.

23          I'm objecting to the second part of his statement of

24   her answer.  That's a determination that the jury is going to

25   be making, Your Honor.

```
 1                THE COURT:  Overruled.
 2                MS. COLLAZO-ORTIZ:  Your Honor, I don't think the
 3     translation was completed due to the objection.
 4                THE INTERPRETER:  Your Honor, it was.
 5                MS. COLLAZO-ORTIZ:  Okay.  I'm sorry.
 6                THE COURT:  My understanding coincides with what the
 7     interpreter just said.
 8     BY MS. CINTRON-COLON:
 9     Q    Ms. Rodriguez, when you were interviewed by police, you
10     told them that your sister worked at a grooming salon; is that
11     right?
12     A    Yes.
13     Q    And you told them that Mr. Marcelino was physically
14     aggressive with Keishla on her workplace?
15                MR. GOTTFRIED:  Objection, Your Honor, asked and
16     answered.
17                THE COURT:  Overruled.
18                THE WITNESS:  He tried to assault her.  He did not
19     assault her.
20     BY MS. CINTRON-COLON:
21     Q    And you also told the police that he was not charged with
22     any crimes for that aggression?
23                THE INTERPRETER:  Counsel, can you please repeat?
24                MS. CINTRON-COLON:  Yes, sir.
25     BY MS. CINTRON-COLON:
```

1    Q    And that you also told the police that he was never

2    charged with any criminal charges for that assault?

3    A    Yes.

4    Q    And you did not tell the police that he attempted to hit

5    her.  You told the police that he, in fact, had hit her at her

6    workplace?

7    A    No.

8    Q    You also -- sorry.  You also said this morning -- scratch

9    that.

10          Meanwhile, you never witnessed domestic violence

11   between Mr. Verdejo and Keishla, correct?

12   A    That's correct.

13   Q    Going back to April of, April 29th of 2021, you also told

14   Sister Counsel this morning that after you could not contact

15   your sister, that you received a call from Miguelito?

16   A    Correct.

17   Q    And in the afternoon, Miguelito also sent you a text

18   message, correct?

19   A    Correct.

20   Q    And during your morning phone call with Miguelito, you

21   asked him about Keishla?

22   A    No.

23   Q    You asked him where Keishla was?

24   A    No.

25   Q    You told him that Keishla had planned to see Felix that

1   morning?

2   A    Correct.

3   Q    And Miguelito told you that Felix was a [non-English

4   language], correct?

5           MR. GOTTFRIED:  Objection, Your Honor, hearsay.

6           THE COURT:  The objection is overruled.

7           THE WITNESS:  Correct.

8   BY MS. CINTRON-COLON:

9   Q    And he also told you that because he was a [non-English

10  language], not to worry because he wouldn't do anything to

11  Keishla?

12          MR. GOTTFRIED:  Objection, Your Honor, same, hearsay.

13          THE COURT:  Overruled.

14          THE INTERPRETER:  Can you please repeat the question?

15          MS. CINTRON-COLON:  Yes.

16  BY MS. CINTRON-COLON:

17  Q    I'm sorry.  Miguelito also told you that because Felix was

18  a [non-English language], that not to worry because he would

19  not do anything to Keishla?

20  A    Correct.

21  Q    Also in that morning, you received a phone call from Ms.

22  Eliz Santiago-Sierra, correct?

23  A    Correct.

24  Q    And also in the afternoon, you received a text message

25  from Eliz Santiago-Sierra, correct?

```
 1   A    Correct.

 2   Q    And Eliz Santiago-Sierra is Miguelito's daughter, correct?

 3   A    Correct.

 4   Q    Earlier you told us that Keishla changed her phone number

 5   twice, correct?

 6   A    Correct.

 7   Q    And you said that the last time that she changed her phone

 8   number was so that Felix wouldn't have it?

 9   A    Correct.

10   Q    But Keishla gave her phone number to Felix after that?

11   A    Correct.

12   Q    And she, in fact, continued to call him from that phone

13   number, correct?

14   A    Correct.

15   Q    You also told us that during April of 2021, Keishla was in

16   a relationship with Mr. Verdejo, correct?

17   A    Correct.

18   Q    But Keishla and Mr. Verdejo's relationship was not

19   monogamous, correct?

20   A    Correct.

21   Q    In fact, during the many years that they were on and off

22   in relationships, they were never monogamous?

23   A    I'm sorry?

24   Q    During all the time that Felix and Keishla were in

25   relationship, they were never monogamous or exclusive with one
```

1    another?

2    A    No.

3    Q    In fact, when Keishla was married to "Malpica" --

4            MR. GOTTFRIED:  Objection, Your Honor.  Can we

5    approach for a sidebar?

6            THE COURT:  Yes.

7    (Sidebar conference commenced.)

8            MR. GOTTFRIED:  Your Honor, the government had filed

9    a motion in limine that was granted, precluding the defense

10   from going into the sexual history of the victim.  They did ask

11   whether or not the relationship was monogamous.  We didn't

12   object at that point.  But to the extent that they're going

13   into her sexual relationship, whether it was exclusive, not

14   exclusive, that we think approaches close to, if not goes into,

15   the prohibition on going into the victim's sexual history.

16           MS. CINTRON-COLON:  I am not going into her sexual

17   history.  I explicitly asked her about sentimental and romantic

18   relationships.  A relationship, a sentimental relationship, may

19   not be a sexual relationship.  And a sexual relationship may

20   not be a romantic relationship.

21           I exclusively and specifically asked Ms.

22   Rodriguez-Ortiz about sentimental relationships, and a marriage

23   is a sentimental relationship.  I'm not going into details of

24   whether or not they had sexual intercourse or sexual relations

25   in any way.

```
 1              In fact, it fails to logic, because at the time that
 2     Mr. -- they were married, Mr. Marcelino and Keishla were
 3     married, which was from 2013 to 2018, he was in prison.
 4     Therefore, I cannot be talking about sexual relationships
 5     between him during the period that they were married because he
 6     was in prison for most of the time that they were married.
 7              I'm only going into monogamous and exclusivity as in
 8     a sentimental relationship, not whether or not they had sex,
 9     they had intercourse or she was sleeping around with other men.
10     That is not the way nor the direction that the questions are
11     going nor what I asked Ms. Rodriguez-Ortiz about her
12     relationships.
13              MS. COLLAZO-ORTIZ:  The question about whether a
14     relationship is monogamous or not is intertwined with
15     sexuality.  If they are talking about monogamous relationships,
16     that's a sexual nature of the relationship.  So she's mincing
17     words to say that it's an emotional attachment, but that's not
18     the line of questioning.
19              THE COURT:  What's your next question?
20              MS. CINTRON-COLON:  Let me check real quick.
21              THE COURT:  You said, in fact, when she was with --
22              MS. CINTRON-COLON:  In fact, when Keishla was married
23     to Mr. Marcelino, that he was in jail.
24              THE COURT:  No.
25              MS. CINTRON-COLON:  I know that was going to be
```

1    afterwards, or if the witness is not responsive.

2              That when they were married, she was also seeing Mr.

3    Verdejo.  They have had three witnesses testify about the

4    sentimental relationship and connection.  In fact, it was in

5    opening statement from Ms. Collazo that they even stated about

6    the proclaimed love that this girl had for Mr. Verdejo.

7              I'm not going into the details of sexual intercourse

8    or sexual relationships.  That is why I'm asking if she was

9    seeing Mr. Verdejo.  I'm not saying was she sleeping with Mr.

10   Verdejo.  That is not my question.

11             Even so, I can ask if she was sleeping with Mr.

12   Verdejo because they limited their sexual history of Ms.

13   Keishla to Mr. Verdejo.  So I can ask if, when she was married

14   to Marcelino, she was also seeing Mr. Verdejo.

15             And I could actually ask her if Ms. Keishla was

16   having sex with Mr. Verdejo while she was married to Marcelino,

17   because that is a sexual history that I am allowed to go into.

18   But I'm not going into sexual history with other men.

19             MR. GOTTFRIED:  The question is, why is it relevant

20   that while she's legally married to someone, that she's having

21   sex with Verdejo?  If you want to ask her why she had sex with

22   Verdejo for 10 years, that's fine, or 11 years, or since what

23   date.  But to say that she was in relationship with this person

24   and was having sex with Verdejo, I mean, again, that kind of

25   goes into the fact that she's having multiple sexual partners.

 1                 THE COURT:  I'm concerned about that, what Mr.

 2    Gottfried just said.  I'm also concerned when the word

 3    "monogamous" was used because in common experience, in general

 4    experience, I should say, when one characterizes a relationship

 5    as monogamous or not, one is not, people are not thinking only

 6    platonic relationships.  We're talking sexual relationships,

 7    open marriages, open relationships, and so forth.  There was no

 8    objection, and that's fine.

 9                 MR. GONZALEZ-DELGADO:  Your Honor, but the government

10    --

11                 THE COURT:  Wait.

12                 There was no objection, and that's fine.  But I'm

13    concerned about where this is going because I do not think the

14    sexual life of the victim is relevant.

15                 MR. GONZALEZ-DELGADO:  We're not, we're not going

16    into that.

17                 THE COURT:  So where is this going?

18                 MR. GONZALEZ-DELGADO:  These three witnesses have

19    testified to the government's questions that when Ms. Keishla

20    disappeared, they went to the police, and the first thing that

21    they did was ask them who did she have a relationship with, so

22    that they could investigate it.  And that's where we're going.

23                 They had -- the first witness said that it was

24    Marcelino, who she said that was many years ago.  I think she

25    said Ivan, who was four years ago.  And Ms. Bereliz has

```
 1    testified that it wasn't -- they weren't exclusive, and that
 2    she had -- she called, she called -- she told the police that
 3    it was either Felix or it was either Marcelino.  And the police
 4    actually --
 5             MS. COLLAZO-ORTIZ:  That's misquoting.  At no time
 6    did she point at Marcelino for anything and mentioning his
 7    name.  So you are misquoting the reports on that.
 8             MR. GONZALEZ-DELGADO:  Your Honor, she mentions other
 9    names of other individuals.
10             MS. COLLAZO-ORTIZ:  Because she was asked about
11    relationships.  You have to be careful not to misquote the
12    reports because you have done it before.
13             THE COURT:  Listen.  Listen.  I do not want questions
14    about Keishla Rodriguez's sexual encounters with anybody --
15             MR. GONZALEZ-DELGADO:  We haven't made them.
16             THE COURT:  -- except, perhaps, Mr. Verdejo.
17             MR. GONZALEZ-DELGADO:  Mr. Verdejo.
18             THE COURT:  That includes the line about:  In fact,
19    Marcelino.  Because what would be the logical questions to
20    follow the line you were following, ma'am?  Come on, we're all
21    intelligent guys, intelligent people, with experience in
22    courtroom proceedings.
23             MS. CINTRON-COLON:  I understand.
24             THE COURT:  Where were you going?  I saw you, for
25    myself, I saw you walking towards that line.
```

1           MS. CINTRON-COLON:  I was not going to touch it, but

2    I understand.

3           THE COURT:  Walking towards that line, and you did

4    not have to reach the line to have people think about where

5    you're going and why.  And that's what I wanted to avoid.  I

6    think I've given you leeway.

7           MS. CINTRON-COLON:  Yes, Your Honor.

8           THE COURT:  But that's a line that should not be

9    crossed.  You should not be close to that line.

10           MS. CINTRON-COLON:  I understand.  I can --

11           THE COURT:  Listen.  This individual, Marcelino, has

12    been mentioned here.  Ivan has been mentioned here.

13           MS. CINTRON-COLON:  Miguelito.

14           THE COURT:  Miguelito has been mentioned here, and so

15    forth.  That's fine.  And there were other relationships, and

16    they were not monogamous.  That's right there.  Leave it there

17    --

18           MS. CINTRON-COLON:  Sure.

19           THE COURT:  -- unless you have other area of inquiry.

20           MR. GONZALEZ-DELGADO:  Your Honor, if I may.

21           THE COURT:  Go ahead.

22           MR. GONZALEZ-DELGADO:  We have the, we have the

23    responsibility to our client, under the Sixth Amendment, to put

24    in the -- to elicit from the witnesses statements that they may

25    have made or they are making in court to [non-English

1    language], to plant reasonable doubt.  And this is a way that

2    we can do it, by cross-examining the witnesses related to facts

3    that they have, that the government has presented, and that we

4    have alternate facts that go along, without us having to cross

5    the line, to cross the line that the Court has set.

6            You granted the government's motion and said we

7    cannot talk about the sexual relationships that she had, or

8    abortions, or anything other related to that.  And we are not

9    crossing that line.  We are just keeping it within the

10   boundaries and talking about sentimental relationships.

11           That is reasonable doubt.  There are other people who

12   could have done that.  We believe, Your Honor, that we can do

13   this through the cross-examination of the witnesses, and that's

14   what we're trying to do, bring our theory of defense with these

15   witnesses and with any other witness we may bring as our case

16   in chief.

17           MS. CINTRON-COLON:  I can proffer that, instead of

18   going through the line of while she was married to Marcelino,

19   directly like that, she was also seeing Verdejo.  I can go into

20   that she knew Mr. Marcelino was in jail for how many years, and

21   that she was seeing Mr. Verdejo during those years, because

22   that would go as to she has a sentimental relationship with

23   Marcelino at that time.

24           It's impossible for them to have a sexual

25   relationship.  But she was also seeing Mr. Verdejo.  In the

1    sense that he gets out of jail, he learns all about this, it's

2    part of the theory of defense and that, what we're trying to

3    present.  That is the line, which I did not want to proffer in

4    front of the government necessarily, but that is the line on

5    where we're trying to go with that.

6            I don't have many more questions about this person

7    either.  It's just what I just proffered to the Court.

8            THE COURT:  So what are you going to ask?  Your next

9    three questions?

10           MS. CINTRON-COLON:  I'm going to rephrase it to not

11   walk this line.  Does she know -- because she knew that

12   Marcelino was in prison.  She has told police on numerous

13   occasions the years that he was imprisoned, the years that they

14   were married, and that during the years that he was imprisoned,

15   she knew that Mr. -- that Ms. Keishla was also seeing, was

16   seeing Mr. Verdejo while he was in prison.

17           MR. GOTTFRIED:  "Also seeing."  Again, we're kind of

18   getting into this question of her emotional, her sexual

19   practices here.  And the government did not object.  There was

20   a cross-examination on her relationship, on Keishla's

21   relationship with Ivan.  There was no objection to that.  With

22   Marcelino.  No objection to that.

23           If you want to talk about Keishla's relationship with

24   them, I have no objection.  But now it's getting into the fact

25   that while she's with one guy, she's with another guy also.

1    And that I just don't see --

2              MS. CINTRON-COLON:  He's in jail, so he's a

3    sentimental relationship.

4              MR. GOTTFRIED:  Conjugal visits.

5              MS. CINTRON-COLON:  It's federal prison.  He gets out

6    of jail, he finds that Verdejo is with Keishla.  And even after

7    that, that was in 2018, we have good-faith basis that she just

8    testified that he attempted to hit her.  We have other reliable

9    information that that was --

10             THE COURT:  We're beyond that.

11             MS. CINTRON-COLON:  Yes, Your Honor.  But this is why

12   this part of he was released from jail in 2018, and she was

13   having another relationship with Verdejo or seeing Verdejo

14   while he was imprisoned.  So that was a purely sentimental

15   relationship.

16             He gets out of jail in 2018.  They get divorced in

17   2020.  They're still friends.  And this aggression happens, and

18   then we're looking literally less than a year later, in 2021,

19   she disappears.  And that is part of a theory of defense that

20   we are trying to present, Your Honor.

21             MR. GONZALEZ-DELGADO:  And that's a reasonable

22   inference, Your Honor.

23             MR. GOTTFRIED:  Whether she's seeing Verdejo or not

24   seeing Verdejo while she's with Marcelino is irrelevant.

25             MS. CINTRON-COLON:  It could go as to motive of

1    another person.  It goes to whether or not Mr. Verdejo could be

2    guilty or not, and that is a reasonable inference for the jury

3    to make.  That is the relevance that that would have.

4              THE COURT:  So Marcelino -- so what's, again, your

5    next question?

6              MS. CINTRON-COLON:  My next question would be if she

7    knew that Marcelino was in federal prison, which we already

8    know she knows.

9              THE COURT:  Uh-huh.

10             MS. CINTRON-COLON:  During what period of time, which

11   was 2013 to 2018.

12             THE COURT:  Uh-huh.

13             MS. CINTRON-COLON:  And when did Keishla and

14   Marcelino get married and when they get divorced.  And that's

15   going to align exactly with the 2013/2018 period.

16             THE COURT:  I got the first question.  What's the

17   next?

18             MS. CINTRON-COLON:  Yes, sir.  The next question

19   would be that, if while Marcelino was prison, she was seeing

20   Mr. Verdejo.

21             THE COURT:  That's it?

22             MS. CINTRON-COLON:  As to the Marcelino topic, yes.

23             MR. GOTTFRIED:  Your Honor, we would object, first,

24   on relevance.  And I understand that they're trying to dirty up

25   Marcelino, but where does this line of questioning go that he

```
 1    was a federal convict from 2013 to 2018?

 2              Okay.  That she was with Mr. Verdejo at that time.

 3    So while she's married to one man, she's sleeping with another

 4    man.  Is that what --

 5              THE COURT:  That's the inference.

 6              MR. GOTTFRIED:  That's the inference.  That's the

 7    kind of woman she is.  And that's the argument that we object

 8    to.

 9              THE COURT:  That's where I think this is going.

10              MS. CINTRON-COLON:  Your Honor, it's --

11              THE COURT:  You've talked about, you've led her to

12    talk about monogamous relationships, relationships, right?

13    Sentimental relationships, not friendships, not just platonic

14    relationships.

15              This is something else.  You have all that on the

16    record.  So I think you've reached the line, ma'am.  You have

17    what you need to do your job in front of the jury later on.

18              MR. GONZALEZ-DELGADO:  Your Honor, but we need, we

19    need to finish our questions, because for our -- for us to be

20    able to have the jury make a reasonable inference, we need the

21    information in.  I cannot go at the end of the trial and say

22    that -- this is an example -- that Mr. Marcelino wanted to eat

23    a hamburger, and just leave it at that:  He went out to go get

24    something to eat.

25              I have to present evidence that says that he went out
```

1    to eat, and he went to a hamburger place.  And I can leave it

2    at that.  I don't have to go into what he ordered.  And this is

3    a, I'm making an example, a metaphor, to the sexual

4    relationship.

5            I don't have to say that they actually had the sexual

6    encounter if I just leave it at the relationship.  And I have,

7    I have to lay the foundation.  I have to have a basis in fact,

8    because I can't ask the jury to make a reasonable inference if

9    I don't have the, if I don't have the evidence submitted in

10   trial.

11           THE COURT:  Okay.  So only two questions you have in

12   mind with respect to Marcelino?

13           MS. CINTRON-COLON:  Yes, exactly what I responded to

14   the Court.

15           THE COURT:  Repeat the first one again.

16           MS. CINTRON-COLON:  Yes, sir.  Almost verbatim my

17   question to Mrs. Rodriguez would be if Keishla and Marcelino

18   were married from 2013 to 2018.

19           THE COURT:  Uh-huh, one.

20           MS. CINTRON-COLON:  Exactly.

21           Two, if she knew that Mr. Marcelino had been in

22   prison.  I'm not asking for what, where or how.  And does she

23   know that he was in prison from 2013 to 2018.

24           And the last question would be, if during the period

25   that Mr. Marcelino was in prison, which is 2013 to 2018, Ms.

1    Keishla was seeing Mr. Verdejo.

2            MR. GOTTFRIED:  And that last question about extra

3    marital sex is what we object to because I don't think that's

4    relevant.

5            THE COURT:  I'll give you what in my mind is a lot of

6    leeway by asking those three questions.

7            MS. CINTRON-COLON:  Four.

8            THE COURT:  No, three.

9            MS. CINTRON-COLON:  There are four, I believe.

10           THE COURT:  Okay.  Repeat them again.

11           MS. CINTRON-COLON:  Yes, sir.

12           The first one is that if she knew that Keishla and

13   Marcelino were married from 2013 to 2018, were the dates; if

14   she knew that Mr. Marcelino had been imprisoned while they were

15   married; and if she knows that Mr. Marcelino was imprisoned.

16           THE COURT:  That they were married from what time to

17   what time?

18           MS. CINTRON-COLON:  2013 to 2018.

19           THE COURT:  That he was imprisoned from what time to

20   what time?

21           MS. CINTRON-COLON:  2013 to 2018.  They got married a

22   couple of months before he went to jail.

23           THE COURT:  So that's Question Number 2.

24           MS. CINTRON-COLON:  Well, I was intending to divide

25   it so that she wouldn't be confused, but I can do it as a

1    compound question.

2              THE COURT:  First question, married; second question,

3    prison.

4              MS. CINTRON-COLON:  Yes, and what were the time

5    periods, and if she knew that Ms. Keishla and Mr. Verdejo were

6    seeing each other while Mr. Marcelino was in prison.

7              THE COURT:  Three.  That's it.

8              MR. GOTTFRIED:  Again, Your Honor --

9              MS. CINTRON-COLON:  On the Marcelino topic, yeah,

10   that would be it.

11             MR. GOTTFRIED:  Again, Your Honor, that third

12   question we object to because it goes to portraying the woman

13   who is someone that has extramarital sex.  We don't think

14   that's relevant to this.  We're talking about something that

15   happened in 2013, years before the incident here, and we just

16   don't see how it's relevant.  And it's basically just trying to

17   dirty up the victim.

18             MS. CINTRON-COLON:  Well, literally talking about the

19   sexual history she has with Mr. Verdejo in other timeframes,

20   which is what we were allowed to talk about, her sexual history

21   with Verdejo and not with anyone else, and that is where we're

22   standing.

23             MR. GOTTFRIED:  But you're tying it to the marriage.

24   It's already on the record that they had a sexual relationship.

25             THE COURT:  One at a time.

1          MR. GOTTFRIED:  It's on the record they've had a

2    sexual relationship for years.  What your question does there

3    is say:  While she's married to Man Number 1, she's having a

4    sexual relationship with Man Number 2.  That's the connection

5    that we object to.

6          MS. CINTRON-COLON:  I was not even going to ask about

7    sexual relationship with Mr. Verdejo, just that they were

8    seeing each other.

9          MR. GONZALEZ-DELGADO:  Your Honor, the facts, the

10   facts are the facts.  In 2013 to 2018, this man was in prison.

11   In 2013, Ms. Keishla was married to Marcelino.

12         If we go back 10 years, like Ms. Bereliz Rodriguez

13   and Keila Ortiz and the other witness stated, they had a

14   relationship for over 10 years.  She was 20 -- in 2021, the

15   facts of this case happened.

16         If we go back 10 years, since 2011, Mr. Verdejo, this

17   is the testimony of the witnesses that they brought, Mr.

18   Verdejo was in a sexual relationship with Ms. Keishla.  And in

19   that time that they were in a sexual relationship, Ms. Keishla

20   married another man, who just happened to be in jail for most

21   of the time that they were married.

22         THE COURT:  Leave it there.  Three questions.

23         MS. CINTRON-COLON:  Yes, sir.

24         THE COURT:  And then what?

25         MS. CINTRON-COLON:  And then --

1                    THE COURT:  Because I do not want to spend time in

2        sidebar going over issues that we can anticipate and discuss at

3        this point.  So after that, what?

4                    MS. CINTRON-COLON:  After that, I'm -- the last thing

5        I pretty much have is regarding the phone call which the

6        exhibit was admitted, for which the transcript of the phone

7        call was admitted as a Government's Exhibit.

8                    THE COURT:  What are you going to ask about that,

9        more or less?

10                   MS. CINTRON-COLON:  More or less, what she stated to

11       --

12                   MR. GONZALEZ-DELGADO:  Your Honor, we believe that

13       that is part of our defense.

14                   THE COURT:  No, no.  Listen.  Listen.

15                   MR. GONZALEZ-DELGADO:  Your Honor --

16                   THE COURT:  Listen.  Listen.  I need to know.  I need

17       to know.  At this point, I need the government's input.

18                   I know this theory about defense theory.  All right?

19       And I have respected that with ex-parte exchanges with both

20       counsel, with you and your colleague.  But at some point, there

21       are issues that I need the government to provide input on.

22                   Now, there were questions about those recordings, and

23       she answered those questions in direct.  And now, of course,

24       you are going to ask questions in cross.  What I want to make

25       sure is that we don't spend significant amounts of time here in

1    sidebar discussing issues we can anticipate objections on.

2              MR. GONZALEZ-DELGADO:  The problem --

3              THE COURT:  If we need to be here until 10 a.m.

4    tomorrow working 24 hours from today, that's fine.  I'm used to

5    it.

6              MR. GONZALEZ-DELGADO:  Your Honor --

7              THE COURT:  But I also have the responsibility to

8    manage this trial.  Of course, you are going to say about my

9    client's Sixth Amendment Right.  Of course.  But a lot of

10   moving parts work alongside that right.  So I'll leave it at

11   that for now.

12             Three questions on Marcelino.

13             MS. CINTRON-COLON:  That's it.

14             THE COURT:  We've gone over what the questions are.

15   Then we'll go step-by-step with respect to the questions you

16   want to ask her about the recordings.

17             MS. COLLAZO-ORTIZ:  And, as I reminded, the Court

18   ruled that other portions were not admissible as hearsay.

19             THE COURT:  The exhibit is what it is.  That's it.

20   The exhibit is what it is.  Okay?  And that's what entered into

21   evidence, and that's what direct examination was all about.

22             MR. GONZALEZ-DELGADO:  And we objected under Rule 106

23   for the completeness of --

24             THE COURT:  We are not revisiting that.  Okay?

25             MS. CINTRON-COLON:  Just in anticipation, she made

1    statements, because I know that Your Honor said that --

2                    MR. GONZALEZ-DELGADO:  Hold on.  Your Honor, may I

3    have one second, please?

4                    MS. CINTRON-COLON:  Three questions and moving on

5    from Mr. Marcelino, Your Honor.

6                    THE COURT:  Three questions.  That's what I think we

7    had agreed on.

8                    MS. CINTRON-COLON:  Yes, Your Honor.

9                    MR. GONZALEZ-DELGADO:  Yes, sir.  That's it.

10                   THE COURT:  And that's it.

11                   MS. CINTRON-COLON:  On the Marcelino topic, yes, it

12   is.

13                   THE COURT:  But then you said you were going to cover

14   the recordings.

15                   MS. CINTRON-COLON:  Yes, Your Honor.  And I don't

16   intend to try to introduce any portion that is not already in

17   exhibit.

18                   THE COURT:  Okay.  Thank you.

19       (Sidebar conference concluded.)

20                   THE COURT:  Go ahead.

21                   MS. CINTRON-COLON:  Thank you, Judge.

22   BY MS. CINTRON-COLON:

23   Q    Ms. Rodriguez, before we took this recess, we were talking

24   about Keishla's marriage to Mr. Marcelino.  My question to you

25   is:  Ms. Keishla and Mr. Marcelino were married from 2013 to

```
1    2018; is that correct?

2    A    They were married in 2012.

3    Q    And Mr. Marcelino was in prison from 2013 to 2018,

4    correct?

5    A    Correct.

6    Q    During the time that Mr. Marcelino was imprisoned, Keishla

7    was seeing Mr. Verdejo?

8    A    Correct.

9    Q    Okay.  Going a little forward to the phone call that you

10   witnessed on May 2nd of 2021 between your husband and Mr.

11   Verdejo.

12   A    Fine.

13   Q    To questions this morning, you stated that during that

14   phone call, you heard Mr. Verdejo say that he had nothing to do

15   with anything?

16   A    Correct.

17   Q    And in that phone call, you also heard Junior asking Felix

18   if it was Miguelito?

19            THE INTERPRETER:  I'm sorry, Counsel.  Can you say

20   that again?

21            MS. CINTRON-COLON:  Yes, sir.

22   BY MS. CINTRON-COLON:

23   Q    In that conversation, you heard Junior ask Mr. Verdejo --

24            MR. GOTTFRIED:  Objection, Your Honor.  Objection,

25   Your Honor.
```

```
1              THE COURT:  Wait.  Ask the question again.
2              MS. CINTRON-COLON:  Yes.
3   BY MS. CINTRON-COLON:
4   Q    During that phone call, you heard Mr. -- Junior, your
5   husband, ask Verdejo if it had been Miguelito?
6              THE COURT:  Don't answer.  Don't translate.
7              MS. CINTRON-COLON:  May we approach, Your Honor?
8        (Sidebar conference commenced.)
9              THE COURT:  What was the question again?
10             MS. CINTRON-COLON:  My question was, if during that
11  phone call that she witnessed, as she testified earlier, if she
12  heard her husband asking Mr. Verdejo if it had been Miguelito.
13             MR. GOTTFRIED:  It's a violation of the Court's
14  order, and it completely ignores what just happened here two
15  minutes ago.  We have Exhibits 15E, F, G and H here, which are
16  the transcripts of the, of the phone calls that were admitted.
17  And these were the same ones that appeared in the motion in
18  limine.  Nowhere in these transcripts does that question
19  appear.
20             And what this is is an effort to get around the
21  Court's order.  It's an effort to get in her client's
22  statements in a fashion that's completely contrary to the rules
23  of evidence.  And, Your Honor, I think it's so egregious that
24  we would ask for a public admonition in front of the jury of
25  this violation of the Court's order.
```

1          MS. COLLAZO-ORTIZ:  Before we left the sidebar, the

2     last words of Defense Counsel Cintron were:  We're not going

3     into anything beyond the exhibits.  And that's exactly what she

4     did.

5          MS. CINTRON-COLON:  No.  I said:  We are not going to

6     move to admit anything else that is not in the exhibits, and

7     we're not seeking to move this into exhibit.  It's just their

8     conversation, because she opened the door to things that she

9     heard being said during the conversation, which were not in the

10    government's exhibits that were admitted in the transcripts

11    that they issued.

12         THE COURT:  I heard you.

13         MR. GONZALEZ-DELGADO:  If we, if we take -- if we, if

14    we agree with the government and -- that it's not in the

15    recording, she can ask if she heard her husband ask Felix if it

16    was somebody else.  We're not going into the recording.  We're

17    not presenting the recording to the jury.  I'm not playing

18    anything.

19         I'm asking her if she heard something personally.

20    That is 602.  That is personal knowledge of a statement made by

21    her husband, who has testified to her testimony throughout, the

22    full day, because he's been talking all through the day saying

23    this, saying that, saying that.  It's because the government

24    has been eliciting it from her.

25         We have objected.  The Court has denied our

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

1    objections as being hearsay.  And now we're asking the same

2    question:  Did you hear your husband ask Mr. Verdejo, do you

3    think it was Miguelito?

4          That is something that she perceived, that she saw

5    and she heard.  It's not going into the recording.  We're not

6    presenting the recording as evidence.

7          MS. CINTRON-COLON:  And we're not, my question is not

8    what Mr. Verdejo -- I'm sorry -- answered because they would

9    argue it's -- I'm not eliciting the response from Mr. Verdejo.

10   It's just a question posed by Mr. Junior in the conversation

11   where she was a witness, and she heard him say that.  I'm not

12   moving to admit anything into evidence, just that question, if

13   she heard him say that, ask that.

14         MS. COLLAZO-ORTIZ:  The question without the answer

15   is irrelevant.

16         MR. GOTTFRIED:  And testimony is evidence.

17         THE COURT:  But that was part of the sequence of

18   questions you wanted me to admit.

19         MS. CINTRON-COLON:  I'm sorry.  Can you repeat that?

20         THE COURT:  That was part of the sequence of

21   questions you wanted me to admit for completeness purposes.

22         MS. CINTRON-COLON:  Well, here's -- the difference

23   between the government's motion, when it was filed on the

24   arguments, is that she today has testified, as previously was

25   stated, to different portions of that conversation that are not

1    admitted in the transcripts.  So that gives a different

2    picture.

3           Her saying, oh -- I'll look for it -- she has said,

4    she mentioned that she heard some statements that were not in

5    the transcripts.  And I am asking her one question, because

6    this is literally my last question about that conversation,

7    about what she heard during the conversation, which is not in

8    the government's transcripts, as other statements that she has

9    made regarding that phone conversation about what she heard.

10          And I'm not even asking what was the answer posed by

11   Mr. Verdejo because I've been limited stating that that would

12   be self-serving.

13          MR. GOTTFRIED:  Again, Your Honor, this is a

14   violation of the Court's order on the motion in limine.  As the

15   Court pointed out, they explicitly asked to include the

16   statement, and that request was denied.  The only portion of

17   the recording that was admitted was in the transcript.

18          The Court asked, in order to front any issues, right

19   before Sister Counsel mentioned this.  They did not raise that.

20   She said she would be limited to what has been admitted into

21   evidence.  And then she proceeded to elicit something new into

22   evidence, which is completely improper under the Rules of

23   Evidence, namely her client's statement.

24          And this is a trend that we're seeing over and over

25   again, that they're trying to elicit their client's statements

1    through other parties.

2                    THE COURT:  I heard arguments from all sides.  The

3    objection is sustained.  I'm going to instruct the jury to

4    disregard the last question.

5        (Sidebar conference concluded.)

6                    THE COURT:  Ladies and gentlemen, you will disregard

7    Counsel's last question.

8                    Go ahead, ma'am.

9                    MS. CINTRON-COLON:  May I have one second, Your

10   Honor?

11                   THE COURT:  Yes.

12                   MS. CINTRON-COLON:  We have no more questions, Judge.

13                   THE COURT:  Okay.  Redirect?

14                   MS. COLLAZO-ORTIZ:  May it please the Court?

15                   THE COURT:  Go ahead.

16                           REDIRECT EXAMINATION

17   BY MS. COLLAZO-ORTIZ:

18   Q    Ms. Rodriguez, you previously testified that the --

19   Thursday, April 29th, you spoke with Eliz Santiago, correct?

20   A    Correct.

21   Q    Who was more concerned about Keishla, Eliz or Felix?

22                   MS. CINTRON-COLON:  Objection, Your Honor, calls for

23   speculation.

24                   THE COURT:  Wait.  Wait.  Wait.

25                   Yes.

1              MS. CINTRON-COLON:  Calls for speculation, state of

2      mind, Your Honor.

3              MR. GONZALEZ-DELGADO:  And it's outside the scope of

4      the cross-examination, Your Honor.

5              THE COURT:  Overruled.

6              Now ask the question again.

7      BY MS. COLLAZO-ORTIZ:

8      Q    Based on your conversations with both Felix and Eliz, who

9      was more concerned about Keishla on April 29th?

10             MR. GONZALEZ-DELGADO:  Objection under 702, Your

11     Honor.

12             THE COURT:  Objection overruled.

13             THE WITNESS:  Eliz Marie.

14     BY MS. COLLAZO-ORTIZ:

15     Q    And, again, you testified that you spoke to Miguelito on

16     April 29th.  Who was more concerned about Keishla, Miguelito or

17     Verdejo?

18     A    Miguelito.

19             MR. GONZALEZ-DELGADO:  Continuing objection, Your

20     Honor, under 702, and 602 also, Your Honor.

21             THE COURT:  Overruled.

22     BY MS. COLLAZO-ORTIZ:

23     Q    And, now, who was more worried about Keishla, Marcelino or

24     Verdejo?

25     A    Marcelino.

1          MR. GONZALEZ-DELGADO:  Objection, Your Honor.  This

2    is requesting opinion, or expert opinion, from a witness who is

3    not an expert.

4          THE COURT:  Overruled, 701.

5          MR. GONZALEZ-DELGADO:  Objection under 702.  It does

6    not comply with the three factors in 702.

7          THE COURT:  Objection overruled.

8    BY MS. COLLAZO-ORTIZ:

9    Q    And let me ask you:  What did Marcelino do to help find

10   Keishla?

11         MS. CINTRON-COLON:  Your Honor, objection.  That's

12   outside the scope of cross.

13         THE COURT:  Sustained.

14         MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

15         THE COURT:  Okay.  The jury will disregard the last

16   question by the prosecutor.

17         MS. COLLAZO-ORTIZ:  We have nothing further, Your

18   Honor.

19         THE COURT:  I have no questions for the witness.

20         Ms. Rodriguez, you are free to, you are free to go.

21         Before you go, ma'am --

22         Counsel, sidebar.

23         Before you go, ma'am --

24   (Sidebar conference commenced.)

25         THE COURT:  Okay.  I'm going to provide you all with

1    my thinking process.  Many people love to post things on social

2    media.  Earlier today, Mr. Gonzalez -- I think it was Mr.

3    Gonzalez.

4            MR. GONZALEZ-DELGADO:  Yes, sir.

5            THE COURT:  -- expressed concern that Ms. Rodriguez

6    had posted something on social media.  Now her testimony is

7    over, and I think that puts forward the issue I said earlier

8    would be discussed at the end of the day, because we would not

9    be able to un-ring the bell once she's gone.  I am concerned of

10   her First Amendment Rights.  Now she's on her own.

11           I also, as I said earlier, need to be protective of

12   Mr. Verdejo's Sixth Amendment Rights.  As I indicated, there

13   are moving parts working around that right and together with

14   that right.  So we need to manage all that.

15           Bottom line, should we do anything in terms of

16   warning her against speaking out or answering questions or

17   offering comments or posting comments on social media?  Bearing

18   in mind again, at this point, once she's gone -- and by the

19   way, she's over as a witness in this trial, I think.

20           MR. GONZALEZ-DELGADO:  Not yet, Your Honor.  We just

21   sent a subpoena for her, Your Honor.  Yes.  And the --

22           MS. CINTRON-COLON:  Marshals.

23           MR. GONZALEZ-DELGADO:  The marshal told us that we

24   have to take it to the Marshal's Office, and Mr. Matos took it

25   for us, so just to make sure that they can subpoena her before

1     she leaves.

2                THE COURT:  And on the same theory of this morning?

3                MR. GONZALEZ-DELGADO:  Yes, sir.

4                MS. CINTRON-COLON:  And some other things, but the

5     theory is the same.

6                THE COURT:  Okay.  So it's good that, you know, I

7     brought this up, because then we would have had the issue of

8     comments on the media and you're complaining that she would be

9     subpoenaed.

10                Go ahead.

11                THE COURTROOM DEPUTY CLERK:  Judge, for purposes of

12     the Clerk's Office, we need, we need a motion for the marshals

13     to process, to do the service of process.  So this morning

14     would take it as the Court granted the oral motion for the

15     service of process as to those two witnesses with request of

16     the defense?

17                THE COURT:  This morning, you said.

18                THE COURTROOM DEPUTY CLERK:  This morning.  We would

19     take that as an oral motion for the record to reflect that the

20     Court granted that the marshals do the service of process as to

21     them.

22                THE COURT:  Right.  This morning.

23                THE COURTROOM DEPUTY CLERK:  Okay.  Thank you, Your

24     Honor.

25                MR. GONZALEZ-DELGADO:  Your Honor, we asked the

1    marshal to process it, and he was the one who instructed us

2    that it couldn't be directly in court; that we had to take it

3    to the office because they had to receive it and process it.

4    And that's why we did it in that fashion.

5           And, Your Honor, regarding this issue, we're not

6    asking that she be precluded from posting on social media

7    whatever she wants.  The only request that we are making is

8    that, related to the case, until the jury reaches a verdict,

9    she refrain from commenting on her statements or what she hears

10   in court.

11          THE COURT:  Well, as to that, I cannot agree.  I can

12   only go step-by-step.  You said you were going to use her,

13   subpoena her.  That does not mean you have to use her as a

14   witness, and probably you do not know at this point if there is

15   100 percent certainty you're going to do it, or along which

16   lines, because that belongs to defense theory.  And I respect

17   that.

18          So, Mr. Gottfried, before we go ahead, what's your --

19          MR. GOTTFRIED:  Your Honor, if I may.  Defense

20   counsel has been speaking to the press.  They have given

21   statements as they've come into court that have been published

22   online.  They have been talking to reporters in hallways.

23          It seems very odd that Verdejo's paid counsel can

24   talk with the press, give their perspective on the case, but

25   that a member of the public, and a victim, is, essentially,

1     that they're asking to gag her and prevent her from making

2     statements regarding personal opinions on the case.  It puts a

3     thumb on the scale of what's happening in the media and in the

4     free press.

5                And I think it would be a clear First Amendment

6     violation.  It would be one thing if you were telling everyone.

7     I also think it would be improper if you were telling everyone.

8     But if what you're doing is basically imposing a kind of

9     viewpoint discrimination, saying this person, along with a

10    victim, cannot talk because that might prejudice Verdejo, I do

11    think that there are First Amendment issues.

12               To the extent she makes comments and they're out

13    there in the public, it's more fodder, potentially, for

14    cross-examination.  It's not something I would like her to do,

15    but I do think that she has a right to do it. So I would be

16    opposed to any kind of gag order on her or, or any witness on

17    either side.

18               MR. GONZALEZ-DELGADO:  Your Honor, if I may?  I have

19    to respond to that because it's not correct what the government

20    has just stated.

21               THE COURT:  Well, I've seen statements.

22               MS. CINTRON-COLON:  Statements, yes, and they're not

23    commenting on either guilt or innocence.

24               MR. GONZALEZ-DELGADO:  No.  And, actually, Your

25    Honor, I have to put this on the record, Your Honor.

```
1              THE COURT:  Wait.  Wait.  Wait.  You will do it at
2    the end of the day.  For now, no one says anything else to the
3    press except:  "No comment."
4              MR. GONZALEZ-DELGADO:  That's all I have said in all
5    my --
6              MS. CINTRON-COLON:  He's talking about me.
7              THE COURT:  I'm not talking about you, Mr. Gonzalez.
8    I'm talking about your colleague.
9              MS. CINTRON-COLON:  Yes, sir.
10             THE COURT:  And I've seen it.
11             MS. CINTRON-COLON:  Yes, sir.
12             THE COURT:  So at this point on:  "No comment."
13             MS. CINTRON-COLON:  Understood.
14             THE COURT:  Okay.  Now, as to Ms. Rodriguez, call her
15   in.
16        (Sidebar conference commenced with Bereliz
17          Rodriguez-Ortiz.)
18             THE COURT:  Ms. Rodriguez, good afternoon.
19             THE WITNESS:  Good afternoon.
20             THE COURT:  I have been informed that counsel for Mr.
21   Verdejo will be serving a subpoena on you to, in order to allow
22   them to present you as a witness during their phase of the
23   case.
24             Do you understand what I said?
25             THE WITNESS:  No.
```

1            THE COURT:  Well, you are going to receive a subpoena

2     to appear as a witness when the defense will be presenting

3     their part of the case.

4            Do you understand that?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  Because of that situation and

7     since you are going to be a potential, you are going to be a

8     potential witness, I am instructing you, ma'am, not to post

9     comments on social media related to this case.

10            Do you understand?

11            THE WITNESS:  Yes.

12            THE COURT:  Likewise, you should not make comments to

13     the media about this case.

14            Do you understand, ma'am?

15            THE WITNESS:  Yes.

16            THE COURT:  Okay.  Do you have any questions?

17            THE WITNESS:  No.

18            THE COURT:  Okay.  You are free to go to the

19     courtroom, ma'am.

20        (Sidebar conference with Bereliz Rodriguez-Ortiz

21        concluded.)

22            THE COURT:  By the way, and before we close this

23     sidebar, she can stay in the courtroom.

24            MS. CINTRON-COLON:  Yes, Your Honor.  We're not

25     requesting that she be removed.

```
 1                    THE COURT:  Okay.

 2                    MR. GOTTFRIED:  Your Honor, I understand the Court

 3        has made a decision for the record.  We are going to object to

 4        that, and I would also --

 5                    THE COURT:  File a motion for reconsideration.

 6                    MR. GOTTFRIED:  Yes, Your Honor.

 7                    THE COURT:  If I believe there is -- I should be

 8        persuaded otherwise, I will do it.

 9                    MR. GOTTFRIED:  Yes, sir.

10           (Sidebar conference concluded.)

11                    THE COURT:  Go ahead.

12                    MS. COLLAZO-ORTIZ:  Your Honor, just as housekeeping,

13        are we -- we have another witness lined up, but if the Court is

14        going to give a break, we would rather do it before we start a

15        witness.

16                    THE COURT:  Okay.  We'll do that.

17                    Ladies and gentlemen, we'll take a short recess.

18        Before you go to the jury room, remember not to talk about the

19        case or your impressions of the case.  Do not research matters

20        in the case or about the individuals or issues in the case and

21        do not read reports or anything having to do with the case.

22                    We'll reconvene in about 10 or 15 minutes.  And,

23        again, thank you for your patience.

24           (Whereupon the following proceedings were had in open court

25              without the presence of the jury.)
```

```
 1                    THE COURT:  Okay.  We'll return in about 10 or 15
 2        minutes.
 3           (Whereupon a recess was taken at 3:31 p.m., until 3:58
 4            p.m.)
 5           (Whereupon the following proceedings were had in open court
 6            without the presence of the jury.)
 7                    THE COURT:  All set to call the jury in?
 8                    MS. COLLAZO-ORTIZ:  Yes, Your Honor.
 9                    MR. GONZALEZ-DELGADO:  Yes.
10           (Whereupon the following proceedings were had in open court
11            in the presence of the jury.)
12                    THE COURT:  Welcome back to the courtroom.  Please
13        take a seat.
14                    MS. COLLAZO-ORTIZ:  May it please the Court?  The
15        government calls David Ruiz-Berrios to the stand.  He's already
16        at the witness box.
17                    THE COURTROOM DEPUTY CLERK:  Mr. Ruiz, please stand
18        and raise your right hand.
19           (Witness sworn.)
20                    THE COURTROOM DEPUTY CLERK:  So help you God.  You
21        may take a seat.
22                    MS. COLLAZO-ORTIZ:  With the Court's permission?
23                    THE COURT:  Go ahead.
24                             DAVID RUIZ-BERRIOS,
25             called as a witness on behalf of the Plaintiff,
```

```
 1                      having been previously duly sworn,
 2                  was examined and testified as follows:
 3                          DIRECT EXAMINATION
 4    BY MS. COLLAZO-ORTIZ:
 5    Q    Good afternoon.  Please state your full name.
 6    A    David Alexander Ruiz-Berrios.
 7    Q    And what is your occupation?
 8    A    Contractor.  I have my own business.
 9    Q    And do you practice any sports?
10    A    Yes.
11    Q    Which one?
12    A    Cycling.
13    Q    And have you ever met Mr. Felix Verdejo-Sanchez?
14    A    Yes.
15    Q    How do you know Mr. Felix Verdejo-Sanchez?
16    A    From sports.
17    Q    Okay.  And how -- where would you see Mr. Felix Verdejo?
18    A    At my house.
19    Q    For what reason?
20    A    Because of sports.
21    Q    Okay.  And when he was at your house, what would you do?
22    A    We exercise:  coordination exercises, reflex exercises.
23    Q    Did you have a trainer for that?
24    A    Yes.
25    Q    Who was that trainer?
```

1    A    Manuel Garcia.

2    Q    Does Mr. Garcia have any nicknames?

3    A    Yes.  Manny.

4    Q    Okay.  And when did Mr. Verdejo start training at your

5    house?

6    A    January or February of 2021.

7    Q    Okay.  And what kind of facilities do you have at your

8    house for training?

9    A    A home gym that we have that we created at my house in

10    order to train after the pandemic.

11    Q    And when, which days would you train there with Mr.

12    Verdejo?

13    A    Normally, Tuesdays and Thursdays.

14    Q    At what time?

15    A    Around 6:00 and on.

16    Q    And, approximately, how many times did Mr. Verdejo, Felix

17    Verdejo, go to your house to train?

18    A    Maybe 24 times, 25 times.

19    Q    And that person that we have been talking about by the

20    name of Felix Verdejo, can you please tell us if you see him in

21    court today?

22    A    Yes.

23    Q    Can you please tell us where he is and what he's wearing?

24    A    He's to my right.

25    Q    What is he wearing?

1     A    A mint green shirt.

2            MS. COLLAZO-ORTIZ:  I would ask the Court for the

3     record to reflect that the witness has identified Mr. Verdejo.

4            THE COURT:  The record will so reflect.

5     BY MS. COLLAZO-ORTIZ:

6     Q    When Mr. Verdejo would train at your house, did you ever

7     record any of the training sessions?

8     A    Yes.

9            MS. COLLAZO-ORTIZ:  Permission to approach the

10    witness with ID 17.

11           THE COURT:  Did you show it to your opponent?

12           MS. COLLAZO-ORTIZ:  Yes, Your Honor.

13           MR. GONZALEZ-DELGADO:  She did, Your Honor.

14           THE COURT:  All right.  Permission granted.

15    BY MS. COLLAZO-ORTIZ:

16    Q    Mr. Ruiz, I have provided to you what has been marked as

17    Government's ID 17.  Do you recognize what that is?

18    A    A DVD with my initials and a date, a DVD with my full name

19    and my signature and the date, the date when I signed it.

20    Q    And before signing that DVD, did you verify its contents?

21    A    Correct.

22    Q    And is the content of that CD a fair and accurate copy of

23    a video recorded at your house, as you have described?

24    A    Correct.

25           MS. COLLAZO-ORTIZ:  Your Honor, we move that ID 17 be

1    marked as Exhibit 17.

2                    THE COURT:  Mr. Gonzalez?

3                    MR. GONZALEZ-DELGADO:  We still believe, Your Honor,

4    that it lacks foundation.

5                    THE COURT:  Overruled.

6                    Now, you said, Ms. Collazo, 16 or 17?

7                    MS. COLLAZO-ORTIZ:  17, Your Honor.

8                    THE COURT:  By my account, the last one was 15.

9                    MS. COLLAZO-ORTIZ:  Yes, but we're not doing them in

10   order.  We haven't submitted 16 yet.

11                    THE COURT:  Okay.  17 it is then.

12        (Exhibit No. 17 admitted into evidence.)

13                    MS. COLLAZO-ORTIZ:  May I publish?

14                    THE COURT:  Yes.

15        (Video played.)

16                    MS. COLLAZO-ORTIZ:  For the record, the video is

17   playing.

18   BY MS. COLLAZO-ORTIZ:

19   Q    Mr. Ruiz, can you please tell the Court who are the person

20   depicted on that video?

21   A    Felix Verdejo, Manuel Garcia, and in the back, Alejandro

22   Cox appeared.

23   Q    And to be clear, can you please tell the members of the

24   jury what is Mr. Verdejo wearing in the video?

25   A    Red shorts and a gray or black T-shirt.

```
1    Q    And where was this recorded?

2    A    At my house.

3    Q    And what vehicle would Mr. Verdejo use when he went to

4    your house?

5    A    A Durango.

6    Q    What color?

7    A    Black.

8    Q    And how would you describe your relationship with Mr.

9    Verdejo in April of 2021?

10   A    It was completely of a sporting nature.

11   Q    And in what context would the two of you interact?

12   A    Obviously, in the sports aspect at the gym.

13   Q    Okay.  And I'm going to turn your attention now to April

14   27th, 2021, Tuesday.  Did you speak to Mr. Verdejo that

15   Tuesday?

16   A    Yes.

17   Q    At what time, approximately, did you talk to Mr. Verdejo?

18   A    Approximately, from 5:00 on, almost 6:00 in the afternoon.

19   Q    And can you please tell us what number you used to talk to

20   him?  What was your phone number?

21   A    I used my personal phone and the phone number that I had

22   for him.

23   Q    And can you tell us the last four numbers of your personal

24   phone?

25   A    Yes, 2597.
```

1    Q    Okay.  On that day, April 27th, what happened during that

2    conversation that you had with Mr. Verdejo?

3    A    Well, he called me.  Normally, we didn't talk over the

4    phone.  We used WhatsApp.

5    Q    And what happened when he called you?

6    A    Well, I thought, all of the sudden I thought he called

7    because, in order to motivate me at the gym.  I thought that in

8    order to excuse -- because I had not arrived there.  Because --

9    Q    And what actually, what did he actually tell you when he

10   called you?

11   A    Actually, it was to excuse himself; that he was not going

12   to be able to come; that he was going through a personal

13   situation.

14   Q    And how did he sound when he told you that?

15   A    Honestly, I felt that he was concerned, like when you're

16   going through something.

17            MR. GONZALEZ-DELGADO:  Objection, calls for state of

18   mind, Your Honor.

19            THE COURT:  Overruled.

20   BY MS. COLLAZO-ORTIZ:

21   Q    And what happened after he told you that he had -- he

22   couldn't go for personal reasons?

23   A    I asked, because I was concerned, if I could help him with

24   something, what was happening, and, obviously, that's when he

25   told me part of what was happening.

1    Q    What did he tell you was happening?

2    A    Well, he told me that he believed that he had gotten a

3    girl pregnant.

4         Should I continue?

5    Q    Yes.  Go on.

6    A    Well, he told me that he had gotten a girl pregnant, and

7    he told me that he was on his way to her house to talk to her.

8    Q    And what were his words when he had told you that he had

9    gotten a girl pregnant?

10   A    Well, that, like, that he was having problems at home;

11   that he couldn't at the time, not at the time; that already at

12   the house they knew; they were aware, so he couldn't be --

13        I'm sorry.  I'm nervous.

14        MR. GONZALEZ-DELGADO:  Objection, move to strike

15   under 602, Your Honor.

16        THE COURT:  Overruled.  But he kind of did not

17   finalize what he was saying.

18   BY MS. COLLAZO-ORTIZ:

19   Q    Mr. Ruiz, I understand you're nervous.  We can take it

20   slowly.

21        What did Mr. Verdejo tell you about this girl that he

22   said he had gotten pregnant?

23   A    Obviously, I told him that this wasn't anything that

24   hadn't happened to other people before, and I entered into

25   advisor-mode to counsel him about what was happening.

1           Should I continue?

2     Q    Yes.

3           What did Mr. Verdejo tell you when you were trying to

4     counsel him?

5     A    Well, he told me that he was going there, to the girl's

6     house; that she had already taken a test; and that he was going

7     there to her house to verify, to talk to her, to look at the

8     test, and he was concerned.  In part, he was in denial of the

9     news that he had, that he had gotten a girl pregnant outside of

10    his relationship.  He said that he was on his way to her house

11    to talk to her and in denial of the situation.

12    Q    What do you mean that he was in denial of the situation?

13    A    Well, like, like anything, like he had his relationship, I

14    believe, you know, from whatever little we talked, for

15    sometime.  And now he had -- he was in denial that he was going

16    to have a baby outside of wedlock --

17          THE INTERPRETER:  Correction.

18          THE WITNESS:  A baby outside of his marriage.  So I

19    told him that he wasn't the first person that this happened to,

20    and, obviously, like everything, if he was going to talk to the

21    girl, that it was a situation, a two-person situation that had

22    to be discussed between two people.  And he had, like,

23    everything -- I mean, it was a delicate situation.

24    BY MS. COLLAZO-ORTIZ:

25    Q    Why do you say it was a delicate situation?

```
 1              MS. CINTRON-COLON:  Objection, Your Honor, to the
 2     previous answer, full speculation, and move to strike.
 3              THE COURT:  Overruled.
 4     BY MS. COLLAZO-ORTIZ:
 5     Q    Why do you say that you told him it was something
 6     delicate?
 7              THE INTERPRETER:  I'm sorry, Counsel.  Can you please
 8     repeat?
 9     BY MS. COLLAZO-ORTIZ:
10     Q    Why do you say it was something sensitive or delicate?
11     A    Well, because we're talking now, because we're talking
12     about a creature that is coming to the world, and that is a
13     delicate situation.  It's something between two people.  It's a
14     decision between two parties, and it's about that topic.
15     Q    And what did he say were his plans in going to her house?
16     A    He said that he was going to talk to her; that he couldn't
17     have the baby at the time because it was, obviously, outside of
18     his marriage.  And I went in, and I advised him.
19              And I told him that this was something that was
20     sensitive because it was between two people; that he was a
21     figure, and so in that case, the girl, she could make the
22     decision of whether to have the baby because she wanted to be a
23     mother, or just because he was a figure, that it was something
24     sensitive; that when he went there to talk to her to look at
25     the tests, to speak kindly to her.
```

1    Q    And you previously mentioned a pregnancy test.  What did

2    Mr. Verdejo tell you about that pregnancy test that he was

3    going to see?

4    A    Well, he told me that the girl had already done a home

5    pregnancy test, and that he was going to talk to her to ask her

6    for -- that he was going to ask her to get the blood one.

7    Q    And how did the call end?

8    A    Well, practically, the call ended when he told me that he

9    was --

10              THE INTERPRETER:  Correction.

11              THE WITNESS:  Well, he practically, the call ended

12    when he told me that he had arrived at the girl's residency,

13    and the call ended because he was going to go up to talk to

14    her.

15    BY MS. COLLAZO-ORTIZ:

16    Q    To talk to her about what?

17    A    About the test.  That he was going to look at the test,

18    and he was going to talk to her about whether or not she could

19    have the baby, and from what I understood from the previous

20    conversation with him.

21              MR. GONZALEZ-DELGADO:  Objection, Your Honor, 602,

22    and calls for speculation.

23              THE COURT:  Overruled.

24    BY MS. COLLAZO-ORTIZ:

25    Q    And how did Mr. Verdejo sound in regards to the potential

1    baby that he was going to have?

2    A   Well, that it was news to him.  I noticed that he was

3    concerned, worried, like a person that receives news that are

4    unexpected, like anybody, a person that would be concerned

5    because they received an unexpected news all of the sudden.

6    Q   And do you speak to him after that call ended?

7    A   Correct.

8    Q   At what time?

9    A   When I finished training, close to 9:00.

10    Q   Who called who?

11    A   I called him.

12    Q   Why did you call him?

13    A   Because, obviously, since it was a sensitive topic, I was

14    concerned, because I had already come to appreciate him, and I

15    called him to see how it had gone.

16    Q   And did you manage to talk to him?

17    A   Simply short, some seconds, less than a minute.

18    Q   And what happened during that call?

19    A   I asked him, I asked him how it had gone, and he told me

20    nothing, simply that nothing had happened, no success, and that

21    simply nothing had happened and that he would call me later

22    because he was with some friends.

23    Q   What do you mean that, "no success?"

24    A   Well, I understood from the previous conversation as he

25    had told me that he had not -- that with the idea that he had

 1    of going to talk to her about the pregnancy and the test, that

 2    everything like, like he made me understand that, like, not

 3    with the intention that he had gone there.

 4            MR. GONZALEZ-DELGADO:  Objection, Your Honor.  It's

 5    speculation.  He just said it:  It's my understanding.  He's

 6    not even responsive.

 7            THE COURT:  Overruled.

 8    BY MS. COLLAZO-ORTIZ:

 9    Q    And did Mr. Verdejo tell you anything about how this woman

10    had reacted?

11    A    No.  Simply what he said, it was a short conversation,

12    that she wanted to go ahead, that she wanted to have the baby.

13    Simply, his words were, if I remember correctly, that:  No,

14    there was no resolution; I'm with friends, so I'm going to call

15    you later.

16            MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

17            MR. GONZALEZ-DELGADO:  Can I have one second, Your

18    Honor?

19            THE COURT:  Go ahead.

20            MR. GONZALEZ-DELGADO:  May it please the Court?

21            THE COURT:  Go ahead.

22            MR. GONZALEZ-DELGADO:  Thank you.

23                            CROSS-EXAMINATION

24    BY MR. GONZALEZ-DELGADO:

25    Q    Good afternoon, Mr. Ruiz.

1    A    Good afternoon.

2    Q    Mr. Ruiz, you say that you trained with Mr. Verdejo for

3    about 20 to 22 times; is that correct?

4    A    Correct.

5    Q    That would be, more or less, two months?  Less?

6    A    That would be, more or less, approximately, two to three

7    months.

8    Q    And you say that -- or it's your recollection that your

9    relationship with Mr. Verdejo was in the gym?

10    A    Correct.

11    Q    You weren't friends that went out and hung out, correct?

12    A    No.

13    Q    And the time that he was at the gym, he was actually

14    participating or practicing whatever exercises he had to do,

15    correct?

16    A    Correct.

17    Q    And you were interviewed by police officers in this case a

18    couple of times, correct?

19    A    Correct.

20    Q    And you told the police that when you were with Mr.

21    Verdejo, you did not discuss your personal life?

22    A    Correct.

23    Q    But you're telling the ladies and gentlemen of the jury

24    that this incident, he did open up to you?

25    A    Correct.

1    Q    It's a delicate issue?

2    A    Yes.

3    Q    And this was the first time he opened up to you regarding

4    his personal issues?

5    A    Correct.

6    Q    And all he said was he was going to go talk to her?

7    A    Yes.

8    Q    And that's the reason why he didn't go to train on

9    Tuesday, April 27th?

10   A    Correct.

11   Q    He never told you that he was going to kill her?

12   A    Correct.

13   Q    Never told you that he was going to do any damage to her?

14   A    No.

15   Q    Actually, what he said was that what he was going to do

16   was go to her house to see the home test and ask her for a

17   blood test?

18   A    Are you asking me a question?

19   Q    Yes.

20   A    Yes, correct.

21        MR. GONZALEZ-DELGADO:  I have no further questions,

22   Your Honor.

23        MS. COLLAZO-ORTIZ:  Nothing on redirect, Your Honor.

24        THE COURT:  I have no questions for the witness.

25        Mr. Ruiz, thank you for your testimony.  You are free

1    to go.

2              THE WITNESS:  You're welcome.

3         (Witness excused.)

4              MS. COLLAZO-ORTIZ:  We're ready for the next witness,

5    Your Honor.

6              THE COURT:  Go ahead.

7              MS. COLLAZO-ORTIZ:  The government calls Ms. Mayra

8    Cruz-Carmona.

9              THE COURTROOM DEPUTY CLERK:  Ms. Cruz, please raise

10   your right hand.

11        (Witness sworn.)

12             THE COURTROOM DEPUTY CLERK:  So help you God.  You

13   may take a seat.

14             MS. COLLAZO-ORTIZ:  May it please the Court?

15             THE COURT:  Go ahead.

16                        MAYRA CRUZ-CARMONA,

17          called as a witness on behalf of the Plaintiff,

18              having been previously duly sworn,

19              was examined and testified as follows:

20                        DIRECT EXAMINATION

21   BY MS. COLLAZO-ORTIZ:

22   Q    Good afternoon.  Please tell us your full name.

23   A    Mayra Cruz-Carmona.

24   Q    And what is your occupation?

25   A    Medical technologist.

```
1   Q    Since when?

2   A    Since September 1981.

3   Q    And where have you worked?

4   A    At the Fajardo area hospital, what is now HIMA Fajardo.

5   After that, at the University of Puerto Rico, at Carolina's,

6   hospital, and my third job at Laboratorio La Cumbre.

7   Q    And what is Laboratorio Clinico La Cumbre?

8   A    It's a facility that offers clinical analysis services to

9   patients.

10  Q    And since when have you been working at Laboratorio La

11  Cumbre?

12  A    Since April 15th, 1985.

13  Q    And what is your current position?

14  A    I am the director and administrator of the lab.

15  Q    And what are your responsibilities as director and

16  administrator of the lab?

17  A    I watch over the quality control of the entire lab,

18  contracts for providers, equipment, and everything having to do

19  with medical insurance.

20  Q    And where is the lab located?

21  A    At Emiliano Street 264 in San Juan.

22  Q    And how far is that from the Villa Esperanza Public

23  Housing Project?

24  A    The housing project is at the corner of the street.

25  Q    Okay.  And who regulates the operations of the laboratory?
```

1    A    We have a federal certification issued by CLIA.  Besides

2    that, we have a state license.

3    Q    And does "CLIA" stand for Clinical Laboratory Improvement

4    Amendments Act?

5              THE INTERPRETER:  I'm sorry?  Clinical Laboratory

6    Improvement --

7              MS. COLLAZO-ORTIZ:  Clinical Laboratory Improvement

8    Amendments.  I don't think it needs to be translated.

9              THE WITNESS:  That's correct.

10   BY MS. COLLAZO-ORTIZ:

11   Q    That's a federal regulation, correct?

12   A    Yes.

13   Q    And what do they evaluate as part of that regulation?

14   A    They evaluate the functioning and the quality warrantee of

15   all of the services that are provided.

16   Q    And has the laboratory passed all of the inspections so

17   far?

18   A    Yes.

19   Q    And how does the laboratory keep information about its

20   operations and their patients?

21   A    We have an information system known as TechPro where that

22   contains all the necessary information for the lab.

23   Q    And what information is input into that system?

24   A    All of the information required for the patient record.

25   Q    And is that in some cases or in every case?

1    A    Always.

2    Q    Is that something that is done in the ordinary course of

3    your business?

4    A    That's correct.

5    Q    And how does the laboratory verify the identity of its

6    patients?

7    A    We require a license with a picture.

8    Q    And where is that identity information kept?

9    A    In the patient record.

10   Q    Okay.  And can you please explain to the members of the

11   jury the process, when a patient arrives at the laboratory,

12   after verifying the identity, what happens?

13   A    The patient goes to the secretary.  She generates all of

14   the information required by the system.  A work slip is

15   generated, and several labels with all of the patient's

16   information, and a unique sample number.

17        Once all of this has been filled out, then they go to

18   the nurse for obtaining the sample.  Once the sample is taken,

19   the nurse notates, makes notes on all of the tubes, and they go

20   to the processing area.

21   Q    And to be clear, the tubes are labeled with the label that

22   was previously generated, correct?

23        THE INTERPRETER:  I'm sorry.  The tubes are --

24   BY MS. COLLAZO-ORTIZ:

25   Q    The tubes are labeled with the labels that were generated

1    by the system?

2    A    That's correct.

3    Q    That you said were -- had a unique number?

4    A    That's correct.

5    Q    And what do you mean when you say that then it goes to the

6    processing area?

7    A    The processing area of the lab is a specific area where

8    the technologists are located, the medical technologists are

9    located.

10    Q    And what happens after the sample is taken to that area?

11    A    It is processed, and once the medical technologist

12    processes it and obtains the results, then it is entered into

13    the system.

14    Q    Okay.  What information is input into the system?

15    A    The patient's results.

16    Q    And is that in some cases or every case?

17    A    Always.

18    Q    Is that the regular course of your business?

19    A    That's correct.

20    Q    How long is patient information kept for?

21    A    By regulation, pursuant to regulation, for 20 years.

22    Q    And where is that information kept?

23    A    In the TechPro information system.

24    Q    And how would you describe the system operation in April

25    of 2021?

1    A    Perfect.

2    Q    Have you had any issues with the system since April 2021?

3    A    No.

4         MS. COLLAZO-ORTIZ:  I'm asking permission to approach

5    the witness with ID 149A and B, which is the Spanish-language

6    document, with a corresponding translation, as well as 150A and

7    B, which is the same situation, a Spanish-language document,

8    with its translation.  I've already shown them to defense

9    counsel.

10        MR. GONZALEZ-DELGADO:  That's correct, Your Honor.

11        THE COURT:  Go ahead.

12   BY MS. COLLAZO-ORTIZ:

13   Q    Ms. Cruz, I've given you what has been previously marked

14   as Government ID 149 and 150.  Let's start specifically with

15   149.

16        Do you recognize that document?

17   A    This is a result for a patient from the lab.

18   Q    And is that a fair and accurate copy of a document that is

19   kept by the laboratory in the ordinary course of business?

20   A    That's correct.

21   Q    Turning to Government ID 150.  Do you recognize that

22   document?

23   A    Yes.  This is one of the pages of the patient record.

24   Q    Do you recognize that as a fair and accurate copy of

25   documents that the laboratory keeps in the ordinary course of

1    business?

2    A    That's correct.

3            MS. COLLAZO-ORTIZ:  Your Honor, we ask that ID 149

4    and ID 150 be admitted as exhibits.

5            MR. GONZALEZ-DELGADO:  No objection, Your Honor.

6            THE COURT:  Without objection, so ordered.  This

7    would be Government Exhibits 149A and B and 150A and B.

8        (Exhibit Nos. 149 and 150 admitted into evidence.)

9            MS. COLLAZO-ORTIZ:  May we publish?

10            THE COURT:  Go ahead.

11    BY MS. COLLAZO-ORTIZ:

12    Q    Okay.  Publishing first Government's Exhibit 150A.  Can

13    you explain what that is?

14    A    That is the software page where the patient's ID is

15    scanned, as well as the medical insurance, if any.

16    Q    And what patient does this document correspond to?

17    A    Keishla Rodriguez-Ortiz.

18    Q    What is her date of birth?

19    A    November 6th of 1993.

20    Q    And what is her age, according to the document?

21    A    Currently, 29 years.

22    Q    And is that the age that she was at the time she visited

23    or the age she would be now?

24    A    No.  That's the current age.

25    Q    And pursuant to this document, what is Ms.

1     Rodriguez-Ortiz's phone number?

2     A     787-397-2408.

3     Q     And what is her address?

4     A     Manuel A. Perez Public Housing Project, A16, 2300 Lopez

5     Sicardo Street, Apartment 189, San Juan, Puerto Rico.

6     Q     And according to this document, when did Ms. Keishla

7     Rodriguez-Ortiz last visited the laboratory?

8     A     April 28th, 2021.

9     Q     Publishing now what is Exhibit 149A.  Can you explain to

10    the members of the jury what that is?

11    A     That is the test that was done on Keishla Rodriguez-Ortiz

12    on April 28th, 2021.

13    Q     And what type of test is it?

14    A     This is what is known at the clinical laboratory as a

15    pregnancy test.

16    Q     And what was the result of the pregnancy test?

17    A     Positive.

18    Q     And just to make sure everyone understands, why is there

19    another column that says "negative?"

20    A     Because that is what is considered as the normal reference

21    value.

22    Q     And for our purposes, can you please explain what is a

23    beta sub unit?

24    A     The test consists of one marker, it's one specific

25    molecule, HCG.  That is a hormone that's beta sub units, and

1    the methodology is specific to that hormone.

2    Q    So, essentially, that's the same as a pregnancy test?

3    A    That's correct.

4    Q    Okay.  And based on the document, can you tell us when Ms.

5    Keishla went to have this test done?

6    A    On April 28th, 2021, at 8:37 in the morning.

7    Q    And when were the results generated?

8    A    On April 28th, 2021, at 9:28 in the morning.

9              MS. COLLAZO-ORTIZ:  No further questions, Your Honor.

10             MR. GONZALEZ-DELGADO:  We have no questions, Your

11   Honor.

12             THE COURT:  I have no questions for the witness.

13             Ms. Cruz, thank you for your testimony.  You are free

14   to go.

15             THE WITNESS:  Okay.  Thank you.

16       (Witness excused.)

17             MR. GOTTFRIED:  Your Honor, given that it's almost

18   5:00, we would respectfully suggest that we adjourn for the day

19   and take it up tomorrow, rather than trying to start another

20   witness, if that's okay with the Court.

21             THE COURT:  Sidebar.

22       (Sidebar conference commenced.)

23             THE COURT:  Who is your next witness?

24             MR. GOTTFRIED:  He's a police officer.

25             THE COURT:  Okay.

```
1              MR. GOTTFRIED:  It might take, it's going to take
2       longer than half an hour on direct.
3              THE COURT:  Okay.  Remember, tomorrow we are working
4       from 9:00 to 1:00, with a short recess in the middle.
5              MR. GONZALEZ-DELGADO:  Okay.
6              THE COURT:  So you have that in mind when you plan
7       your testimony -- not your testimony, the testimony of your
8       next witness.
9              MR. GOTTFRIED:  Yes, Your Honor.
10             THE COURT:  All right?
11             You also mentioned the government will be filing a
12      motion for reconsideration with respect to the order I gave to
13      Keishla's sister --
14             MR. GONZALEZ-DELGADO:  Bereliz Rodriguez.
15             THE COURT:  -- Bereliz Rodriguez.
16             MR. GOTTFRIED:  Your Honor, we're going to -- I'm
17      going to go back now and look at the case law to see whether or
18      not I have a basis and discuss it with my colleagues.  And so
19      if I have something to file, I will do so tonight.  If I don't,
20      then the Court can understand that I'm not filing it.
21             THE COURT:  Sure.  I'm not rushing you into anything.
22      Keep all in mind what I did was to freeze the status quo.  My
23      intuition tells me that was the correct thing to do.  But,
24      again, I'm open to reconsideration, to arguments on both sides.
25      All right?
```

1            Final point, just as a reminder:  No comments.  How

2      did the case go:  No comments.  What's going to happen

3      tomorrow:  No comments.

4            MS. CINTRON-COLON:  Yes, Your Honor.

5            THE COURT:  All right?

6            MR. GONZALEZ-DELGADO:  Yes, sir.

7            THE COURT:  Anything else we need to touch on before

8      we adjourn?

9            MS. COLLAZO-ORTIZ:  No, Your Honor.

10           THE COURT:  No?  Okay.  Well, thank you all.

11           MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

12           MS. CINTRON-COLON:  Thank you, Your Honor.

13      (Sidebar conference concluded.)

14           THE COURT:  Ladies and gentlemen, it's 5:02, 5:03, so

15      I've decided this is a good point to adjourn.  We will

16      reconvene tomorrow to start work at 9:00 a.m.  Remember,

17      tomorrow we won't be working the whole day.  Tomorrow we'll be

18      working from 9:00 to 1:00 p.m., with perhaps a short break in

19      between.  Before we adjourn, I just want to repeat what I said

20      earlier:

21            First, thank you for your patience.  It's been a long

22      day, and there has been a lot of work to do.  And I've asked

23      you to step out of the jury box and wait in the jury room.  And

24      I know that is not an easy thing to do, for you to endure, but

25      it's part of the process.  So I appreciate your patience.

1          Finally, just remember not to talk about or

2      communicate with anybody about your impressions of the case or

3      of the evidence.  Do not view, read or hear reports, comments

4      or articles about the case.  Do not conduct any research about

5      the case, the matters in the case or the individuals involved

6      in the case.

7          Finally, keep an open mind until you've heard and

8      seen all evidence and heard my instructions and you've gone to

9      the jury room to deliberate and all of you have discussed all

10      evidence amongst yourselves.  That's how a verdict is reached.

11          If you need to tell me anything, just give a side

12      note to the court security officer or court staff, and they

13      will give the note to me.

14          With this, I look forward to seeing you all tomorrow

15      at 9:00 a.m.

16      (Whereupon the following proceedings were had in open court

17      without the presence of the jury.)

18          THE COURT:  All right.  The Court adjourns until

19      tomorrow at 9:00 a.m.  You are free to go.

20          MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

21      (Whereupon the evening recess was taken at 5:06 p.m.)

22                              -oOo-

23

24

25

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6         I, CINDY LEE BROWN, RPR, Federal Official Court

 7    Reporter for the United States District Court for the District

 8    of Puerto Rico, appointed pursuant to the provisions of Title

 9    28, United States Code, Section 753, do hereby certify that the

10    foregoing is a true and correct computer-aided transcript of

11    proceedings had in the within-entitled and numbered cause on

12    the date herein set forth; and I do further certify that the

13    foregoing transcript has been prepared by me or under my

14    direction.

15

16         Dated this 25th day of June, 2023.

17

18

19                        /s/ Cindy Lee Brown

20                        _____
                          CINDY LEE BROWN, RPR, Federal
                          Official Court Reporter
21                        150 Carlos Chardon, Room 150
                          San Juan, PR  00918
22                        (787) 772-3478

23

24

25
```