1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF PUERTO RICO

3                              -oOo-

4    THE UNITED STATES OF AMERICA,    )
                                      )
5            Plaintiff,               )   Case No. 3:21-CR-00161-PAD
                                      )
6    -vs-                             )
                                      )
7    FELIX VERDEJO-SANCHEZ,           )
                                      )
8            Defendant.               )
     _____)
9
         TRANSCRIPT OF JURY TRIAL - DAY FIVE - A.M. SESSION
10      HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
            UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                    MONDAY, JUNE 26, 2023
     _____
12                  A P P E A R A N C E S
13
     FOR THE UNITED STATES OF AMERICA:
14
     AUSA Jonathan L. Gottfried &
15   AUSA Jeanette M. Collazo-Ortiz

16   FOR THE DEFENDANT:

17   Jason Gonzalez-Delgado, Esq. &
     Gabriela Jose Cintron-Colon, Esq.
18
     COURT INTERPRETERS:
19
     Edna Brayfield &
20   Lynmar Vera

21   GOVERNMENT INTERPRETER:

22   Mayra Cardona

23

24

25


                Cindy Lee Brown, RPR, Official Court Reporter
                 U.S. District Court, District of Puerto Rico
                             (787) 772-3478

```
1                         I N D E X

2     WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:          PAGE:

3     MANUEL COLON-RUIZ

4     Direct Examination by Mr. Gottfried:                      8

5     Cross-Examination by Mr. Gonzalez-Delgado:               64

6     EXHIBITS:                                              PAGE:

7     Government Exhibit No. 39                                18
      Government Exhibit No. 40                                18
8     Government Exhibit No. 41                                18
      Government Exhibit No. 42                                18
9     Government Exhibit No. 43                                18
      Government Exhibit No. 44                                18
10    Government Exhibit No. 45                                18
      Government Exhibit No. 46                                18
11    Government Exhibit No. 47                                18
      Government Exhibit No. 48                                18
12    Government Exhibit No. 49                                18
      Government Exhibit No. 50                                18
13    Government Exhibit No. 20                                25
      Government Exhibit No. 21                                25
14    Government Exhibit No. 22                                25
      Government Exhibit No. 23                                25
15    Government Exhibit No. 24                                25
      Government Exhibit No. 25                                35
16    Government Exhibit No. 26                                35
      Government Exhibit No. 27                                35
17    Government Exhibit No. 136                               35
      Government Exhibit No. 30                                40
18    Government Exhibit No. 31                                40
      Government Exhibit No. 32                                40
19    Government Exhibit No. 28                                44
      Government Exhibit No. 29                                45
20    Government Exhibit No. 33                                52
      Government Exhibit No. 34                                52
21    Government Exhibit No. 35                                52
      Government Exhibit No. 36                                57
22    Government Exhibit No. 37                                60
      Government Exhibit No. 38                                62
23

24

25
```

1          (Proceedings commenced at 9:06 a.m.)

2                              -oOo-

3          (Whereupon the following proceedings were had in open court

4          without the presence of the jury.)

5                    THE COURT:  How many cases do we have on calendar

6     this morning?

7                    THE COURTROOM DEPUTY CLERK:  We have one, Your Honor.

8                    THE COURT:  Call the case.

9                    THE COURTROOM DEPUTY CLERK:  Criminal Case Number

10    21-161, the United States of America against Felix

11    Verdejo-Sanchez, for fifth day of jury trial.  On behalf of the

12    government are Assistant U.S. Attorneys Jeanette Collazo and

13    Jonathan Gottfried.  And on behalf of the defendant is Attorney

14    Jason Gonzalez.

15                   The defendant is present in the courtroom, and he's

16    being assisted by a certified court interpreter.

17                   THE COURT:  Thank you.

18                   Would counsel identify themselves?

19                   MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  AUSA

20    Jeanette Collazo for the United States.

21                   THE COURT:  Good morning, ma'am.

22                   MR. GOTTFRIED:  Good morning, Your Honor.  AUSA

23    Jonathan Gottfried.

24                   THE COURT:  Good morning, sir.

25                   MR. GONZALEZ-DELGADO:  Good morning, Your Honor.

1    Jason Gonzalez-Delgado on behalf of Mr. Felix Verdejo-Sanchez.

2    Ms. Cintron-Colon is almost here.

3              THE COURT:  All right.  Good morning, sir.

4              Would the interpreters identify themselves?

5              THE INTERPRETER:  Good morning, Your Honor.  This is

6    Lynmar Vera, the court interpreter.

7              THE COURT:  Good morning, ma'am.

8              THE INTERPRETER:  Good morning.  Edna Brayfield.

9              THE COURT:  Good morning, ma'am.

10             THE INTERPRETER:  Mayra Cardona.

11             THE COURT:  Good morning, ma'am.

12             All set to call the jury in?

13             MR. GOTTFRIED:  Yes, from the government.

14             MR. GONZALEZ-DELGADO:  Your Honor, we had a -- can we

15    approach?

16             THE COURT:  Yes.

17        (Sidebar conference commenced.)

18             MR. GONZALEZ-DELGADO:  If I'm not mistaken --

19             Good morning.

20             If I'm not mistaken, last night around 7:09 p.m., we

21    received a new discovery package.  I believe it was a 302 that

22    was prepared of an interview that they had yesterday of Mr.

23    Luis Cadiz.  But I just wanted to make sure that the extraction

24    that they sent us was already --

25             These are the deleted text messages?

1                    THE COURT:  Slower.

2                    MR. GOTTFRIED:  That was produced about two years

3      ago.  That's from Verdejo's cell phone extraction.

4                    MR. GONZALEZ-DELGADO:  Okay.  Because I remember

5      seeing it, but I just don't remember seeing it, obviously, this

6      way.

7                    There are a couple of words here that have, that we

8      will have objection to the translation.  But if you're going to

9      put that in, if they're going to be presented as evidence, I

10     will request that it be amended.

11                   And then we have the CAST.  These are also text

12     messages, the 23 pages.  Are these the deleted ones?

13                   MR. GOTTFRIED:  Which ones are those?

14                   MR. GONZALEZ-DELGADO:  These are the deleted ones.

15                   MR. GOTTFRIED:  Those were deleted, yes.  Those were

16     produced.

17                   MR. GONZALEZ-DELGADO:  But they're still missing

18     because these aren't complete.

19                   And this CAST analysis that was made, this is a brand

20     new one, the cellular?

21                   MR. GOTTFRIED:  No.

22                   MR. GONZALEZ-DELGADO:  It's the same one, just with

23     the identification?

24                   MR. GOTTFRIED:  It has the identification number, and

25     then it has the --

 1            MR. GONZALEZ-DELGADO:  What I can see was, the legend
 2    was amended.
 3            MR. GOTTFRIED:  No.  The legend should be the same.
 4            MR. GONZALEZ-DELGADO:  From what I can remember,
 5    it's, it's -- it included -- the other ones that I had only had
 6    what it was -- what they pretended to use, like if they were
 7    going to use the victim's home, the kidnapping location, and
 8    Verdejo's residence.  That's all that they had.
 9            From what I can see in these, it was like the houses.
10    Other information was added to pinpoint places.
11            MR. GOTTFRIED:  These should be basically the same.
12    There was -- what we eliminated from these was, there were some
13    additional pages that we moved to demonstrative exhibits.
14            MR. GONZALEZ-DELGADO:  Okay.  So it was something
15    that you eliminated from this.
16            MR. GOTTFRIED:  There is something eliminated from
17    that.  I'll go back and check whether or not -- these should
18    have all had been identified in the prior CAST report.
19            MR. GONZALEZ-DELGADO:  Okay.  Because I didn't see
20    what was, what was eliminated.  I don't know what they, what
21    they were.
22            And the last page is just a -- this --
23            MR. GOTTFRIED:  This was produced in discovery, and
24    we just --
25            MR. GONZALEZ-DELGADO:  Included it in the --

 1                    MR. GOTTFRIED:  Exhibit label on it, identification.

 2                    MR. GONZALEZ-DELGADO:  Okay.  Just that.

 3                    MR. GOTTFRIED:  Yes.  It's the same analysis.

 4                    MR. GONZALEZ-DELGADO:  Because if it's new discovery

 5      or late *Jencks*, well, I'm, obviously, objecting to it.  But

 6      they are saying that it was all produced.  I've reviewed it.  I

 7      remember seeing some of this in the discovery that was

 8      provided.  It's just that I wanted to make sure that it wasn't

 9      something that was added that I missed.

10                    MR. GOTTFRIED:  The only thing was the *Jencks*.  There

11      was an interview yesterday.  We produced a 302 yesterday and

12      sent it to you last night.

13                    MS. COLLAZO-ORTIZ:  Everything else is just advance

14      copies of additional exhibits.

15                    MR. GONZALEZ-DELGADO:  Okay.  That's not in the

16      government exhibit that we have.

17                    MS. COLLAZO-ORTIZ:  If they are repeated, these are

18      --

19                    MR. GONZALEZ-DELGADO:  The one that you will use.

20                    MS. COLLAZO-ORTIZ:  Right.

21                    MR. GONZALEZ-DELGADO:  No problem.  I just wanted to

22      make sure on the record.  Thank you.

23                    THE COURT:  Okay.

24           (Sidebar conference concluded.)

25                    THE COURT:  All set to call the jury in?

```
 1                    MR. GOTTFRIED:  The government is.
 2                    MR. GONZALEZ-DELGADO:  Yes, Your Honor.  We're ready.
 3                    THE COURT:  Let's call the jury in.
 4          (Whereupon the following proceedings were had in open court
 5          in the presence of the jury.)
 6                    THE COURT:  Good morning.  Welcome back to the
 7          courtroom.  Please take a seat.
 8                    MR. GOTTFRIED:  May it please the Court?
 9                    THE COURT:  Go ahead.
10                    MR. GOTTFRIED:  Your Honor, the government calls
11          Manuel Colon-Ruiz.  He's in the witness box right now.  Can he
12          be sworn in?
13                    THE COURT:  Yes.
14                    THE COURTROOM DEPUTY CLERK:  Mr. Colon, please stand.
15          Raise your right hand.
16          (Witness sworn.)
17                    THE COURTROOM DEPUTY CLERK:  So help you God.  You
18          may take a seat.
19                    THE WITNESS:  Thank you.
20                    MR. GOTTFRIED:  May it please the Court?
21                    THE COURT:  Go ahead.
22                         MANUEL COLON-RUIZ,
23               called as a witness on behalf of the Plaintiff,
24                  having been previously duly sworn,
25                  was examined and testified as follows:
```

```
 1                    DIRECT EXAMINATION
 2   BY MR. GOTTFRIED:
 3   Q    Good morning, sir.
 4   A    Good morning.
 5   Q    Can you please tell the members of the jury your name?
 6   A    Agent Manuel Colon-Ruiz, Badge 36115.
 7   Q    And for who do you work?
 8   A    Specialized Unit Major Crimes of the Puerto Rico Police.
 9   Q    Okay.  And how long have you been an investigative agent?
10   A    Since 2012, 2011.
11   Q    And where are you currently assigned?
12   A    Major Crimes Unit, Major Crimes Specialized Unit, San
13   Juan.
14   Q    Before being in the Major Crimes Unit in San Juan, were
15   you in any other police unit?
16            THE INTERPRETER:  I'm sorry.  Before being in the
17   Major Crimes?
18   BY MR. GOTTFRIED:
19   Q    In the Major Crimes Unit in San Juan, were you in any
20   other unit?
21   A    Yes.
22   Q    Which one?
23   A    I was assigned to the San Juan Homicide Division.
24   Q    For how long?
25   A    Approximately, 11 years.
```

```
1    Q    On May 1st, 2021, how did your workday start?
2    A    I was at home on May 1st, 2021.  At, approximately, 12:17
3    in the afternoon, I received a call from my supervisor,
4    Sergeant Karina Ojeda-Erazo.
5    Q    And what happened next?
6    A    She told me that she needed me to go to work.
7    Q    And did she explain why?
8    A    Yes.
9    Q    Why?
10    A    She told me that a body had appeared floating in the San
11    Jose Lagoon.
12    Q    What did you do next?
13    A    I went to my job, and I took service at 1:55 in the
14    afternoon.
15    Q    Where specifically did you go?
16    A    General headquarters, Specialized Major Crimes Unit.
17    Q    Where is that?
18    A    That's on the sixth floor of general headquarters in Hato
19    Rey.
20    Q    Once you got to the general headquarters, sixth floor,
21    Hato Rey, what did you do next?
22    A    I took service, and I went on to the FURA Unit in Pinones.
23    Q    And what was your role at that point in the, in the
24    matter?
25    A    I was going to investigate the scene.
```

1    Q    What did you do once you got to the FURA Unit in Pinones?

2    A    Once I arrived at FURA Pinones, they were organizing a

3    work team.  Homicide San Juan was there.  Homicide Carolina was

4    there.  Missing persons, Rescue was there, Maritime, Forensic

5    Science Institute, Carolina prosecution.

6    Q    Once -- and then what happened?

7    A    This work team was directed by Lieutenant Colonel Carlos

8    Cruz.

9    Q    Okay.  And what did you do?

10   A    Once the instructions were issued, yours truly was going

11   to take control and custody of the scene and the body.

12   Q    What happened next?

13   A    Once the instructions were issued, I got on a large

14   motorboat.

15   Q    What happened after you got onto the large motorboat?

16   A    We were going straight -- we were going to the scene.

17   Q    And then did you, in fact, go to the scene?

18   A    That's correct.  But before that, there was a second

19   motorboat, and we did some kind of a command post because the

20   large motorboat could not go through below the Los Angeles

21   Avenue Bridge and Baldorioty Avenue.  Therefore, I got onto the

22   second motorboat identified as C-11.

23   Q    Once you got onto the smaller boat, what happened next?

24   A    We went toward the scene.

25   Q    And did you, in fact, get to the scene?

1    A    That's correct.

2    Q    Please describe the scene for the jury.

3    A    The scene develops in an open space in the waters of the

4    San Jose Lagoon.  The day was a clear day.  Toward the end,

5    there is a mangrove.  So when I arrived there, I interviewed

6    the first agent on the scene, Agent Francisco Avila.

7    Q    And what, if anything, did you learn?

8    A    He told me that he had received a call from the Carolina

9    Commissioner, Mr. Ruben Moyeno, telling him to go to the site.

10              MR. GONZALEZ-DELGADO:  We have an objection, Your

11   Honor.  This is all hearsay.

12              If I just may have one second.

13              Agent Francisco Avila isn't a witness in this case,

14   Your Honor.

15              THE COURT:  It doesn't matter.  Objection overruled.

16              Go ahead.

17   BY MR. GOTTFRIED:

18   Q    What happened next, sir?

19   A    He was asked how he had gotten that information, and he

20   said that he was corroborating some information he had

21   received.

22   Q    Okay.  Once you had that information, what did you do?

23   A    I was able to notice that, in fact, there was a body

24   floating in the San Jose Lagoon.

25   Q    Can you please describe the body that you saw?

1    A    At that time, what you could see was a brown and blonde

2    hair, which was dressed in a shirt of a blue fabric, with

3    little drawings of clouds and animals.  It had on a blue pants,

4    and the shoes were pink.

5    Q    And once you observed the body, was there anything else

6    that you observed?

7    A    The body was in ventral decubitus position, practically

8    underwater.

9    Q    What did you do next?

10    A    Since the scene, the currents of the San Jose Lagoon are a

11    little unstable, we made a determination to remove the body

12    from the water to transfer it and to work on it at FURA

13    Pinones, on ground, not without before having asked the

14    Forensic Sciences Institute to take photos and videos of the

15    original scene.

16    Q    And when you observed the body at that point floating in

17    the water, what, if any, marks or tattoos did you notice?

18    A    At that time, the rescue personnel was requested to take

19    the body out of the water.  Once the body had been taken out of

20    the water, I noticed that it was tied with a silver-colored

21    wire.  In addition to that, that silver-colored wire was

22    connected to a concrete block, cinder block.

23    Q    What else did you notice?

24    A    Once the body was taken out of the water, it was placed on

25    a gurney, and the body was transferred to the FURA Pinones

1    Division to be worked on.

2    Q    Did you accompany the body to FURA Pinones?

3    A    That's correct.

4    Q    Okay.  And what happened at FURA Pinones with the body?

5    A    Once the body was taken to FURA Pinones, the body started

6    to be described and photographed.  The body was a female,

7    white-skinned, long straight brown and blonde hair, which was

8    dressed in a blue shirt with little animals and little clouds

9    print.

10    Q    What else did you observe?

11    A    Blue pants, blue fabric, pink Nike sneakers with a white

12    sole.  It showed on an area of the back a tattoo of a diamond.

13    The body was tied with a silver wire.  This wire was wrapped

14    around the area of her neck, left wrist.

15    Q    And where else?

16    A    The same wire was wrapped around the area of the waist,

17    and it extended to both feet.  And the same wire was tied to a

18    cinder block.

19    Q    After observing the wire tied to various parts of the body

20    and tied to the cement block, what happened next?

21    A    The determination was made to transport, to take the body

22    to Forensic Sciences.  Because of the type of tying it had, not

23    without first requesting the Institute of Forensic Sciences to

24    place brown paper bags on both hands to be able to preserve any

25    kind of evidence that would help us.

1    Q    Was the body identified at that scene in FURA Pinones?

2    A    No.

3    Q    Why not?

4    A    We were starting the investigation.

5            MR. GOTTFRIED:  Okay.  Your Honor, at this time, I

6    would like to mark as Government IDs 39 through 50 various

7    photos, which have been shown to Brother Counsel.

8            May I approach the witness?

9            MR. GONZALEZ-DELGADO:  Before that, may we approach

10   the bench, Your Honor?

11       (Sidebar conference commenced.)

12           MS. CINTRON-COLON:  Good morning, Judge, apologies.

13           MR. GONZALEZ-DELGADO:  Your Honor, we have an

14   objection to the photos that will be presented.  We are

15   objecting to Government's Identifications Numbered 42, 46, 47,

16   48 and 49.

17           These photos are grotesque photos of a body that is

18   decomposing.  It is, it has flies on them.  It has, it shows

19   the bulging eyes of the victim.  It shows water bags on the

20   arms of the victim and the bulging eyes and tongue on

21   Government's Identification Number 42.

22           Under 403, Rule 403, must be cautious and sparing.

23   Its major function is limited to excluding matter of scant or

24   cumulative probative force dragged in by the heels for the sake

25   of its prejudicial effect.  We believe it's cumulative

1    probative force because it has scant relevance in this case

2    because the other photos that are being presented do show

3    exactly the same thing without the grotesque nature of the

4    photos.  And that's from *United States versus McRae*, 593 F.2d

5    700, at page 707.  It's a Fifth Circuit case, 1979.

6         "Rule 403 controversies by their very nature present

7    competing considerations, and compromise is often the best

8    solution for a particularly knotty Rule 403 problem."

9         That's *Faigin versus Kelly,* 184 F.3rd 67, at page 80,

10   First Circuit, 1999.

11        But the Supreme Court in *Carter versus Hewett*, 617

12   F.2d 961, at page 972, a Third Circuit 1980 case, says:

13        "It is unfairly prejudicial if it 'appeals to the

14   jury's sympathies, arouses its sense of horror, provokes its

15   instinct to punish,' or otherwise 'may cause a jury to base its

16   decision on something other than the established propositions

17   in the case.'"

18        It's in accord with *Old Chief versus United States*,

19   519 U.S. 172, at 180, 1997, and *United States versus Skillman*,

20   922 F.2d 1370*,* at page 1374, Ninth Circuit*,* 1999.

21        And now I can't find the -- let me see if it was

22   here.

23        In *United States versus Salim*, it's 189 Fed. Supp.

24   2d 93, Southern District of New York, 2002, in an assault case,

25   the district court excluded photos of officer's head taken

1    after surgery to repair damage caused by stabbing, concluding

2    that prejudicial impact substantially outweighed relevance

3    under Rule 403.

4              And we believe that would be exactly what would

5    happen if those identifications that we have mentioned are

6    admitted and shown to the jury in this case.  That would be my

7    objection, Your Honor.

8              THE COURT:  All right.  Objection overruled.

9         (Sidebar conference concluded.)

10             THE COURT:  Could you repeat the IDs?

11             MR. GOTTFRIED:  Yes, Your Honor.  It's Government IDs

12   39 through 50.

13             THE COURT:  In sequence.

14             MR. GOTTFRIED:  In sequence, yes, Your Honor.

15             THE COURT:  Yes.

16             MR. GOTTFRIED:  May I approach the witness?

17             THE COURT:  Yes.

18   BY MR. GOTTFRIED:

19   Q    Sir, can you please take a look at Government IDs, each

20   one, 39 through 50?  And then I'm going to ask you some

21   questions.

22             Have you finished, sir?

23   A    Yes, sir.

24   Q    Do you recognize those photos?

25   A    They are a true and exact copy of the scene that we worked

 1    on.

 2              MR. GOTTFRIED:  Your Honor, I move to admit

 3    Government IDs 39 through 50 into evidence as Government

 4    Exhibits 39 through 50.

 5              THE COURT:  Admitted as exhibits.

 6              MR. GONZALEZ-DELGADO:  We renew our objection under

 7    403, Your Honor.

 8              THE COURT:  Same ruling as in sidebar.  That's

 9    overruled.

10              So this would be Government's Exhibits 39, 40, 41,

11    42, 43, 44, 45, 46, 47, 48, 49 and 50.

12              MR. GOTTFRIED:  Yes, Your Honor.

13              THE COURT:  Okay.  Admitted.

14        (Exhibit Nos. 39 through 50 admitted into evidence.)

15              MR. GOTTFRIED:  May I recover the exhibits?

16              THE COURT:  Go ahead.

17              MR. GOTTFRIED:  Your Honor, may we publish these

18    exhibits to the jury?

19              THE COURT:  Yes.

20              MR. GOTTFRIED:  Starting with Exhibit 39.

21    BY MR. GOTTFRIED:

22    Q    Okay.  Sir, can you please tell us what we see in

23    Government Exhibit 39?

24    A    You can see the body floating in the San Jose Lagoon.

25    Q    Okay.  If we can please move to Exhibit 40.

1    A    Here you can see the Teodoro Moscoso Bridge, and the water
2    is of the San Jose Lagoon.
3    Q    Okay.  Moving to Exhibit 41.  Can you please tell us what
4    we see here?
5    A    There you can see the body floating, as I explained,
6    blonde/brown hair, how she was dressed, how a shirt with little
7    clouds and little animals, blue pants, which was in ventral
8    decubitus position, "underground."
9    Q    And, sir, I think you said, is it "cubitus" position, was
10    the word you were using?
11    A    Ventral decubitus.
12    Q    And what do you mean by that?
13    A    Face-down.
14    Q    Moving to exhibit, Government Exhibit 42.  What do we see
15    here?
16    A    There you can see when the fellow officers of Rescue took
17    out the body, and you can see the wiring and the cinder block.
18    Q    Moving to Government Exhibit 43.  What do we see here?
19    A    The wire tied to the feet, and the cinder block.
20    Q    Moving to Government Exhibit 44.  What do we see here?
21    A    The wire tied in the area of the waist.
22    Q    Moving to Government Exhibit 45.
23    A    There you can see the silver-colored wire with the cinder
24    block.
25    Q    Moving to Government Exhibit 46.  What do we see here?

 1    A    There you can see the wire tied to the neck and to the
 2    left wrist.
 3    Q    Moving to Government Exhibit 47.  What do we see here?
 4    A    There we see the wire tied to the waist and to the left
 5    wrist.
 6    Q    Moving to Government Exhibit 48.  What do we see here?
 7    A    There we can see the wire tied in the area of her waist,
 8    and the shirt that I was saying, blue with a print of little
 9    animals and clouds, and blue pants and fabric.
10    Q    Moving to Government Exhibit 49.  What do we see here?
11    A    There you can see the brown and blonde hair, the wire and
12    the block tied to the body.
13    Q    And the wire in this photo, and based on your personal
14    observations, where was that wire tied to specifically?
15    A    It was bound to her neck.  It went to the left wrist.  The
16    same wire was tied to the area of her waist, and it extended to
17    both feet.  And the same wire was tied to the cinder block.
18    Q    And, sir, the last government exhibit, 50, can you please
19    tell us what we see here?
20    A    The wire tied to both feet.
21    Q    And based on your observation, that wire was connected to
22    what?
23    A    Neck, left wrist, waist, both feet and the cinder -- the
24    wire was attached to the cinder block, from her body.
25              MR. GOTTFRIED:  Okay.  If we can please clear the

1    screen.

2    BY MR. GOTTFRIED:

3    Q    Sir, after Forensics finished processing the scene, what

4    did you do next?

5    A    Once the body had been processed, information came up as

6    to a black Dodge Durango.

7    Q    I'm sorry.  And, again, we're still on May 1st, 2021; is

8    that correct?

9    A    That's correct.

10    Q    After you got this information regarding the Dodge Durango

11    -- and what information was it that you received?

12    A    I received information that that Dodge Durango had been

13    parked days prior at the Teodoro Moscoso Bridge.

14    Q    Based on that information, what did you do next?

15    A    Well, the same thing, the work team went, after having

16    finished the scene, we went towards that area.  Some went to

17    the Teodoro Moscoso Bridge, and others were going to go on to

18    the search of that vehicle.

19            The license plate of the vehicle was India, Victor,

20    Golf, 226.  Once the information had been received, the vehicle

21    was found in the area of the Antigua Via Sector in Cupey.  So I

22    went to that place.

23    Q    Around what time did you get to the Antigua Via Sector in

24    Cupey?

25    A    At, approximately, 9:17 in the evening of that same day,

1    May 21st, 2021.

2    Q    Okay.  Again, what was your goal of going to Antigua Via

3    Sector in Cupey?

4    A    To corroborate the information of this vehicle.

5    Q    Once you got to Cupey, what did you do next?

6    A    I corroborated with the license plate and the information

7    about the SUV.

8    Q    Once you corroborated that information, what did you do

9    next?

10   A    Once I corroborated the license plate and the information

11   about the SUV, I asked the neighbors around who the SUV

12   belonged to.

13   Q    What information did you receive?

14   A    That the vehicle belonged to Mr. Felix Verdejo-Sanchez,

15   AKA "El Diamonte."

16   Q    And with that information from the neighbors regarding the

17   ownership of the Durango, what did you do next?

18   A    They pointed at the residence M3 of that sector, Antigua

19   Via.

20   Q    What did you do next?

21   A    They were asked who lived there, and they indicated that

22   the mother and the grandmother of Felix Verdejo lived there.

23   Q    Did you, in fact, go to that house?

24   A    That's correct.

25   Q    What happened?

1    A    I got to the house, and I knocked on the door several

2    times and did not get an answer.

3    Q    After you did not get an answer, what did you do?

4    A    What I did was, I transferred the information to

5    specifically Sergeant Santiago of Homicide San Juan to request

6    a search and seizure warrant to seize that vehicle, search and

7    seize that vehicle.

8    Q    Did you, in fact, get a warrant for the Dodge vehicle?

9    A    That's correct, to control the custody until we obtained

10   the search and seizure warrant, which was given to me,

11   hand-delivered at, approximately, 2:00 in the morning.

12   Q    And what did you do once you got the search warrant?

13   A    Once I had received the order, I again proceeded to the M3

14   residence, where I knocked several times.

15   Q    Why did you go back to the residence?

16   A    To execute the search and seizure warrant to occupy that

17   vehicle.

18   Q    And what happened when you knocked on the door again?

19   A    I did not receive an answer, so, at that time, we

20   proceeded to seize the vehicle, not without first calling the

21   attorney, legal representative, of Mr. Felix Verdejo, Mr. Jorge

22   Colinas.

23   Q    Did you get in touch with the lawyer?

24   A    No.  The one who called was Sergeant Omayra Arnaldi of the

25   San Juan Homicide Division, where she called him several times,

1    and she did not get an answer.  In addition to that, a text

2    message was sent, and no answer was received.

3    Q    What happened next?

4    A    We proceeded to seize the vehicle.

5    Q    Okay.  Did you, yourself, enter into the vehicle at the

6    scene?

7    A    No.  What we did was, we started, yours truly, started to

8    seal off all of the doors of the vehicle, including the trunk

9    and the bumper of the vehicle.  It was sealed off, and I put my

10   initials on each one of the seals for the guarantee of process,

11   for the purity of the process.  We requested to take photos and

12   videos.

13          Afterwards, we contacted, I contacted the Tow

14   Division of the Puerto Rico Police, where we started to tow up

15   the vehicle on the tow truck.

16   Q    And where, if anywhere, was the vehicle taken?

17   A    To the Forensic Sciences Institute for analysis and

18   evaluation.

19          MR. GOTTFRIED:  Your Honor, I'm going to mark as

20   Government IDs 20, 21, 22, 23 and 24, various photos that have

21   been shown to Brother Counsel.

22          May I approach the witness?

23          THE COURT:  Yes.

24   BY MR. GOTTFRIED:

25   Q    Sir, I'm going to ask you to look at each of those photos.

```
 1   A    Uh-huh.

 2   Q    Sir, have you had a chance to look at each of those

 3   photos?

 4   A    That's correct.

 5   Q    Do you recognize them?

 6   A    Yes.

 7   Q    What are they?

 8   A    True and exact copies of the scene where the vehicle,

 9   Dodge Durango, had been found, with license plate IVG 266.

10   Q    And that was the scene that you were personally present

11   at?

12              THE INTERPRETER:  226, correction.

13   BY MR. GOTTFRIED:

14   Q    That was the scene that you were personally present at?

15   A    That's correct, on May 1st in the Antigua Via Sector in

16   Cupey.

17              MR. GOTTFRIED:  And the government would move to

18   admit Government IDs 20 through 24 into evidence as Government

19   Exhibits 20 through 24.

20              MS. CINTRON-COLON:  We have no objection, Your Honor.

21              THE COURT:  Without objection, so ordered.  These

22   would be Government Exhibits 20, 21, 22, 23 and 24.

23         (Exhibit Nos. 20 through 24 admitted into evidence.)

24              MR. GOTTFRIED:  Your Honor, may I recover the

25   exhibits?
```

```
 1                THE COURT:  Yes.
 2                MR. GOTTFRIED:  May I publish to the jury those
 3      exhibits, starting with Government Exhibit 20?
 4                THE COURT:  Yes.
 5      BY MR. GOTTFRIED:
 6      Q    Sir, what do we see in Government Exhibit 20?
 7      A    That's the Antigua Via Sector.  We can see the Dodge
 8      Durango parked, and that was the house that we asked to whom
 9      that vehicle belonged to.
10      Q    And ask you please describe in words where on the photo
11      the Dodge Durango is.
12      A    It's parked onto the right.  You can see the front part of
13      the SUV.
14      Q    Okay.  And you said it was what color?
15      A    Black.
16      Q    Okay.  Showing you, sir, what's Exhibit Number 21.  What
17      do we have here?
18      A    Here we have the black Dodge Durango.  You can see the
19      license plate:  India, Victor, Golf, 226.  In addition to that,
20      if you look towards the left, in the houses you can see, you
21      can see M3.  Specifically, this one right here, where yours
22      truly went to knock several times, and I did not receive an
23      answer.
24      Q    Okay.  Showing you --
25                MR. GOTTFRIED:  Can we clear the screen and then move
```

1    to Government Exhibit 22?

2    BY MR. GOTTFRIED:

3    Q    Okay.  Sir, what do we see in Government Exhibit 22?

4    A    The black Dodge Durango, exactly where it was parked.

5    Q    Moving to Government Exhibit 23.  What do we see here?

6    A    There we can corroborate the license plate:  India,

7    Victor, Golf, 226, of the black Dodge Durango.

8    Q    And, sir, does the word "Durango" appear in that photo?

9    A    Yes.

10   Q    Where does it appear?

11   A    On the bottom part of the SUV, right here.

12        MR. GOTTFRIED:  Okay.  If we can please clear the

13   screen and move on to Government Exhibit 24?

14   BY MR. GOTTFRIED:

15   Q    Sir, what do we see here?

16   A    You see there yours truly sealing off the SUV.

17        MR. GOTTFRIED:  If we can please clear the screen.

18   BY MR. GOTTFRIED:

19   Q    Sir, after arranging for the towing of the sealed Durango

20   in Cupey, where did you go next?

21   A    There we received the last location of Mr. Felix Verdejo

22   in the Caguas municipality.

23   Q    Did you, in fact, go to Caguas?

24   A    That's correct.

25   Q    Why?

1    A    Because the Intelligence Division of Puerto Rico Police

2    notified us of that information.  So I went to the municipality

3    of Caguas, in exactly to the Golden Gate urbanization, Golden

4    Gate One urbanization of the Bairoa urbanization in the

5    Municipality of Caguas, and so I went there to execute the

6    search warrant of this vehicle.

7    Q    At that time, did you have any other search warrants?

8    A    That's correct.

9    Q    For what?

10   A    For the telephone equipment, for Mr. Felix Verdejo's cell

11   phone.

12   Q    Around what time did you arrive at the Golden Gate

13   residence in Caguas?

14   A    At, approximately, 3:19 in the morning of May 2nd of 2021.

15   Q    What happened once you got there?

16   A    Once I arrived there, I was able to see a black Honda

17   Pilot vehicle parked in front of the residence D2 of the Golden

18   Gate One urbanization in the Municipality of Caguas.

19   Q    Why did you notice the Honda Pilot?

20   A    Because there had been information that Mr. Felix Verdejo

21   had gone over the Moscoso Bridge in that SUV, a black Honda

22   Pilot.

23   Q    After noticing the black Honda Pilot, what did you do

24   next?

25   A    I knocked on the house, the door of the house, in D2.

1    Q    Okay.  And what happened?  Did anyone answer?

2    A    Yes.  There the door was opened by a female named Jennifer

3    Acevedo, who, when she opened the door, was in a sleeping gown,

4    like a baby doll.  She was asked whether she knew Mr. Felix

5    Verdejo.

6    Q    What, if anything, did she say?

7    A    She said yes.

8    Q    And what did you do with that information?

9    A    She was asked whether Mr. Felix Verdejo was inside the

10   residence.

11   Q    And what, if anything, did she say?

12   A    That, yes, that he was inside the residence.

13   Q    What did you do with that information?

14   A    She was asked whether, aside from Mr. Felix Verdejo, there

15   was anyone else inside the residence.

16   Q    And what was the response?

17   A    That, no.

18   Q    What happened next?

19   A    We asked the lady to call Mr. Felix Verdejo to come over

20   to where we were, which was at the door to the residence.

21   Q    Did Felix Verdejo eventually come out?

22   A    Yes.  She started calling him, and then Felix Verdejo came

23   out.

24   Q    What, if anything, was he wearing?

25   A    He only had some shorts on.

```
1   Q    What happened once he came out?

2   A    Once he came out, I identified myself.  I told him I was

3   Agent Manuel Colon, and that I had a search and seizure warrant

4   for a vehicle.

5   Q    What happened next?

6   A    He was asked whether he had knowledge of a vehicle, a

7   Dodge Durango, India, Victor, Golf, 226, which he answered

8   that, yes, that it was his car.

9   Q    Then what happened?

10  A    He was asked whether he had the key to that vehicle, and

11  he answered yes.

12  Q    And after Mr. Verdejo indicated that he had the key to the

13  black Dodge Durango, what happened next?

14  A    The search and seizure warrant was executed to him, and he

15  was asked where the key was.

16  Q    And after you showed the search warrant for the Durango to

17  Mr. Verdejo, what did he do?

18  A    He signed it.  The Technical Services Division of the

19  Puerto Rico Police was asked to take photographs to certify

20  that this search and seizure warrant had been executed.

21  Q    Okay.  So after the photo of Mr. Verdejo being served with

22  the search warrant was taken, what happened next?

23  A     In addition to that, he was told that we had a second

24  search and seizure warrant for his cell phone.

25  Q    What, if anything, did Mr. Verdejo tell you?
```

1    A    That he did not have his cell phone on him; that upon

2    instructions of his counsel, Jorge Colinas, he had left his

3    cell phone at his office.

4              MS. CINTRON-COLON:  Your Honor, objection on hearsay

5    and on communications that allegedly -- since this person was

6    not a witness.

7              THE COURT:  Overruled.

8    BY MR. GOTTFRIED:

9    Q    And once Mr. Verdejo indicated that he had given his phone

10   to his lawyer, what happened next?

11   A    He was told that he had to contact his attorney to deliver

12   the equipment.

13   Q    Then what happened?

14   A    Once this was done, Mr. Felix Verdejo was told to tender

15   the key.

16   Q    Which key?

17   A    The key to the black Dodge Durango.  He was asked where

18   the key was located.

19   Q    Then what happened?

20   A    And he said that it was in the bedroom, in the bedroom

21   where he had been sleeping.  At that time, he was asked whether

22   he was armed because we had knowledge that he did have

23   firearms, and he had a permit for it.

24   Q    And so once you asked him whether or not he had any

25   firearms, what did he say?

1    A    That, yes, that he did have a firearm.

2    Q    Then what happened?

3    A    For his safety and ours, he was requested to go with us to

4    the bedroom.

5    Q    And did you all, in fact, go to the bedroom?

6    A    No.

7    Q    Okay.  What happened next?

8    A    Yours truly and him, Mr. Felix Verdejo, went to the

9    bedroom to get the key and the firearm.

10   Q    What happened in the bedroom?

11   A    The firearm was on a night table next to the key, and it

12   was loaded.

13   Q    And then what happened?

14   A    For his safety and ours, we requested him to move to a

15   safer area, so we moved towards the area of the living room.

16   Q    And once Mr. Verdejo was in a secure area, what did you

17   do?

18   A    I put on gloves to manipulate the firearm, unloading it.

19   Q    Okay.  And how many rounds were in the magazine of the

20   firearm?

21   A    The firearm, I'm going to describe the firearm.  It was a

22   Glock pistol, nine millimeter, brown.  It was loaded with a

23   magazine for 17 rounds, but when I unloaded it, it only had 14

24   rounds and one in the chamber of the pistol.  So it was removed

25   and placed on top of the table.  There were 14 -- 15 -- there

1    were 15 rounds, and there were two missing.

2    Q    And, sir, once you unloaded the firearm and noticed that

3    there were two bullets missing, what did you do next?

4    A    He was asked whether he had the permit for the firearm on

5    him, which he said yes.  It was seized, and a property receipt

6    was filled in as to what was being seized.

7    Q    And after filling out a property receipt, what happened

8    next?

9    A    On the receipt, all of the information that had been

10   seized was documented.  And it was provided to him to sign it

11   as having tendered it, and I, yours truly, signed it as having

12   received it.

13   Q    Did you see Mr. Verdejo sign that receipt of property for

14   the evidence that had been seized?

15   A    That's correct.  He signed it in my presence.

16   Q    Okay.  And, sir, I'm sorry, did you, in fact, find the key

17   for the Dodge Durango?

18   A    That's correct, and it was described on the receipt that

19   was given to him.  And the receipt, we documented the property

20   that was seized, which was a firearm permit in the name of

21   Felix Verdejo, a brown nine millimeter Glock pistol.  Two brown

22   Glock magazines were seized, 15 rounds, and the key, a key ring

23   type, which is plastic, that on the back said "Dodge."

24   Q    Okay.  After filling out the property receipt and watching

25   Mr. Verdejo sign it, did you do anything else in the residence?

```
 1    A    He was given a copy.  And we asked, because we had
 2    knowledge that he had a second firearm, and we knew that
 3    because of the REAL system of the Puerto Rico Police, he was
 4    asked where that second firearm was located.
 5    Q    What, if anything, did Mr. Verdejo respond?
 6    A    He answered that this firearm was located in the house of
 7    his daughter's mother.
 8              MR. GOTTFRIED:  Okay.  Let me pause there for a
 9    moment.  I'm going to mark as Government IDs 25, 26, 27, and
10    136, photos that have been shown to Brother Counsel.
11              May I approach the witness?
12              THE COURT:  Yes.
13    BY MR. GOTTFRIED:
14    Q    Sir, can you please take a look at each of those photos?
15    And when you're done, if you can please look up.
16    A    Uh-huh.
17    Q    Sir, do you recognize those photos?
18    A    Yes.
19    Q    How do you recognize them?
20    A    These are true and exact photographs of --
21              THE INTERPRETER:  Correction.
22              THE WITNESS:  Two exact copies of the photographs
23    that we took on the day that we went to the Golden Gate One
24    urbanization in the Municipality of Caguas.  This is residence
25    D2, where Ms. Jennifer Acevedo opened the door to us.
```

1   Q    And are those photos true and correct representations of

2   what you personally saw that day?

3   A    That's correct, true and exact copy.

4         MR. GOTTFRIED:  Your Honor, at this time, the

5   government would move to introduce into evidence Government IDs

6   25, 26, 27, and 136, as Government Exhibits 25, 26, 27, and

7   136.

8         MS. CINTRON-COLON:  No objection, Your Honor.

9         THE COURT:  Without objection, so ordered.

10        (Exhibit Nos. 25, 26, 27 and 136 admitted into evidence.)

11        MR. GOTTFRIED:  Your Honor, may I recover those

12  exhibits?

13        THE COURT:  Yes.

14        MR. GOTTFRIED:  Thank you.

15        And if I can ask please that Exhibit 25 please be

16  published.

17        THE COURT:  Go ahead.

18  BY MR. GOTTFRIED:

19  Q    Sir, what do we see in Government Exhibit 25?

20  A    The D2 residence of the Golden Gate One urbanization in

21  the Bairoa Sector in Caguas.  That's when the lady, Ms.

22  Jennifer Acevedo, opened the door to us.

23  Q    And, sir, do we see you in this photo?

24  A    No.

25  Q    Okay.  Sir, moving into Government Exhibit 26.  What do we

1     see here?

2     A     This is the entrance to the residence D2.

3     Q     And who is sitting on the couch?

4     A     Yes, Mr. Felix Verdejo.

5     Q     Okay.  Moving on to Government Exhibit 27.

6     A     That's when we're already inside the residence.

7     Q     Okay.  Thank you for that clarification.

8           Moving on to Government Exhibit 27.  What do we see

9     here?

10    A     That's yours truly executing the search and seizure

11    warrant.

12    Q     Sir, I believe you mentioned that when you first saw

13    Verdejo, he did not have a shirt.  At what point, if any, did

14    he put a shirt on?

15    A     Yes.

16    Q     At what point was that?

17    A     He was told to put on a shirt.

18    Q     Okay.  Sir, moving on to Government Exhibit 136.  What do

19    we see here?

20    A     There we were already inside the residence, and you can

21    see the black Honda Pilot, which was the SUV that there had

22    been information that Mr. Felix Verdejo had gone over on the

23    Teodoro Moscoso Bridge on May 1st.

24    Q     And, sir, that day, the night of May 1st, leading into May

25    2nd, when you were at this house, did you search the house for

1    Mr. Verdejo's phone?

2              THE INTERPRETER:  For Mr. Verdejo's?

3    BY MR. GOTTFRIED:

4    Q    Phone.

5    A    No.

6    Q    Why not?

7    A    Because I did not have a warrant to search the house.  We

8    trusted him that he had given the phone to his attorney, but we

9    did inform him that he had to make the arrangements to contact

10   the attorney and deliver the phone.

11             MR. GOTTFRIED:  Okay.  At this time, I'd like to mark

12   as Government ID 31A, in Spanish; 31B, certified English

13   translation; 32A, in Spanish; 32B, certified English

14   translation; as well as Government ID 30A, in Spanish; and 30B,

15   certified English translation, which have been shown to Brother

16   Counsel.

17             Your Honor, may I approach the witness?

18             THE COURT:  Yes.

19             MR. GONZALEZ-DELGADO:  Before that, may we approach,

20   Your Honor?

21             THE COURT:  Yes.

22        (Sidebar conference commenced.)

23             MR. GONZALEZ-DELGADO:  Your Honor, we would just

24   request that in Government's Identification 30B, that his birth

25   date be redacted.  It was redacted in 30A, but it seems that

1     they missed it on 30B.  And that's a personal identifying

2     number.

3                    And in the other ones, I don't think there is a

4     social security number around.

5                    Yes, there is.  In Government's Identification 31A,

6     there is his social security in both the Spanish certification

7     and in the English translation.

8                    Just to make sure I don't have his social security.

9                    That would be our request, Your Honor, that the birth

10    date and social security numbers be protected.

11                   MR. GOTTFRIED:  Your Honor, we don't have an

12    objection to removing that personal identifying information.

13    If I can just scratch it out, is that acceptable?

14                   MR. GONZALEZ-DELGADO:  I have a black magic marker.

15    You can just black it out.

16                   THE COURT:  Okay.

17                   MR. GONZALEZ-DELGADO:  Thank you.

18         (Sidebar conference concluded.)

19                   MR. GOTTFRIED:  Your Honor, may I approach the

20    witness with Government IDs 30, 31 and 32?

21                   THE COURT:  Yes.

22    BY MR. GOTTFRIED:

23    Q    Sir, if you can take a look carefully at each of those

24    pages, and when you're done, if you can please look up.

25    A    Uh-huh.

```
1    Q    Sir, have you had a chance to look at each of those
2    documents?
3    A    That's correct.
4    Q    Okay.  Do you recognize those documents?
5    A    That's correct.
6    Q    And how do you recognize those documents?
7    A    This was the permit that was seized from Mr. Felix Verdejo
8    on May 2nd at the Golden Gate One urbanization in the Bairoa
9    Sector in Caguas.
10   Q    Let me ask you more generally.  Are those true and correct
11   copies of documents that you witnessed being seized on May 1st,
12   May 2nd, 2021?
13   A    That's correct, and here is the permit and the receipts of
14   the weapons seized.
15             MR. GOTTFRIED:  Your Honor, the government, at this
16   time, would ask that Government IDs 30, 31 and 32, for each of
17   those the Spanish original is identified as A, with the English
18   translation as B, that those IDs be admitted into evidence.
19             THE COURT:  Mr. Gonzalez?
20             MR. GONZALEZ-DELGADO:  No objection, Your Honor.
21             THE COURT:  Without objection, so ordered.  These
22   would be 30, 31, 32 --
23             MR. GOTTFRIED:  Yes, Your Honor.
24             THE COURT:  -- with Spanish and corresponding
25   translations.
```

```
 1              MR. GOTTFRIED:  Yes, 30A, 30B, 31A, 31B, 32A, 32B.
 2              THE COURT:  Correct.
 3         (Exhibit Nos. 30 through 32 admitted into evidence.)
 4              MR. GOTTFRIED:  I would note for the record, Your
 5    Honor, at defense counsel's request, which we agreed, we have
 6    blocked out certain personal information of Mr. Verdejo, such
 7    as social security number, as well as birth date.
 8              THE COURT:  Noted.
 9              MR. GOTTFRIED:  Your Honor, may I recover the
10    exhibits?
11              THE COURT:  Yes.
12    BY MR. GOTTFRIED:
13    Q    And before, sir, I show you these exhibits, you have
14    mentioned Mr. Verdejo during your testimony.  Do you see him in
15    court today?
16    A    That's correct.
17    Q    Can you please identify where he is sitting and what he is
18    wearing?
19    A    He is sitting right here to my right, and he has a white
20    long-sleeved shirt on.
21              MR. GOTTFRIED:  Okay.  May the record reflect that
22    the witness has identified Mr. Verdejo?
23              THE COURT:  The record will so reflect.
24              MR. GOTTFRIED:  And if I may publish Government
25    Exhibits, the Government Exhibits 30, 31 and 32 to the jury,
```

1    starting with Government Exhibit 30?

2              THE COURT:  Go ahead.

3              MR. GOTTFRIED:  I'll use the Elmo.

4    BY MR. GOTTFRIED:

5    Q    Sir, what do we see here in Government Exhibit 30?

6    A    That is a true and exact copy of the firearms permit

7    issued to Mr. Felix Verdejo-Sanchez by the Puerto Rico Police,

8    the Government of Puerto Rico.

9    Q    And when was that received by the police?

10   A    It was issued on October 6th, 2020.

11   Q    Okay.  And when was this particular card taken by the

12   police?  When did you receive the card?

13   A    On May 1st, 2021.

14   Q    Showing you on the Elmo Government 31.

15             Okay.  Sir, what do we see in Government Exhibit 31?

16   A    That is the PPR-384 of the Puerto Rico Police that

17   acknowledges receipt of firearms and ammunition.  This is the

18   PPR that yours truly filled in on May 2, 2021, to document that

19   the firearm had been seized from Mr. Felix Verdejo, and the --

20   and it is a brown Glock pistol, nine millimeter, with serial

21   number Bravo, Kilo, Kilo, Papa, 634.

22   Q    And, sir, in the lower left-hand corner, do you recognize

23   the signature on Exhibit 31?

24   A    Yes.  I recognize the receipt because my signature is

25   right here.

1    Q    And when you're saying "right here," you're referring to

2    the lower left-hand corner of the document?

3    A    That's correct.

4    Q    And on the lower right-hand corner, who did you see sign

5    that?

6    A    Mr. Felix Verdejo.

7    Q    Okay.  Sir, I'm going to show you -- I'm sorry.  In the

8    upper right-hand corner, under "Telephone," do you see that

9    box?

10   A    That's correct.

11   Q    Okay.  Where did you get that information?

12   A    From Mr. Felix Verdejo.  He provided it to me.

13   Q    And can you please read that number that you wrote?

14   A    (787)963-3693.

15        MR. GOTTFRIED:  Okay.  If we can please clear that

16   screen?

17   BY MR. GOTTFRIED:

18   Q    And I'm going to show you now Exhibit 32.  Can you please

19   tell us what that document is at Exhibit 32?

20   A    Yes.  That is the PPR-126, which is the document that the

21   Puerto Rico Police uses to document the inventory of seized

22   property.

23   Q    And where was this property seized from?

24   A    From Mr. Felix Verdejo.

25   Q    In the lower left-hand corner, whose signature do we see

1    there?

2    A    The first signature is the signature of Felix Verdejo, who

3    signed on May 2nd, 2021.

4    Q    And who wrote the telephone number that we see on the

5    right-hand side?

6    A    Mr. Felix Verdejo, and he even wrote the address also.

7    Q    Okay.  Sir, does your signature appear on this page?

8    A    That's correct.

9    Q    Where?

10   A    Below on the page, on the bottom, right smack in the

11   middle, where I'm marking it.  In addition to my signature, I

12   put in my badge number, 35115.  I printed my name to the left,

13   on the lower left side, and the division that I am currently

14   attached to, the San Juan Major Crimes Unit.

15   Q    Okay.  Okay.  And, sir, around what time of day was it

16   when you seized this property?

17   A    May 2nd, 2021, at, approximately, 3:15 to 3:30 in the

18   morning.

19         MR. GOTTFRIED:  Your Honor, if I may just have one

20   second?

21         Your Honor, I have, as Government Exhibit 28, a

22   firearm that has been shown to the marshals beforehand that has

23   been cleared and safety-tested by them.  I'd like to approach

24   the witness with it.

25         THE COURT:  Go ahead.

1          MR. GOTTFRIED:  Your Honor, may I approach the

2    witness with this Government ID?

3          THE COURT:  Yes.

4    BY MR. GOTTFRIED:

5    Q    Sir, my question to you is whether or not you recognize

6    Government ID 28.

7    A    That's correct.  I recognize it.

8    Q    And how do you recognize it?

9    A    This is the pistol that Mr. Felix Verdejo gave to me.  I

10   can corroborate it with the serial number and with the receipt,

11   which is a brown Bravo, Kilo, Kilo, Papa, 634, nine millimeter

12   Glock pistol.

13   Q    And is what color, sir?

14   A    Brown.

15          MR. GOTTFRIED:  Okay.  At this time, Your Honor, the

16   government would move to admit Government ID 28 into Government

17   Exhibit 28.

18          MR. GONZALEZ-DELGADO:  No objection, Your Honor.

19          THE COURT:  Without objection, so ordered.

20      (Exhibit No. 28 admitted into evidence.)

21          MR. GOTTFRIED:  May I recover it?

22          THE COURT:  Yes.

23          MR. GOTTFRIED:  And, Your Honor, at this time, I'd

24   like to approach the witness with Government ID 29 --

25          THE COURT:  Go ahead.

```
1              MR. GOTTFRIED:  -- which has already been shown to

2    defense counsel.

3    BY MR. GOTTFRIED:

4    Q    Sir, do you recognize the item depicted in that Government

5    Exhibit, Government ID 29?

6    A    Yes.

7    Q    Is that a true and exact copy of an item that you seized

8    on May 2nd in Caguas?

9    A    That's correct.  I can confirm it with the serial number:

10   Bravo, Kilo, Kilo, Papa, 634, brown nine millimeter Glock

11   pistol.

12             MR. GOTTFRIED:  At this time, Your Honor, the

13   government would move Government ID 29 into evidence as

14   Government Exhibit 29.

15             MS. CINTRON-COLON:  No objection, Your Honor.

16             THE COURT:  Without objection, so ordered.

17      (Exhibit No. 29 admitted into evidence.)

18             MR. GOTTFRIED:  May I recover the exhibit, Your

19   Honor?

20             THE COURT:  Yes.

21   BY MR. GOTTFRIED:

22   Q    Sir, where did you recover the brown Glock firearm again?

23   A    I seized it from the last bedroom at the D2 house of the

24   Golden Gate One urbanization in the Bairoa Sector in the

25   Municipality of Caguas.
```

1    Q    And, sir, just to be clear, the Government Exhibit 29 has

2    certain straps around the gun.  When you seized it, did it have

3    those straps?

4    A    No.

5    Q    Okay.  And who handed the gun to you?

6    A    Mr. Felix Verdejo.

7    Q    Sir, after, after seizing the gun, the keys, the bullets,

8    and the magazine, from the residence on the morning of May 2nd,

9    what happened next?

10   A    Well, he was given the PPR-126 and the PPR-384, having him

11   sign them both and leaving him with copy.  In addition to that,

12   we asked him whether he had a second firearm because we had

13   information that he had another one.

14   Q    And what, if anything, did Mr. Verdejo say in response to

15   that question?

16   A    That he did not have that firearm; that the firearm was

17   located in the house of his daughter's mother.

18   Q    What did you do next?

19   A    He was asked what was the name of the female.

20   Q    And what, if anything, did he say?

21   A    He indicated that the name of the female was Eliz Marie

22   Santiago-Sierra.  He was asked where she lived.  He answered

23   that she lived in Apartment 402B of the San Jose Condominium in

24   San Jose, San Juan.  Therefore, we left the Golden Gate at that

25   time.  And, approximately, 4:44 in the morning --

1   Q   And where did you go next?

2   A   To the Apartment 402B of the San Jose Condominium in San

3   Jose area of San Juan.

4   Q   And, sir, what time did you say that you got there?

5   A   At 5:10 in the morning.

6   Q   And this is May 2nd, 2021?

7   A   That's correct.

8   Q   Okay.  And once you got to Condominium San Jose around

9   5:10 in the morning, what did you do?

10   A   I recall that the apartment was an apartment that was high

11   up, where I went up.  Then we knocked, and we were received by

12   a gentleman.  And we asked him his name.

13   Q   What, if anything, did he tell you?

14   A   He answered that his name was Miguel Santiago, and he was

15   asked whether he knew the female, Eliz Marie Santiago.

16   Q   What, if anything, did he say?

17   A   He said that it was his daughter.

18   Q   Then what happened?

19   A   He was asked whether Eliz was inside the apartment.

20   Q   What did he say?

21   A   He answered yes, that she was sleeping.

22   Q   And with that information, what did you do?

23   A   We asked the gentleman to call her to come over to where

24   we were.

25   Q   And did he comply with your request?

1    A    That's correct.  He started calling her.

2    Q    And what happened?

3    A    Eliz Santiago came out then, and I recall that the

4    apartment -- the room was toward the left.  Once the lady came

5    to us, we asked her whether she was Eliz Santiago.

6    Q    What, if anything, did she say?

7    A    She said yes.

8    Q    After she identified herself, what happened?

9    A    After she identified herself, I identified myself as Agent

10   Manuel Colon of the Major Crimes Unit.

11   Q    Then what happened?

12   A    And we indicated the purpose of our visit in that

13   apartment there, which was to seize a pistol that belonged to

14   Felix Verdejo.

15   Q    And what was Ms. Eliz Santiago's demeanor?

16   A    She was a little surprised.

17   Q    Then what happened?

18   A    She was told that we should proceed to get the firearm;

19   where was the firearm, to which she answered that it was

20   located in the bedroom where she was sleeping with her

21   daughter.

22   Q    Is that where, in fact, you went?

23   A    That's correct.  When she told us that, we asked her

24   whether we could accompany her, and she agreed to.  She took us

25   to the area of the bedroom that had the door to the left.

```
 1    Q    What happened next?

 2    A    Where we proceeded to go to a safety box.  The safety box

 3    was black, and it was locked.

 4    Q    Were you able to open the safety box?

 5    A    That's correct.  She opened it.  She placed the code.

 6    Q    Before placing the code, did she call anyone?

 7    A    Yes.

 8    Q    Whom?

 9    A    Felix Verdejo, several times.

10    Q    And did they speak?

11    A    No.  She could not reach him.

12    Q    After she opened the safety box for you, what, if

13    anything, did you do?

14    A    She tried to put in the code, and she opened the safety

15    box.  And when she opened it, we could observe the pistol

16    inside the safety box.

17    Q    Okay.  Once you observed the pistol, what did you do next?

18    A    Once we saw the pistol, since there was a minor child

19    inside the bedroom, we asked her to take out the child outside

20    for her safety, which the girl was tendered to Mr. Miguel.

21    Q    So after the young girl was placed in a secure location,

22    what happened next?

23    A    Once she gave the child to Mr. Miguel, we proceeded, in

24    her presence, to take out the firearm in the presence of Ms.

25    Eliz Santiago.  I put on gloves to manipulate the weapon, not
```

 1    without, before holding onto the firearm, we contacted the

 2    Technical Services Division of the Puerto Rico Police to

 3    proceed to photograph the procedure, to guarantee purity of the

 4    proceedings.

 5    Q    So after Technical Services photographed the scene, what

 6    happened next?

 7    A    We extracted -- yours truly extracted the firearm from the

 8    safety box, placing it on the table that was there, in Eliz's

 9    presence.

10    Q    And once you placed the items on the table, what happened

11    next?

12    A    It was loaded, so I proceeded to handle it to unload it.

13    It was loaded with a magazine that has the capacity for 12

14    rounds, but this one had 11, and it had one round in the

15    chamber of the pistol --

16    Q    So how many --

17    A    -- for a total of 12 rounds, placing it next to the

18    magazine.  The pistol was a black Sig Sauer.

19    Q    And what was the capacity of the magazine?

20    A    It had the capacity for 12 rounds, and it was complete.

21    Q    And what else did you take out?

22    A    And in addition, from the safety box, we retrieved two

23    magazines with capacity for 12 rounds, which were fully loaded.

24    In addition, we extracted from the safety box another magazine

25    -- and correction, the prior magazine was Sig Sauer brand.

1    This magazine was brown Glock brand with capacity for 17 nine

2    millimeter round, which was fully loaded.

3    Q    And after taking out the fully, that fully-loaded

4    magazine, what did you do next?

5    A    We extract the magazine, and inside the safety box, there

6    were several boxes of rounds and several loose rounds of nine

7    millimeter.  All of this was counted in front of the lady, Eliz

8    Santiago, filling in the PPRs, two receipts of evidence:

9    PPR-126, which is inventory of property seized, and PPR-384,

10   which is a receipt of firearms and ammunition.

11           MR. GOTTFRIED:  So let me pause there for a minute,

12   and, at this time, I'm going to mark as Government IDs 33, 34

13   and 35 various photos that have been shown to Brother Counsel.

14   I am going to ask for permission to approach the witness with

15   these Government IDs.

16           THE COURT:  Permission granted.

17   BY MR. GOTTFRIED:

18   Q    Sir, can you please take a look at those photos, and once

19   you're done, can you please look up so that I know you're

20   finished?

21   A    Okay.

22   Q    Do you recognize those photos?

23   A    That's correct.

24   Q    Are those true and correct copies of photos of the scene

25   at which you were personally present?

1    A    That's correct, true and exact copies.

2            MR. GOTTFRIED:  Your Honor, at this time, the

3    government would move into evidence Government IDs 33, 34, 35

4    as Government Exhibits 33, 34, 35.

5            MR. GONZALEZ-DELGADO:  No objection, Your Honor.

6            THE COURT:  Without objection, so ordered.

7        (Exhibit Nos. 33 through 35 admitted into evidence.)

8            MR. GOTTFRIED:  Your Honor, may I recover those

9    exhibits?

10            THE COURT:  Yes.

11            MR. GOTTFRIED:  Could those exhibits please be

12    published to the jury?

13    BY MR. GOTTFRIED:

14    Q    Sir, can you please, sir, tell us what you see in

15    Government Exhibit 33?

16    A    Yes.  This photograph is the San Jose Plaza Condominium,

17    Building B.  If you see me, yours truly is on the second floor.

18    That's Apartment 402, where Ms. Eliz Santiago-Sierra lived.

19    Q    Showing you, sir, Government Exhibit 34.  What do we see

20    here?

21    A    That's the black safety box where the second firearm was

22    located.

23    Q    Showing you Government Exhibit 35.  What do we see here?

24    A    This is all of the evidence that was recovered from that

25    safety box.  As you can see, there is a black Sig Sauer pistol,

1    the three magazines that were seized, the additional brown

2    magazine, the Glock brand, the boxes of nine millimeter

3    ammunition, and the loose ammunition.

4    Q    Sir, after the property receipts were signed, after the

5    photos were taken, what happened next on the morning of May

6    2nd?

7    A    Once we had finalized with seizing the evidence and

8    signing the receipt of the property inventory, we left the San

9    Juan Condominium at around 6:15 a.m., and we went towards the

10    general headquarters, the big house, and arrived there,

11    approximately, 6:30 in the morning.  And so we proceeded to put

12    in the evidence office all of the evidence that we had seized.

13    Q    And once you had put the seized evidence into the police

14    evidence vault, what did you do?

15    A    I filled in the receipt of seized evidence, the entry and

16    exit of evidence, folio 69.

17    Q    And then what did you do?

18    A    I went home.

19    Q    Did you see Mr. Verdejo again on May 2nd, 2021?

20    A    That's correct.

21    Q    Under what circumstances?

22    A    That day, on May 2nd, approximately, 1:00 in the

23    afternoon, I again took service.

24    Q    And what happened after you took service?

25    A    I took service, and I had already been informed that the

1    fellow federal officers had taken control of the case.  So I

2    went to the facilities of the federal fellow officers to be

3    interviewed, and while I was there, I received a phone call

4    from Sergeant Omayra Arnaldi on my cell phone.

5    Q    And what happened on that phone call?

6    A    On her cell phone.  She received a phone call.

7              At this time --

8    Q    I'm sorry.  What was your understanding of that phone

9    call?

10   A    At that time, Attorney Jorge Colinas was communicating to

11   perform the delivery of Mr. Felix Verdejo's phone.

12   Q    And what did you do based on that information?

13   A    They were coordinating the delivery of the cell phone at

14   the Hato Rey West Police Station at Roosevelt Avenue.  The

15   delivery was coordinated for 2:00 in the afternoon.

16   Q    Did you participate in that delivery?

17   A    That's correct.  At that moment, I went towards the police

18   station Hato Rey West.  Then we parked, and we saw a gray Mazda

19   arriving.

20   Q    I'm sorry.  You said in the parking lot of what?

21   A    Of the Hato Rey West station.

22   Q    Okay.  And you saw a car approaching.  What happened next?

23   A    A gray Mazda parked there, and another vehicle came and

24   parked.  And when that vehicle parked, Mr. Felix Verdejo got

25   out of the gray Mazda.

1    Q    Okay.  And once you saw Mr. Felix Verdejo exit the Mazda,

2    what happened next?

3    A    He went towards the second vehicle, where Attorneys Jorge

4    Colinas and Eli Lopez got out.  Once they got out, we got out

5    of the vehicle, Sergeant Omayra Arnaldi and yours truly.

6    Q    What did you see next?

7    A    The attorneys and Felix Verdejo arrived to where we were.

8    Q    Then what did you see?

9    A    Mr. Jorge Colinas asked me to show him the document.

10    Q    What document are you referring to?

11    A    The search and seizure warrant for Mr. Felix Verdejo's

12    cell phone.

13    Q    Did you, in fact, show Mr. Felix Verdejo's lawyer the

14    search warrant?

15    A    That's correct.

16    Q    Then what happened?

17    A    He then read it, and once he had read it, he gave the

18    instruction to Mr. Felix Verdejo to turn in the equipment.

19    Q    Then what did you see?

20    A    That Mr. Felix Verdejo, with his right hand, put his hand

21    in his right pocket, taking out his cell phone.

22    Q    How did Mr. Felix Verdejo seem at that moment?

23    A    At that moment, he seemed nervous.

24    Q    Why do you say that?

25    A    Because of the delivery of the phone.

 1   Q    What about the delivery of the phone made you understand

 2   that he was nervous?

 3              MR. GONZALEZ-DELGADO:  Objection, calls for state of

 4   mind, Your Honor.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Product of investigation.

 7              MR. GONZALEZ-DELGADO:  Objection, Your Honor, state

 8   of mind.

 9              THE COURT:  Overruled.

10   BY MR. GOTTFRIED:

11   Q    Did you, in fact, receive the phone from Mr. Verdejo?

12   A    That's correct.

13   Q    Could you describe the phone?

14   A    He gave us, it was an iPhone, that in the back it was

15   gray, and in the front it was completely broken.  It was all

16   black.  It was off.  And it had a rubber plastic carcass that,

17   on the back it said "Discovery Innovation."  The phone was

18   taken out of the carcass.  It was broken, in the back part.

19   Q    Sir --

20              MR. GOTTFRIED:  Your Honor, at this time, I'd like to

21   mark as Government ID 36, which has been shown to Brother

22   Counsel, a phone, and ask for permission to approach the

23   witness.

24              MS. CINTRON-COLON:  No objection, Your Honor.

25              THE COURT:  All right.  Go ahead.

 1    BY MR. GOTTFRIED:

 2    Q    Sir, after you've had a chance to take a look at the

 3    phone, my question to you is:  Do you recognize that phone?

 4    A    Yes.  This is the same property that Mr. Felix gave to me.

 5    Q    How do you know?

 6    A    I recognize it because it's broken in the front, and it's

 7    a gray iPhone.  And it's completely broken on the back.

 8          MR. GOTTFRIED:  Okay.  Your Honor, at this time, Your

 9    Honor, I would move to admit Government ID 36 as Government

10    Exhibit 36.

11          MR. GONZALEZ-DELGADO:  Your Honor, may we have the

12    phone a minute?

13          THE COURT:  Go ahead.

14          MR. GONZALEZ-DELGADO:  No objection, Your Honor.

15          MR. GOTTFRIED:  Again, Your Honor, the government

16    would move to admit Government ID 36 into evidence as

17    Government Exhibit 36.

18          THE COURT:  Yes, admitted.

19       (Exhibit No. 36 admitted into evidence.)

20          MR. GOTTFRIED:  Your Honor, may I recover the phone?

21          THE COURT:  Yes.

22          MR. GOTTFRIED:  May I have the Elmo, please?

23    BY MR. GOTTFRIED:

24    Q    Sir, I'm showing you Government Exhibit 36.  Can you tell

25    us what we have on the screen here?

1    A    Yes, a gray iPhone with the back broken.

2    Q    And when you received it, did it have that white sticker

3    on it?

4    A    No.

5    Q    Sir, I'm showing you the front of the phone.  Do you

6    recognize that?

7    A    Yes.

8    Q    Okay.

9    A    Broken black screen.

10    Q    Okay.

11            THE COURT:  At this point, let's take a 10, 15-minute

12    break so you can stretch your legs and so forth.

13            Now, before the break, remember, ladies and

14    gentlemen, do not talk about or communicate with your

15    colleagues, or anybody else, about your impressions of the case

16    or of the evidence in the case.  Do not view, read or hear

17    reports, comments or articles about this case, and do not

18    conduct any research about the case, the matters in the case or

19    the individuals involved in the case.

20            I look forward to seeing you all back in the

21    courtroom in about 15 minutes.

22        (Whereupon the following proceedings were had in open court

23        without the presence of the jury.)

24            THE COURT:  Officer, we are going to be in a 10,

25    15-minute break.  You do not have to stay there where you are.

1    You can step out, walk around, stretch your legs and so forth.

2            The important thing is, do not talk with anybody

3    about this case.  Do not review materials related to this case.

4    Do not post messages on social media about this case.

5            THE WITNESS:  Understood.

6            THE COURT:  Thank you.  We'll be back in the

7    courtroom in about 10 or 15 minutes.

8      (Whereupon a recess was taken at 11:08 a.m., until 11:30

9      a.m.)

10      (Whereupon the following proceedings were had in open

11      court without the presence of the jury.)

12            THE COURT:  Ready to call the jury in?

13            MR. GOTTFRIED:  Yes, Your Honor.

14      (Whereupon the following proceedings were had in open

15      court in the presence of the jury.)

16            THE COURT:  Welcome back to the courtroom.  Please

17    take a seat.

18            MR. GOTTFRIED:  Your Honor, may the government

19    continue?

20            THE COURT:  Yes.

21            MR. GOTTFRIED:  Your Honor, if I may approach the

22    witness with Government ID 37, which consists of four photos

23    which have been shown to Brother Counsel.

24            THE COURT:  Yes.

25    BY MR. GOTTFRIED:

1    Q    Sir, I'm going to ask you to look at each of those photos

2    carefully, and when you're done, please look up.

3            Sir, do you recognize those photos?

4    A    Yes, I recognize them.

5    Q    How do you recognize them?

6    A    Those are the photographs of the cell phone that was

7    tendered to me as a cracked screen.

8    Q    And are those true and correct copies of the cell phone

9    that you, you received from Mr. Verdejo?

10   A    That's correct.  That's a true and exact copy.

11           MR. GOTTFRIED:  At this time, the government would

12   move ID 37 into Government Exhibit 37 as evidence.

13           MS. CINTRON-COLON:  No objection, Your Honor.

14           THE COURT:  Without objection, so ordered.

15       (Exhibit No. 37 admitted into evidence.)

16           MR. GOTTFRIED:  May I recover the evidence, Your

17   Honor?

18           THE COURT:  Yes.

19           MR. GOTTFRIED:  Can Government Exhibit 37 please be

20   published to the jury?

21           THE COURT:  Go ahead.

22   BY MR. GOTTFRIED:

23   Q    Sir, what do we see on this first page of Government

24   Exhibit 37?

25   A    A phone with the front screen cracked.

1    Q    Whose phone?

2    A    Mr. Felix Verdejo.

3    Q    Showing you the second page of Government Exhibit 37.

4    What do we see here?

5    A    A blow to the cell phone.

6    Q    Showing you page 3 of Government Exhibit 37.  What do we

7    see there?

8    A    It's assembled in China, the phone.

9    Q    Okay.  And moving to page 4 of Government Exhibit 37.

10   What do we see here?

11   A    The gray iPhone that was given to me by Felix Verdejo, the

12   back of it.

13   Q    Okay.  And when you received it, did it have that sticker,

14   that white sticker on it?

15   A    No, it did not have it.

16        MR. GOTTFRIED:  Okay.  At this time, Your Honor, I

17   would like to mark as Government ID 38A property inventory,

18   which I have shown to Brother Counsel.

19        May I approach the witness with Government ID 38A?

20        THE COURT:  Yes.

21        MR. GOTTFRIED:  For the record, 38A is a Spanish

22   version; 38B is a certified English translation.

23   BY MR. GOTTFRIED:

24   Q    Sir, do you recognize Government Exhibit 38?

25   A    That's correct.  I recognize it.

1    Q    And is that a true and complete copy of an inventory

2    document that you signed?

3    A    That is correct.  That is the PPR-126 that the Puerto Rico

4    Police uses to document seized property.

5              MR. GOTTFRIED:  At this time, Your Honor, the

6    government would move Government ID 38A and 38 into evidence as

7    Government Exhibit 38.

8              MS. CINTRON-COLON:  No objection, Your Honor.

9              THE COURT:  Without objection, so ordered.

10       (Exhibit No. 38 admitted into evidence.)

11             MR. GOTTFRIED:  Your Honor, may I recover the

12   exhibit?

13             THE COURT:  Go ahead.

14             MR. GOTTFRIED:  And permission to publish to the jury

15   Government Exhibit 38.

16             THE COURT:  Go ahead.

17   BY MR. GOTTFRIED:

18   Q    Sir, if we can go to the second page of that exhibit?

19   A    Uh-huh.

20   Q    At the bottom, the first signature that appears, whose

21   signature is that?

22   A    That is my signature.

23   Q    Okay.  On that date, did you sign it?

24   A    May 2nd, 2021.

25   Q    And below that, whom did you see sign?

1    A    Mr. Felix Verdejo.

2    Q    Okay.  Turning to the first page of Exhibit 38.  Who wrote

3    the letters on this page?

4    A    Yours truly.

5    Q    And what did you write?

6    A    On this page, I described the black iPhone, which is gray

7    on the back, which front and back were cracked, and also

8    described the carcass in which the phone had been tendered,

9    which on the back said "Discovery Innovation."

10           MR. GOTTFRIED:  Just a question about the

11    translation, "carcass?"

12           THE INTERPRETER:  Carcass, the cover, correction.

13    BY MR. GOTTFRIED:

14    Q    Okay.  Once you received the black iPhone from Mr.

15    Verdejo, what did you do next?

16    A    The phone was packaged in a brown paper bag.  The property

17    receipt was signed.  Mr. Felix Verdejo was requested to sign

18    it.  In addition, Attorney Jorge Colinas, who was with him, was

19    requested to sign it.

20    Q    What happened?

21    A    He indicated that it was enough with his client's

22    signature.

23    Q    Then what happened?

24    A    A copy of the receipt was given to him, and of the search

25    and seizure warrant, to Mr. Verdejo.

1    Q    Then what happened?

2    A    Once having done this, we left the place.

3    Q    What did you do with the phone?

4    A    It was stored in the property vault of the Puerto Rico

5    Police, the evidence room.

6    Q    At anytime, did you take that phone out of the evidence

7    vault?

8    A    Yes.

9    Q    What happened?

10   A    It was delivered to the fellow federal officers who had

11   taken jurisdiction of the case.

12   Q    Approximately, on what date?

13   A    May 4th, 2021.

14   Q    Sir, after turning the certain evidence over to federal

15   officials, what more, if anything, did you do on the case?

16   A    No, nothing else.  That is where my participation reached.

17            MR. GOTTFRIED:  Okay.  Your Honor, no further

18   questions at this time.

19            MR. GONZALEZ-DELGADO:  May it please the Court?

20            THE COURT:  Go ahead.

21            MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

22                           CROSS-EXAMINATION

23   BY MR. GONZALEZ-DELGADO:

24   Q    Good morning, Mr. Colon.

25   A    Good morning.

1    Q    Mr. Colon, when you went to your office when you were

2    called at 12:13 p.m., was it at night or in the morning?

3    A    12:31?

4    Q    Was it in the morning or in the afternoon?

5    A    When I was told about the case?

6    Q    Yes.

7    A    I received the call at 12:17, while I was at home, and I

8    took service at 1:55 of May 1st, at general headquarters, in

9    the Major Crimes Unit, where I am currently assigned.

10   Q    My question was:  a.m. or p.m.?

11   A    P.m.

12   Q    Okay.  Now, when you got there, the other police officers

13   were already there; is that correct?

14   A    At the FURA Division.

15   Q    In Loiza?

16   A    In Pinones, yes.

17   Q    Okay.  And when you got there, you were told that you were

18   going to be the person who was going to take control of the

19   scene; is that correct?

20   A    That's correct.

21   Q    Now, when you got there, you said you get on a boat, and

22   you actually go to the scene; is that correct?

23   A    Correct.

24   Q    Okay.  And at the scene, you saw when they were taking out

25   the body of Ms. -- who resulted to be Keishla; is that correct?

```
 1    A    That's correct.

 2    Q    Okay.  Now, referring to Government's Exhibit 42.

 3              MR. GONZALEZ-DELGADO:  Permission to publish, Your

 4    Honor.

 5    BY MR. GONZALEZ-DELGADO:

 6    Q    There was blood on the side of the boat; is that correct?

 7    A    Blood?  No.

 8    Q    Let me see if I can focus.

 9              Here, in this area.  I can't focus it.

10              Is this blood that's coming from the body?

11    A    No.

12    Q    Okay.  Now, in Exhibit 43, at the bottom of the stretcher,

13    is this blood?

14    A    That's water.

15    Q    You were there?

16    A    That's correct.

17    Q    I'm asking you if, when you were there, did you see that

18    this was blood?

19    A    No.

20    Q    Now, the body was taken by the [non-English language]; is

21    that correct?

22    A    The body was taken out of the water by federal officers of

23    Rescue.  It was worked in the area of the Pinones --

24    Q    My question was, did [non-English language], the Forensic

25    Institute Division, take the body of Ms. Keishla that day?
```

1    A    After it had been worked on, yes.

2    Q    Looking at Government's Exhibit Number 50.  This is at the

3    bottom, where you can see that there is liquid there.

4         My question is:  Is that blood?

5    A    I cannot determine that that is blood.

6    Q    You've been in multiple crime scenes; is that correct?

7    A    That's correct.

8    Q    And you have experience in crime scenes?

9    A    That's correct.

10   Q    And you've seen bloody scenes; is that correct?

11   A    That's correct.

12   Q    Okay.  Now, you said that you received information that

13   you had to "occupate" a Dodge Durango; is that correct?

14   A    That's correct.

15   Q    Was it a 911 call?

16   A    No.

17   Q    Who gave that information out?

18   A    That information was transferred to the work team.

19   Q    By who?

20   A    By Sergeant Jose Santiago.

21   Q    Did you interview Sergeant Jose Santiago to know where

22   this information came from?

23   A    Well, the work team gathered the information.

24   Q    My question is:  Did you personally call Sergeant Santiago

25   to ask him where he got this information from?

```
 1   A    I did not call him personally.

 2   Q    All you know is that there was an order to seize this

 3   vehicle?

 4   A    What I knew was that there was a subpoena that had been

 5   executed for the AutoExpreso and the Teodoro Moscoso Bridge.

 6   Q    When did you find out that?

 7   A    While working on the body at Pinones.

 8   Q    So you were receiving information that they were searching

 9   for a vehicle on the Teodoro Moscoso Bridge; is that correct?

10   A    It appears from the subpoena that the vehicle had passed

11   over the Moscoso Bridge.

12   Q    That wasn't my question.  My question was:  Did you know

13   that they were searching for a vehicle that had passed through

14   the Teodoro Moscoso?  That's the question.

15   A    By transferred information, yes.

16   Q    And when did this Dodge Durango pass on the bridge?

17   A    I did not go into the content of the Teodoro Moscoso

18   Bridge.  I received the information that that vehicle was being

19   sought.

20   Q    So you had no idea why they were searching for that

21   vehicle, correct?

22   A    Because of the subpoena.

23   Q    But you had no personal knowledge about any reason why

24   they were searching for this vehicle?

25   A    Well, from the work team, it appears that they were
```

1    searching for this vehicle.

2    Q    Once again, my question is --

3    A    The subpoena performed.

4    Q    Once again, my question is:  You had no idea why they were

5    searching for this vehicle?

6              MR. GOTTFRIED:  Objection, asked and answered.

7              THE COURT:  Overruled.

8              THE WITNESS:  With the work team, yes.  This was

9    information that had been supplied.

10   BY MR. GONZALEZ-DELGADO:

11   Q    Listen to my question.

12   A    That the vehicle was being sought under subpoena.

13   Q    Listen to my question.  Listen to my question.  Did you

14   have any personal knowledge why they were searching for this

15   vehicle?

16   A    Yes, because I was part of the work team.

17   Q    So what was your personal knowledge regarding the reason

18   why they were searching for this Dodge Durango?

19   A    That that Dodge Durango had stood at the Teodoro Moscoso

20   Bridge days prior.

21   Q    How many cars had stopped at the bridge in the prior days?

22   A    The only one that had stopped was the Dodge Durango, black

23   Dodge Durango, with license plate India, Victor, Golf, 226.

24   Q    Did you see the videos of the Teodoro Moscoso of the prior

25   days?

 1    A     No.

 2    Q     So you don't know that a couple of vehicles actually

 3    stopped on the bridge --

 4              MR. GOTTFRIED:  Objection, Your Honor.

 5    BY MR. GONZALEZ-DELGADO:

 6    Q     -- on the days before?

 7              THE COURT:  Don't answer.

 8              Yes.

 9              MR. GOTTFRIED:  Objection, Your Honor.  It's facts

10    not in evidence.

11              THE COURT:  Overruled.

12    BY MR. GONZALEZ-DELGADO:

13    Q     My question was:  So you have no personal knowledge that

14    other vehicles stopped on the bridge multiple times a couple of

15    days prior to the day that you were searching for the Dodge

16    Durango?

17    A     Well, I was part of the work team.  The information was

18    received, and I heard it, so I did have knowledge.

19    Q     My question was:  Do you have knowledge that multiple

20    vehicles stopped on the bridge on the days prior to finding the

21    body?

22    A     Not multiple.  Of this vehicle, yes.

23    Q     You have no knowledge that a couple of minutes prior to

24    the Dodge Durango passing the bridge for the first time, there

25    was a red SUV that also stopped on the bridge?

1           MR. GOTTFRIED:  Objection, Your Honor, facts not in

2     evidence.

3           THE COURT:  Overruled.

4           THE WITNESS:  I do not know.  I did not go into the

5     content of videos obtained.  All right?

6     BY MR. GONZALEZ-DELGADO:

7     Q    It wasn't discussed between the group that was

8     investigating this that a red SUV had stopped exactly at the

9     same spot that they allege that the Dodge Durango had stopped

10    on the same day the alleged crime occurred?

11          THE INTERPRETER:  Alleged crime?

12          MR. GONZALEZ-DELGADO:  Crime.

13          THE WITNESS:  No.

14    BY MR. GONZALEZ-DELGADO:

15    Q    Okay.  So when you go to -- you say then that the groups

16    are divided.  One went -- stayed at the bridge, and the other

17    one went to find the car that you were searching for; is that

18    correct?

19    A    That's correct.

20    Q    And you knew that there were police officers that were

21    tailing Felix Verdejo for a couple of days?

22    A    No.

23    Q    You were part of this investigation, and you didn't know

24    that there were police officers assigned to follow Felix

25    Verdejo to see what he was doing?

1    A    My participation was on May 1st to seize the body.

2    Q    But then you got orders to go and find the car.  That's

3    what you said.

4    A    Afterwards, when we were working on the body, this

5    information was obtained.

6    Q    And the information that you obtained was that you got a

7    search warrant, and they told you:  I need you to go and seize

8    this vehicle.

9              Is that correct?

10   A    No.  No.  The information, I go again and say that the

11   group was divided.  One of the group went on to look for the

12   vehicle, and the other group went on to stay at the Teodoro

13   Moscoso.

14   Q    And you were in charge of going and looking for the

15   vehicle?

16   A    No.

17   Q    But I thought you said that you had gone to Antigua Via to

18   see if the vehicle was at his mother's house.

19   A    When fellow officers found the vehicle, afterwards, and I

20   went to confirm that information.

21   Q    But you were in charge of that, weren't you?

22   A    That's correct.

23   Q    Okay.  So now you're in charge of finding the vehicle.

24   You receive information about the vehicle, and my question is:

25   Did the information that you were provided as to where was the

1    vehicle given by the police officers who were tailing Felix

2    Verdejo for a couple of days?

3    A    The work team was composed of several persons.  I was in

4    charge of the body.  After I had finished with the body, this

5    information of a vehicle came up; that there were other people

6    searching for that vehicle.  When they located it at the

7    sector, the Antigua Via Sector, I went to corroborate the

8    information with the license plate.

9    Q    My question is:  Did the information that you received

10   where the vehicle was found given by the police officers who

11   were tailing Mr. Verdejo for a couple of days?

12   A    Not several days.  On May 1st, that information was

13   received.

14   Q    So I'm going to assume that your answer is that you don't

15   know who gave the information.  Correct?

16   A    I told you it was Jose Santiago.  He was in charge of the

17   investigation.  He was in charge of getting that subpoena.

18   Q    But he was in charge of the subpoena, not actually going

19   and picking up the vehicle?

20   A    No.  It was a large work team.

21   Q    Can we agree that you were the one who was in charge of

22   finding the vehicle?

23   A    I was in charge of the body.  Once we finished with the

24   body, this information came up, and I went to corroborate the

25   information at the Antigua Via Sector.

 1   Q    Officer, let's say you finished the body.  You got new

 2   instructions, and the order is:  Go get the vehicle.  Let's

 3   forget about the body.  We're at the stage that you are in

 4   charge of searching for the vehicle.

 5   A    Yes.  I told you that the team had divided.  Some went to

 6   the Teodoro Moscoso, and some went on to the search of the

 7   vehicle.

 8   Q    And you were one of the ones that was in charge of

 9   searching the vehicle?  Yes or no?

10   A    I was in charge of the body and the investigation.

11   Q    Can you -- did you understand my question?

12   A    I told you that it was a work team.

13   Q    Listen to my question.  It's simple.  You testified that

14   you were in charge of getting the vehicle.

15   A    I was in charge of corroborating the information when they

16   saw the vehicle.

17   Q    Nobody could touch the vehicle until you got there; is

18   that correct?

19   A    That's correct.

20   Q    Because you were the one in charge.  That's my question.

21   A    At that time, when I corroborated that it was the vehicle,

22   then, yes.

23   Q    Thank you.

24        And then you get to the house, because that is the

25   address that's on the license, the vehicle license of the Dodge

1    Durango?

2    A    We did not have an address.

3    Q    Didn't you search the, the vehicle's license?

4    A    I told you that the work team had found the vehicle in

5    that Antigua Via Sector.  I went there to corroborate the

6    information.

7    Q    Agent, when you got to the house, it was at night; is that

8    correct?

9    A    9:18, precisely.

10   Q    And nobody went to the house prior to you arriving there;

11   is that correct?

12   A    Not up to where I understand.

13   Q    Because you were there to search for the vehicle.  You had

14   no information regarding the house where, allegedly, his mother

15   might have lived; is that correct?

16   A    When we arrived there at the Antigua Via Sector, we asked

17   the neighbors who was that vehicle.

18   Q    My question is:  When you arrived at the place where the

19   vehicle was, you did not have a search warrant for a house, and

20   you had no information about a house connected to this vehicle?

21   A    No.  We asked the neighbors, and the neighbors were the

22   ones who told us that the vehicle belonged to Felix Verdejo,

23   AKA "El Diamonte."

24   Q    That's exactly how they answered:  Felix Verdejo, AKA "El

25   Diamonte?"

1    A    "El Diamonte," that's correct.  They pointed at the house,
2    and they told us that that's where the mother and the
3    grandmother lived.  Therefore, yours truly went and knocked on
4    the door several times.
5    Q    But you didn't have a search warrant for the house; is
6    that correct?
7    A    No, not for the house, and even at that time, neither for
8    the vehicle.  When we knocked on the door several times and no
9    one came out, then we transferred the information in order to
10    be able to get a warrant for the vehicle.
11        MR. GONZALEZ-DELGADO:  May I have a second, Your
12    Honor?
13        May I have one second, Your Honor?  I'm looking for
14    an ID.
15        May I have Exhibit 22 and 23, please?
16        May I approach?
17        THE COURT:  Yes.
18    BY MR. GONZALEZ-DELGADO:
19    Q    Agent, did you -- was the vehicle open when you got there?
20    A    No.
21    Q    Did you try to open it?
22    A    No.
23    Q    Did you ask for the keys from Mr. Verdejo for the car when
24    you interviewed him?
25    A    That's correct.

1    Q    And he gave you the keys?

2    A    That's correct.

3    Q    But when you saw the vehicle for the first time, just to

4    make sure that nothing was altered, you sealed the vehicle,

5    correct?

6    A    That's correct.

7    Q    Okay.  And the vehicle, you looked inside the vehicle to

8    see if you could see something that was illegal in the car; is

9    that correct?

10   A    It's that you could not see inside the vehicle because of

11   the tinted windows, plus it was night out.

12   Q    And you didn't use a flashlight to see if you could see

13   something in plain view?

14   A    No, no.

15   Q    Now, wasn't -- in Exhibit 20, in Exhibit 20, you could see

16   -- and let me see if I have it here.

17            Here it is.

18            In Exhibit 20 --

19            MR. GONZALEZ-DELGADO:  May I publish, please?

20   BY MR. GONZALEZ-DELGADO:

21   Q    This is where you found the vehicle, correct?

22   A    That's correct.

23   Q    That's a light post, right?

24   A    That's correct.

25   Q    Couldn't you just look through the front of the vehicle to

1    see if you could see anything inside?

2    A    The tints of the window did not allow me to see.

3    Q    Okay.  Now, while you're there, you received additional

4    information that someone said that Mr. Verdejo was in Caguas?

5    A    From the work team.

6    Q    So somebody found out that he was in Caguas?

7    A    The Police Intelligence Division.

8    Q    My question is:  Was the information relayed by the agents

9    who were tailing Mr. Verdejo, who followed him to Caguas?

10    A    Intelligence Division of the Police.

11    Q    Who was following?  Who were following Mr. Verdejo?

12    A    He was provided custody.

13    Q    But he wasn't, he wasn't charged at that time, correct?

14    A    No.

15    Q    But you were following him?

16    A    Well, he was being followed because he was the owner of

17    the vehicle, and we had a search and seizure warrant to search

18    the vehicle.

19    Q    And how was he being followed if you didn't know where he

20    was?

21    A    The Puerto Rico Police Intelligence Division was following

22    him.

23    Q    But I thought you said that you didn't know where he was?

24    A    Was not --

25    Q    Mr. Verdejo?

```
 1    A    No.  Because, at that time, I was working with the

 2    vehicle.

 3    Q    But you were looking for Mr. Verdejo, is my question.

 4    A    We knocked on the M3 residence where the neighbors had

 5    said that the vehicle belonged to that residence.

 6    Q    And you already said that nobody came out.

 7              My question is:  How did you find out that he was in

 8    Caguas?

 9    A    The Intelligence Division of the Puerto Rico Police.

10    Q    You know that Golden Gate One is a gated community,

11    correct?

12    A    That's correct.

13    Q    And it's pretty big?

14    A    I don't know.

15    Q    You were there, weren't you?

16    A    Afterwards, when I finished with the vehicle, I went

17    towards Golden Gate One.

18    Q    And when you were going up the hill to go to the gate of

19    Golden Gate One, the truth is, you can't see inside the

20    community; is that correct?

21    A    It's that I didn't go to see whether or not you could see

22    into the community.  I was going there to execute a search

23    warrant, the last location that had been identified of where

24    Mr. Felix Verdejo had been located.

25    Q    Mr. Felix Verdejo or his phone?
```

1    A    Mr. Felix Verdejo.

2    Q    So somebody actually told you that they saw Mr. Verdejo in

3    Golden Gate One in Caguas?

4    A    I repeat, the Intelligence group of the Puerto Rico Police

5    was part of the work team, and they were following him.

6    Q    So your answer to my question that somebody told you that

7    they physically saw Mr. Verdejo at Golden Gate One was because

8    they saw him and not because his telephone had pinged as the

9    last location?

10   A    I did not understand the question.

11   Q    Once again, your answer, or your statement, is that

12   somebody physically saw Mr. Verdejo in Bairoa, Golden Gate One

13   in Caguas on the night of May 1st, 2021?

14   A    When I finished working on the vehicle, the Intelligence

15   Division that had that mission indicated that Mr. Verdejo was

16   located at the Golden Gate One neighborhood, and I went there

17   to execute the search and seizure warrant of the vehicle.

18   Q    Once again, I'm repeating my question.  That's not my

19   question.

20        My question is:  Did somebody tell you that they

21   physically saw Mr. Verdejo the night of May 1st, 2021, in

22   Bairoa, Golden Gate One in Caguas, Puerto Rico?

23   A    I told you that in the work team there was people from

24   the Intelligence Division who had been following and had seen

25   him in Caguas, and they should be following him since the 1st,

1    and early morning of the 2nd, and the 2nd of May.

2    Q    Listen to my question.  I'm talking about you, you.

3    Nobody else.

4         Did you receive information that somebody actually

5    saw Mr. Verdejo in Bairoa, Golden Gate One, on May 1st, 2021?

6    A    Yes.  That's why I went over there to execute the search

7    and seizure warrant for the vehicle and the phone.

8    Q    It wasn't because somebody said that the phone had last

9    connected to a tower in Caguas near Bairoa Golden Gate One?

10   A    I do not know because I was in charge of seizing the

11   vehicle at that time.  After I had finished, the Intelligence

12   Division gave me the location of Mr. Felix Verdejo.

13   Q    Going back two questions, and your answer.  Who told you

14   that they saw Mr. Verdejo in Caguas?

15   A    The Caguas Intelligence Division.

16   Q    Who there?

17   A    The work team.  I cannot tell you specifically who.

18   Q    Okay.  And you said that the Division of Photograph of the

19   Police of Puerto Rico was with you when you went to execute the

20   search warrant; is that correct?

21   A    To seize the vehicle and to execute the search and seizure

22   warrant, yes.

23   Q    And you gave the order that you wanted everything

24   documented?

25   A    That's correct, to photograph it.

1    Q    Excuse me.  I'm sorry.

2    A    To photograph it.

3    Q    To photograph it.

4         And the photographer was with you when you were doing

5    this?

6    A    That's correct.

7    Q    But today the only four pictures that you have shown are

8    exhibits, or were shown, are Exhibit 25, 26, 27, and 136; is

9    that correct?

10   A    Yes.  I've been shown several photographs.

11   Q    Okay.  In this photograph, Exhibit 136 that the government

12   showed you, you can see that there is two agents and Mr.

13   Verdejo sitting on the, on the, on a sofa or a seat; is that

14   correct?

15   A    That's correct.

16   Q    And in Exhibit 25, you can also see that this photograph

17   shows the lady that opened the door?

18   A    That's correct, Ms. Jennifer Acevedo.

19   Q    And she's got a tank top and a pair of shorts, correct?

20   A    Sleeping clothes.

21   Q    But that's not a baby doll?

22   A    Well, I call it sleeping clothes, pajamas.

23   Q    But to answers of Brother Counsel, you said that the

24   person who opened the door came out in a baby doll?

25   A    Like a sleeping gown, like a baby doll.

1    Q    That wasn't the explanation you gave the prosecutor,
2    correct?
3    A    Yes, sleeping gown.
4    Q    My question is:  Didn't your answer to the prosecutor's
5    question as to who opened the door was:  The person who came
6    out was in a baby doll?
7    A    Sleepwear, like a baby doll.
8    Q    So the expression "baby doll" was a mistake?
9    A    It's a baby doll, can be sleepwear.
10   Q    But not what we're seeing on the photos?
11   A    But we see here, in sleepwear, like a baby doll.
12   Q    Okay.  Now, Exhibit 27, you say that this picture was
13   taken after you told Mr. Verdejo to put on a shirt?
14   A    That's correct.
15   Q    So there must be, or there must exist a picture of Mr.
16   Verdejo, when you first saw him, without a shirt on?
17   A    If the photographer took it, yes.
18   Q    I thought you said the photographer was with you taking
19   pictures of everything that was happening there?
20   A    That's correct.
21   Q    So there must be a picture of Mr. Verdejo without a shirt
22   that night?
23   A    If it was taken, yes.
24   Q    But you were with him.  Did you see him take pictures of
25   Mr. Verdejo without a shirt?

1  A    At this point, I am executing the search and seizure

2  warrant, so at that point, I had told him to put on a shirt.

3  Q    But prior to you executing this search warrant, you spoke

4  with Mr. Verdejo?

5  A    Yes.  I identified myself, and we indicated the intention

6  of why we were there.

7  Q    And, at that moment, he was without a shirt, and your

8  photographer was with you?

9  A    I was executing the search and seizure warrant.  Whatever

10 he photographed, I cannot give you that details.

11 Q    Didn't you see the pictures that were taken that day by

12 the photographer that you took?

13 A    That one specifically, yes.

14 Q    To prepare for this case?

15 A    No.

16 Q    Okay.  When did you see the pictures that he took?

17 A    When they requested from the Technical Services Division

18 of the Puerto Rico Police.

19 Q    How many pictures did you see?

20 A    Several.

21 Q    And much more than the ones that we have here?

22 A    Of those that have been shown here, yes.

23 Q    Actually, we haven't seen a picture of you entering the

24 room where you say that you found the weapon; is that correct?

25 A    That's correct.

```
 1   Q    But isn't that something that you wanted to preserve?

 2   A    The execution of the search and seizure warrant.

 3   Q    That's not my question.  My question is:  Wouldn't you

 4   want to preserve a picture of the place where you say that you

 5   found the weapon?

 6   A    It's that we did not go to seize the weapon.  We went

 7   there to execute a search and seizure warrant for the vehicle

 8   and for the cell phone, and by investigation, the firearms were

 9   seized.

10   Q    But you didn't have to ask for his weapon; is that

11   correct?

12   A    By investigation, they were seized.

13   Q    Listen to my question.  You didn't have an order to seize

14   his weapons; is that correct?

15   A    I did not have an order to seize the weapon.

16   Q    And then, just by chance, you ask if his weapon is with

17   him, and he says yes.  And you don't take a picture of the

18   place where he -- where you found a weapon that you had no

19   order to seize?

20   A    What I asked was whether he was armed, and he said yes.

21   Q    And you knew he had a license?

22   A    That's correct.

23   Q    So it wasn't illegal for him to be possessing his own

24   weapon; is that correct?

25   A    It was not illegal.
```

1    Q    But then you said, you know:  Can I have the weapon, just

2    for investigation?

3    A    For his safety and ours, and for the investigation, the

4    firearms were seized.

5    Q    Why was there safety and danger when he was with you in

6    the living room, and the weapon was in a room that he had no

7    access to because you were there with him?

8    A    Because we went to go get the key, and that key was right

9    next to the firearm.

10    Q    But you didn't know that?

11    A    He told me.

12    Q    He told you that:  My keys are next to the weapon?

13    A    He was asked where was it -- he was asked whether he had

14    the key, and he said yes.  He was asked whether he was armed,

15    and he said yes.  And he was asked where was the key, and he

16    said that it was in the night table --

17            THE INTERPRETER:  Correction.

18            THE WITNESS:  He was asked where was the weapon, and

19    he answered that it was on the night table next to the key.

20    And for reasons of safety and investigation, the firearms were

21    seized.

22    BY MR. GONZALEZ-DELGADO:

23    Q    When you asked about the key, Mr. Verdejo didn't tell you

24    that it was next to his weapon; is that correct?

25    A    He said -- he was asked whether he was armed, and he said

1     yes.

2     Q    Listen to my question.  When you asked for the key,

3     listen, you asked Felix:  Where is your key to the Dodge

4     Durango that I'm serving this search warrant?  That's the

5     question.

6            Felix didn't say:  The keys are next to my weapon in

7     the room.  That wasn't his answer?

8     A    No.  But to questions by yours truly, when I asked him

9     whether he was armed, he said yes, and that the firearm was

10    next to the key.

11    Q    When you asked for the weapon, it was after he had already

12    answered that he had possession of the key; is that correct?

13           THE INTERPRETER:  Counsel, can you repeat the

14    question?

15    BY MR. GONZALEZ-DELGADO:

16    Q    When you asked for the key, you had not asked about the

17    weapon?

18    A    In the question, I asked whether he was armed.

19    Q    Listen to my question.  Once again, do you need me -- am I

20    not communicating appropriately with you?

21           MR. GOTTFRIED:  Objection, argumentative.

22           MR. GONZALEZ-DELGADO:  It's a fair question.  He

23    doesn't understand my questions, Your Honor.  Six times I've

24    asked the same question.

25           THE COURT:  Counsel, counsel, leave it at that.  Go

1   on with your question.

2            MR. GONZALEZ-DELGADO:  Thank you, Your Honor.

3   BY MR. GONZALEZ-DELGADO:

4   Q    Listen carefully.  You served the subpoena like you're in

5   this picture?

6   A    That's correct.

7   Q    That's the one for his vehicle?

8   A    That's correct.

9   Q    You asked him:  Do you have the keys of this vehicle with

10  you?  That was your question?

11  A    That's correct, and he answered yes.

12  Q    And he said yes.  And you asked:  Where is the key?

13  A    That's correct.

14  Q    And he said:  In the room?

15  A    That's correct.

16  Q    And then you asked him:  Are you armed?

17  A    That's correct.

18  Q    And he said:  Yes, and the weapon is in the room?

19  A    That's correct.

20  Q    He didn't have the weapon accessible to him.  He couldn't

21  just take his hand out and get the weapon; is that correct?

22  A    No.

23  Q    Actually, you weren't the only police officers that were

24  there, correct?

25  A    That's correct.

```
 1    Q    He wasn't violent?

 2    A    No.

 3    Q    He was answering your questions?

 4    A    Yes.

 5    Q    He was complying with what you said?

 6    A    That's correct.

 7    Q    And then my question is:  We have not seen a photo of the

 8    place where the weapon and the keys were actually found; is

 9    that correct?

10    A    No.

11    Q    Okay.  And you say that after you get the keys, you get

12    the weapon, he says:  I have another weapon, but it's in my

13    house, in my ex or my baby momma's house; is that correct?

14    A    That's correct.

15    Q    And the photographer went with you also?

16    A    That's correct.

17    Q    What's his name?

18    A    Eduardo Colon.

19    Q    Okay.  And then he said that it was in a safety box, in a,

20    in a safe?

21    A    That's correct.

22    Q    And he gave you the number of the safe?

23    A    He indicated that the firearm was in his daughter's

24    mother's house.

25    Q    In a safe?
```

 1    A    Eliz told me that when we arrived at the place.

 2    Q    So Mr. Verdejo never said in Golden Gate One that his

 3    weapon was in a safe at his baby's mother's house?

 4    A    Yes, he said so.  I asked him.

 5    Q    It was in a safe, is my question.

 6    A    He told me that it was in the house of his daughter's

 7    mother.

 8    Q    And he never gave you the combination to the safe in

 9    Caguas?

10    A    No.

11    Q    Okay.  So then you go to -- you come back to San Juan

12    because you wanted to pick up the weapon?

13    A    That's correct.

14    Q    Okay.  And when you get to the house in San Jose Plaza B,

15    you go up the stairs, and you knock on the door?

16    A    Correct.

17    Q    And the person who opens the door is Miguel Santiago-Laiz?

18    A    No.  I did not say at anytime that he opened the door.  I

19    said that, when we arrived there, we were received by Miguel

20    Santiago.

21    Q    Downstairs?

22    A    No.  Upstairs, when we went up.

23    Q    Was he on the stairway?

24    A    No.

25    Q    He was inside the house?

```
 1    A    He was inside.

 2    Q    He was inside the house?

 3    A    And we called.

 4    Q    But you had to knock on the door.  The door was closed?

 5    A    There was a gate.

 6    Q    And the gate was open?

 7    A    No.

 8    Q    But then he's the person who receives you, correct?

 9    A    When we arrived at the condominium.

10    Q    And you said:  I need to get into this house?

11    A    No.

12    Q    So what did you say to the person who received you at that

13    house?

14    A    That we went to get a firearm that belonged to Felix

15    Verdejo.

16    Q    Miguel Santiago-Laiz told you that he wasn't there?

17    A    Who was not there?

18    Q    Mr. Verdejo.

19    A    No.  I asked him whether he knew Ms. Eliz Santiago.

20    Q    My question was:  Did Mr. Santiago-Laiz tell you that Mr.

21    Verdejo was not in the apartment?

22    A    He was not asked that.

23    Q    Did you ask him that you needed to go into the house to

24    seize a weapon from Mr. Verdejo, from Mr. Verdejo?

25    A    He was asked whether he knew Ms. Eliz Santiago, and he
```

1    said that she was his daughter.

2    Q    Did you ask who was the owner of the apartment?

3    A    Yes.

4    Q    And he told you?

5    A    Eliz Santiago, his daughter.

6    Q    And she came out?

7    A    That's correct.  He called her.

8    Q    And when you went to the room, you say that you found the

9    weapon inside, inside this safety box; is that correct?

10   A    It was inside the safe with the code.  She opened the

11   safe, and the firearm was there, that firearm, the Sig Sauer.

12   Q    And that's how it's supposed to be, correct?

13   A    That's correct.

14   Q    Okay.  And it's not illegal to have more than one

15   magazine?

16   A    No.

17   Q    And it's not illegal to have bullets?

18   A    No.

19   Q    And, actually, in exhibit --

20          MR. GONZALEZ-DELGADO:  For the record, I'm sorry, the

21   picture that I showed was Exhibit 34.  And now I am showing him

22   Exhibit 35 by the government.

23   BY MR. GONZALEZ-DELGADO:

24   Q    Now, you said that the weapons were loaded, correct?

25   A    The weapon was loaded.

1    Q    Okay.  The weapon in Caguas was also loaded?

2    A    That's correct.

3    Q    And what's the standard magazine for a Glock nine

4    millimeter?

5    A    There are different magazines.

6    Q    That's not my question.  My question is -- okay.  Let me

7    rephrase.

8            The Glock nine millimeter is the official police

9    weapon of Puerto Rico; is that correct?

10   A    That's correct.

11   Q    And standard issue Glock nine millimeter has a 17-round

12   magazine with each weapon?

13   A    There are different magazines.

14   Q    My question is:  Isn't the 17-bullet magazine the standard

15   magazine provided with the Glock 19X?

16   A    At least the magazine that the Police of Puerto Rico

17   provide to me is a magazine for 15 ammunition, not for 17

18   rounds of ammunition.

19   Q    And that's your weapon, correct?

20   A    Yes.  But I said that there are different magazines.

21   Q    And what I'm asking you is if a Glock 19X has a standard

22   17-bullet magazine with it.

23   A    There are magazines of 17.

24   Q    And the two magazines that you occupied in Caguas, they

25   both had 15 bullets?

1    A    The magazine was for 17 rounds, and they both had 15

2    rounds.

3    Q    So my answer is yes?

4    A    Yes.

5    Q    Okay.  Now, you said that, in this photograph, we can see

6    bullets, loose bullets, and the magazines, correct?

7    A    That's correct.

8    Q    But these loose bullets that you see here, and I'm

9    referring to Exhibit 35, were the bullets that you took out

10   from the magazines that you occupied inside the safe; is that

11   correct?

12   A    The evidence was placed on the table.

13   Q    Hold on.  You said that you occupied fully-loaded

14   magazines; is that correct?

15   A    Uh-huh.

16   Q    The government has not presented a photo of those loaded

17   magazines as you found them; is that correct?

18   A    No.

19   Q    And you said that you put them on top of a table; is that

20   correct?

21   A    All of the evidence on a table.

22   Q    And in order for security purposes, you took out the

23   bullets that were on the magazines so you could know two

24   things:  how many bullets were there, and to make sure that

25   nothing happened with those bullets?

1  A    That's correct.

2  Q    But to make sure that you knew which bullets belonged to

3  which magazine, you divided them like, like this picture shows.

4  The bullets that are here that I'm, I'm circling, are the

5  bullets that you found in the brown magazine; is that correct?

6  A    Well, yes.

7  Q    And it's the same thing for the bullets that are shown on

8  top of the other three magazines that I'm circling right now;

9  is that correct?

10 A    That's correct.

11 Q    No loose bullets are seen in this picture?

12 A    No, because they had been arranged in the boxes to be able

13 to count them.

14 Q    So in order to count them, you altered the scene?

15 A    It was not altered.  The little boxes were extracted from

16 the safe, and they were placed on the table to be able to count

17 them.

18 Q    So referring to Exhibit Number 34.  That's a picture of

19 when you opened the safe, correct?

20 A    That's correct.

21 Q    You can't see any loose bullets there, right?

22 A    No.  You see the magazine, the pistol, several boxes of

23 bullets.

24 Q    You've been in the police for how long?

25 A    11 -- it will be 13 years with the police.

```
 1   Q    And as part of your investigation, or your preparation,
 2   you've been shooting for 13 years, or maybe more?
 3   A    13 years.
 4   Q    And you know that there is a difference between a loose
 5   bullet that you found on the floor and bullets that you found
 6   inside a box; is that correct?
 7   A    That's correct.
 8   Q    And as part of your preparation, you know that if you go
 9   to a scene, and you have bullet casings or you have bullets
10   that are loose on the floor and you have bullets on top of a
11   table, you can't mix them; is that correct?
12   A    That's correct.
13   Q    But here you took the bullets that we can't see in the
14   safe that you say were loose, and you just mixed them up with
15   the ones that were in the box; is that correct?
16   A    That's correct.
17   Q    And then you say that, when you were there, you called Mr.
18   Verdejo a couple of times?
19   A    I did not call him.
20   Q    But you said that Eliz did?
21   A    Eliz did call him.
22   Q    Because you wanted to speak with him?
23   A    No.
24   Q    I thought that you said you need the code or something?
25   A    She called him for him to facilitate the code of the safe.
```

1   Q    He didn't pick up?

2   A    No.

3   Q    Because he told you that his phone was with his attorney?

4   A    That's correct.

5   Q    Okay.  Then you take the weapons, and you put them in

6   evidence bags; is that correct?

7   A    That's correct.

8   Q    And as part of that, of putting them in the bags, is that

9   so you can give them to the appropriate expert to do tests on

10  it?  Is that correct?

11  A    That's correct.

12  Q    Fingerprint analysis?

13  A    That procedure is done by forensics.

14  Q    Listen to my question.  The reason why you do this is so

15  that fingerprint analysis of the weapon can be conducted by

16  [non-English language]?

17  A    Yes.

18  Q    To see if the weapon had been actually fired?

19  A    That's correct.

20  Q    To see if the bullets in the weapon match bullets found at

21  the crime scene?

22  A    Whether they match to the same place of the crime?

23  Q    If they're the same bullets.

24  A    Yes.

25  Q    And you are in charge, and you gave that order?

1    A    What order?

2    Q    To have this firearm analyzed.

3    A    No.

4    Q    It was the prosecutor, the state prosecutor?

5    A    No.

6    Q    Who gave the order to analyze this weapon?

7    A    All of that evidence was delivered to the fellow officers

8    of Forensics Institute, to the federal officers, on May 4th,

9    2021.

10    Q    I'm talking about May 1st.  On May 1st, you're the one who

11    puts this weapon in an evidence bag?

12    A    That's correct.

13    Q    The federal government had not taken over this case yet;

14    is that correct?

15    A    I make a correction.  It was on May 2nd.

16    Q    Okay.  So on May 2nd, you take the weapon, you put it in

17    an evidence bag, and you give it to the forensic team; is that

18    correct?

19    A    No, not to the forensic team.  I put all of that evidence

20    into the evidence vault of the Puerto Rico Police.

21    Q    And the reason you do that is that so the forensic team

22    can come and pick it up and analyze it?

23    A    Yes.  Afterwards, it is taken to the Forensic Sciences

24    Institute for analysis and investigation.

25    Q    Is that standard operating procedure?

1    A    That's correct.

2    Q    Okay.  So you have all this evidence there, and do you

3    have knowledge that this weapon was actually analyzed by the

4    forensic team?

5    A    I do not know.

6    Q    After you transferred it on May 4th to the federal

7    government, you did not ask or did not see a weapons report?

8            THE INTERPRETER:  What report?

9    BY MR. GONZALEZ-DELGADO:

10    Q    Forensic, forensic.

11    A    No.

12    Q    Nobody told you to certify that that bag that contained

13    the weapon was the bag that you put the weapon that you

14    obtained from Mr. Verdejo?

15            THE INTERPRETER:  I'm sorry.  Can you repeat the

16    question?

17    BY MR. GONZALEZ-DELGADO:

18    Q    Nobody asked you to certify that the weapon that was in

19    that bag was the weapon that you seized from Mr. Verdejo?

20    A    On May 4, I provided all of the evidence seized to the

21    federal officers, by yours truly, at the office.  They gave me

22    a property receipt as having received that inventory.

23    Afterwards, they took jurisdiction, and my participation ended

24    there.

25    Q    That was my question.  You gave the evidence to the

1    federal government?

2    A    That's correct.

3    Q    But the forensic team from Puerto Rico had still not made

4    any analysis of the weapon that you seized from Mr. Verdejo; is

5    that correct?

6    A    I do not know.  My participation was up until May 4th,

7    when I gave all of the evidence to the federal fellow officers.

8    Q    Listen to my question.  On May 4th, you didn't have to go

9    to the Forensic Institute of Puerto Rico to retrieve the weapon

10   that you seized from Mr. Verdejo; is that correct?

11   A    No, because it was provided by receipt to the federal

12   authorities.

13   Q    Because it was still in your locker?

14   A    No.  On May 4th, I took all of that from the evidence

15   vault of the Puerto Rico Police, and it was all given to the

16   federal authorities by receipt.

17   Q    Because the Forensic Institute of Puerto Rico had still

18   not seized that evidence.  That's my question.

19   A    I don't understand the question.

20   Q    See if you can follow me.

21   A    Okay.

22   Q    May 1st, you seize the weapon, the weapon?

23   A    At 2:00 a.m.

24   Q    I'm sorry.  Yes, 2:00 a.m.  It was around 3:00 a.m. that

25   you said, correct?

1    A    Approximately.

2    Q    You take possession of the weapon?

3    A    That's correct, the first weapon.

4    Q    Standard operating procedure calls that you put that

5    weapon in an evidence bag?

6    A    To package it in an evidence bag, correct.

7    Q    And your orders are that you have to take that bag, that

8    evidence bag, to the police locker, the police evidence locker;

9    is that correct?

10   A    That's correct, with the content, but I have to open it

11   for them to see what I am leaving inside the room.

12   Q    Because you have to make sure that what you say or you

13   wrote on the evidence bag is what is contained inside the bag?

14   A    That's correct.

15   Q    You seal it again?

16   A    That's correct.

17   Q    And you put it in the evidence locker?

18   A    In the evidence room, correct.

19   Q    If the federal government had not taken charge of the

20   case, you would have taken that bag, evidence bag, to the

21   Forensic Institute; is that correct?

22   A    That's correct.

23   Q    Okay.  So my question is:  On May 4th, when the federal

24   government takes over the case, the evidence bag had not been

25   transferred to the Forensic Institute of Puerto Rico?

1    A    On May 4th, when I delivered all of the evidence seized to

2    the federal authorities, I do not know what they did with that

3    evidence.

4    Q    My question is:  May 4th, Forensic Institute of Puerto

5    Rico had not received the evidence that you seized on May 2nd?

6    Yes or no?

7    A    I do not know because I did not have that evidence.  The

8    federal authorities were the ones that had that evidence.

9    Q    And besides that, you gave them the cell phone, correct?

10   A    I'm sorry?

11   Q    Besides the weapon that you seized, you made sure that the

12   federal government received the phone that we saw a little

13   while ago as exhibit?

14   A    That's correct.

15   Q    And to prepare for today's testimony, what did you review?

16   A    What did I review?  Nothing.

17   Q    So all of this is from memory?

18   A    Of the work performed, correct.

19        MR. GONZALEZ-DELGADO:  I have no further questions,

20   Your Honor, and I am returning the exhibits.

21        THE COURT:  Ladies and gentlemen, at this point, we

22   are going to break for lunch.  We will return to the courtroom

23   around 2:15 p.m., 2:15 p.m.

24        Now, remember, do not talk about or communicate

25   amongst yourselves about your impressions of the case or the

1    evidence in the case.  Do not view, read or hear reports,

2    comments or articles about the case.  And, finally, do not

3    conduct any research about the case, the matters in the case or

4    the individuals involved in the case.

5              I look forward to seeing you all this afternoon at,

6    more or less, 2:15 p.m.

7        (Whereupon the following proceedings were had in open court

8         without the presence of the jury.)

9              THE COURT:  Officer, as you heard, we're going to be

10   on a lunch break until, more or less, 2:15.  You do not have to

11   stay here.  You can walk around and so forth.  You may even

12   interact with members of the prosecution.  No problem with

13   that.

14             Now, do not talk about your testimony with anybody.

15   Do not review materials related to this case.  That includes

16   exhibits or documents or pictures.  Do not use -- do not post

17   any messages related to the case on social media.

18             With this, we'll return to the courtroom to continue

19   trial at 2:15 p.m.  Thank you.

20       (Whereupon a recess was taken at 1:04 p.m., until 2:18

21        p.m.)

22                              -oOo-

23

24

25

```
 1   UNITED STATES DISTRICT COURT )
                                  )   ss.
 2   DISTRICT OF PUERTO RICO      )

 3

 4                    REPORTER'S CERTIFICATE

 5

 6           I, CINDY LEE BROWN, RPR, Federal Official Court

 7   Reporter for the United States District Court for the District

 8   of Puerto Rico, appointed pursuant to the provisions of Title

 9   28, United States Code, Section 753, do hereby certify that the

10   foregoing is a true and correct computer-aided transcript of

11   proceedings had in the within-entitled and numbered cause on

12   the date herein set forth; and I do further certify that the

13   foregoing transcript has been prepared by me or under my

14   direction.

15

16           Dated this 26th day of June, 2023.

17

18

19                          /s/ Cindy Lee Brown
                            _____
20                          CINDY LEE BROWN, RPR, Federal
                            Official Court Reporter
21                          150 Carlos Chardon, Room 150
                            San Juan, PR  00918
22                          (787) 772-3478

23

24

25
```