```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF PUERTO RICO

 3                           -oOo-

 4   THE UNITED STATES OF AMERICA,    )
                                      )
 5          Plaintiff,                )  Case No. 3:21-CR-00161-PAD
                                      )
 6   -vs-                             )
                                      )
 7   FELIX VERDEJO-SANCHEZ,           )
                                      )
 8          Defendant.                )
     _____)
 9
             TRANSCRIPT OF JURY TRIAL - DAY NINE - P.M. SESSION
10        HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
             UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                     FRIDAY, JUNE 30, 2023
     _____
12              A P P E A R A N C E S
13
     FOR THE UNITED STATES OF AMERICA:
14
     AUSA Jonathan L. Gottfried &
15   AUSA Jeanette M. Collazo-Ortiz

16   FOR THE DEFENDANT:

17   Jason Gonzalez-Delgado, Esq. &
     Gabriela Jose Cintron-Colon, Esq.
18
     COURT INTERPRETERS:
19
     Carlos Ravelo &
20   Edna Brayfield

21   GOVERNMENT INTERPRETER:

22   Jose Luis Rosado

23

24

25
```

```
 1                            I N D E X

 2    WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:         PAGE:

 3    RICARDO CADIZ-MARTINEZ

 4    Direct Examination by Mr. Gottfried:                    3

 5    Cross-Examination by Mr. Gonzalez-Delgado:             74

 6    EXHIBITS:                                            PAGE:

 7    Government Exhibit No. 146                              9
      Government Exhibit No. 147                              9
 8    Government Exhibit No. 133                             31
      Government Exhibit No. 123                             48
 9    Government Exhibit No. 124                             48
      Government Exhibit No. 132                             68
10    Defense Exhibit No. A2                                124

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings commenced at 1:19 p.m.)

2                              -oOo-

3        (Whereupon the following proceedings were had in open

4          court without the presence of the jury.

5              MR. GOTTFRIED:  Yes, Your Honor.  The government's

6    ready to proceed.

7              MS. CINTRON-COLON:  We're ready, Your Honor.

8              THE COURT:  Okay.  All systems go?  All systems go?

9              THE INTERPRETER:  Yes, sir.

10             THE COURT:  Okay.  Let's call the jury in.

11       (Whereupon the following proceedings were had in open court

12         in the presence of the jury.)

13             THE COURT:  Welcome back to the courtroom.  Please

14   take a seat.

15             MR. GOTTFRIED:  Sorry, Your Honor.  The government

16   calls Ricardo Cadiz.

17             THE COURT:  All right.

18             THE COURTROOM DEPUTY CLERK:  Good afternoon, sir.

19   Please raise your right hand.

20       (Witness sworn.)

21             THE COURTROOM DEPUTY CLERK:  So help you God.  You

22   may take a seat.

23             MR. GOTTFRIED:  May it please the Court?

24             THE COURT:  Go ahead.

25                      RICARDO CADIZ-MARTINEZ,

```
 1                  called as a witness on behalf of the Plaintiff,
 2                     having been previously duly sworn,
 3                    was examined and testified as follows:
 4                          DIRECT EXAMINATION
 5      BY MR. GOTTFRIED:
 6      Q    Good afternoon, sir.
 7      A    Hi.
 8      Q    Can I please ask you to remove the mask in its entirety?
 9           Can you please tell the members of the jury your
10      name?
11      A    Ricardo Antonio Cadiz-Martinez.
12      Q    How old are you?
13      A    31.
14      Q    Where were you born?
15      A    In Rio Piedras, at Centro Medico.
16      Q    And where did you grow up?
17      A    At the Luis Llorens Torres Public Housing Project.
18      Q    How many siblings do you have, brothers and sisters?
19      A    Both from my mother and my father, it's me and Luis, and
20      on my father's side, I have three more.
21      Q    When you were growing up, how was your relationship with
22      Luis?
23      A    The best in the world.
24      Q    Can you explain a little bit?
25      A    We grew up under the same roof.  We went to the same
```

1    school all of the time.  We're not very far apart in age.  We

2    always did sports together.  In everything, we were together.

3    Q    What was the last school that you attended?

4    A    Twelfth grade.

5    Q    Where was that?

6    A    It was independent studies at public housing.

7    Q    And what are some of the places, or where are some of the

8    places where you have worked?

9    A    I worked at a Mexican restaurant, and I always worked in

10   public housing.

11   Q    And what did you do for public housing?

12   A    I was a laborer, and I helped the administrator with the

13   residents.

14   Q    Do you have any kids?

15   A    Yes.

16   Q    How many?

17   A    Three.

18   Q    And, sir, do you know how to swim?

19   A    No.

20   Q    What drugs have you consumed in the past?

21   A    Oxycodone.

22   Q    Which, if any other drugs, have you consumed in the past?

23   A    In the United States, Fentanyl, in pills.

24   Q    In April 2021, what drugs were you using?

25   A    Oxycodone.

```
 1    Q    Approximately, how much were you consuming, at that time,
 2    on a daily basis?
 3    A    Over 15 to 20 per day.
 4    Q    Okay.  And are you talking about 15 to 20 pills?
 5    A    Yes, 30 milligrams.
 6    Q    And what were the effects that the Oxycodone had on you?
 7    A    Nothing.  They kept me calm.
 8    Q    Did they affect your memory?
 9    A    No.
10    Q    Are you currently taking any drugs?
11    A    No.  I'm under medication.
12    Q    And does that medication affect your ability to testify
13    here today?
14    A    It's Suboxone.
15    Q    Okay.  And, sir, have you ever been charged with any
16    crimes locally?
17    A    Here in Puerto Rico?
18    Q    Either here in Puerto Rico or outside of Puerto Rico?
19    A    Not in Puerto Rico.  When I was in the United States, yes.
20    Q    Okay.  And in the United States, at the local level, in
21    the mainland United States, at the local level, what have you
22    been charged with?
23    A    Of distribution.
24    Q    Distribution of what?
25    A    Heroin.
```

```
 1   Q    And what is the status of that case?

 2   A    My attorney got me a detour.

 3   Q    What do you mean by a "detour?"

 4   A    I'm under probation.  My attorney got me a detour so that

 5   it doesn't affect my record.  So if, in a year, I do everything

 6   right, they take everything out of my record.

 7   Q    I asked you about the local level.  Now I'm going to ask

 8   you about the federal level.

 9        Have you been accused of any crimes at the federal --

10   by the federal government?

11   A    Right now, I'm facing charges at the federal level.

12   Q    What charges, what criminal charges, are you facing at the

13   federal level?

14   A    Conspiracy and possession of substances.

15   Q    Which substances?

16   A    Cocaine.

17   Q    Okay.  Which charge, if any, have you pled guilty to at

18   this time?

19   A    Of the charges that I have right now, the federal level.

20   Q    And that's for distribution of cocaine; is that correct?

21   A    That's correct.

22   Q    Have you been sentenced yet at the federal level?

23   A    No.

24   Q    Okay.  And who do you understand will determine the

25   sentence for your federal crime?
```

1    A    The judge.

2            MR. GOTTFRIED:  Your Honor, the government is marking

3    two documents:  Government ID 146 and Government ID 147, and

4    which have been shown to Brother Counsel.  We're requesting

5    permission to approach the witness.

6            THE COURT:  Granted.

7    BY MR. GOTTFRIED:

8    Q    Sir, I'm just going to ask you to take a look at those two

9    documents that I've placed in front of you.

10            Have you had an opportunity to look at those

11    documents, sir?

12    A    Yes.

13    Q    I'm going to start with Government ID 146, the one that

14    has a sticker that says "146" on it.  Sir, do you recognize

15    that document?

16    A    Yes.

17    Q    Whose initials or signatures are on the pages?

18    A    Mine.

19    Q    And was that document -- who, if anyone, explained that

20    document to you in the Spanish language?  Who translated it to

21    you in the Spanish language?

22    A    My attorney.

23    Q    Okay.  And is that an accurate copy of the document that

24    you, yourself, signed?

25    A    Yes.

1    Q    Sir, I'm going to ask you the same question about

2    Government ID 147.  If you can go to the next document, 147.

3              Do you recognize that document?

4    A    Yes.

5    Q    Okay.  Whose initials or signatures are on those pages?

6    A    Mine.

7    Q    Okay.  And was that document also translated and explained

8    to you in the Spanish language?

9    A    Yes.  My attorney did.

10    Q    And is Government ID 147, in front of you, is that a true

11    and correct copy of a document that you signed?

12    A    Yes.

13              MR. GOTTFRIED:  Your Honor, the government would move

14    to admit into evidence Government IDs 146 and 147 as Government

15    Exhibits 146 and 147.

16              MR. GONZALEZ-DELGADO:  No objection, Your Honor.

17              THE COURT:  Without objection, so ordered.

18    Government ID 146 admitted as Government Exhibit 146.

19    Government ID 147 admitted as Government Exhibit 147.

20    (Exhibit Nos. 146 and 147 admitted into evidence.)

21              MR. GOTTFRIED:  Your Honor, permission to recover the

22    exhibits, and permission to publish Government Exhibit 146.

23              THE COURT:  Granted.

24    BY MR. GOTTFRIED:

25    Q    Okay.  Sir, I'm going to turn your attention to the first

```
 1    page.  Do you see where it says:  "Charges to which Defendant
 2    will plead guilty?"
 3    A    Yes.
 4    Q    Okay.  And is Count One the count to which you pled
 5    guilty?
 6    A    Yes.
 7    Q    Okay.  Sir, turning to page 3, do you see in paragraph 6,
 8    where it states:  "Defendant understands the sentence to be
 9    imposed will be determined solely by the United States District
10    Judge?"
11              Do you understand that?
12    A    Yes.
13    Q    And do you see the next line, where it states:  "The
14    United States cannot" --
15              MR. GOTTFRIED:  Please go back to the --
16              Thank you.
17    BY MR. GOTTFRIED:
18    Q    "The United States cannot make and has not made any
19    promise or representation as to what sentence Defendant will
20    receive."
21              Do you see that?
22    A    Yes.
23    Q    And do you see, on page 4, in paragraph 8, that the
24    parties have agreed that they will request a sentence of
25    imprisonment within the applicable guideline range at a total
```

1    offense level of 21?

2              Do you see that?

3              MR. GOTTFRIED:  I'm sorry.  I'm looking at paragraph

4    8, the first paragraph:  "That the parties agree that the

5    parties will request a sentence of imprisonment."

6              THE INTERPRETER:  My apologies.

7    BY MR. GOTTFRIED:

8    Q    And do you understand that?

9    A    Yes.

10    Q    And, lastly, above paragraph 8, do you see that there are

11    guideline calculations for your sentence?

12    A    Yes.

13    Q    Sir, I'm going to refer to the last page, page 12 of

14    Government Exhibit 146.

15              Okay.  Above the line that reads "Ricardo A.

16    Cadiz-Martinez," whose signature is there?

17    A    Mine.

18    Q    Okay.  And what is the date of that signature?

19    A    May 17th, 2023.

20    Q    Okay.  Is that, in fact, when you signed this agreement?

21    A    Yes.

22    Q    Okay.  Now, sir, turning to Government Exhibit 147.

23    Turning to the last page, page 5, whose signature appears above

24    -- I'm sorry.  Whose signature appears above "Ricardo

25    Cadiz-Martinez?"

1    A    Mine.

2    Q    Okay.  And when did you sign this agreement?

3    A    May 17th, 2023.

4    Q    Okay.  Turning to the first page of Exhibit 147, and in

5    that first paragraph, in the first sentence, do you see where

6    it says:  "It is agreed that the defendant will cooperate fully

7    and truthfully with the United States?"

8             Do you see that?

9    A    Yes.

10   Q    Is that what you've agreed to do?

11   A    Yes.

12   Q    Okay.  Do you see, on page 2, next to paragraph (c), do

13   you see where it states that:  "The defendant agrees to provide

14   truthful, complete and accurate testimony and information in a

15   continuing basis and as requested by the United States?"

16            Do you see that?

17   A    Yes.

18   Q    And is that what you have agreed to do?

19   A    Yes.

20   Q    On that same page, in paragraph 2, do you see where it

21   states that, "This cooperation agreement," in the first

22   sentence, "is conditioned only upon defendant providing full,

23   complete and truthful cooperation?"

24            Do you see that?

25   A    Yes.

1   Q    And do you see in that same paragraph, it states that:

2   "This plea agreement and cooperation agreement is not

3   conditioned upon charges being brought against any other

4   individual?"

5   A    Yes.

6   Q    And do you understand that?

7   A    Yes.

8   Q    Turning to page 3, at the top, the first complete

9   sentence, do you see where it says:  "The defendant is not

10  required to make a case against any other person, but is only

11  required to tell the complete truth?"

12  A    Yes.

13  Q    And do you see on that same page, under paragraph 3,

14  before the letter (a), where it states:  "If the defendant

15  knowingly withholds evidence or otherwise is not completely

16  truthful with the United States, an officer of the United

17  States, any law enforcement officer, or in testimony before a

18  grand jury," then there are a number of consequences?

19       Do you see that?

20  A    Yes.

21  Q    And do you understand that?

22  A    Yes.

23  Q    Okay.  And do you understand that if, in fact, you are not

24  truthful, that under this agreement, under paragraph (a), you

25  can be prosecuted for perjury, false declaration, false

1    statement and/or obstruction of justice?

2             Do you understand that?

3    A    Yes.

4    Q    Okay.  Sir, why did you sign this agreement?

5    A    For one, I want justice to be done.  I also want to clear

6    up my name.  And, also, so that when the judge gives me time,

7    to do the time and then be able to go back to my family.

8             MR. GONZALEZ-DELGADO:  Objection, Your Honor,

9    self-serving statements.

10            THE COURT:  Overruled.

11   BY MR. GOTTFRIED:

12   Q    Mr. Cadiz, do you know Felix Verdejo?

13   A    Yes.

14   Q    Okay.  Do you see him here in the courtroom today?

15   A    Yes.

16   Q    Can you tell us what he's wearing and, generally, where

17   he's seated?

18            And what is he wearing?

19   A    A white shirt.

20            MR. GOTTFRIED:  Your Honor, may the record reflect

21   that the witness has identified Mr. Felix Verdejo?

22            THE COURT:  The record will so reflect.

23   BY MR. GOTTFRIED:

24   Q    Sir, do you know someone named Miguel Santiago-Laiz?

25   A    No.

1    Q    Do you know someone named Marcelino Perez?

2    A    No.

3    Q    Around what time, what year, did you first meet Felix

4    Verdejo?

5    A    Late 2016 or early 2017.

6    Q    How did you meet him?

7    A    Through my [non-English language].

8    Q    And what do you mean by -- clarification of the

9    translation.  [Non-English language]?

10           THE INTERPRETER:  The interpreter would need to

11    clarify.

12           THE WITNESS:  My daughter's godfather.

13    BY MR. GOTTFRIED:

14    Q    Where did you meet him?

15    A    Cupey, Puerto Rico.

16    Q    And under what circumstances did you meet Mr. Verdejo?

17    A    I saw that the godfather of my daughter had uploaded a

18    picture of him, and I wanted to meet him.

19    Q    And when you say -- can you please explain what you mean

20    by, when you say the Spanish word [non-English language]?  Can

21    you please explain what you mean by that?

22    A    He is the godfather of my daughter, so in the future, if

23    something happens to me, he will be responsible for my

24    children.  He's always been there, up to today.

25    Q    Okay.  And that person you're describing is whom you

1    referred to as your [non-English language]; is that accurate?

2    A    Yes.

3    Q    Now, what was your relationship with Felix Verdejo like in

4    2016 and in the years after?

5    A    It was always good.

6    Q    What kinds of things did you talk about?

7            MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401.

8            THE COURT:  Overruled.

9            THE WITNESS:  We talked about sports, basketball.

10   BY MR. GOTTFRIED:

11   Q    And what kinds of things would you do together?

12   A    At the beginning when I met him, he would come down to

13   Llorens, to a shop, to watch the NBA matches, and later on, we

14   did a few things together.

15   Q    And did Mr. Verdejo have any nicknames for you?

16   A    Yes.

17   Q    What?

18   A    [Non-English language] or "Rabbit."

19   Q    Now, did you ever meet Keishla Rodriguez-Ortiz?

20   A    No.

21   Q    Did Verdejo ever mention that name to you?

22   A    No.

23   Q    Did you ever meet or see Eliz Santiago?

24   A    Yes, but not up close.

25   Q    Under what circumstances would you see Eliz Santiago?

1    A    Well, for example, sometimes when he came down with, when

2    he came down to Cupey and I was hanging out with the guys,

3    Felix would pass by sometimes with her, and we would greet each

4    other like:  Hello, goodbye.

5    Q    What car did you see Mr. Felix Verdejo using?

6    A    A black Dodge Durango.

7    Q    Did you ever see anyone else driving that car?

8    A    No.

9    Q    Did you work with Mr. Verdejo in anything?

10    A    Yes.

11    Q    With what?

12    A    Cocaine kilos.

13    Q    Now, when did you begin --

14        MS. CINTRON-COLON:  Objection, Your Honor.  May we

15    approach?

16        (Sidebar conference commenced.)

17        MS. CINTRON-COLON:  Your Honor, the objection is

18    under 401 and 404(b).

19        THE COURT:  And 4-0 what?

20        MS. CINTRON-COLON:  404(b) and 403.  This is

21    character evidence only being brought to show criminal

22    propensity.  It does not apply, none of the exceptions to Rule

23    404(b) or (c) or 404 apply in this case at all.  Their only

24    purpose of bringing this evidence is literally to show, what

25    has been in the last couple of days, to show his character, his

1    criminal nature, his criminal propensity.  There is no

2    relevance at all with drug-trafficking, alleged drug-handling

3    kilos of cocaine, in a case where no drug-trafficking or

4    possession or relation has been charged or even mentioned

5    before this precise second.

6            And I believe my Brother Counsel has --

7            THE COURT:  One.  Only one.

8            MS. CINTRON-COLON:  Okay.  Well, Your Honor, the main

9    issue as well is that, under 403, it's definitely going to

10    mislead the jury because this is invoking -- the danger of

11    misleading the jury, and it refers to the possibility that the

12    jury might attach onto weight to the evidence.

13            We have a person who is saying that he is a

14    drug-trafficker; that this has been one of his jobs for a long

15    time.  He even entered into a plea agreement for a conspiracy

16    in which he is the only one indicted in this conspiracy.  Even

17    in the stipulation of facts, it doesn't even mention other

18    persons or anything.

19            So this is certainly some evidence that is going to

20    mislead the jury, confuse the issues, cause undue prejudice,

21    aside that it's 404(b) evidence being brought for the exact

22    purposes prohibited by the rule, Your Honor.  And we definitely

23    believe it would be improper to use this evidence.

24            If the government wants to establish that Felix

25    Verdejo and Ricardo Cadiz knew each other or had some kind of

1   relationship, it can be done without having to go into the

2   alleged criminal enterprise or nature or relationship that they

3   had, because it bears absolutely no relevance, and especially

4   no special relevance that would allow the 404(b) evidence to be

5   admissible in this trial, Your Honor.

6           THE COURT:  Mr. Gottfried?

7           MR. GOTTFRIED:  Yes, Your Honor.

8           This was a subject of a motion in limine.  I'll

9   expound upon the arguments.

10          This is not just any relationship between the

11  defendant and this witness.  First of all, this witness is the

12  brother of the codefendant.  And we can proffer to the Court

13  that Mr. Verdejo first went to this witness, Ricardo Cadiz, in

14  order to request abortion pills and assistance in Keishla's not

15  having the baby, and that, in fact, he called Ricardo, before

16  he even went to Luis, in order to ask for his assistance in

17  getting an abortion for Keishla.

18          Later on, Mr. Verdejo went to this witness's brother

19  and proposed the scheme of eventually murdering Keishla.  It's

20  a relationship of extreme confidence and trust between Mr.

21  Verdejo and this witness that would allow him to go to this

22  witness and ask for abortion pills.  And as he will describe,

23  it became clear in the course of that conversation that Keishla

24  was not willing to have an abortion.

25          So this is something that Mr. Verdejo wanted to do in

1    spite of the fact that she was not willing.  This is not a

2    conversation you have simply with anyone you play NBA baseball

3    -- or basketball with or simply hang out with.

4           This is something that you go to someone whom you

5    trust and whom you trust because in the past you have committed

6    other illegal acts and feel comfortable approaching that

7    person.  So that's the relevance.

8           It's not -- and we can proffer that we're not going

9    to go into extensive details.  What we would ask to do is to

10   simply talk about three transactions briefly that they engaged

11   in around the timeframe.  And to the extent that there is any

12   questioning by defense counsel as to whether or not these

13   transactions happened, we also have text messages between them

14   that were produced to defense counsel that we would also like

15   to show the defendant briefly just to corroborate the fact.

16          THE COURT:  The defendant.

17          MR. GOTTFRIED:  I'm sorry.  To the witness.

18          MS. CINTRON-COLON:  And, Your Honor, what does

19   alleged cocaine-trafficking have to do with abortion pills?

20   It's definitely contradictory.  If they want to say, Oh, he had

21   the trust to go to him and ask for abortion pills, why does --

22   what does it have to do with alleged drug-trafficking,

23   especially cocaine-trafficking.  They are not related on any

24   way.

25          And they are really good friends because he said his

1    daughter's godfather is really good friends with Felix, and

2    they have been friends since 2016.  So we're talking about a

3    five-year relationship.  They know each other.  They see each

4    other often.  They talk to each other all the time.  He said

5    that they had a very good relationship since the beginning.

6              There is no need to go into alleged

7    cocaine-trafficking and transactions that literally have

8    nothing to do with alleged abortion pills.  He's not saying:

9    Oh, we trafficked in pills; I did some drug-trafficking related

10   to pills or related to kidnapping people or anything that is of

11   similar nature to the charged offenses here.

12             This is completely unrelated.  It's impermissible

13   404(b), and it's precluded by 403, Your Honor.  It's the same

14   argument.

15             MR. GOTTFRIED:  Your Honor, we expect a likely line

16   of cross to be:  And Mr. Verdejo randomly called you and asked

17   you to get abortion pills, and he somehow understood that, even

18   though you never did anything wrong together, that you would be

19   willing to obtain abortion pills; and not only that you're

20   willing to obtain abortion pills, and you have access to

21   illegal drugs, but also that you would be willing to, perhaps,

22   do this with someone who was unwilling.

23             That's simply not a phone call that you can make to

24   anyone.  And the jury, in order to evaluate the credibility of

25   this witness, needs to understand, just have some background on

1    the relationship.

2         MS. CINTRON-COLON:  Which I believe, Your Honor, is

3    -- can be established by them just saying:  He is friends with

4    my children's godfather; we have a really good relationship.

5    And direct examination cannot be based on the speculation of

6    what cross-examination will be.

7         Even if we would think about making those questions

8    in any manner, it still does not, it cannot override the

9    prohibitions of Rule 404 and 403.  And it's still irrelevant,

10   and it's still brought, being brought for it to show criminal

11   propensity and why they would engage in criminal acts in the

12   present, Your Honor.

13        It's misleading to the jury.  And it certainly

14   confuses the issue.  It causes unfair prejudice.  And they are

15   going to end up judging Mr. Verdejo for other criminal acts

16   that are not the ones here, merely because he was, allegedly,

17   trafficking cocaine and then:  Oh, well, he asked for abortion

18   pills from a cocaine-trafficker.  And there is no correlation

19   to the two things whatsoever.

20        MR. GOTTFRIED:  And just last, briefly, Your Honor.

21   The fact that the two crimes are not similar, one is selling

22   cocaine, and the other is murdering an unborn child, assists

23   the government because it decreases the possibility that it's

24   going to be used as propensity evidence here.  We're talking

25   about two fairly distinct crimes.

1          THE COURT:  That's the link to 404(b)?

2          MR. GOTTFRIED:  What is the link?

3          THE COURT:  That is the link to 404(b)?

4          MR. GOTTFRIED:  The link is to explain the

5    relationship between the two and why Mr. Verdejo had the level

6    of comfort and the motive to go to this individual and ask him

7    to, to obtain illegal drugs, first of all; and, secondly, in

8    the context of someone who is not willing to have an abortion.

9    That the background, mainly prior illegal acts, made Mr.

10   Verdejo comfortable going to this person.

11          Without that, the jury is left with the impression

12   that someone who happened to live in Llorens Torres, who is a

13   friend of a friend and who he hung out with occasionally, that

14   Mr. Verdejo randomly called that person and asked for abortion

15   pills and then asked him -- asked him to illegally obtain

16   abortion pills, and on top of that, indicated that the woman

17   was not willing, and then afterwards, felt comfortable enough

18   going to that person's brother to commit an act, which the

19   government alleges he eventually completed.

20          MS. CINTRON-COLON:  And that should be an allegation

21   that is for the jury to decide whether they believe Mr. Verdejo

22   did that or not.  And we're not talking that they were just

23   people who knew each other or saw each other occasionally.  He

24   just said that they had a really good relationship.  They were

25   close.

1           And they have, yes, a mutual friend, but it's not

2    just a mutual friend.  That's not how they know each other.

3    It's that a mutual friend introduced the two of them.  So

4    showing the relationship, that they had the friendship that

5    they had, and that bond, is sufficient.

6           It is for the jury to determine the allegations, if

7    they believe or not that Mr. Verdejo went to him.  And by

8    saying that, Oh, this will show the killing of an unborn child,

9    this person is not even charged here.  This is not a

10   conspiracy.  He has nothing to do with the, with the charge

11   Count IV, Your Honor.

12          THE COURT:  I understand the argument.  I'm not

13   persuaded that the objection should be sustained, so it is

14   overruled.

15          MR. GOTTFRIED:  Your Honor, just so we can avoid

16   sidebars, can I proffer what I'm going to elicit, just to

17   ensure that everyone's okay?

18          THE COURT:  Yes.

19          MS. CINTRON-COLON:  What?

20          MR. GOTTFRIED:  I just want to proffer what I am

21   going to elicit, and if you have objections, we can just -- so

22   I'm just going to ask him to describe the transactions he did.

23   He will say that there were three, and he will describe the

24   first one, not in a lot of detail, basically say the same with

25   the other two.

1          He will then say that, around the time of the murder,

2     Mr. Verdejo was asking again for another transaction, which did

3     not happen.  And then, finally, to corroborate what he's

4     talking about would be Government ID 133, which you have, which

5     are simply text messages between them.

6          MR. GONZALEZ-DELGADO:  Your Honor, the problem is

7     that we have a reliability issue in here.  These are text

8     messages that they could have been talking about anything.

9          We believe that, under 403 and 401, they're not

10    relevant.  And even if they were, the effect is more

11    prejudicial than not, and the judge should not allow relevant

12    evidence to enter if the fear of becoming prejudicial overcomes

13    the actual purpose of the evidence.

14          These are cell -- these are text messages, allegedly,

15    between them.

16          MR. GOTTFRIED:  And I can proffer to the Court that

17    the witness will testify that these would concern drug

18    transactions.

19          THE COURT:  Objection overruled.

20     (Sidebar conference concluded.)

21          MR. GOTTFRIED:  Your Honor, if I can just have 10

22    seconds?

23     BY MR. GOTTFRIED:

24     Q    Sir, when did you begin to work with Mr. Verdejo to sell

25     cocaine?

 1              MR. GONZALEZ-DELGADO:  Objection, Your Honor.  That
 2     was not the answer that the witness gave.
 3              THE COURT:  Okay.  Go back to the questions that led
 4     to the sidebar-related objection.
 5              MR. GOTTFRIED:  Okay.  Yes, Your Honor.
 6     BY MR. GOTTFRIED:
 7     Q    Did you do any work with Mr. Verdejo?
 8     A    Yes.
 9     Q    What?
10     A    To sell kilos of cocaine.
11     Q    When did you begin to work with Mr. Verdejo to sell
12     cocaine?
13     A    Back, it was during the pandemic.
14     Q    And what were the circumstances?
15     A    A call came in from a friend, and Felix was standing next
16     to me.  And after I hung up, I asked him if he knew anybody who
17     could get some for me, and he said that he did.
18     Q    Where physically were you and Mr. Verdejo when this
19     happened?
20     A    At Llorens Torres.
21     Q    What happened after Mr. Verdejo indicated that he had
22     access to the cocaine?
23     A    Well, the next day, he came with a kilo, and we completed
24     the sale.
25     Q    Who interacted with the buyer?

```
1    A    I did.

2    Q    What car was Mr. Verdejo driving when he arrived in

3    Llorens?

4    A    The Dodge Durango.

5    Q    Okay.  And how much did the buyer pay?

6    A    $24,000.

7    Q    How much did you receive?

8    A    $500.

9    Q    How much did Mr. Verdejo get?

10   A    $23,500.

11   Q    Prior to that date, had you ever sold drugs before?

12   A    Well, when I was younger, but not like kilos or anything.

13   Q    And how had you sold drugs when you were younger?

14   A    17.

15   Q    And under what circumstances had you sold drugs when you

16   were a teenager?

17   A    I did it to have two or three bucks on me.

18   Q    When was the next time, if any, that you sold cocaine with

19   Mr. Verdejo?

20   A    After the first time, the next week.

21   Q    And was that around the same time period you referenced

22   before, the start of the pandemic?

23   A    Yes.

24   Q    Okay.  And was that most -- were the terms of that

25   transaction the same as what had happened before?
```

```
 1    A    Yes.
 2    Q    And when, if any, was the next time that you sold cocaine
 3    with Mr. Verdejo after that second time?
 4    A    It was during the pandemic, but the shops were already
 5    open.
 6    Q    And were the terms of that transaction the same as the
 7    previous two times?
 8    A    Yes.
 9    Q    And what car was Mr. Verdejo using during those
10    transactions?
11    A    The Dodge Durango.
12    Q    Okay.  And just to be clear, what were you and Mr. -- your
13    and Mr. Verdejo's roles in those transactions, generally?
14    A    I did not understand.
15    Q    What role did you -- what did you do during those drug
16    transactions, generally, the three ones you talked about?
17         What did you do in that transaction versus Mr.
18    Verdejo?
19    A    My friend would come.  He would give me the money, and
20    Felix would wait in the vehicle.
21    Q    And in April of 2021, what, if any, conversation did you
22    have with Mr. Verdejo regarding the sale of cocaine?
23    A    We had -- we had our conversation, but nothing came to
24    fruition.
25    Q    When you and Mr. Verdejo communicated about
```

1    drug-trafficking, which phone did you understand that he was

2    using?

3    A    Sometimes we would use our personal phones, or sometimes

4    we would use prepaid phones.

5    Q    And how long, generally, would you keep the prepaid

6    phones?

7              MR. GONZALEZ-DELGADO:  Objection, Your Honor, under

8    602.  He might talk about himself.

9              THE COURT:  The question was:  "And how long,

10   generally, would you keep the prepaid phones."

11             MR. GOTTFRIED:  Yes, Your Honor.

12             THE COURT:  Is he not referring to -- is that not

13   referring to the witness?

14             MR. GOTTFRIED:  It is, Your Honor.

15             MR. GONZALEZ-DELGADO:  Your Honor, it seems that it's

16   in plural.  That's why I objected.

17             THE COURT:  Well, it is referring to the witness.  In

18   that sense, objection overruled.

19             Go ahead.

20   BY MR. GOTTFRIED:

21   Q    Sir, again, how long would you keep the prepaid phone?

22   A    Once a month.

23   Q    And how would Mr. Verdejo communicate to you when his

24   phone number changed?

25   A    Sometimes he used Snapchat.

1    Q    And, approximately, how often would Mr. Verdejo

2    communicate with you via Snapchat, or some other application,

3    to indicate that he was using a new phone number?

4    A    We used WhatsApp, normal stuff.

5    Q    How often, with what frequency, would Mr. Verdejo

6    communicate to you or tell you that he had a new phone number?

7    A    Once a month.

8        MR. GOTTFRIED:  Your Honor, I'm going to mark

9    Government ID 133, which has been shown to Brother Counsel, and

10   request permission to approach the witness.

11       THE COURT:  Granted.

12   BY MR. GOTTFRIED:

13   Q    Sir, can you please take a look at the document that I

14   placed in front of you?

15       Do you recognize that document?

16   A    Yes.

17   Q    Okay.  How do you recognize it?  How do you recognize it?

18   A    Because it's my phone number.

19   Q    Okay.  And are those true and correct copies of messages

20   that you're familiar with?

21   A    Yes.

22       MR. GOTTFRIED:  Your Honor, at this time, the

23   government would move to admit that Government ID 136 into

24   evidence as Government Exhibit --

25       MR. GONZALEZ-DELGADO:  With our objection for

1    foundation, Your Honor.

2              MR. GOTTFRIED:  I'm sorry, it's 133, Your Honor, 133.

3    Government ID 133 as Government Exhibit 133.

4              MR. GONZALEZ-DELGADO:  We object under foundation,

5    Your Honor.  He only said that he recognizes his number.

6              MR. GOTTFRIED:  I asked, Your Honor, whether or not

7    he recognizes those messages as true and correct copies of

8    messages.

9              THE COURT:  Right.  Objection overruled.

10   Government's ID 133 admitted as Government's Exhibit 133.

11       (Exhibit No. 133 admitted into evidence.)

12             MR. GOTTFRIED:  Permission to recover and publish the

13   exhibit.

14             THE COURT:  Granted.

15   BY MR. GOTTFRIED:

16   Q    Sir, do you recognize the -- you said earlier you had

17   recognized these messages.  These messages are between who and

18   who?

19   A    Between Felix and I.

20   Q    And when you say "Felix," are you referring to Felix

21   Verdejo?

22   A    Yes.

23   Q    And, sir, this first message, on March 27th, 2020, can you

24   please read that message in Spanish?

25   A    Is it okay if it has lewd words, can I say them?

1    Q    Yes, sir.

2    A    "Mother-fucker, I don't want to go over there.  Fuck

3    Llorens."

4    Q    And who wrote that message?

5    A    Felix.

6    Q    And did you receive that message?

7    A    Yes.

8    Q    Do you see where it says "To Rabbit," and then there is a

9    phone number beginning "939?"  Do you see that?  It's

10   (939)496-9838?

11            MR. GONZALEZ-DELGADO:  Objection, Your Honor,

12   leading.  He asked the question.  We should wait for the

13   answer.

14            MR. GOTTFRIED:  The question is, who's number; do you

15   recognize that number.

16            THE COURT:  Overruled.

17            Go ahead.

18            THE WITNESS:  Yes.

19   BY MR. GOTTFRIED:

20   Q    How do you recognize it?

21   A    Because that's my phone number.

22   Q    Okay.  Going to the next message.

23            Okay.  And, sir, what is written there?

24   A    "You're going to my house.  You're not going to be down."

25   Q    Okay.  And why did you write that to Mr. Verdejo?

```
1    A    Because we were going to do something, and we were going
2    to go directly to my house.  We were not going to be out on the
3    street.
4    Q    Okay.  Sir, next message.  Do you see, on April -- I'm
5    sorry.  On March 27th, 2020, can you please read that message?
6    A    "I don't want to go in there, mother-fucker, that piece of
7    shit housing project too."
8    Q    And what did you understand Mr. Verdejo was saying there?
9    A    That he didn't want to go to Llorens.
10   Q    Sir, the next message, what is it that you wrote on March
11   27th, 2020, to Mr. Verdejo?
12   A    "Mother-fucker, nobody here goes down there."
13   Q    And why did you write that "nobody goes down there?"
14   A    Because there was a pandemic at that time.
15   Q    Okay.  Now, sir, moving on to April 16th, 2020.  What did
16   you write to Mr. Verdejo?
17   A    "The dude called me.  He told me that in about an hour
18   he's coming to me.  But since he has to turn in the money
19   quickly, I have to stay with him.  So I'll get to your house.
20   I'll stay there with him.  You go and take it."
21   Q    What did you mean in this?
22   A    That something was going to be brought to him so that he
23   did the business.
24   Q    And what business are you referring to?
25   A    Kilos.
```

1    Q    And kilos of what?

2    A    Cocaine.

3    Q    And the next message that you wrote on April 16th, 2020,

4    at 4:01 p.m., what did you say?

5    A    "And bring the money."

6    Q    And then what did you write?

7    A    "He's coming with eight, but he's going to give it to me

8    from two in two."

9    Q    And what are you referring to there?

10    A    Kilos.

11         MR. GONZALEZ-DELGADO:  Your Honor, we have an

12    objection.  Whatever said there is, obviously, hearsay.

13         THE COURT:  Overruled.

14    BY MR. GOTTFRIED:

15    Q    Sir, then what does Mr. Verdejo write to you on April

16    16th, 2020?

17    A    "Oh, then okay.  All set.  I'm leaving.  I'll wait for you

18    over there.  Don't fail me, my love.  I don't want to look

19    bad."

20    Q    And then what did Mr. Verdejo write to you next?

21    A    "Boy, there's a curfew.  Is it much longer?"

22    Q    And then what did Mr. Verdejo write?

23    A    "Mother-fucker, never mind.  Forget it.  I'm not going to

24    keep looking bad, mother-fucker."

25    Q    And then what did Mr. Verdejo write to you on April 25th,

```
1    2020, at 11:03 a.m.?
2    A    "Your friend still hasn't hit you up, right?"
3    Q    And what was your response?
4    A    "I'm texting him."
5    Q    Okay.  And who were you texting?
6    A    A friend.
7    Q    For what?
8    A    What do you mean?
9    Q    Why?  Why were you texting your friend?
10   A    About the same topic, about the same conversation.
11   Q    What topic is that?
12   A    Topics about kilos.
13   Q    Kilos of cocaine?
14   A    Yes.
15   Q    And what is Mr. Verdejo's response to you?
16   A    "Okay.  Nothing more."
17   Q    In April 2021, where did you live?
18   A    At Llorens.
19   Q    Whom, if anyone, did you live with?
20   A    With my mother and my brother.
21   Q    And, again, what's your brother's name?
22   A    Luis Cadiz.
23   Q    How many bedrooms did that apartment have?
24   A    Three.
25   Q    And in April 2021, did you know if your brother, Luis, had
```

```
 1    a job?

 2    A    Yes.

 3    Q    What was it?

 4    A    He was a community leader at a public housing project, and

 5    he also washed cars.

 6    Q    Okay.  And where was his carwash business?

 7    A    In front of my house in Llorens.

 8    Q    What, if any, help did you provide to Luis in washing

 9    cars?

10    A    Yes.  Whenever I was bored, sometimes that would help me,

11    and, for example, if a car needed to be delivered or picked up,

12    I would do it.

13    Q    Who, if anyone, were you dating in April 2021?

14    A    Yes.  I had a girlfriend.

15    Q    What was her name?

16    A    Suheily.

17    Q    During that week, during April 26th of 2021, did you go

18    anywhere with Suheily?

19    A    Yes.

20    Q    Where did you go?

21    A    Plaza Las Americas.

22    Q    Okay.  And how did you get from Llorens to Plaza Las

23    Americas?

24    A    In my car.

25    Q    And around what days was that?
```

```
 1    A     It was Tuesday, April 27th.

 2    Q     Why were you going to Plaza Las Americas?

 3    A     To shop.

 4          MR. GONZALEZ-DELGADO:  Objection, Your Honor, 401.

 5          THE COURT:  I will allow it.

 6    BY MR. GOTTFRIED:

 7    Q     And around what time of day was it, approximately?

 8    A     It was, more or less, noon.

 9    Q     Did you receive any phone calls from anyone while you were

10    shopping in Plaza Las Americas?

11    A     Yes.

12    Q     From whom?

13    A     From Felix.

14    Q     What, if anything, did Mr. Verdejo tell you?

15    A     He had asked me for some abortion pills.

16    Q     Did he explain why he wanted those pills?

17    A     He called me right away.  He said:  Mother-fucker, can you

18    get me some abortion pills?  And I said:  First make sure that

19    the person wants to abort, because if the person wants to

20    abort, I can get them for you; but if the person doesn't want

21    to abort, I will not get them for you.

22    Q     Where were you physically inside of Plaza when you took

23    that call?

24    A     That, at that point in time, I was about to go into

25    Victoria's Secret.
```

```
 1    Q    Were you with anyone?
 2    A    Yes.
 3    Q    With whom?
 4    A    With my girlfriend.
 5    Q    And her name?
 6    A    Suheily.
 7    Q    When you answered that call, did you stay in Victoria's
 8    Secrets?
 9    A    I told her to go in, and I remained outside.
10    Q    Okay.  And was Suheily with you when you took that first
11    call?
12              Clarification:  When you were talking on the phone?
13    A    She was inside Victoria's Secret.
14    Q    After taking that first call, where, if anywhere, did you
15    and Suheily go next?
16    A    After we left Victoria's Secret, we walked to Kids
17    Footlocker.
18    Q    Why were you going to Kids Footlocker?
19    A    To buy some tennis shoes.
20    Q    Okay.  Did you, in fact, buy those tennis shoes there?
21    A    No.
22    Q    Why not?
23    A    They were not available.
24    Q    And for whom were you buying those shoes?
25    A    Me, for her.
```

```
 1    Q    Okay.  So after not being able to find those shoes at the
 2    Footlocker, what did you do next?
 3    A    From Kids Footlocker, they called Plaza Carolina.  And at
 4    Plaza Carolina, they did have them, so we left Plaza Las
 5    Americas.  We got in my car, and we went to Plaza Carolina.
 6    Q    Who was driving?
 7    A    I was.
 8    Q    What kind of car did you have?
 9    A    A Honda Accord.
10    Q    Where was Suheily seated in the car?
11    A    On the passenger's side.
12    Q    On the front?
13    A    Yes.
14    Q    Okay.  And during that trip in your car from Plaza Las
15    Americas to Plaza Carolina, what, if anything, happened?
16    A    When I was passing by the Luis Munoz-Marin International
17    Airport, a video call, FaceTime call, came in.
18    Q    From whom was the call?
19    A    Felix.
20    Q    And what, if anything, did he tell you?
21    A    After I answered, he said that the person did not want to
22    abort.
23    Q    How did he seem?
24    A    I told him to -- he looked a little bit desperate.  I told
25    him to take it easy:  Look at me, I have three children; one of
```

1    them is not mine.  And he said that he and I were not the same;

2    that he was a public figure; that he did not want to lose his

3    family.

4    Q    During that phone call, did Mr. Verdejo mention who the

5    pregnant woman was?

6    A    No.

7    Q    And during that phone call, did he mention the name

8    Keishla?

9    A    No.

10   Q    Can you recall anything else about that phone call?

11   A    No.  It was like that, quick.

12   Q    When you say that, in the first phone call, that you might

13   be able to provide abortion pills, what were -- abortion pills

14   were you referring to?

15   A    The name is Cytotec.

16   Q    And how did you know about those abortion pills?

17   A    Just like that.  You know, in conversations with friends,

18   I had once heard about them, because I have never used them

19   myself.

20   Q    After receiving that call, that FaceTime call, with Mr.

21   Verdejo, where did you and your girlfriend go next?

22   A    To Plaza Carolina.

23   Q    Okay.  And what, if anything, did you do there?

24   A    The purchase was made.  And then we ate, and just normal,

25   we went on to Llorens.

```
1    Q    Okay.  Now, after you received that phone call on Tuesday,
2    those phone calls on Tuesday from Mr. Verdejo, did you tell --
3    and prior to April 29th, did you tell your brother, Luis, about
4    those calls with Mr. Verdejo?
5    A    No.
6    Q    Okay.  And then before Thursday, April 29th, 2021, did you
7    have --
8            THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat
9    the date again?
10           MR. GOTTFRIED:  Sure.  April 29th, 2021.
11           THE INTERPRETER:  You said "Thursday?"
12           MR. GOTTFRIED:  Thursday.
13   BY MR. GOTTFRIED:
14   Q    Did you have any other conversations with Mr. Verdejo
15   regarding the abortion?
16   A    No.
17   Q    Did you have any conversations with Mr. Verdejo regarding
18   Keishla?
19   A    No.
20   Q    On Thursday, April 29th, 2021, around what time did you
21   wake up?
22   A    In the morning.  I always woke up in the morning to have
23   breakfast.
24   Q    Okay.  Where did you wake up?
25   A    At my house.
```

```
 1    Q    And was anyone with you when you woke up?

 2    A    My girlfriend.

 3    Q    And when you say "your house," what are you referring to?

 4    A    The Luis Llorens Torres Public Housing Project.

 5    Q    Okay.  And after waking up that morning, April 29th, what,

 6    if anything, did you do?

 7    A    After I had breakfast, at around 10:00, or after 10:00, my

 8    friend called.  And when my friend came down to Llorens, when I

 9    went down to talk to my friend, Felix was parked in front of my

10    house.

11    Q    Did you -- who was with Felix?

12    A    I saw him by himself.

13    Q    And what, if anything, was Felix doing at that point?

14    A    He had his window rolled down.  We only saw each other

15    from afar.  We greeted each other.

16    Q    And then who else that morning did you see besides Felix?

17    A    I saw my brother and my friend.

18    Q    And when you say your "brother," to whom are you

19    referring?

20    A    Luis Cadiz.

21    Q    Okay.  And what, if anything, happened with Luis Cadiz at

22    that time, with your brother?

23    A    Well, my brother said that he had just finished washing a

24    car for a client and that he had to take it back to the client,

25    and since he had no way of coming back, if I could go pick him
```

1    up.

2    Q    Okay.  And what car did your brother indicate that he had

3    just finished washing for the client?

4    A    A Kia.

5    Q    Sir, I'm going to show you what's been introduced as

6    Government Exhibits 123 and 124.

7               MR. GOTTFRIED:  Strike that.

8               I'm going to mark Government ID 123 and 124.  After

9    showing them to Brother Counsel, Your Honor, may I approach the

10   witness?

11              THE COURT:  Yes.

12              THE COURTROOM DEPUTY CLERK:  123?

13              MR. GOTTFRIED:  Yes, 123 and 124.

14   BY MR. GOTTFRIED:

15   Q    Sir, do you recognize Government IDs 123, 124 that I

16   placed in front of you?

17   A    Yes.

18   Q    How do you recognize them?

19   A    Because that was the car that I was driving for me --

20              THE INTERPRETER:  The interpreter needs to clarify.

21              THE WITNESS:  Because that was the car that my

22   brother was driving.

23   BY MR. GOTTFRIED:

24   Q    And are those true and correct, true and accurate, photos

25   of the car that your brother was driving?

1    A    Yes.

2         MR. GOTTFRIED:  Your Honor, at this time, the

3    government would move to admit into evidence Government ID 123,

4    124, as Government Exhibits 123, 124.

5         MR. GONZALEZ-DELGADO:  Can we have a small voir dire,

6    Your Honor?

7         THE COURT:  Sidebar.

8      (Sidebar conference commenced.)

9         THE COURT:  Voir dire as to what?

10         MR. GONZALEZ-DELGADO:  As to the photo, because prior

11    to --

12         THE COURT:  Wait, wait, wait.  As to 123 and 124?

13         MR. GONZALEZ-DELGADO:  Yes, sir.

14         THE COURT:  You were going to say something, and I

15    interrupted you.

16         MR. GONZALEZ-DELGADO:  It's just that I believe that

17    the foundation hasn't been properly made.  No questions were

18    made prior to showing the pictures to the witness to establish

19    the mark, the make, the license plate, the color, how many

20    doors it had.

21         The government just went straight into the pictures,

22    and the witness, allegedly, identified it.  And I think we're

23    entitled voir dire regarding what he actually saw or how he can

24    say that this is the vehicle that he -- his brother drove two

25    years ago.

1          MR. GOTTFRIED:  Your Honor, I can lay a better

2    foundation.  I have no issues with that.

3          THE COURT:  Okay.  Go ahead and do it.

4      (Sidebar conference concluded.)

5    BY MR. GOTTFRIED:

6    Q    Sir, the car that your brother wanted help to deliver to a

7    client, you had said it was what car?

8    A    I did not understand.

9    Q    Is it correct that your brother asked you to help deliver

10   a car to a client?

11   A    He asked me to pick him up because he had no way of coming

12   back.

13   Q    Okay.  And what kind of car was your brother working with?

14   What kind of car was he cleaning for the client?

15   A    Well, at that point, he told me that he had just finished

16   washing the Kia.

17   Q    Okay.  And so when your brother told you that he needed

18   help being picked up, what did you do?

19   A    I told my friend that, since his car was already running,

20   to go together and pick him up.

21   Q    Okay.  And what kind of car did your friend have?

22   A    A Lexus.

23   Q    And where were you at that time, when you spoke with your

24   friend about the Lexus?

25   A    In front of my house.

```
 1   Q    And that's in Llorens?

 2   A    Yes.

 3   Q    And where was your brother when he asked you for help?

 4   A    In front of my house.

 5   Q    Also in Llorens?

 6   A    Yes.

 7   Q    And so which car did your brother get into?

 8   A    In a gray, charcoal gray, Kia.

 9   Q    And what car did you get into?

10   A    In the Lexus.

11   Q    Who was driving the Lexus?

12   A    My friend.

13   Q    Okay.  And then where did the black Lexus and the Kia go?

14   A    We were on our way.  We were behind my brother.  My

15   brother was ahead.  He was driving, and we were right behind

16   him until we got to there, to where you showed me in the image.

17   Q    Generally speaking, where did you drive to?  What area of

18   town?

19   A    Canovanas.

20   Q    How did you know where to go in Canovanas?

21   A    We were behind my brother.

22   Q    And did your brother tell you beforehand where he was

23   going to take you?

24   A    No.  He said:  Follow me.

25   Q    Okay.  And your understanding, again, was that what was
```

1    your brother going to do?

2    A    To hand the car over to the client.

3    Q    Okay.  And you say a "client."  What kind of client are

4    you referring to?

5    A    To a person, a client.  Since he had people that he washed

6    cars for, I thought it was just a client.

7    Q    Sir, once you got to the location to drop off the car,

8    what happened?

9    A    My brother got down from the car.  He got into the car,

10   and we went to Llorens.

11   Q    Your brother got into what car?

12   A    In the black Lexus.

13   Q    And where was he seated in the black Lexus?

14   A    In the backseat.

15   Q    And where were you seated?

16   A    In the passenger's front seat.

17   Q    And, at that time, did your brother mention anything about

18   Keishla?

19            MR. GONZALEZ-DELGADO:  Objection, leading, Your

20   Honor.

21            THE WITNESS:  No.

22            THE COURT:  Overruled.

23   BY MR. GOTTFRIED:

24   Q    Where did you, your brother and your friend return to, or

25   go, in the black Lexus?

1      A      Llorens.

2              MR. GOTTFRIED:  Your Honor, at this time, I would ask

3      to approach the witness with Government IDs 123 and 124.

4              THE COURT:  Permission granted.

5              MR. GONZALEZ-DELGADO:  Your Honor, we maintain our

6      objection as to lack of foundation.

7              THE COURT:  Noted.

8      BY MR. GOTTFRIED:

9      Q    Sir, do you recognize the images depicted in Government

10     IDs 123, 124?

11     A    Yes.

12     Q    And are those true and correct copies of images that

13     you're familiar with?

14     A    Yes.

15             MR. GOTTFRIED:  Your Honor, the government would move

16     to admit into evidence Government IDs 123, 124 as Government

17     Exhibits 123, 124.

18             MS. CINTRON-COLON:  With the same objection as

19     sidebar, Your Honor.

20             THE COURT:  Objection is overruled.  Government IDs

21     123 and 124 admitted as Government Exhibits 123 and 124.

22         (Exhibit Nos. 123 and 124 admitted into evidence.)

23             MR. GOTTFRIED:  Your Honor, permission to recover the

24     exhibits and to publish.

25             THE COURT:  Granted.

1    BY MR. GOTTFRIED:

2    Q    Sir, can you tell us what we have in Government Exhibit

3    123?

4    A    A gray Kia car.

5    Q    And do you recognize that car?

6    A    Yes.

7    Q    How do you recognize it?

8    A    Because it was the car that my brother was driving.

9    Q    Do you recognize the background, the location where the

10   car is?

11   A    Yes.

12   Q    How do you recognize it?

13   A    Because that is where we picked up my brother.

14   Q    Moving on to Government Exhibit 124.  Same question, sir.

15   Do you recognize the area where this Kia is parked?

16   A    Yes.

17   Q    How do you recognize it?

18   A    Because that is where we picked up my brother from.

19   Q    After you and your brother and your friend returned in the

20   black Lexus to Llorens, what did you see your brother do?

21   A    No.  My friend left.  I left with my girlfriend, and my

22   brother just went on normal.

23   Q    Okay.  Did you see Mr. Verdejo that same day again?

24   A    When I arrived, he was no longer in the parking lot.  He

25   came a little bit, like at noon.

1    Q    Okay.  And when you say "he came," he came where?

2    A    He came back to Llorens.

3    Q    Okay.  In what car?

4    A    In the Dodge Durango.

5    Q    Okay.  And what, if anything, did you do with Mr. Verdejo

6    when he returned to Llorens in the Dodge Durango around noon on

7    Thursday, April 29th?

8    A    We went to buy food.

9    Q    What kind of food?

10    A    Fries and chicken.

11    Q    Was anyone else with you?

12    A    No.

13    Q    How did Mr. Verdejo seem?

14    A    Normal.

15    Q    Did he -- what, if anything, did he talk about with you?

16    A    No.  We weren't talking about anything.  Just normal.  We

17    were eating, but we didn't finish eating the food completely.

18    Q    And how did the interaction with Mr. Verdejo end?

19    A    He told me he had to leave.  I walked over to my house.

20    And before he left, he asked me for some money, and I lent it

21    to him.

22    Q    Okay.  How much money did he ask you for?

23    A    $100.

24    Q    Sir, moving on to the next day, Friday, April 30th, what

25    happened on April 30th?

```
 1    A    I got up in the morning, as usual, and when I woke up, my
 2    girlfriend was already half woke.
 3    Q    Then what happened?
 4    A    She had shown me a video of the mother present here.
 5    Q    And when you say, you talk about the "mother," the mother
 6    of whom?
 7    A    Keishla's.
 8    Q    Okay.  And then what happened after your girlfriend showed
 9    you the video of Keishla's mother?
10    A    I saw the video where the mother was desperately looking
11    for her daughter.  And I saw that they were mentioning Felix's
12    name, and I started to get worried.
13    Q    What did you do next?
14    A    I went down to buy some breakfast, and on the way between
15    my house and the shop, several people told me:  Richard, your
16    friend is in trouble.
17         MS. CINTRON-COLON:  Objection, Your Honor, hearsay
18    and move to strike.
19         THE COURT:  Overruled.
20    BY MR. GOTTFRIED:
21    Q    And how did that make you feel, sir?
22    A    Well, I was concerned.
23    Q    And then what happened?
24    A    Well, I bought breakfast.  I went to my house.  My brother
25    had not yet woken up, and if he had woken up, he had not left
```

1    his room.

2    Q    When you say your "brother," are you referring to Luis

3    Cadiz?

4    A    Yes.

5    Q    Then what happened?

6    A    As the hours went by, we were standing watching the TV,

7    and they had found the car.  And when we were standing together

8    watching the TV, I realized that that was the car where we had

9    picked up my brother.

10   Q    And when you say "they had found the car," which car are

11   you referring to?

12   A    The gray Kia that he was driving the day before.

13   Q    Okay.  And after you saw that image of the gray Kia in the

14   area where you had picked up your brother, what did you do

15   next?

16   A    We looked at each other in the eyes, and he moved to the

17   side and went to the bathroom.

18   Q    Who is "he" that you're referring to?

19   A    My brother.

20   Q    And that's Luis?

21   A    Yes.

22   Q    And once Luis got up to go to the bathroom, what happened

23   next?

24   A    He had told me to go to him in the bathroom.

25   Q    Then what happened?

1    A    Right away, when I was about to inquire about him, he

2    asked me to forgive him.

3              MR. GONZALEZ-DELGADO:  Objection, Your Honor, as to

4    anything Luis says.  That's hearsay.

5              MR. GOTTFRIED:  Impact upon listener.  We're going to

6    talk about how it made him feel and what he did as a result.

7              THE COURT:  Okay.  Go ahead.  Objection overruled.

8    BY MR. GOTTFRIED:

9    Q    And how did that make you feel, sir?

10   A    Well, he made me feel bad because he had told me that it

11   was a fucking client, and it wasn't.

12   Q    What did you do next, sir?

13   A    My children's aunt was in the area.

14   Q    And what, if anything, did your children's aunt do?

15   A    She called me to tell me:  Look, did you watch the news;

16   Felix is in trouble.

17             MS. CINTRON-COLON:  Objection, Your Honor, hearsay

18   and move to strike as to what this woman said, allegedly.

19             THE COURT:  Overruled.

20   BY MR. GOTTFRIED:

21   Q    And as a result of what she said, what did you do?

22   A    Since we were in front of my house downstairs, and the

23   atmosphere was already a little bit tense, I told her:  Let's

24   go up to the house.

25             THE COURT:  All right.  At this point, let's take a

1    10, 15-minute break.

2            Ladies and gentlemen, remember not to talk about the

3    case, the evidence of the case or your impressions of the case.

4    Do not view reports or articles about the case.  Do not conduct

5    any research about the case, the matters in the case or the

6    individuals involved in the case.

7            With this, we'll be back in the courtroom in about 10

8    or 15 minutes.

9        (Whereupon the following proceedings were had in open court

10        without the presence of the jury.)

11            THE COURT:  Mr. Cadiz, we are going to be on a 10,

12    15-minute break.  You do not have to stay where you are.  You

13    can walk around and so forth.  However, do not talk about your

14    testimony with anybody.  Do not review materials related to the

15    case.  Do not send out messages on social media related to this

16    case.

17            Do you understand?

18            THE WITNESS:  I do.

19            THE COURT:  All right.  We'll be back in the

20    courtroom in about 10 or 15 minutes.

21        (Whereupon a recess was taken at 3:06 p.m., until 3:21

22        p.m.)

23        (Whereupon the following proceedings were had in open court

24        without the presence of the jury.)

25            MR. GOTTFRIED:  Your Honor, before the jury is called

1    in, can we just approach on a sidebar issue while we get the

2    witness?

3        (Sidebar conference commenced.)

4            MR. GOTTFRIED:  Your Honor, we want to raise one

5    thing in response to Brother and Sister Counsel's objections,

6    hearsay objections, regarding Luis Cadiz's statements.  So Luis

7    Cadiz is a cooperator.  He is a codefendant.  He is a party

8    opponent still.  He may be cooperating, but he's on the other

9    side of the "V."  He's a party opponent.

10            The government's allowed to introduce his statements,

11    they are not hearsay, as admissions of a party opponent.  So we

12    understand that we are allowed to discuss.  If he confessed to

13    the crime to his brother, those are admissions that we are

14    allowed to admit as party opponent admissions, regardless of

15    hearsay.

16            MR. GONZALEZ-DELGADO:  Your Honor, but there is --

17    there was a case in the Supreme Court that just came down that,

18    I think it was this weekend.  If -- I don't -- oh, here's my

19    phone.

20            May I have one second to look for the case?  I'm

21    sorry.

22            MS. COLLAZO-ORTIZ:  Your Honor, everyone's standing.

23            THE COURT:  What?

24            MR. GONZALEZ-DELGADO:  Everybody's standing.

25            THE COURT:  Well, the jury will be brought in

1    shortly.

2              MS. COLLAZO-ORTIZ:  I don't know how long we're going

3    to take.

4              MR. GONZALEZ-DELGADO:  It's --

5              THE COURT:  The case from New York?

6              MR. GONZALEZ-DELGADO:  No, no.  The case that -- I'm

7    not sure it was New York, but it's a Supreme Court case that

8    says that the confession of a codefendant is --

9              THE COURT:  They clarified the extent and scope of

10   *Bruton*.

11             MR. GONZALEZ-DELGADO:  Yes.  But it should be only

12   against the person, and it has to be sanitized.

13             In this case, the government has not sanitized that

14   confession, and he -- they -- if they're going to bring the

15   confession in through this witness, that confession could only

16   go against his brother and not Mr. Verdejo.

17             And, second of all, we're making these objections

18   because we don't know if the government is going to bring in

19   this witness or not, because if they're going to bring in the

20   witness, well, then we will have an opportunity to

21   cross-examine him against anything.

22             But if they decide not to bring him in, then we have

23   a huge hearsay problem, and that's why I have been objecting to

24   any statement made by Mr. Luis Cadiz as a hearsay objection

25   until the government brings him in as a witness, if they do.

1    If they do not, then I am going to respectfully request that

2    the Court remove and strike from the record every statement

3    allegedly made by him, including the confession that the

4    government is going to try to bring in right now.

5            So I would request, Your Honor, that if that is going

6    to be allowed, that the Court and -- in two minutes, I'll get

7    the case, and I'll review it again.  But I would request that

8    the Court give a limiting instruction to the jury that that

9    confession alone, brought in by this witness, can only be taken

10   against the witness that, allegedly, said it, which would be

11   Luis Cadiz.  And it has to be redacted.  That would be my

12   request, Your Honor.

13           That was this week.

14           THE COURT:  I saw it.  I read the case.  And it

15   clarifies the scope of *Bruton*, clarifying doubts that have been

16   raised by intervening events.

17           So, Mr. Gottfried?

18           MR. GOTTFRIED:  Again, Your Honor, we think that the

19   party opponent exception does apply.  And with respect to any

20   *Crawford* issue, which I think he's raising, Brother Counsel's

21   raising, when he says that this depends on whether or not he'll

22   have an opportunity to cross-examine the witness, these are not

23   testimonial statements prepared for trial.  So *Crawford* would

24   not apply to them, in any event.

25           But we do believe that this is admissible as party

1    opponent admissions, in addition to the other reasons we've
2    mentioned:  impact upon listener.
3              THE COURT:  Sure.  I understand.
4              All right.  To the extent there was an objection, the
5    objection is overruled, but the point has been made.  It's
6    preserved.
7              MR. GONZALEZ-DELGADO:  And I'll, I will give the
8    Court the cite in the next segment of the case.  I know that
9    you've read it, but we need it on the record.  If we lose or
10   he's convicted, the Court of Appeals knows what I was referring
11   to.
12             THE COURT:  I understand.  I have the case on my
13   desk.  But I understand.  Sure.  You can do that at the end of
14   the day.
15             MR. GONZALEZ-DELGADO:  Sure.
16        (Sidebar conference concluded.)
17             THE COURT:  Let's bring the jury in.
18             MR. GONZALEZ-DELGADO:  Your Honor, as soon as the
19   jury comes in, may we have a sidebar?
20        (Sidebar conference commenced.)
21             THE COURT:  Go ahead.
22             MR. GONZALEZ-DELGADO:  Your Honor, it's just that I
23   was reviewing Rule 801(d)(2), which is what Brother Counsel is
24   stating that it pretends to bring in the statements of Mr. Luis
25   Cadiz that he, allegedly, told the witness that is testifying.

1    Now, under 801(d)(2), it says that:  Statements that are not

2    hearsay, a statement that meets the following conditions is not

3    hearsay:  an opposing party statement.

4         First of all, the opposing party isn't sitting down

5    here.  The only person who's sitting down here is Mr. Felix

6    Verdejo.

7         It says:  The statement is offered against an

8    opposing party, and they're offering this against Mr. Verdejo,

9    if it was made by the party in an individual or representative

10   capacity.

11        Mr. Verdejo is not the person making these

12   statements.

13        (B) is when the party manifested that it adopted or

14   believed to be true.

15        Mr. Verdejo has not adopted and has not believed to

16   be true this statement.

17        (C) was made by a person whom the party authorized to

18   make his statement on the subject.

19        Mr. Verdejo has not authorized anybody to make any

20   statements on his behalf, and, actually, has pleaded the Fifth.

21        (D) was made by the party's agent or employee on a

22   matter within the scope of that relationship and while it

23   existed.

24        This, this paragraph does not comply with the rule

25   either; and

1              (E) was made by the party's co-conspirator during and
2      in furtherance of a conspiracy.
3              Mr. Verdejo is not charged in a conspiracy in any of
4      the counts that he is charged.
5              And it says:  The statement must be considered, but
6      that does not by itself establish the declarant's authority
7      under (C) the existence or scope of the relationship under (D),
8      or the existence of the conspiracy or participation under (E).
9              So if Brother Counsel is bringing this in, like he
10     just stated to the Court, as an opposing party's statement, it
11     does not qualify under any of the five paragraphs contained in
12     Rule 801(d)(2).
13             THE COURT:  Mr. Gottfried?
14             MR. GOTTFRIED:  Yes, Your Honor.
15             With respect to Brother Counsel's discussion about
16     the conspiracy, the government doesn't need to charge a
17     conspiracy in order for the Court to consider two defendants as
18     coconspirators.
19             And with respect to (2)(A), it states that the
20     government -- the statement is offered against an opposing
21     party and was made by the party in a general capacity or
22     representative capacity.  We understand that it could be, to
23     the extent that they are codefendants, one codefendant's
24     admissions about his own involvement in the crime, is an
25     opposing party's admissions under that.

 1                That is one of several exceptions that we're relying
 2        upon for the hearsay.
 3                THE COURT:  Okay.  Objection overruled.
 4            (Sidebar conference concluded.)
 5            (Whereupon the following proceedings were had in open court
 6             in the presence of the jury.)
 7                THE COURT:  Welcome back to the courtroom.  Please
 8        take a seat.
 9                MR. GOTTFRIED:  May it please the Court?
10                THE COURT:  Go ahead.
11        BY MR. GOTTFRIED:
12        Q    Sir, after the aunt of your kids went up to you and your
13        brother's apartment in Llorens on Friday, April 30th, what
14        happened next?
15        A    We went into my room, and I called my brother.  And I
16        explained to him that she was a police officer.
17        Q    Then what happened?
18        A    And I told him to speak, to tell me what it was that had
19        happened.
20        Q    Okay.  And is that what he did?
21        A    Yes.
22        Q    Then what happened?
23        A    He started crying.  Before telling me anything, all he did
24        was ask me for forgiveness, and he told me that he and Felix
25        had killed somebody.

```
 1                MS. CINTRON-COLON:  Objection, Your Honor, under
 2    Bruton and Crawford.
 3                THE COURT:  Overruled.
 4                MS. CINTRON-COLON:  May we approach, Your Honor?
 5                THE COURT:  No.  We already discussed that at
 6    sidebar.
 7                MS. CINTRON-COLON:  Your Honor, but not under
 8    Crawford.
 9                THE COURT:  I understand the argument.  Objection
10    overruled.
11                Go ahead.
12    BY MR. GOTTFRIED:
13    Q    Sir, then what happened?
14    A    He told me that he had arrived at the female's house, and
15    he was with him in the car.  And the female got into the car,
16    and my brother was in the backside.
17    Q    Okay.  And, sir, what did, eventually, your brother
18    indicate happened to the woman?
19    A    Since he, at the time he was not well, he explained to me
20    that Felix had hit the female.
21                MR. GONZALEZ-DELGADO:  We continue to object under
22    hearsay, Your Honor.
23                THE COURT:  Overruled.
24    BY MR. GOTTFRIED:
25    Q    And what, eventually, happened to the woman?
```

1    A    He had told me that they had hit the woman; that they had

2    injected her with drugs, but he never explained what they did

3    to her after that.  He was just crying and asking for my

4    forgiveness.

5    Q    And as a result of what your brother told you, what did

6    you do next?

7    A    In my room, my kids' aunt told me that she had a lawyer

8    that would help us.

9              MR. GONZALEZ-DELGADO:  Objection, Your Honor,

10    hearsay.

11              THE COURT:  Overruled.

12    BY MR. GOTTFRIED:

13    Q    And did you, in fact -- did anyone, in fact, contact that

14    lawyer?

15    A    I did.

16    Q    Okay.  What was the name of the lawyer?

17    A    Edwin Prado.

18    Q    Okay.  And how did you put yourself -- how did you

19    communicate with Mr. Prado?

20    A    From my cell phone.

21    Q    Okay.  And what was the agreement with Mr. Prado?

22    A    In that moment of desperation, wanting to help my brother,

23    I told him that I wanted him to help my brother; that I could

24    pay for it in any way:  with drugs, with money.

25    Q    Okay.  And did you, in fact, see Mr. Prado that day?

1    A    No.

2    Q    Okay.  And where did you understand that Mr. Prado was at

3    that time, that day, on Friday?

4    A    He explained to us that he was not in Puerto Rico.

5    Q    Okay.  Now, that day, or in the days afterwards, did you

6    have any communication or receive any communication with or

7    from Mr. Verdejo?

8    A    Yes.

9    Q    How?

10   A    Through Snapchat.

11   Q    And how did you know that the person communicating with

12   you through SnapChat was Mr. Verdejo?

13   A    Because that's how we always communicated.  When he told

14   me that, I am going to Llorens, via Snapchat, the person who

15   came to Llorens was him, not anybody else.

16   Q    Sir, you've been referring to the aunt.  She's the aunt of

17   whom?

18   A    Of my children's mother.

19        MR. GOTTFRIED:  Okay.  Your Honor, at this time, I'd

20   like to mark Government ID 132, which has been shown to Brother

21   Counsel, and request permission to approach the witness.

22        THE COURT:  Granted.

23   BY MR. GOTTFRIED:

24   Q    Sir, do you recognize that Government ID 132 that's in

25   front of you now?

1    A    Yes.

2    Q    How do you recognize it?

3    A    Because that's where we talked to each other through

4    Snapchat.

5    Q    And you say "we."  Who are you referring to?

6    A    Felix and I.

7    Q    And is that what you have in front of you, Government ID

8    132, a true and correct copy of a message between you and Mr.

9    Verdejo?

10    A    Yes.

11            MR. GOTTFRIED:  Okay.  At this time, Your Honor, the

12    government would move to admit Government ID 132 as Government

13    Exhibit 132.

14            MR. GONZALEZ-DELGADO:  Objection under Rules 901,

15    902, 1001, 1002, and we'd request to approach the bench, Your

16    Honor.

17        (Sidebar conference commenced.)

18            MR. GONZALEZ-DELGADO:  Your Honor, just to conclude

19    the prior objection, the case is *Samia versus U.S.*, Number

20    22-196, decided June 23rd, 2023.

21            Your Honor, we are --

22            THE COURT:  Decided by the Supreme Court on that

23    date.

24            MR. GONZALEZ-DELGADO:  Yes.

25            Your Honor, we are objecting for lack of foundation,

1    the Government's Identification "103," under Rules 901, 902,

2    1001 and 1002, because the witness has not established that

3    this is a text message between him and anybody.  There has been

4    no evidence presented as to the contents of this message.

5    Actually, the information contained here has a name of another

6    person.

7            We'd request that, under the Rule of Best Evidence,

8    that the actual screen-shot, or screen on the phone, be

9    provided.  Because, if the Court can see, this is a photo of

10   another photo.  And, honestly, there is no guarantees of who

11   owned this phone and who is, can say is Luis Torres in this

12   conversation, Your Honor.

13           MR. GOTTFRIED:  Your Honor, the witness -- I have not

14   gone into the contents because I am authenticating it

15   beforehand.  My understanding is I should not go into the

16   contents until it's authenticated.

17           But the witness has indicated that he communicated

18   with Mr. Verdejo via Snapchat; that this is a communication

19   with Mr. Verdejo via Snapchat, and that's a true and correct

20   copy of a message that was exchanged with Mr. Verdejo.  And I

21   think, for purposes of authentication, that's sufficient.

22           MR. GONZALEZ-DELGADO:  We don't have a Cellebrite

23   phone extraction.  We don't know where that message was

24   received, if the phone exists or not.  The witness has stated

25   that every month he changed his phones.  We don't know from

1    where that, that phone, that screen-shot was taken.

2          And, second of all, the witness has not stated

3    anything related to who this person Luis Torres is, Your Honor.

4    And the fact that they might have communicated via Snapchat

5    doesn't mean that this conversation was specifically made

6    between Mr. Verdejo and him.

7          MR. GOTTFRIED:  The witness is saying that this is a

8    message that he had with Verdejo, and he knew that this was a

9    message from Verdejo.  And in terms of, you know, we don't have

10   to produce the extraction, to the extent we even had it, of

11   this phone with a Snapchat message.  The witness himself can

12   identify whether or not it's a message that he or she sent or

13   received from a particular person.

14         THE COURT:  I understand the arguments.  Objection

15   overruled.

16         MR. GONZALEZ-DELGADO:  Your Honor, just for the

17   record, we have not received a cell phone extraction from Mr.

18   Verdejo's phone that corroborates the Government's

19   Identification 132.

20         THE COURT:  Noted.

21       (Sidebar conference concluded.)

22         MR. GOTTFRIED:  Yes, Your Honor.  I believe that it's

23   pending the government's motion to admit.

24         THE COURT:  Government's ID 132 admitted as

25   Government Exhibit 132.

1          (Exhibit No. 132 admitted into evidence.)

2               MR. GOTTFRIED:  Permission to publish.

3               THE COURT:  Granted.

4     BY MR. GOTTFRIED:

5     Q    Sir, where is this Government Exhibit 132, where is this

6     image from?

7     A    From one of my phones.

8     Q    Okay.  After taking this image, what did you do with it?

9     A    Nothing.  I kept it in the gallery, stored in the gallery.

10    Q    And, eventually, did you provide this image to anyone?

11    A    I waited until my brother turned himself in.  And then

12    over the days, I had a conversation with the FBI, and I gave it

13    to them.

14    Q    And, sir, can you tell us whom you understand is

15    communicating to you in this message?

16    A    I did not understand.

17    Q    Who is the message from?

18    A    Felix.

19    Q    How do you know?

20    A    Because that's where we always talked.

21    Q    Okay.  And when you say "that," where is that?

22    A    We communicated there.

23    Q    Okay.  And when you say "there," what application are you

24    referring to?

25    A    To the Snapchat application.  I'm sorry.

1    Q    Okay.  And can you please read the message that you
2    received from Mr. Verdejo?
3    A    "Hey, I need Tony.  I'm going to get you over there where
4    the people who are working with me.  It's to make a story, more
5    or less, of what we did at that time, as in we passed by there
6    and took something to that area after the bridge.  Tell him to
7    think of someone's house and nearby, like for to pass by again
8    in the frequency that he did on the bridge."
9    Q    Who is the "Tony" referred to in the message, from what
10   you understand?
11   A    My brother.  That's the nickname that we have for him.
12   Q    And what was your understanding of this message?
13   A    I never showed the message to my brother.
14   Q    And what did you understand that the message meant?
15   A    I, at least, did not tell him anything because I, at
16   least, understood that he wanted my brother to go to him, and I
17   didn't want for anything bad to happen to my brother.
18   Q    And, sir, you see at the top where it says "Luis Torres?"
19   You see that?
20   A    Yes.
21   Q    And whom did you understand that was in reality?
22   A    He, himself.
23   Q    And who is "he?"
24   A    Felix.
25   Q    Did you respond to this message?

```
1    A    No.

2    Q    Why not?

3    A    Because the message was not for me.

4    Q    And whom did you understand the message was for?

5    A    For my brother.

6    Q    Did you, in fact, show the message to your brother?

7    A    No.

8    Q    Why not?

9         MS. CINTRON-COLON:  Objection, Your Honor, already

10   answered that.

11        THE COURT:  I will allow it.

12        THE WITNESS:  Because I was afraid that he would get

13   to the place.  If I showed it to him, if he agreed, my fear was

14   that he would go to the place, and something would happen to

15   him.

16   BY MR. GOTTFRIED:

17   Q    Sir, turning to Saturday, May 1st, 2021, what happened on

18   that day?

19   A    I got up early, as usual.  I waited for the lawyer to

20   arrive in Puerto Rico to call me, and for my brother to talk to

21   him and to agree whatever they would agree.

22   Q    Okay.  And who was that lawyer?

23   A    Edwin Prado.

24   Q    And did you see your brother in the offices of Mr. Prado

25   on Saturday, May 1st, 2021?
```

1    A    Yes.

2    Q    Okay.  Around what time of day or night?

3    A    I do not recall the exact time, but it was about 7:00 or

4    8:00.

5    Q    7:00 or 8:00 a.m. or p.m.?

6    A    In the evening.

7    Q    Okay.  After that meeting between -- after -- were you

8    present in the meeting between your brother and Mr. Prado?

9    A    No.

10   Q    Okay.  And after leaving your brother with Mr. Prado in

11   his office on Saturday night, did you see your brother again

12   after that?

13   A    No.

14   Q    Okay.  Did you ever pay Mr. Prado for his representation

15   of your brother?

16   A    No.

17   Q    Turning to Sunday, May 2nd, 2021, what, if anything,

18   happened on that day?

19   A    My brother, he had bought a cake for me, because May 2nd

20   was my birthday.  And I got up in the morning, and I had stayed

21   that day at my girlfriend's house.

22        And at around 6:00 p.m., I went to the house of the

23   mother of my children, and there was my mother waiting for me

24   and waiting for my brother to sing me happy birthday.  And she

25   told me that she was waiting for my brother to come, but I knew

1    that my brother was not going to come.

2    Q    And what, if anything, did you do then?

3    A    Come again?

4    Q    What did you do?

5    A    I couldn't find the way to tell my mother that the FBI had

6    taken my brother away.

7    Q    Now, sir, have you been interviewed by the FBI on

8    different occasions?

9    A    Yes.

10   Q    Okay.  Now, when you were originally interviewed by the

11   FBI, what did you tell the FBI about Mr. Verdejo's drug sales?

12   A    At the time, I did not tell them anything because we were

13   talking about a murder.

14   Q    Okay.  And, at a later point, did you tell the FBI

15   something different than what you had originally told them

16   regarding those drug sales?

17   A    At the beginning, I did not communicate anything to them,

18   but afterwards, the FBI came to the United States to seize my

19   cell phones.

20   Q    Okay.  And, afterwards, did you tell them something

21   different than what you had originally said about the drug

22   sales with Mr. Verdejo?

23   A    At that point in time, I decided to tell the truth.

24   Q    Okay.  Which was what?

25   A    The truth?

1    Q    Yes.  What was the truth that you told the FBI regarding

2    those drug sales?

3    A    Yes.  That we got to make a couple of sales.

4    Q    Okay.  Before Friday, April 30th, 2021, before that day,

5    did your brother, Luis, discuss the murder of Keishla with you?

6            MR. GONZALEZ-DELGADO:  Objection under *Crawford*,

7    under *Samia versus U.S.*, and hearsay, Your Honor.

8            THE COURT:  Overruled.

9    BY MR. GOTTFRIED:

10   Q    Yes, sir.  So, again, before Friday, April 30th, 2021, did

11   your brother, Luis, discuss the murder of Keishla with you?

12   A    No.

13   Q    And after the murder of Keishla, did you continue to live

14   in Puerto Rico?

15   A    Yes.

16   Q    And did you, eventually, leave?

17   A    I left on May 5th.

18   Q    Why?

19   A    Because the atmosphere was not -- there were many people

20   passing by my house, and people believed that Felix was my

21   friend.

22           MR. GONZALEZ-DELGADO:  Objection, speculation, Your

23   Honor.

24           THE COURT:  Overruled.

25   BY MR. GOTTFRIED:

1    Q    And so why did you decide to leave?

2    A    Because if I stayed in Puerto Rico, it's obvious that

3    nothing good would happen to me.

4              MR. GOTTFRIED:  Your Honor, if I can just have 30

5    seconds?

6              No further questions at this time, Your Honor.

7              MR. GONZALEZ-DELGADO:  May I have one second, Your

8    Honor?

9              May it please the Court?

10             THE COURT:  Go ahead.

11             MR. GONZALEZ-DELGADO:  Thank you.

12                           CROSS-EXAMINATION

13    BY MR. GONZALEZ-DELGADO:

14    Q    Mr. Cadiz, in the year 2021, you had at least three

15    interviews with the FBI; is that correct?

16    A    Yes.

17    Q    The first one being May 2nd, 2021; is that correct?

18    A    No.  It was May 3rd, because Sunday was my birthday.

19    Q    Okay.  That's the one that you just told Brother Counsel

20    that you lied to the FBI; is that correct?

21    A    Yes.

22    Q    Now, you also had -- okay.  In that meeting that you had

23    in the FBI, you were invited to the FBI; is that correct?

24    A    How so?

25    Q    You were invited to the FBI to have some questions

1    answered?

2    A    Yes.

3    Q    But you didn't go alone?

4    A    I was there with the attorney.

5    Q    But it wasn't Edwin Prado, right?

6    A    No.

7    Q    Who was the attorney who accompanied you there?

8    A    I do not recall his last name, but it was --

9            THE INTERPRETER:  Correction.

10           THE WITNESS:  I do not recall her last name, but it

11   was a lady.

12   BY MR. GONZALEZ-DELGADO:

13   Q    But it was a lady who worked at Edwin Prado's office; is

14   that correct?

15   A    Yes.

16   Q    And you just told Brother Counsel that you never paid

17   Edwin Prado; is that correct?

18   A    That's correct.

19   Q    Even though you said that you would pay him either in cash

20   or cocaine.  Yes or no?

21   A    Yes.

22   Q    Okay.  So you are at a meeting with the FBI with an

23   attorney that you did not pay?

24   A    Yes.

25   Q    And in that meeting, Agent Lorenzo Vilanova, who's sitting

1    here, was present; is that correct?

2    A    Yes.

3    Q    You recognize Agent Vilanova, right?

4    A    Forbidden to forget him.

5    Q    And the truth is, he was present in all of your

6    interviews; is that correct?

7    A    Correct.

8    Q    Okay.  So during that interview, he wasn't the only agent

9    that was present; is that correct?

10    A    Yes.

11    Q    The prosecutors were there?

12    A    Yes.

13    Q    Mr. Gottfried and Ms. Collazo; is that correct?

14    A    Correct.

15    Q    And they were the ones that were conducting the

16    interrogation; is that correct?

17    A    Yes.

18    Q    And it was in a full office?

19    A    Yes.

20    Q    And it was a very serious conversation that you were

21    having?

22    A    Yes.

23    Q    Everybody had a notebook?

24    A    Yes.

25    Q    And they were all copying what you said?

1    A    Yes.

2    Q    Okay.  Was this meeting after your brother had already

3    spoken with the Brother Counsels and the agents of the case?

4    A    I do not understand the question.

5    Q    Okay.  Let me go back a little.

6          May 1st was the day that you say that your brother

7    confessed the murder; is that correct?

8    A    Yes.

9    Q    And that same day, you called Edwin Prado to see if he

10   could meet with you?

11   A    Okay.  We saw the attorney on May 1st.  I communicated

12   with the attorney the day before.

13   Q    And when you go to the meeting with Mr. Prado, at the end

14   of the meeting, you knew that you were going to the FBI the

15   next day, on May 3rd; is that correct?

16   A    Yes.

17   Q    But your brother didn't have any money to pay for Mr.

18   Prado?

19   A    Yes.

20   Q    And that's why you offered to pay for him?

21   A    Yes.

22   Q    Even though you had no money either?

23   A    That's correct.

24   Q    Okay.  So in this meeting, do you remember seeing the

25   agents taking notes of everything that you said?

1    A    Yes.

2    Q    Okay.  At the end of the meeting, did you see or read the

3    notes that the agents had taken of your testimony?

4    A    No.

5    Q    Did they repeat what they had written to see if they had

6    correctly written down your testimony?

7    A    Yes.

8    Q    And you said that what they wrote was accurate; it was

9    correct?

10    A    Yes.

11    Q    And didn't have to tell them:  Listen, you have to amend

12    that statement or I didn't say that.  You did not have to do

13    that, correct?

14    A    Yes.

15    Q    So their notes are accurate?

16    A    At the time, yes.

17    Q    But, like we said, on May 3rd, 2021, it was a story that

18    you gave the FBI and you gave the Department of Justice?

19         THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat

20    the date?

21    BY MR. GONZALEZ-DELGADO:

22    Q    On May 3rd, 2021, the truth is that that testimony was a

23    story that you gave to the prosecutors and to the FBI?

24    A    Yes.

25    Q    Okay.  Now, do you remember if your second meeting with

 1     the FBI and Brother Prosecutors was on June 7th, 2021?

 2     A     I don't remember clearly.

 3     Q     But you remember it was about a month after your first

 4     meeting?

 5     A     Yes.

 6     Q     And it was the same conditions:  It was in a room; the

 7     agents were there; the prosecutors were there; they were taking

 8     notes; is that correct?

 9     A     I was not in Puerto Rico.

10     Q     Okay.  So it was in the United States?

11     A     Yes.

12     Q     And the prosecutors were in the United States interviewing

13     you; is that correct?

14     A     No.

15     Q     So it was only the case agents?

16     A     Yes.

17     Q     And this was because the case agents called you to meet

18     with you, or was it because you had repented and wanted to tell

19     the truth?

20     A     No.  They conducted an operative.

21     Q     But that was for your drug case in wherever you're

22     charged; is that correct?

23     A     No.

24     Q     So it was for this case that they made an operative?

25     A     They went searching for my phones.

```
 1   Q    But it wasn't that you were arrested?

 2   A    No.

 3   Q    They just knocked on your door and said:  Listen, we have

 4   a search warrant for your phone; this is the search warrant;

 5   please give it up?

 6   A    I gave them to them.

 7   Q    And you were scared when you gave them the phone, right?

 8   A    I was normal.

 9   Q    But weren't you afraid of what they were going to find on

10   that phone?

11   A    No.

12   Q    Okay.  So the reason that you gave them the phone had no

13   effect on you whatsoever?

14   A    No.

15   Q    And the truth is that the phone that you gave them -- was

16   it an Android or an iPhone?

17   A    At the time, they were iPhones.

18   Q    More than one, right?

19   A    Two.

20   Q    Do you know if the FBI did an extraction of those phones?

21   A    No.

22   Q    You were never confronted with the contents of those two

23   phones?

24   A    No.

25   Q    And the truth is that Exhibit 132 --
```

```
 1                    MR. GONZALEZ-DELGADO:  May I have --

 2    BY MR. GONZALEZ-DELGADO:

 3    Q    Exhibit 132 is not one of the phones that you gave to the

 4    FBI on that day; is that correct?

 5    A    I did not turn in the iPhones.

 6                    THE COURT:  "I did" or "did not?"

 7                    THE WITNESS:  When they went to the United States, I

 8    handed them in.

 9                    THE COURT:  The iPhones.

10                    THE WITNESS:  Yes.

11    BY MR. GONZALEZ-DELGADO:

12    Q    And my question is, this phone that we're seeing in

13    Exhibit 132 is not an iPhone; is that correct?

14    A    Correct.

15    Q    You didn't give the FBI this phone that we're showing

16    right here?

17    A    No.  Because that phone was no longer in my possession

18    because that was a prepaid one.

19    Q    One of the ones that you monthly just got rid of?

20    A    Yes.

21    Q    Were you legally working?

22    A    Yes.

23    Q    Now, the third -- on that June 7th, 2021, visit that the

24    agents made to you, you answered additional questions that they

25    did, that they asked you, correct?
```

```
 1   A    Yes.

 2   Q    And you saw them take notes, once again, correct?

 3   A    Yes.

 4   Q    And, once again, they read the notes to you, just to make

 5   sure that they had accurately written down what you had told

 6   them?

 7   A    Yes.

 8   Q    And see if you remember having told the agents on that

 9   second visit that you once had an Android cell phone that you

10   threw away because you did not want to get into trouble

11   regarding certain calls and Snapchat conversations stored on

12   this device?

13   A    I do not recall.

14   Q    But if you said it, they wrote it down; is that correct?

15   A    Yes.

16   Q    Okay.  Now, the third time that the -- that you're

17   interviewed was on December 5th, 2022; is that correct?

18   A    Yes.  I was in prison.

19   Q    For which case?

20   A    For the case that I have in the United States.

21   Q    For selling heroin, correct?

22   A    Correct.

23   Q    How much heroin were you accused of selling?

24   A    No, because they did not found any drugs on me.

25   Q    But you pled guilty to distributing heroin; is that
```

 1    correct?

 2    A    No.  In that case that I have in the United States, I am

 3    in diversion.  My attorney got me diversion, so I am neither

 4    guilty or innocent.

 5    Q    But in order to be in a program, you have to admit

 6    responsibility so that you qualify for the program; is that

 7    correct?

 8    A    No.  What happens is that I never pled guilty or innocent.

 9    I am just in a diversion program.  The attorney got me a

10    diversion, and he told me that if in exactly one year I do

11    everything right, they erase everything from my record.

12    Q    And one of the requisites of this program is that you have

13    to work?

14    A    That's correct.

15    Q    You've got to take drug treatment?

16    A    Correct.

17    Q    And the drug treatment that you're taking is for heroin

18    use; is that correct?

19    A    No.  I had opioid abuse; that is, Oxycodone.  I've never

20    consumed heroin.

21    Q    And Oxycodone is known as Percocet; is that correct?

22    A    Yes.

23    Q    So you were taking around 15 to 20 a day?

24    A    Correct.

25    Q    The regular-strength Percocets or the ones that you buy at

1    a drug point?

2    A    In the street.

3    Q    And those Percocets have additional chemicals included; is

4    that correct?

5    A    Yes.

6    Q    Because they cut them up, and they mix them up with other

7    drugs; is that correct?

8    A    Yes.

9    Q    Like Fentanyl?

10    A    When I was in Puerto Rico, I knew what I was consuming.

11    When I arrived in the United States, that's when I realized

12    that the pills that I was consuming had Fentanyl.

13    Q    Which are -- makes it stronger than a regular Percocet

14    pill?

15    A    Yes.

16    Q    And how did you pay for those 30 pills a day?

17         Let me withdraw the question.

18         How much is each pill worth on the street?

19    A    $10.

20    Q    So we can agree that you were spending between $200 and

21    $300 a day on pills?

22    A    I had good savings.  I worked.

23    Q    And the savings were from your drug deals in Puerto Rico?

24    A    No.

25    Q    How much -- what were you working in in United States?

1   A    I'm not working in the United States.

2   Q    I'm talking about, when you left Puerto Rico, that you

3   were using 20 to 30 Percocet pills that you were buying on the

4   street.

5   A    In the United States, I was not taking that amount because

6   those pills, they were stronger, and with two per day, maybe

7   one already.

8   Q    You had the same effect as taking the 30 pills in Puerto

9   Rico?

10  A    I would say a little bit stronger.

11  Q    And did you take those pills with alcohol?

12  A    No.

13  Q    Did you take anything else?  Marijuana?  Cocaine?  Heroin?

14  Anything else?

15  A    No.  Only pills.

16  Q    Okay.  And the first time that you were interviewed by the

17  FBI, you were taking 30 -- 20 to 30 pills a day of Percocet; is

18  that correct?  In Puerto Rico?

19  A    I do not recall well the amount that I told you, but I was

20  consuming quite a bit.

21  Q    And in your second interview in the United States, you

22  were also taking, this time, one or two pills a day, with the

23  same effect as maybe 30 pills of Percocet; is that correct?

24  A    Yes.

25  Q    Okay.  Your third interview was on December 5th, 2022; is

1      that correct?

2      A    Yes.

3      Q    In Puerto Rico, or in the United States?

4      A    The third one in the United States.

5      Q    And on that day, were you still taking these amounts of

6      drugs?

7      A    No, because I was in prison.

8      Q    So that interview was actually in a jail?

9      A    They made their adjustments, and they took me out of

10     prison.

11     Q    They took you to a local FBI office, and Agent Vilanova

12     and some other agents were there present interviewing you; is

13     that correct?

14     A    Yes.

15     Q    And Prosecutor Jeanette Collazo was there, correct?

16     A    Yes.

17     Q    Was also Gottfried there?

18     A    No.

19     Q    Okay.  And this is December 5th -- December 5th, 2022,

20     correct?

21     A    Yes.

22     Q    And it's the same situation:  It's an FBI office; they all

23     have notebooks; they're all taking notes, correct?

24     A    Yes.

25     Q    And they asked you, at the end of the meeting:  You know,

1    let me read my notes; tell me if there is something that I need

2    to add, I need to subtract or something that is not correct.

3    Is that accurate?

4    A    Yes.

5    Q    Now, your fourth interview with the FBI was on April 19th,

6    2023; is that correct?

7    A    I do not recall, but, yes.

8    Q    That was in Puerto Rico, or in the United States?

9    A    I was in the United States.

10    Q    And AUSA Gottfried and AUSA Collazo were there with Agent

11    Vilanova; is that correct?

12    A    It was over the phone.

13    Q    Okay.  It was a phone call between these two prosecutors

14    and you; is that correct?

15    A    Correct.

16    Q    And the reason why you had that phone call is because they

17    needed to clarify some of the information that you had

18    previously given them?

19    A    Yes.

20    Q    Okay.  Now, your fifth interview was on May 17th, 2023; is

21    that correct?

22    A    Yes.

23    Q    And this was also by phone?

24    A    Yes.

25    Q    And the same prosecutors and agent were on the phone with

1    you, correct?

2    A    Yes.

3    Q    And this is when you, once again, clarified some

4    information that you had previously given to the government; is

5    that correct?

6    A    Yes.

7    Q    Now, in May of this year, you had two interviews with the

8    government, correct?

9    A    I would say so.

10    Q    17th and the 23rd of May, if you remember?

11          THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat

12    that?

13    BY MR. GONZALEZ-DELGADO:

14    Q    17th and the 23rd of May, if you remember?

15    A    Yes.  I remember, yes.

16    Q    And correct me if I'm wrong.  Your last interview was on

17    June, Sunday, June 1st, 2023; is that correct?

18    A    I do not recall.

19    Q    But was it -- the trial had already started, correct?

20    A    No.  I never talked to them during the trial, like that.

21    Q    No, no.  My question is:  Do you remember being

22    interviewed by the government during the first week of June of

23    this year, a couple of weeks ago?

24    A    Yes.

25    Q    And you remember having clarified or told the prosecutors

1    and the agents that there was some information that you had

2    missed in your previous interviews; is that correct?

3    A    I always maintained the same version.  I never added or

4    deleted any information.

5    Q    Okay.  Let's get this clear.  In these seven interviews,

6    we can agree, from what you just said, that in the first

7    interview, you lied to the FBI?

8    A    We were talking about a murder so --

9    Q    Didn't you just answer my question a little while ago

10   that, on that first interview, you lied to the FBI, and that

11   you clarified it in your second meeting?

12   A    Well, I didn't tell them, I mean, normal.  I didn't tell

13   them that I was selling drugs with Felix on that occasion.

14   Q    With Felix or with anybody else.

15   A    With Felix.

16   Q    But you haven't told the FBI that you sold drugs with

17   other people; is that correct?

18   A    Come again?

19   Q    Did you tell the FBI that, besides selling drugs with

20   Felix, you also sold drugs for other people?

21   A    When I was younger.

22   Q    Okay.  So since you were 17, that's when you were selling

23   drugs, correct?

24   A    I did, but it wasn't like I did a complete shift.  I did

25   it to have two or three bucks on me, like half hour, 40

```
 1    minutes, but I didn't do a complete shift.
 2    Q    But you know how a drug point works, correct?
 3    A    I would say so.
 4    Q    Because you sold drugs there, right?
 5    A    Yes.
 6    Q    And you were a seller.  That was all that you were?
 7    A    And I worked in public housing.
 8    Q    Okay.  Let's talk about the drugs.  You were only a
 9    seller; nothing else.  You weren't a runner; you weren't a
10    supervisor; you weren't an armed seller; you weren't a lookout?
11    A    No.
12    Q    Okay.  And you know from experience that drug points, they
13    have the sellers on 12-hour shifts?
14    A    Yes.
15    Q    So if you're going to sell drugs, you're the only person
16    selling, maybe, cocaine, heroin, or whatever drug you're
17    selling, in a 12-hour shift; is that correct?
18    A    In the drug points, yes.  But when I did it, it was only
19    crack.
20    Q    Isn't crack the most sold drug in a drug point like
21    Llorens Torres?
22    A    Yes.
23    Q    So you know that in Llorens Torres you sold drugs in Calle
24    Cuatro?
25    A    I am not from Calle Cuatro.
```

1    Q    Because that's the enemy, right?

2    A    No.  I have no problems with anybody.

3    Q    But Calle Cuatro doesn't sell drugs with the west side of

4    Llorens Torres, correct?

5    A    No.  Each one in their own world.

6    Q    They have two different bosses, two different drug points

7    sales, drug point drug sales points; is that correct?

8    A    Each one with their own thing.

9    Q    So my answer is yes?

10    A    Each one with their own thing.

11    Q    Which is a yes?

12    A    Yes.

13    Q    Okay.  But you were so privileged that you could work 30

14    to 40 minutes and leave.  Is that what you're telling the jury?

15    A    Yes.

16    Q    And the only reason that you could do that was because you

17    had power in the drug point?

18    A    No.  I did not have power.

19    Q    So drug-dealers -- I mean, drug-sellers would leave

20    whenever they want?

21    A    The one on shift was my friend.  And I would ask him for

22    the favor, and he would give me the favor, do me the favor.

23    Q    So two people were selling drugs at the same time.  Is

24    that what you're saying?

25    A    No, no.  He would give me the break, so I would stay 20,

1    30, 40 minutes.

2    Q    And you say that's how you paid for your drug substance

3    abuse?

4    A    Yes.

5    Q    So 20 minutes a day, you made $200, $300, bought your

6    pills, and that was it?

7    A    But at the time, I was not consuming.  At 17, I was not

8    consuming.  I started using Oxycodone at 25.

9    Q    Okay.  So that's -- you said that you had a legal job.

10   How much money were you making in that legal job?

11   A    $500, almost $600.

12   Q    A month?

13   A    No.

14   Q    A week?

15   A    Biweekly.

16   Q    So that would mean $300 a week?

17   A    I got paid biweekly.

18   Q    $600, correct?

19   A    Yes.

20   Q    So if we split it by two, that's $300 a week?

21   A    Yes.

22   Q    So you would work for one full week in order to pay for

23   one day of pills?

24   A    No.  Because when I was in Puerto Rico, that is when I

25   started consuming.  I had somebody who gave them to me super

 1    cheap.

 2    Q    What's his name?

 3    A    Of that person?

 4    Q    Yes.

 5    A    I don't think that I should say it.

 6    Q    Isn't part of your agreement with the government to say --

 7    let me go to your plea agreement and plea agreement supplement,

 8    which would be Exhibit 147.

 9              MR. GONZALEZ-DELGADO:  May I have the Elmo?

10    BY MR. GONZALEZ-DELGADO:

11    Q    We're in agreement that this is your plea agreement

12    supplement; is that correct?

13    A    Yes.

14              THE COURT:  Okay.  Sidebar.

15        (Sidebar conference commenced.)

16              THE COURT:  You want the name of the seller?

17              MR. GONZALEZ-DELGADO:  Yeah.

18              THE COURT:  Why?

19              MR. GONZALEZ-DELGADO:  Because it says here --

20              THE COURT:  Why?

21              MR. GONZALEZ-DELGADO:  Because he has to tell the

22    truth.

23              THE COURT:  Why do you want the name of the seller?

24              MR. GONZALEZ-DELGADO:  Because he has to tell the

25    truth.

1          THE COURT:  Why do you want the name?  He already

2     said what the arrangement was.  Now you want him to tell you,

3     in public, the name of the seller.

4          MR. GONZALEZ-DELGADO:  Because I'm going to ask him

5     afterwards if, as part of his plea and cooperation agreement,

6     there is an indictment against this person, which he admitted

7     and confessed to the government was selling drugs for him -- or

8     selling him drugs.  That's my next question.

9          And Exhibit 147 says clearly that it is agreed that

10    the defendant will cooperate fully and truthfully with the

11    United States.  The defendant agrees to provide all information

12    known to the defendant regarding any criminal activity,

13    including, but not limited to, the offenses described in the

14    pending indictment.

15         And I'm probing into, this goes to credibility of the

16    witness, Your Honor.

17         MR. GOTTFRIED:  Your Honor, who --

18         MR. GONZALEZ-DELGADO:  Let me -- I'm sorry.  Let me

19    just finish.

20         The last sentence of paragraph 1 of Exhibit 147 says:

21    The defendant understands that such information may be provided

22    to any state, local or federal law enforcement agencies.

23    Obviously, to prosecute the people that he is testifying

24    against.

25         That's why I'm asking the name of this individual for

1    which if, when he gives me the answer, I will investigate to

2    see if this person has been actually accused or indicted,

3    either in state or local court.  And that goes to the

4    credibility of the statements that he's making, Your Honor.

5          MR. GOTTFRIED:  Your Honor, who may have sold this

6    individual, years ago in Llorens, some Percocet is completely

7    irrelevant here.  And the name, the fact that he's trying to

8    push this defendant to publicly disclose that name, again, is

9    unnecessary.

10          Even if you were to give credit to what he's saying,

11    he wants to know whether or not the government has brought

12    charges against that person or if he knows whether or not the

13    government has brought charges, he doesn't need the name for

14    that.  But even setting that aside, this is completely

15    irrelevant whether or not the government has decided to bring

16    charges against someone who, years ago, was selling and may no

17    longer be selling, assuming that we had the name.

18          There are multiple factors as to why we may or may

19    not prosecute, including, among others, how much drugs someone

20    is selling.  If you're a street seller in Llorens selling small

21    amounts of Percocet, you may not be prosecuted by the federal

22    government.  So it's misleading, and it's a highly collateral

23    issue.

24          And I would suggest that pushing this defendant to

25    try to publicly disclose the name of someone who sold him,

1    years ago, drugs is, you know, an effort to intimidate the

2    witness.

3           MR. GONZALEZ-DELGADO:  Your Honor, I'm agreeing with

4    what Brother Counsel says.  And if what he says, he believes

5    it, and he is willing to stipulate to that information, I would

6    be requesting that the information provided by this witness to

7    the alleged drug transactions or activities that he made with

8    Mr. Verdejo be stricken from the record because it's the same

9    exact situation.

10          He stated under oath that Mr. Verdejo and him did

11   drug transactions.  Why did Mr. Verdejo's name come up?

12   Because they asked for the name, and he is being accused.   I

13   have a right to ask him the same exact question:  Did you sell

14   drugs with him and other people?  He said:  Yes.

15          When Brother Counsel asked the question, he asked for

16   the name of the person, and he said:  Felix.  And he says:  Is

17   that the defendant?  Yes, that's the defendant.  I'm entitled

18   to exactly the same question.

19          THE COURT:  Okay.  What would be the follow-up

20   question?

21          MR. GONZALEZ-DELGADO:  If this individual, if he is

22   testifying against this individual in a court of law.

23          THE COURT:  Or you can ask that question.

24          MR. GONZALEZ-DELGADO:  Well, Your Honor, it's the

25   same exact question that Brother Counsel made.  I'm repeating,

1    actually, his question:  Did you sell drugs with somebody?  And

2    he said:  Yes.  Who did you sell -- no.  What drugs did you

3    sell?  I sold kilos.  With whom did you sell kilos?  With Mr.

4    Verdejo.

5            My questions were:  Did you sell drugs there?  Yes.

6    Whom did you sell drugs with?  Now I have to stop?  That goes

7    to his credibility also, Your Honor.

8            Besides, this could go to impeach the witness.  If

9    the witness says that this person is not indicted, this person

10   is not accused, or I search the Puerto Rico [non-English

11   language] to see if this person is, actually has been indicted

12   as criminal cases or is pending a trial, that gives credibility

13   to the witness.  If it's not, I can probe into the reason why,

14   if he knows, this person, whom he has testified against, is not

15   being prosecuted, if that's what he was obliged to do with his

16   plea agreement supplement and his plea agreement, Your Honor.

17           MR. GOTTFRIED:  Your Honor, just to clarify, so what

18   Brother Counsel is suggesting is, he can ask for this person's

19   name, first name, last name, and then the argument is that you

20   have bought -- because this person bought drugs, at some point

21   in the past, from this other individual, that you would then be

22   allowed to investigate whether or not that individual has been

23   indicted, either by a local government or the federal

24   government, assuming that person is still alive.

25           And then the question would be why has he or has he

1    not been prosecuted locally or federally, and perhaps, there

2    would be discovery on the prosecuting decision of the federal

3    government or local government as to why that might be the

4    case.  May I suggest that this is just a, kind of a detour

5    that's of no relevance to the case.

6            MR. GONZALEZ-DELGADO:  Your Honor, the only thing I'd

7    like to ask the prosecutor is:  What's the difference from what

8    he did with Mr. Verdejo?

9            MR. GOTTFRIED:  Mr. Verdejo's the defendant in the

10   case, and his relationship with Mr. Verdejo is key to this

11   case.  His relationship years ago with someone who sold him

12   some Percocet in Llorens, who is not involved in this case, is

13   irrelevant.

14           MR. GONZALEZ-DELGADO:  Wasn't Mr. Verdejo's

15   involvement with the witness in drug-trafficking, alleged

16   drug-trafficking, years ago, 2016?

17           MR. GOTTFRIED:  No.  It started in -- he said it

18   started at the beginning of the pandemic, and as of April 2021,

19   he said that Mr. Verdejo was contacting him about the drugs.

20           MR. GONZALEZ-DELGADO:  That's years.

21           MR. GOTTFRIED:  The month of the murder.

22           MR. GONZALEZ-DELGADO:  2020.

23           MR. GOTTFRIED:  2021.

24           MR. GONZALEZ-DELGADO:  2020 would be three to four

25   years ago.

 1           MR. GOTTFRIED:  It was the same month as the murder
 2    happened.  That's when there were communications regarding the
 3    drug transaction, 2021.
 4           MS. CINTRON-COLON:  It began, as you said --
 5           THE COURT:  I understand the point.  You can ask him
 6    whether that person has been indicted.
 7           MR. GONZALEZ-DELGADO:  Your Honor, how am I going to
 8    corroborate or investigate the case if I don't know who the
 9    person is?
10           THE COURT:  I have issues with that.  Ask him whether
11    that person has been indicted.
12           MR. GONZALEZ-DELGADO:  My objection is on the record.
13           MR. GOTTFRIED:  Your Honor, one thing, when I was
14    walking over, the translator said that the witness needs to use
15    the bathroom.
16           THE COURT:  The what?
17           MR. GOTTFRIED:  The witness needs to use the
18    bathroom.  That's what the translator indicated to me as I was
19    walking by.
20           THE COURT:  The witness?
21           MR. GOTTFRIED:  Yes.
22           MR. GONZALEZ-DELGADO:  Your Honor --
23           THE COURT:  We need to --
24           MR. GONZALEZ-DELGADO:  I'm going to be here -- I
25    haven't even started.

```
1                    THE COURT:  I know.  You don't have to tell me.  I
2      mean, don't get me wrong.
3                    MR. GONZALEZ-DELGADO:  No, no, no.  Your Honor, no
4      offense taken.
5                    THE COURT:  You're doing your job, and your
6      colleague's doing her job as well.
7                    What time is it?
8                    MR. GONZALEZ-DELGADO:  4:50.
9                    MR. GOTTFRIED:  It's 4:50.  Your Honor, would there
10     be any way to go over today just to --
11                   THE COURT:  To finalize this today?  I don't think
12     so.
13                   MR. GOTTFRIED:  If we could, or just go over a bit
14     just to get some more time in.
15                   MR. GONZALEZ-DELGADO:  If we take a break now.
16                   THE COURT:  A break means, probably, 20 minutes.  So
17     that would leave Mr. Gonzalez with about, until 6:00 p.m.
18     After 6:00 p.m., I'm not going to keep the jury.
19                   MR. GOTTFRIED:  Yes, Your Honor.
20                   THE COURT:  All right?  Because of logistical
21     complications.
22                   Okay.  He needs to go to the bathroom.  He needs to
23     go.  Who is that, the witness or the interpreter?
24                   MR. GOTTFRIED:  The witness.
25                   THE COURT:  The witness.
```

 1          (Sidebar conference concluded.)

 2          THE COURT:  Ladies and gentlemen, there is a

 3    situation we need to cover.  I'm not going to adjourn yet.  I'm

 4    going to call a 10, 15-minute recess.

 5          So, remember, do not talk about or communicate with

 6    anybody about your impressions of the case or the evidence in

 7    the case.  Do not conduct any research about the case, the

 8    matters in the case or the individuals involved in the case.

 9    Do not view, read or hear reports, comments or articles about

10    the case.

11          We'll be back within 10 or 15 minutes, as soon as we

12    can.

13       (Whereupon the following proceedings were had in open court

14          without the presence of the jury.)

15          THE COURT:  Mr. Cadiz, we're going to be on a break.

16    You don't have to stay where you are.  Do not talk to anybody

17    about your testimony.  Do not review documents related to this

18    case.  Do not post any messages in social media related to this

19    case.

20          Do you understand?

21          THE WITNESS:  Okay.

22          THE COURT:  All right.  We'll be back in about 10 or

23    15 minutes.

24       (Whereupon a recess was taken at 4:55 p.m., until 5:09

25          p.m.)

```
 1        (Whereupon the following proceedings were had in open court
 2        without the presence of the jury.)
 3            THE COURT:  Let's call the jury in.
 4        (Whereupon the following proceedings were had in open court
 5        in the presence of the jury.)
 6            THE COURT:  Welcome back to the courtroom.  Please
 7    take a seat.
 8            MR. GONZALEZ-DELGADO:  May it please the Court?
 9            THE COURT:  Go ahead.
10            MR. GONZALEZ-DELGADO:  Thank you, Your Honor.
11    BY MR. GONZALEZ-DELGADO:
12    Q    Mr. Cadiz, my last question was, you know the person who
13    you sold drugs for; is that correct?
14    A    Back then?
15    Q    Yes.
16    A    Yes.
17    Q    Do you know any other person that you're selling drugs
18    for?
19    A    No.
20    Q    But you knew the people of the drug point in Llorens
21    Torres, correct?
22    A    Back then, those in my area.
23    Q    And the truth is -- did you also know the people who sold
24    drugs in Manuel A. Perez?
25            THE INTERPRETER:  I'm sorry, Counsel.  Can you speak
```

1     into the mic?

2     BY MR. GONZALEZ-DELGADO:

3     Q    Do you also know the names of the people who sold drugs in

4     Manuel A. Perez?

5     A    No.

6     Q    Okay.  So when you met with the government, you signed a

7     plea agreement and a plea agreement supplement -- let me

8     withdraw that.

9              In 2021, you were not accused of selling drugs in

10    Puerto Rico; is that correct?

11    A    Correct.

12    Q    In 2021, you were already cooperating with the government;

13    is that correct?

14    A    I had had conversations, but I started now, in 2023, when

15    I pled guilty.

16    Q    Okay.  So that means that your first three interviews with

17    the FBI, you were just cooperating with them; is that correct?

18    A    Well, yes.

19    Q    You were providing information without anything, without

20    obtaining any type of gain?

21    A    Correct.

22    Q    And you were assigned -- did you -- were you still with

23    the attorney from Prado's office in those three interviews in

24    between 20 -- in the two interviews in 2021 and the interview

25    in December 2022?

1    A    No.  It was only the one on May 3rd.

2    Q    So the interview of June 7th, 2021, and December 5th,

3    2022, did you have an attorney assigned to you?

4    A    No.

5    Q    So those interviews, you went without an attorney?

6    A    I was in prison.

7    Q    But that doesn't mean that you can't have an attorney,

8    correct?

9    A    Yes, correct.

10    Q    Yes, that you can have an attorney, or yes, that that --

11    you don't have an attorney in jail?

12    A    Yes.  I had attorneys, but they were from the city where I

13    live.

14    Q    And they were present when you had these two interviews in

15    jail?

16    A    No.

17    Q    Okay.  Now, when you're brought to Puerto Rico, you were

18    assigned an attorney; is that correct?

19    A    Yes.

20    Q    And the attorney that they assigned you was Mr. Johnny

21    Rivera, correct?

22    A    Correct.

23    Q    Who's sitting in court today?

24    A    Yes.

25    Q    Okay.  When Mr. Johnny Rivera is assigned, you're a

1    material witness at that point; is that correct?

2    A    Yes.

3    Q    Okay.  It's not until the case is almost about to start

4    that the government actually files an indictment against you;

5    is that correct?

6    A    Correct.

7    Q    When did you find out that the prosecutors were going to

8    accuse you of a drug-trafficking crime?

9    A    I do not recall the date, but it was in March, between

10   March and April.

11   Q    Of this year?

12   A    Yes.

13   Q    So you sit with the government; you're cooperating with

14   the government; you're a material witness for the government,

15   and they never told you that they were actually going to charge

16   you with a felony?

17   A    Correct.

18   Q    And then, all of the sudden, boom, I got to come to Puerto

19   Rico to respond for a drug-trafficking crime, for a crime that

20   I confessed to the prosecutors; is that correct?

21   A    Correct.  But before that, there was an arrest.  They

22   arrested me and --

23   Q    That's when you find out that they're going to accuse you?

24   A    If my arrest was in March, two days before.

25   Q    So you know that you were indicted on January 12th, 2023;

```
1    is that correct?

2    A    Indicted?

3    Q    Do you -- you met with Mr. Johnny Rivera multiple times,

4    correct?

5    A    Yes.  We have good communication over the phone.

6    Q    Okay.  And you say that you were arrested on March 28th,

7    2023, for the drug-trafficking crime that you pled guilty to,

8    correct?

9    A    I was arrested on March 30th.

10   Q    And you were held in jail without bond?

11   A    No.  That same day, I was bonded.

12   Q    Were you bonded, or did the prosecutor just give their

13   consent that you remain on bond?

14   A    Yes, the prosecutor.

15   Q    And this was all done in the United States?

16   A    That's correct.

17   Q    And I just want to be clear that the day of your arrest is

18   the day that you find out that the prosecutors in Puerto Rico

19   are going to accuse you for the information that you gave them

20   as part of your cooperation?

21   A    Yes.

22   Q    How did you feel about that?

23   A    To pay for what I did.

24   Q    You weren't shocked that, even though you were helping

25   them, they were accusing you of committing a crime that you had
```

1    confessed?

2    A    To pay for what I did.

3    Q    My question is:  Weren't you shocked, angry or surprised

4    that the prosecutors that you were helping were actually

5    accusing you with the information that you provided?

6    A    At the beginning, it made me uncomfortable, but I already

7    knew two days before that they were going to arrest me.

8    Q    That was because you had been assigned an attorney?

9    A    Correct.

10    Q    Didn't your attorney read a proffer letter to you in this

11    case?

12    A    How so?

13    Q    A letter that said that the prosecutors were offering you

14    to sit down with them, interview you, to have you tell them

15    everything that you knew about the case, and other cases, and

16    that they would make a unilateral determination if that

17    information would be used to accuse someone or not?

18    A    No.

19    Q    Okay.  So you had no protections whatsoever regarding the

20    information that you were providing?

21    A    I did not understand the question.

22    Q    You had no protection against prosecution regarding any

23    information that you provided regarding your criminal

24    activities or people that you knew?

25    A    Yes.

1    Q    So you did sign that proffer letter?

2    A    No, I didn't sign.  My attorney explained to me.  We

3    talked.  He explained something to me about sentencing.

4    Q    We'll get to that later.  I'm talking about prior to being

5    accused.

6          Did you sign the letter, with the information I gave

7    you, and a commitment from the government that you would not be

8    processed for the information that you had given them?

9          THE INTERPRETER:  I'm sorry, Counsel.  Can you repeat

10   that question?

11         MR. GONZALEZ-DELGADO:  Sure.

12   BY MR. GONZALEZ-DELGADO:

13   Q    Did you receive a letter stating what I said in my

14   previous "letter," including that you would not be prosecuted

15   for any information that you provided regarding your criminal

16   activities?

17   A    No.

18   Q    Okay.  Now, in your plea agreement supplement, which is

19   Exhibit 147, in the first terms of the cooperation agreement --

20         THE COURT:  147.

21         MR. GONZALEZ-DELGADO:  Exhibit 147.

22   BY MR. GONZALEZ-DELGADO:

23   Q    -- isn't it true that it says that the -- that you agree

24   to provide all information known to the defendant regarding any

25   criminal activity, including, but not limited to, the offense

1    described in the pending indictment?

2    A    Yes.

3    Q    And that's something that your attorney translated to you?

4    A    Yes.

5    Q    And you understood?

6    A    Yes.

7    Q    And the next line says that:  "The defendant understands

8    that such information may be provided to any state, local or

9    federal law enforcement agencies?"

10    A    Yes.

11    Q    Now, you agreed, in paragraph (a), to testify as a witness

12    in or outside the District of Puerto Rico before any grand jury

13    as may be requested, and that any other hearing or trials, when

14    called upon to do so by the United States.

15           Do you remember that?

16    A    Yes.

17    Q    And my question is:  You gave the federal government

18    information about drug-trafficking activities in Luis Llorens

19    Torres; is that correct?

20    A    Yes.

21    Q    Including the name of the person who you used to sell

22    drugs for?

23    A    Correct, with that of your client.

24    Q    And the thing is, has anybody been prosecuted from the

25    information -- or let me rephrase.

1              Do you know, do you have knowledge that the

2    information that you gave about drug-trafficking activities in

3    Luis Llorens Torres has resulted in the Indictment of people

4    from Luis Llorens Torres?

5    A    No.  I am the only one being accused.

6    Q    And you know that, in paragraph 2, there is a conditional

7    nature of the cooperation agreement; is that correct?

8    A    Yes.

9    Q    All you have to do is give full, complete and truthful

10   cooperation, correct?

11   A    Yes.

12   Q    And the first time that you've signed a document that said

13   this was on May 17th, 2023?

14   A    Correct.

15   Q    So you are protected from the information that you're

16   giving as a witness against the drug-trafficking operations in

17   Llorens Torres from May 23rd -- May 17th, 2023, on; is that

18   correct?

19              MR. GOTTFRIED:  Objection, Your Honor.  It misstates

20   the document, and vague.

21              MR. GONZALEZ-DELGADO:  The witness said he doesn't

22   have a proffer letter.

23              THE COURT:  The witness is not an attorney.  Let's go

24   sidebar.

25        (Sidebar conference commenced.)

```
 1                   THE COURT:  So the question was:  You are protected
 2      only beginning on May 17th, 2023.  You are protected only from
 3      that day.
 4                   MR. GONZALEZ-DELGADO:  From prosecution, from May 17,
 5      2023, on.  That was the question.
 6                   MR. GOTTFRIED:  That's not immunity.  That's a
 7      cooperation agreement.  There is no immunity agreement.  There
 8      is no protection.
 9                   MR. GONZALEZ-DELGADO:  So that's why I'm asking him.
10                   MR. GOTTFRIED:  But you're suggesting that he's
11      somehow protected from May 17th, but there is no basis to say
12      that.  There is no immunity agreement.
13                   MR. GONZALEZ-DELGADO:  I'm going to go into it
14      because that's one of the benefits that he's going to receive
15      for his cooperation.
16                   MR. GOTTFRIED:  No.  There is no immunity that he
17      gets.
18                   MR. GONZALEZ-DELGADO:  I know.  I'm going to ask him.
19                   MR. GOTTFRIED:  To the contrary.
20                   MR. GONZALEZ-DELGADO:  I'm going to ask him if one of
21      the benefits that he's going to receive is that he's not going
22      to be charged for any other information or for any of the
23      crimes he might have admitted.  That's my next question.
24                   MR. GOTTFRIED:  What's the good-faith basis for that?
25      He said there is no proffer letter.
```

1          MR. GONZALEZ-DELGADO:  The good-faith basis is that I

2     asked him.  We know how this works.  Prosecutors send a proffer

3     letter to the individual, and the individual decides if he's

4     going to accept the proffer letter or not.

5          He's assigned an attorney.  The attorney sits with

6     him, explains what a proffer letter is, explains the terms.

7     And that's exactly what I stated a few minutes ago, what's

8     consisted in a proffer letter, and he signs it.

9          I asked him if he had done that, and he said no.  So

10    that's why I'm questioning him regarding his plea and

11    cooperation agreement because that would mean that the plea and

12    cooperation agreement, from that day on, is that he is

13    protected.  It's a benefit that he might receive.

14         Because always:  We might; we haven't promised

15    anything.  And we all know that's not true.  But the language

16    of the plea agreement says he may, he may be prosecuted for

17    crimes that he admits to.

18         MR. GOTTFRIED:  Right.

19         MS. COLLAZO-ORTIZ:  That's why the question is

20    misleading.

21         THE COURT:  Without, without characterizing the

22    question as misleading or not, I'm confused by that question.

23    You know, you are only -- my words:  You are only protected

24    beginning on May 17th, 2023.

25         MR. GONZALEZ-DELGADO:  Protected from prosecution

1      from --

2                  THE COURT:  Protected from prosecution.

3                  MR. GONZALEZ-DELGADO:  After having signed the plea

4      and cooperation agreement.

5                  THE COURT:  But this is not -- see, first, he is not

6      a lawyer.  I know he has a good lawyer.  We all know him.  He's

7      very responsible.

8                  MR. GONZALEZ-DELGADO:  And thorough, that I can --

9                  THE COURT:  He is very thorough.  He makes sure that

10     his clients understand what's going on.  I understand that.

11     Still, this witness is not an attorney.

12                 Number 2.  When I hear the word "protected from

13     prosecution," I immediately think immunity.  And this is not

14     immunity from prosecution.

15                 So what is it that you have in mind, to see if we can

16     -- you can help me out.  Okay?  This is not trying to figure

17     out how many angels can go through the hole of a needle.

18     That's not what I'm after.  But I want to understand your mind

19     set.  Help me out.

20                 MR. GONZALEZ-DELGADO:  That he -- when was it that he

21     knew that his cooperation would lead to a benefit, because he

22     stated to my questions that he did not know he was going to be

23     prosecuted for the statements that he gave in the first meeting

24     in jail until he was informed two days prior to him being

25     brought to Puerto Rico for -- he wasn't brought to Puerto Rico.

1          And the thing is, it was March 28th, because he shows

2     up in the Eastern District of Pennsylvania, if I'm not

3     mistaken, March 30th to have the Indictment read to him and for

4     his Rule 5, I think it's Rule 5(c) hearing.  And he consents to

5     the extradition on that date.

6          My questions were, he had no idea that the government

7     was going to accuse him, even though he was cooperating with

8     the government.  That's why I was asking him if he had an

9     attorney during those meetings, because usually the government

10    always provides an attorney to a, to a material witness so that

11    we don't -- they don't have problems in the understanding the

12    proceedings, and if they want to ask any questions, they can.

13         So he stated that he did not have that opportunity,

14    because he said that the two times that he was interviewed in

15    jail, as a material witness, he was lacking an attorney.  And

16    that was his, his statement.  So I'm just trying to probe --

17         THE COURT:  He had two attorneys, city attorneys, he

18    said, but they were not with him when he was interviewed.

19         MR. GONZALEZ-DELGADO:  In the interviews.

20         THE COURT:  Right.

21         MR. GONZALEZ-DELGADO:  But this is a federal issue.

22         THE COURT:  Right.

23         MR. GONZALEZ-DELGADO:  And usually they request a

24    material witness subpoena, and they request an attorney for the

25    person.  Since he said that, during those two interviews, he

1    was not accompanied by an attorney, I'm probing into when did

2    he find out that his information would be prejudicial to him.

3    That's where my questions were going.

4              And, now, with this question, is to see if the

5    procedure was, was followed, which is the standard operating

6    procedure.  They request a material witness subpoena.  They ask

7    for an attorney to be assigned to them.  And then the meetings

8    are held until either he testifies or he pleads guilty or is

9    sentenced.

10              THE COURT:  I have followed every word you've said,

11    and I'm still at a loss as to the question.

12              MR. GONZALEZ-DELGADO:  I'll rephrase it, Your Honor.

13              THE COURT:  How are you going to rephrase it --

14              MR. GONZALEZ-DELGADO:  What I'll ask him is --

15              THE COURT:  -- to prevent objections or confusion?

16              MR. GONZALEZ-DELGADO:  Yes.  With this plea

17    agreement, you know, that from signing this plea agreement on,

18    you will be cooperating with the government, and that you are

19    expecting a benefit for your cooperation.  I can rephrase it

20    that way.

21              THE COURT:  Okay.

22              MR. GOTTFRIED:  We don't have an objection to that,

23    as long as the benefit isn't, You won't be charged for crimes

24    that you did, because that's nowhere in the agreement.

25              MR. GONZALEZ-DELGADO:  But he could be expecting not

1    to be charged for crimes that he admits to because you have not

2    given him an immunity.

3           MR. GOTTFRIED:  Right.  Yeah, there is no immunity.

4           MR. GONZALEZ-DELGADO:  But that doesn't mean that he

5    does not have a expectation.  Two different things.

6           THE COURT:  Okay.  Let me see, to make sure what is

7    the question you're going to ask.

8           You got that, Ms. Brown?

9           THE COURT REPORTER:  Yes.

10         THE COURT:  He's going to copy that down.

11    (Record reviewed.)

12         THE COURT:  Okay.  What is the question?

13         MR. GONZALEZ-DELGADO:  Yes.  What's in the record is:

14    "With this plea agreement, you know that after signing this

15    plea agreement you will be officially" -- I just added

16    "officially" -- "you will be officially cooperating with the

17    government."  And the second question is:  "And that you are

18    expecting to obtain a benefit from your cooperation."

19         THE COURT:  "You are officially" --

20         MR. GONZALEZ-DELGADO:  Take off "officially."

21         THE COURT:  -- "cooperating with the government."  He

22    said earlier that he was cooperating with the government.  At

23    first, he said:  Well, I don't know.  But you were given that

24    information, and that's cooperation.  And he said:  Yes.  But

25    he was cooperating before.

```
 1            MR. GONZALEZ-DELGADO:  With this plea agreement, you
 2     know that you are signing the plea agreement, you will be
 3     cooperating with the government, and that you are expecting to
 4     obtain a benefit from your cooperation.
 5            THE COURT:  So it's one question with the "and."
 6            MR. GONZALEZ-DELGADO:  No.  Two.
 7            THE COURT:  No, it has to be one.  Because earlier in
 8     your cross-examination, you led him to admit that he had been
 9     cooperating with the government without a cooperation
10     agreement.
11            MR. GONZALEZ-DELGADO:  Okay.  So it will be --
12            THE COURT:  And I agree, he was providing
13     information, so he was, in that sense, cooperating with the
14     government.
15            MR. GONZALEZ-DELGADO:  Yes, sir.  So the question
16     will be:  With this plea agreement, you know that after
17     signing, you are expecting to obtain a benefit from your
18     cooperation.
19            THE COURT:  Well --
20            MR. GONZALEZ-DELGADO:  I haven't asked anything about
21     benefits.
22            THE COURT:  He is expecting benefits?
23            MR. GONZALEZ-DELGADO:  For his cooperation.  I
24     haven't asked him that question yet.
25            THE COURT:  Okay.  Is that the question?
```

1           MR. GONZALEZ-DELGADO:  Yes, that's the question.

2    With this plea agreement, you know, after signing this plea

3    agreement, you are expecting to obtain a benefit from your

4    cooperation.

5           MR. GOTTFRIED:  We don't have an objection to that.

6           I think also -- are you going to ask more questions

7    about material witness?

8           MR. GONZALEZ-DELGADO:  No.

9           MR. GOTTFRIED:  All right.  We would object to that

10   because that is a term of art that he's not going to

11   understand.

12          THE COURT:  Yes.  He should understand that.

13          MR. GONZALEZ-DELGADO:  He did because he answered my

14   question:  Were you assigned -- were you subpoenaed as --

15   wasn't subpoenaed.  But were you served as a material witness?

16   He said:  Yes.  And I asked him:  Were you assigned an attorney

17   when you were designated, or whatever, as a material witness?

18   And he said:  Yes.  So he knows the difference between being a

19   material witness and having been a cooperator after --

20          THE COURT:  I think the way the question is going to

21   be phrased, the one you wrote down, it's okay.

22          Now, it's what, 5:50?

23          MR. GOTTFRIED:  It's 5:46.

24          THE COURT:  Okay.  We're getting close to 6:00.  so

25   after this line of questioning, and I do not want to cut you

1    off, where are you going with your questions?

2              MR. GONZALEZ-DELGADO:  Starting with today's

3    testimony.

4              THE COURT:  Okay.  So after this --

5              MR. GONZALEZ-DELGADO:  I think I can ask him this as

6    a last question.

7              THE COURT:  -- question, I'm going to call it off for

8    the day.

9              Is Bereliz in the courtroom?

10             MR. GOTTFRIED:  No.  She left.

11             MR. GONZALEZ-DELGADO:  She was sitting outside at the

12   break.

13             THE COURT:  I need to, I need to warn her that she is

14   not supposed to be sending out messages on social media.  I'm

15   expecting -- I'm telling all witnesses that, and in that sense,

16   she's not receiving adverse treatment from me, from the Court.

17             And I'm not sure whether the case agent telling her

18   would be sufficient, or the prosecutor telling her would be

19   sufficient.  I believe it is me who needs to tell her.

20             MS. CINTRON-COLON:  I agree.

21             MR. GOTTFRIED:  I agree, Your Honor.

22             THE COURT:  Then the second thing is, this morning

23   Mr. Gonzalez asked me to review ex-parte for *Brady* material

24   notes from --

25             MR. GONZALEZ-DELGADO:  Miguel Santiago-Laiz.

1                THE COURT:  Bereliz's --

2                MR. GONZALEZ-DELGADO:  Eliz's father.

3                THE COURT:  Right.  Okay.  File that ex-parte.

4                MR. GOTTFRIED:  Yes, Your Honor.

5                THE COURT:  It is only for my review.

6                MR. GOTTFRIED:  Yes, Your Honor.

7                THE COURT:  And I'll review it during the weekend.

8        Okay?

9                MR. GOTTFRIED:  Yes, sir.

10               Bereliz is here in the hallway.

11               THE COURT:  Not now.

12               MR. GOTTFRIED:  Once the jury's dismissed?

13               THE COURT:  After the jury's dismissed.  Okay?

14          (Sidebar conference concluded.)

15               MR. GONZALEZ-DELGADO:  May it please the Court?

16               THE COURT:  Go ahead.

17               MR. GONZALEZ-DELGADO:  Thank you.

18       BY MR. GONZALEZ-DELGADO:

19       Q    Mr. Cadiz, making reference to Exhibit 146, which is your

20       plea agreement, and Exhibit 147, which is the plea agreement

21       supplement, after having signed this plea agreement, you are

22       expecting to obtain a benefit from your cooperation; is that

23       correct?

24       A    No.  I do not expect anything.  I expect my time.

25       Q    So if the government requests 50 years of jail, you would

1    just accept it without any type of request either from your

2    lawyer or from yourself?

3    A    Whatever the judge says.

4    Q    But you don't want the judge to give you 50 years of jail?

5    A    No.

6    Q    And that's why you're doing this?

7    A    Yes.

8         MR. GONZALEZ-DELGADO:  Your Honor, as agreed sidebar,

9    it would be my last question for today.

10         THE COURT:  Okay.  Ladies and gentlemen, we are

11    going, at this point, we are going to adjourn.  There will be

12    no trial work on Monday.  There will be no trial work on

13    Tuesday.  We will reconvene on Wednesday to go on with the

14    trial.

15         So please remember, do not talk about or communicate

16    with anybody about your impressions of the case or the evidence

17    in the case.  Do not conduct any research about the case, the

18    individuals in the case or the matters in the case.  Do not

19    view, read or hear reports, comments or articles about the

20    case.

21         Keep an open mind until after you've heard and seen

22    all evidence and heard my instructions and you've gone to the

23    jury room to deliberate and all of you have discussed all

24    evidence amongst yourselves.  That's how a verdict is reached.

25         Thank you for your patience, for having been here

1    early, right on time, for paying close attention to what we are

2    doing in the courtroom.  I appreciate that.  You are doing your

3    job.

4            So I look forward to seeing you all next Wednesday at

5    9:00 a.m.

6        (Whereupon the following proceedings were had in open court

7            without the presence of the jury.)

8            THE COURT:  Mr. Cadiz, we are going to adjourn until

9    next Wednesday at 9:00 a.m.  Do not talk about your testimony

10   with anybody.  Do not review documents related to this case.

11   Do not post on social media any messages related to this case.

12           Do you understand?

13           THE WITNESS:  I do.

14           THE COURT:  All right.  With this, the Court adjourns

15   until next Wednesday at 9:00 a.m.

16           In the meantime, there is some business the Court

17   needs to take care of with counsel in sidebar.  Otherwise,

18   thank you for having been here today.

19       (Sidebar conference commenced.)

20           THE COURT:  Ms. Rodriguez, good afternoon.

21           MS. BERELIZ RODRIGUEZ-ORTIZ:  Good afternoon.

22           THE COURT:  Ma'am, it's been brought to my attention

23   that you recently posted on social media messages related to

24   this case.

25           Is the information I received truthful?

1          MS. BERELIZ RODRIGUEZ-ORTIZ:  No.

2          THE COURT:  Okay.  I'm not going to inquire any

3     further at this point, ma'am.  But I just want to remind you to

4     not post any messages or images related to this case on social

5     media, any type of social media.

6          Do you understand?

7          MS. BERELIZ RODRIGUEZ-ORTIZ:  Yes.

8          THE COURT:  You've heard me, because you've been in

9     the courtroom, instructing witnesses to avoid the same thing.

10    You've heard that?  So I'm not asking you or instructing you to

11    do anything I'm not instructing other witnesses to do.

12         MS. BERELIZ RODRIGUEZ-ORTIZ:  Yes.

13         THE COURT:  Okay?

14         Very well.  I expect you to comply with my

15    instructions, ma'am.

16         Do you understand?

17         MS. BERELIZ RODRIGUEZ-ORTIZ:  Yes.

18         THE COURT:  Okay.  Thank you.

19         Mr. Gottfried?

20         MR. GOTTFRIED:  One thing with respect to the notes

21    from Miguelito.  They're in Spanish.

22         THE COURT:  It doesn't matter.

23         MR. GOTTFRIED:  We'll file those ex-parte.

24         THE COURT:  They are not of an official part of

25    proceedings, but I need to review them to rule on this

1    particular issue.  And I will do it over the weekend.

2              And you do not have to be here on Monday.  We'll

3    return on Wednesday at 9:00 a.m.

4              MR. GOTTFRIED:  Yes, Your Honor.

5              MS. CINTRON-COLON:  Yes, Your Honor.

6              THE COURT:  If there is any issue I need to know

7    about, just file a motion.  We are monitoring the docket at all

8    times.

9              MR. GONZALEZ-DELGADO:  We provided the videos.

10             MR. GOTTFRIED:  Yes.  We got those at lunch.

11             THE COURT:  Okay.  You all enjoy the weekend.

12        (Sidebar conference concluded.)

13             MR. GONZALEZ-DELGADO:  Ms. Otero says something?

14             THE COURT:  Mr. Gonzalez, is there anything you wish

15    to say with respect to A2?

16             MR. GONZALEZ-DELGADO:  Yes, Your Honor.  We'd request

17    that Defense Exhibit A2 be admitted into evidence.

18             THE COURT:  Mr. Gottfried?

19             MR. GOTTFRIED:  What is A2?

20             MR. GONZALEZ-DELGADO:  The amended.

21             THE COURT:  Autopsy report.

22             MR. GOTTFRIED:  Yes, without objection.

23             THE COURT:  Without objection, so ordered.  Exhibit

24    A2 is admitted as the Defendant's Exhibit A2.

25        (Exhibit No. A2 admitted into evidence.)

1            MR. GONZALEZ-DELGADO:  Thank you.  Permission to

2      withdraw.

3            THE COURT:  Granted.

4            MR. GONZALEZ-DELGADO:  Thank you.

5         (Court adjourned at 6:01 p.m.)

6                          -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cindy Lee Brown, RPR, Official Court Reporter
U.S. District Court, District of Puerto Rico
(787) 772-3478

```
 1    UNITED STATES DISTRICT COURT )
                                   )  ss.
 2    DISTRICT OF PUERTO RICO      )

 3

 4                        REPORTER'S CERTIFICATE

 5

 6             I, CINDY LEE BROWN, RPR, Federal Official Court

 7    Reporter for the United States District Court for the District

 8    of Puerto Rico, appointed pursuant to the provisions of Title

 9    28, United States Code, Section 753, do hereby certify that the

10    foregoing is a true and correct computer-aided transcript of

11    proceedings had in the within-entitled and numbered cause on

12    the date herein set forth; and I do further certify that the

13    foregoing transcript has been prepared by me or under my

14    direction.

15

16             Dated this 3rd day of July, 2023.

17

18

19                              /s/ Cindy Lee Brown

20                              _____
                                CINDY LEE BROWN, RPR, Federal
21                              Official Court Reporter
                                150 Carlos Chardon, Room 150
22                              San Juan, PR  00918
                                (787) 772-3478

23

24

25
```