1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF PUERTO RICO

3                            -oOo-

4     THE UNITED STATES OF AMERICA,    )
                                       )
5              Plaintiff,              )   Case No. 3:21-CR-00161-PAD
                                       )
6     -vs-                             )
                                       )
7     FELIX VERDEJO-SANCHEZ,           )
                                       )
8              Defendant.              )
      _____)
9
           TRANSCRIPT OF JURY TRIAL - DAY SIX - A.M. SESSION
10        HELD BEFORE THE HONORABLE PEDRO A. DELGADO-HERNANDEZ
            UNITED STATES COURTHOUSE, HATO REY, PUERTO RICO
11                     TUESDAY, JUNE 27, 2023
      _____
12
                       A P P E A R A N C E S
13
      FOR THE UNITED STATES OF AMERICA:
14
      AUSA Jonathan L. Gottfried &
15    AUSA Jeanette M. Collazo-Ortiz

16    FOR THE DEFENDANT:

17    Jason Gonzalez-Delgado, Esq. &
      Gabriela Jose Cintron-Colon, Esq.
18
      COURT INTERPRETERS:
19
      Carlos Ravelo &
20    Lynmar Vera

21    GOVERNMENT INTERPRETER:

22    Jose Luis Rosado

23

24

25

                 Cindy Lee Brown, RPR, Official Court Reporter
                   U.S. District Court, District of Puerto Rico
                             (787) 772-3478

```
1                          I N D E X

2       WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:         PAGE:

3       RICARDO DIAZ-TORRES

4       Direct Examination (Continued) by Mr. Gottfried:      21

5       Cross-Examination by Mr. Gonzalez-Delgado:            46

6       EXHIBITS:                                            PAGE:

7       Government Exhibit No. 61                              24
        Government Exhibit No. 59                              29
8       Government Exhibit No. 56                              34
        Government Exhibit No. 57                              34
9       Government Exhibit No. 58                              34
        Government Exhibit No. 60                              34
10      Government Exhibit No. 62                              34
        Government Exhibit No. 63                              34
11      Government Exhibit No. 64                              34
        Government Exhibit No. 65                              34
12      Government Exhibit No. 66                              34
        Government Exhibit No. 67                              34
13      Government Exhibit No. 137                             34
        Government Exhibit No. 151                             34
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings commenced at 9:10 a.m.)

 2                              -oOo-

 3          (Whereupon the following proceedings were had in open court

 4          without the presence of the jury.)

 5                    THE COURT:  How many cases do we have this morning?

 6                    THE COURTROOM DEPUTY CLERK:  We have only one case,

 7     Your Honor.

 8                    THE COURT:  Call the case.

 9                    THE COURTROOM DEPUTY CLERK:  Criminal Case Number

10     21-161, the United States of America against Felix

11     Verdejo-Sanchez, for sixth day of jury trial.  On behalf of the

12     government are Assistant U.S. Attorneys Jonathan Gottfried and

13     Jeanette Collazo, and on behalf of the defendant are Attorneys

14     Jason Gonzalez and Gabriela Cintron.

15                    The defendant is present in the courtroom.  And he's

16     being assisted by a certified court interpreter.

17                    THE COURT:  Thank you.

18                    The courtroom is open to the public.

19                    Would counsel identify themselves?

20                    MS. COLLAZO-ORTIZ:  Good morning, Your Honor.  AUSA

21     Jeanette Collazo.

22                    THE COURT:  Good morning, ma'am.

23                    MR. GOTTFRIED:  Good morning, Your Honor.  AUSA

24     Jonathan Gottfried.

25                    THE COURT:  Good morning, sir.
```

```
1                MS. CINTRON-COLON:  Good morning, Your Honor.
2      Gabriela Cintron-Colon on behalf of Felix Verdejo-Sanchez.
3                THE COURT:  Good morning, ma'am.
4                MR. GONZALEZ-DELGADO:  Good morning, Your Honor.
5      Jason Gonzalez-Delgado on behalf of Mr. Verdejo.
6                THE COURT:  Good morning, sir.
7                Would the interpreters introduce themselves?
8                THE INTERPRETER:  Jose Luis Rosado, interpreter for
9      the prosecution.
10               THE COURT:  Good morning, sir.
11               THE INTERPRETER:  Good morning, Your Honor.  This is
12     Lynmar Vera, interpreter for the defense.
13               THE COURT:  Good morning, ma'am.
14               THE INTERPRETER:  Good morning, Your Honor.  This is
15     Staff Interpreter Carlos Ravelo at the services of your court.
16               THE COURT:  Good morning, sir.
17               All set to call the jury in?
18               MR. GOTTFRIED:  Your Honor, we have some housekeeping
19     matters.  One which we'd just like to address in open court,
20     and then one of which in the sidebar.
21               THE COURT:  Go ahead.
22               MR. GOTTFRIED:  With respect, there is an outstanding
23     motion, Number 276, that was asking for judicial notice
24     regarding UTC Atlantic Standard Time.  The Court had noted that
25     at 277.
```

 1              There was no opposition filed.  I understand there is
 2       no opposition.  But we just wanted to bring that to the Court's
 3       attention, that that's still pending, as far as we understand.
 4              THE COURT:  All right.  Mr. Gonzalez?
 5              Ms. Cintron?
 6              MS. CINTRON-COLON:  We have no objection to the
 7       notice, Your Honor.
 8              THE COURT:  All right.  No objection.  The motion is
 9       granted.
10              MR. GOTTFRIED:  Your Honor, Your Honor, can we just
11       approach with counsel?
12              THE COURT:  Yes.
13       (Sidebar conference commenced.)
14              MR. GONZALEZ-DELGADO:  Good morning, Your Honor.
15              MS. CINTRON-COLON:  Good morning.
16              MR. GOTTFRIED:  Just wanted to put on the record that
17       defense counsel has requested interview notes with two
18       witnesses:  Mr. Willie Concepcion-Melendez and Mr. Jorge
19       Aponte.  Jorge Aponte did receive a subpoena from us.  Mr.
20       Willie Concepcion-Melendez, as far as I know, did not.
21              We notified defense counsel that we do not plan on
22       calling either of those witnesses.  With respect to the notes,
23       we did provide some notes for Mr. Jorge -- yeah, for Willie,
24       but not for Jorge.
25              Defense counsel has requested all of the notes on

1    those individuals.  Our position is that since we're not

2    planning on calling them, we don't have to disclose *Jencks*.

3              Defense counsel has expressed a concern that perhaps

4    they could contain *Brady*.  We will review the notes again.

5    Best recollection is they do not, but we will review again.  To

6    the extent there is anything that we believe could potentially

7    be *Brady*, we'll disclose that.

8              Those would have been interviews that were conducted

9    recently.  We just have the agent rough notes at this point.

10   But I just wanted to put that on the record, that that has been

11   a communication among counsel.

12             And the last point I wanted to raise, I'm still on my

13   --

14             THE COURT:  So with respect to this particular point,

15   at this juncture, there is nothing I should do --

16             MR. GOTTFRIED:  I'm not asking --

17             THE COURT:  -- other than note what you just referred

18   to.

19             MR. GONZALEZ-DELGADO:  That's what the government's

20   asking.

21             MR. GOTTFRIED:  There is nothing, at this point, that

22   we're asking the Court to do.  Just putting it on the record

23   that the request has been made, and that we're reviewing the

24   request.

25             THE COURT:  Okay.

1           MR. GOTTFRIED:  Lastly, we wanted to raise a

2    potential issue, which is, given the dispute among counsel

3    regarding the recorded interview that was introduced with their

4    Witness Bereliz, where we introduced certain comments between

5    the defendant and third parties, and on cross, defense counsel

6    attempted to bring in other statements from their client, we

7    wanted to make sure that, with respect to the cell phone

8    extraction, we are introducing opposing party's statements,

9    which is an exception to the hearsay rule.

10          THE COURT:  That you can do.

11          MR. GOTTFRIED:  That we can do.

12          But what we wanted to kind of make sure is clear is

13   that to the extent defense counsel is going to bring in

14   statements that we have not brought in, other text messages

15   from their defendant from the cell phone extraction, that would

16   not be allowed.  That does not fall under any hearsay

17   exception, would be a self-serving statement.

18          That's our understanding of the law.  That they can

19   ask the witness about the extraction that he's testified and

20   the statements that we've admitted, but they cannot use this

21   witness to bring in their client's statements that we have not

22   introduced.

23          MR. GONZALEZ-DELGADO:  Your Honor, I think that's --

24          MS. CINTRON-COLON:  Firstly, if I may briefly, to

25   clarify.  With regards to those recordings, during cross, I did

1    not elicit statements made by defendant.  I asked questions

2    about Mr. Junior Zabala.  My question to the Witness Bereliz

3    was if she heard Mr. Junior Zabala say something.

4          I did not elicit any statements, self-serving or

5    otherwise, from the defendant.  I just want to have that clear

6    for the record that that is inaccurate, first of all -- or

7    second of all.

8          Oh, with regards to the *Jencks* disclosure that we

9    requested last night, we have two issues:

10         First, with Mr. Willie Concepcion, the thing is that

11    he was announced as a potential witness, even if the government

12    is saying that they're not going to use him.  And we do have a

13    302 report and notes from an interview that was conducted in

14    2021.

15         However, he was also interviewed in May 24th, 2023.

16    And that report, or those notes, we do not have.  So we believe

17    that we were entitled to those reports as well because that was

18    before *Jencks* deadline passed and was set by this Court, even

19    if they now decided that they're not going to use him.  That is

20    as to Willie Concepcion.

21         Now, as to Mr. Jorge Aponte, he was also interviewed

22    before *Jencks* disclosure deadline had passed, and they notified

23    him as a witness, and he was even subpoenaed.  And even though

24    they decided not to use him, we believe that we are still

25    entitled to those statements because we are unaware of the

1    contents of that interview, of the second interview with Mr.

2    Concepcion and of that initial interview with Mr. Aponte.

3    That's our position.

4              THE COURT:  I'll take that under advisement.

5              MS. CINTRON-COLON:  And the other thing with regard

6    to Mr. Aponte then, if the government does not intend to call

7    him as a witness, then we believe that he should be able to be

8    in the courtroom as he wanted to initially.  He was here during

9    jury selection, and the prosecution informed that he was

10   subpoenaed so he had to be removed from the courtroom.

11             And now they're not going to call him as a witness.

12   Therefore, we believe that he should be allowed in the

13   courtroom.

14             THE COURT:  Are you planning to use him as a witness?

15             MS. CINTRON-COLON:  Not as far as we know.  Not for

16   the moment, Your Honor.

17             MR. GOTTFRIED:  We have no objection if they're not

18   going to use him as a witness.

19             MR. GONZALEZ-DELGADO:  No, Your Honor.  We have no

20   objection.  Actually, we're requesting.  But when we finish

21   this one, I have --

22             MS. CINTRON-COLON:  I think I'm finished with the

23   *Jencks* issue, and as to clarify that, with the recording, that

24   I did not elicit statements from the defendant.

25             THE COURT:  At the end of the day, what you are

1    saying is these individuals were on the government's witness

2    list.

3              MR. GONZALEZ-DELGADO:  Yes, sir.

4              THE COURT:  Therefore, *Jencks* should have been

5    produced as to them within the deadline.

6              MR. GONZALEZ-DELGADO:  Yes, sir.

7              THE COURT:  It was not.  Too bad.  You should have

8    received those at that time, way back then.  My words.  That's

9    the bottom line.

10             MR. GONZALEZ-DELGADO:  And we're requesting that

11   today --

12             THE COURT:  That's the bottom line?

13             MR. GONZALEZ-DELGADO:  Yes, sir.

14             THE COURT:  Okay.

15             MR. GOTTFRIED:  Your Honor, just on that, there is,

16   as far as I know, no witness list that we were obliged to

17   provide to defense counsel.  We were obligated to provide

18   *Jencks*.

19             What we provided, we provided to the Court a list of

20   people whom were going to be witnesses or we thought might be

21   main characters for purposes of determining conflicts of

22   interest among the jury.  But in terms of a witness list, there

23   was no witness list that we provided to defense counsel locking

24   us into anyone.

25             We did provide *Jencks* for the people whom we believed

1   we were going to call, and our obligation is to turn it over.

2   Under the rules, it's after they've done their examination

3   under the Court's order before trial.  But, in any event, if

4   we're not going to call the witness, we don't have to turn

5   over.

6            I would also note that these are friends of the

7   family.  These are friends of the defendant or friends of the

8   defendant's family, who are equally accessible to defense

9   counsel as to us.

10           THE COURT:  I understand the argument, yes.

11           MR. GONZALEZ-DELGADO:  But the problem is, it doesn't

12   matter if they're friends of the family.  The government

13   interviewed them.  We don't know what they told the government,

14   what was the purpose of their citation to ask them questions

15   regarding this case.

16           We believe that those interviews might have *Brady*,

17   and they might have *Giglio*.  They might have *Jencks* that we

18   should be allowed to review to see if that evidence is

19   favorable to Mr. Verdejo.

20           THE COURT:  Okay.  As to *Brady*, he's going to review.

21   As to *Giglio*, Mr. Gottfried is going to review as well.  So as

22   to whether *Jencks*, strictly *Jencks* should be produced, I'm

23   going to take that under advisement.  I understand the

24   arguments --

25           MR. GONZALEZ-DELGADO:  The problem is --

1          THE COURT:  -- on both sides.

2          MR. GONZALEZ-DELGADO:  Your Honor, also the problem

3    is that the government has their particular way of determining

4    what is *Brady* and what is not.  And sometimes it's a very fine

5    line where they draw, and they say that they're not, they're

6    not *Brady* or they shouldn't be produced.

7          What I'd ask, Your Honor, is that the government

8    produce the Court the documents, and the Court review it and

9    make an independent determination if we should have access to

10   those documents or not.

11         THE COURT:  I'll take that under advisement.

12         MR. GONZALEZ-DELGADO:  And then the other issue, Your

13   Honor --

14         THE COURT:  I'm going to exhaust what I just said.

15   Mr. Gottfried will review, in a good-faith manner, those

16   materials.

17         MR. GONZALEZ-DELGADO:  Yes, Your Honor.

18         THE COURT:  And will make an initial determination on

19   whether *Brady*, they contain *Brady* or they contain *Giglio*, other

20   than strictly *Jencks*.  And we'll see what happens.

21         Next point.

22         MR. GONZALEZ-DELGADO:  Next point is, the government

23   is trying to, to limit our cross-examination regarding the

24   witness of Mr. Diaz.  Mr. Diaz's participation in his case was,

25   from his own words yesterday under oath, to make a cell phone

1    extraction of Mr. Verdejo's cell phone.

2         They provided the documents that they wanted to use,

3    and they also produced some deleted texts between Mr. Verdejo

4    and Ms. Keishla Rodriguez.  Those texts that were produced by

5    the government were extracted by this witness.

6         He has access to them.  He can verify that the

7    documents are original; that they were extracted from the same

8    phone that they had been reading the text messages yesterday.

9         They go to our theory of defense that, in this case,

10   the government stated for the record in their opening

11   statements, and what they've been trying to produce with the

12   witnesses, is that Mr. Verdejo did not want to have this --

13   that they didn't -- that he did not want to have this child,

14   and because he did not want to have this child, he committed

15   the crime that he's charged with.

16         The problem is that in the same text messages that

17   they are using, there are text messages between the alleged

18   victim and Mr. Verdejo where they are discussing this issue

19   more than once in which both of them will make statements that

20   they want to have a baby together.  There is a text message

21   where specifically Mr. Verdejo says:  When am I going to get

22   you pregnant.  And she says:  It can't be now because I'm, I'm

23   taking some anti-inflammatory medication, and I can't.

24         And that is about three days, or four, prior to the

25   facts of this case.  That goes to our theory of defense.  I

1    believe that we're entitled to go into cross-examination into

2    that.  That is evidence that we need in, in our case in chief

3    that the government -- that opposes directly the government's

4    theory of their case.

5             And this is the witness that extracted the text

6    messages from the phone.  So I can't bring somebody else.  I

7    mean, Keishla's not here.  Mr. Verdejo has a right to remain

8    silent.

9             So the only person that I can bring out these, these

10   text messages from is the witness that is sitting down.  And

11   the government just wants us to, wants to limit our

12   cross-examination and not go into that. I think that's

13   improper, Your Honor.

14            MR. GOTTFRIED:  This is exactly our concern, that

15   they're trying to bring in defendant's self-serving statements

16   through a third-party witness, and there is no hearsay

17   exception that applies to that.

18            MS. CINTRON-COLON:  Your Honor, this is partly a

19   similar argument as to with the video-recording of the

20   conversation with Mr. Zabala.  And, in part, we do not believe

21   these are self-serving statements.

22            First of all, they're not necessarily statements.

23   They're not being brought for the truth of the matter because

24   that would call for, literally, state of mind of Mr. Verdejo.

25   Nobody can know if he was lying or if he was telling the truth.

1          They are being brought for the effect that they had
2     on Ms. Keishla, which provides context in the entire
3     conversation, which is our other argument, that completeness
4     requires and allows us to bring in the entirety of the
5     conversations between them, precisely to provide context.
6     Because if we only bring in special -- specific portions of the
7     conversation, it is unclear the entire context of probably why
8     Mr. Verdejo is saying what he is saying.
9          Without the entirety of the communications between
10    them, the jury is not in the best position to be the trier of
11    fact to determine what is accurate, what is not, what they
12    believe, what they do not.  It is the jury, and only the jury,
13    who should have the entirety of the conversation under
14    completeness to determine whether or not the facts of the case
15    have been proven and whether the elements of the offense have
16    been proven beyond a reasonable doubt by the government.
17         These are not saying:  Oh, this is self-serving
18    because he's saying:  I did not commit this.  That is not the
19    comments or the messages that we're trying to present.  The
20    extractions from them is a whole conversation, specifically
21    addressing the relationship that they had.
22         THE COURT:  At this point, at this point, I'm not
23    persuaded.  But your point has been made.
24         MR. GONZALEZ-DELGADO:  Your Honor, we believe --
25         THE COURT:  At this point, I'm not persuaded.  You've

1    been clear as to what you want, what you wish, what the Court

2    should do.  You provided the reasons why that is so.  At this

3    point, I am not persuaded.

4            So should we call the jury in?

5            MR. GONZALEZ-DELGADO:  Your Honor, will we be -- is

6    the Court limiting our cross-examination as to other, other

7    documents or other statements, other pictures, other text

8    messages that were included or were found on that phone during

9    the days that the government alleges that the crime was being

10   planned and committed?

11           THE COURT:  It's kind of hard for me to make a ruling

12   in the abstract without knowing specifically what you are going

13   after.

14           MR. GONZALEZ-DELGADO:  I'm going after the text

15   messages that were included from the -- I think it's like the

16   26th --

17           MS. CINTRON-COLON:  19th, actually.

18           MR. GONZALEZ-DELGADO:  The 19th is when they start,

19   and they end on the 1st of -- no, on the 28th.  That's when the

20   last one.

21           Actually, there is one day that the government did

22   not produce text messages that were provided or were included

23   between Eliz and Mr. Verdejo, which I think is the 27th.

24           MS. CINTRON-COLON:  The 30th.

25           THE COURT:  So let me ask you this:  You want to

```
1    bring up everything he has not referred to?

2              MR. GONZALEZ-DELGADO:  That's --

3              THE COURT:  That's what you want, bottom line.

4              MR. GONZALEZ-DELGADO:  Not everything, but --

5              THE COURT:  Wait, wait, wait.  That's your bottom

6    line.

7              MR. GONZALEZ-DELGADO:  There is other --

8              MS. CINTRON-COLON:  We haven't reached that point

9    yet.

10             THE COURT:  What?

11             MS. CINTRON-COLON:  We haven't reached that point

12   because we're talking now about conversations that Brother

13   Counsel Gottfried advanced, and that testimony has not been

14   presented yet.

15             THE COURT:  Sorry.  That's the problem with

16   abstractions.  In the abstract, it's hard.  I'm not going to

17   offer advice or opinions without knowing specifically what we

18   are talking about.  That's why I asked the question I posed:

19   Your bottom line is, you want to bring in everything in those

20   extractions.  That's your universe.

21             MR. GONZALEZ-DELGADO:  Because that's what happened.

22             THE COURT:  No, no, no.

23             MR. GONZALEZ-DELGADO:  That's the reason.

24             THE COURT:  Yes.

25             MR. GOTTFRIED:  Your Honor, it's the same, the same
```

1    principle applies, that they cannot bring in -- it's hearsay.

2    They cannot bring in their client's statements because there is

3    no exception that applies, unless the stuff that we introduce

4    we introduce as opposing party statements.  They do not have

5    that exception available to them.

6          And to the extent that they are other people's

7    statements that they want to bring in from the cell phone,

8    that's just straight up hearsay.  So what they can introduce,

9    what they can go over in cross, are the statements that we have

10   introduced.  They're not specifying any hearsay exception that

11   would allow them to bring in their client's statements that we

12   have not introduced.

13         THE COURT:  Okay.  I understand the point.

14         Listen, from a managerial standpoint, I would have

15   liked this issue to have been brought before 9:00 a.m.  Why?

16   Because we are consuming jury time.  The jury was here early.

17   They have been here on time, and I believe we should respect

18   their time.

19         I understand the need to go over legal issues.  Of

20   course, I do.  But what I am going to ask is, whatever issues

21   need to be brought by way of housekeeping, let's try to do it

22   before 9:00, not one minute shy of 9:00 or two minutes shy of

23   9:00.

24         I get here around 8:30.  So we need -- we have time.

25   I've been in the trenches where you all are right now, and I

1    know there are last-minute issues that need to be taken into

2    account, last-minute consultations.  I understand that.  But

3    let's keep that in mind.

4              Okay.  For the point -- for the time being, at this

5    point, I'm persuaded by Mr. Gottfried's argument at this point.

6    Let's see what happens.

7              MS. CINTRON-COLON:  May I say one last thing, Your

8    Honor?

9              THE COURT:  Uh-huh.

10             MS. CINTRON-COLON:  As to -- we just wanted to make

11   the record clear that as to the text messages that were read

12   yesterday between, allegedly, Ms. Eliz Santiago and Mr.

13   Verdejo, we did not object to those, even though we understand

14   that the statements allegedly made by Ms. Santiago are clear

15   hearsay.

16             We did not object to those because she has been

17   announced as a potential witness for the government.  However,

18   in the case that she is not brought as a witness, we would

19   certainly object to that as hearsay, and we're going to move to

20   strike the whole conversation, first.

21             And, second, we do not believe that those comply with

22   the requirements of being opposing party statements, as they

23   lack reliability.  This is something that this witness

24   extracted from the phone.

25             He can say:  This is what was found on the phone and

1    was sent from this phone.  But there is no corroborating

2    evidence that actually it was Mr. Verdejo who wrote these

3    messages and were sending them to a number maybe associated

4    with Ms. Santiago-Sierra.  But we do not know.

5            And there is no corroborating evidence that these

6    were messages actually made by Mr. Verdejo.  Therefore, we

7    believe that it does not comply, even with the opposing party's

8    statements, which is going to happen next with the messages

9    that Mr. Gottfried has advanced that will continue occurring in

10   this morning.

11           So we just wanted to make the record clear that we

12   did not object to Ms. Santiago-Sierra's alleged messages, even

13   though they are hearsay, because she is being announced as a

14   witness, Your Honor.

15           THE COURT:  As to your points, noted.

16           MS. CINTRON-COLON:  Thank you.

17       (Sidebar conference concluded.)

18           THE COURT:  Let's call the jury in.

19       (Whereupon the following proceedings were had in open court

20       in the presence of the jury.)

21           THE COURT:  Good morning.  Welcome back to the

22   courtroom.  Please take a seat.

23           MR. GOTTFRIED:  May it please the Court?

24           THE COURT:  Go ahead.

25           Mr. Diaz, please remember that you are under oath.

```
 1                  THE WITNESS:  Yes.

 2                       RICARDO DIAZ-TORRES,

 3           called as a witness on behalf of the Plaintiff,

 4                having been previously duly sworn,

 5        resumed the stand and testified further as follows:

 6                     DIRECT EXAMINATION

 7                        (Continued)

 8    BY MR. GOTTFRIED:

 9    Q    Good morning, sir.

10    A    Good morning.

11    Q    I'd like to briefly ask something that I neglected to ask

12    yesterday regarding Exhibit 55, going back to the message sent

13    on April 29th, 2021.

14         MR. GOTTFRIED:  And if I can just show that on the

15    screen?

16    BY MR. GOTTFRIED:

17    Q    Sir, at what time did Mr. Verdejo send this message to

18    Eliz?

19    A    At 10:46.

20         MR. GOTTFRIED:  Okay.  I'd like to introduce as

21    Government ID 61 a document that has been shown to defense

22    counsel.

23         Your Honor, may I approach the witness?

24         THE COURT:  Yes.

25         MR. GONZALEZ-DELGADO:  May we approach, Your Honor?
```

1          (Sidebar conference commenced.)

2          MR. GONZALEZ-DELGADO:  Your Honor, the government

3     showed us Government's ID 61.  This is an extraction report

4     from, allegedly, an individual called "Sammy," from a phone

5     Number (787)427-9001.  This individual is not a witness in this

6     case.  He has not been announced as a witness in this case.

7          Anything that he might have said or might have

8     written in this text message from, it seems that it was

9     WhatsApp, between him and telephone number associated with

10    Mr. Verdejo, (787)963-3693, is hearsay.  There is no exception.

11          And if the government is going to use the only, the

12    parts that Mr. Verdejo allegedly answered, they provide

13    absolutely no context.  It would only bring confusion to the

14    jury under 403.  I can provide the Court with the document so

15    you can review it.

16          MR. GOTTFRIED:  Your Honor, this goes back to the

17    motion in limine that we filed regarding these text messages.

18    These are, with respect to Mr. Verdejo's statements, opposing

19    party statements, and then they make no sense in isolation,

20    which is why we provide the surrounding messages, so that the

21    jury can understand.

22          THE COURT:  Objection overruled.

23          MR. GONZALEZ-DELGADO:  Your Honor, it's hearsay.

24    This individual is not a witness.  Everything that is stated

25    there, we have no opportunity to cross-examine him.  This is

1    testimonial.

2              We would have, under the Sixth Amendment, we have a

3    right to cross-examine the witnesses against him.  We have no

4    opportunity, if the Court allows this hearsay to enter, without

5    any guarantee that we have an opportunity to inquire if that

6    witness actually wrote that.

7              This is a document that the only thing that we know

8    is it's somebody called "Sammy."  That's all it is.  And this

9    witness cannot testify as to who he is, if he actually wrote

10   that, if he was the person behind the phone, if the phone was

11   used by another person.

12             All he can say is that somebody wrote something, and

13   that's what's written there.  And there is no guarantees.

14   There is no reliability.

15             THE COURT:  Your point is preserved.

16        (Sidebar conference concluded.)

17             THE COURT:  Objection overruled.  Point preserved.

18             Go ahead.

19             MR. GOTTFRIED:  Your Honor, may I approach the

20   witness?

21             THE COURT:  Yes.

22   BY MR. GOTTFRIED:

23   Q    Sir, do you recognize that document?

24   A    Yes.

25   Q    And how do you recognize it?

1    A    It belongs to a chat from the extraction that I did.

2    Q    Okay.  And is that a true and correct copy of a portion of

3    the extraction that you did?

4    A    Yes.

5            MR. GOTTFRIED:  The government, Your Honor, would

6    move to admit Government ID 61 into evidence as Government

7    Exhibit 61.

8            MR. GONZALEZ-DELGADO:  With our objection at sidebar,

9    Your Honor.

10           THE COURT:  Based on my ruling at sidebar, and

11   repeated in open court, the government's request is granted.

12   This would be Government's Exhibit 61.

13      (Exhibit No. 61 admitted into evidence.)

14           MR. GOTTFRIED:  May I retrieve the exhibit, Your

15   Honor?

16           THE COURT:  Yes.

17           MR. GOTTFRIED:  Permission to publish?

18           THE COURT:  Yes.

19   BY MR. GOTTFRIED:

20   Q    Now, sir, on April -- generally speaking, based on your

21   extraction, this is a conversation between whom and whom?

22   A    Between the owner of the cell phone and a Sammy.

23   Q    And the first message from -- the first message that says

24   "Sammy" next to it, what does that say in Spanish?

25   A    "Let Verdejo know that if he needs help to let us know."

```
 1   Q    And the next message?

 2   A    "My attorneys."

 3   Q    Okay.  And what does Verdejo respond on April 30th, 2021,

 4   at 9:50 a.m.?

 5   A    "It's me, Verdejo."

 6   Q    To which the response is?

 7   A    "I know, asshole."

 8   Q    And?

 9   A    "I'm sending you a message that my attorneys sent to me."

10   Q    And?

11   A    "Don't you see that it says forward?"

12   Q    What does Mr. Verdejo say?

13   A    "Ah, okay.  All good.  Sure.  Thanks."

14   Q    And then further down?

15   A    "They wouldn't charge you anything."

16   Q    To which Mr. Verdejo responds on April 30th, at 9:55 a.m.?

17   A    "It's all good.  Okay, dude.  Thanks a ton."

18             MR. GOTTFRIED:  Your Honor, the government is marking

19   as Government ID 59 a document entitled "Extraction Report,"

20   which has been shown to Brother Counsel.

21             May I approach the witness?

22             MR. GONZALEZ-DELGADO:  May we approach the bench,

23   Your Honor?

24       (Sidebar conference commenced.)

25             MR. GONZALEZ-DELGADO:  Your Honor, exhibit, or ID
```

1    Number 59 is the same situation.  This person, we have no idea

2    who he is.  It says "Suegro (father-in-law)" from phone number

3    (787)529-5491 to the phone associated with Mr. Verdejo.

4            This is complete hearsay.  The hearsay Rule 803 says

5    that there are exceptions to the rule against hearsay

6    regardless of whether the declarant is available as a witness.

7    It does not comply with any of the exceptions.

8            It's not present-sense impression.  It's not excited

9    utterance.  It's not a then-existing mental, emotional or

10   physical condition.  It is not a statement made for medical

11   diagnosis or treatment, and it's not a recorded recollection.

12           This is a -- we have no idea who that -- who wrote

13   that, who sent the message.  We just heard that in the, in the

14   message that we just objected to minutes ago, the statement is

15   that somebody is forwarding something.  We don't even know who

16   that other person is who is making a statement that the

17   government just introduced to the jury so that they can make an

18   ultimate question as to if what they're saying is real or not.

19           This individual, which is only identified as

20   "father-in-law," I mean, I have no opportunity to cross-examine

21   this individual either.  I mean, Mr. Verdejo's Sixth Amendment

22   Rights are being trampled.

23           This is like the seventh or eighth witness that the

24   government has introduced via hearsay, without any guarantees

25   that, or reliability, that what they are saying was true, was

1    made by them or they adopted the documents or the statements

2    that are being made and being read in open court to the jury.

3                THE COURT:  Wait, ma'am.

4                Okay.  Let's take this juncture to lay out some

5    rules.  I would appreciate if only one of the attorneys

6    addressed the Court with arguments and objections.

7                MS. CINTRON-COLON:  No problem.

8                THE COURT:  All right?

9                MS. CINTRON-COLON:  Yes, sir.

10                THE COURT:  It can be Mr. Gonzalez; it can be you.

11                Same thing with the prosecution.  It can be Mr.

12    Gottfried; it can be Ms. Collazo.

13                Otherwise, we are going to end up spending a lot of

14    time in this process.  I don't mind, but if there is a way to

15    do it efficiently, I think we should do it efficiently.  And

16    for me "efficiently" means a reasonable opportunity for the

17    attorneys, for the prosecution, to put on the record their

18    objection and the basis for objection.

19                I will listen very carefully, and then I will issue

20    my ruling.  All right?

21                MS. CINTRON-COLON:  Yes, sir.

22                THE COURT:  Okay.  Anything else, Mr. Gonzalez, at

23    this point?

24                MR. GONZALEZ-DELGADO:  No, Your Honor.

25                THE COURT:  Okay.  Mr. Gottfried?

 1          MR. GOTTFRIED:  Your Honor, I'll be brief.  This is

 2     why the government filed a motion in limine on these text

 3     messages.  All those arguments stand.  It's -- we are seeking

 4     to introduce these statements because they are Mr. Verdejo's

 5     statements, an opposing party's statements.

 6          What is the other individual's statements around

 7     those provide context.  Those are not being admitted for the

 8     truth of the matter asserted.

 9          This is something that we briefed.  They opposed,

10     reply, surreply, and the Court ruled that we were allowed to

11     bring in these messages.  So we're going to stand by our

12     briefing and the Court's ruling.

13          THE COURT:  Okay.  Objection overruled.  Point

14     preserved.

15        (Sidebar conference concluded.)

16          MR. GOTTFRIED:  Your Honor, may I approach the

17     witness?

18          THE COURT:  Yes.

19     BY MR. GOTTFRIED:

20     Q    Sir, do you recognize that document that I just placed in

21     front of you?

22     A    Yes.

23     Q    How do you recognize it?

24     A    It's a chat from the extraction that I did.

25     Q    Okay.  Is that a true and correct copy of the report from

1    the extraction that you did?

2    A    Yes.

3            MR. GOTTFRIED:  Okay.  Your Honor, at this time, we

4    would move to admit Government ID 59 into government, as

5    Government Exhibit 59 into evidence.

6            MR. GONZALEZ-DELGADO:  We renew our objection on the

7    Sixth Amendment, Your Honor.

8            THE COURT:  All right.  Objection overruled.

9            ID 59 now becomes Government Exhibit 59.

10           MR. GOTTFRIED:  Yes, Your Honor.

11      (Exhibit No. 59 admitted into evidence.)

12           MR. GOTTFRIED:  May I recover the exhibit?

13           THE COURT:  Yes.

14           MR. GOTTFRIED:  Permission to publish?

15           THE COURT:  Yes.

16   BY MR. GOTTFRIED:

17   Q    Sir, do you see in the upper left-hand corner where it

18   states "father-in-law" next to the image and the phone number

19   (787)529-5491?  Do you see that?

20   A    Yes.

21   Q    Who assigns that name "father-in-law" to that WhatsApp

22   conversation?  Who assigns that name?

23           MR. GONZALEZ-DELGADO:  Objection under 602, Your

24   Honor.

25           THE COURT:  Overruled.

1          THE WITNESS:  The owner of the cell phone.

2    BY MR. GOTTFRIED:

3    Q    Okay.  And then on April 29th, 2021, at 1:50 p.m., what is

4    that statement from "father-in-law?"

5    A    "My king, you know that I've never gotten into your

6    relationship.  I'm only telling you that you have a good woman,

7    and not just because she's my daughter.  My advice, give it

8    your all if you really love her, and if not, make your own life

9    because she really loves you.  And take me as advice that I

10   lost the woman of my life because of this same thing.  Just go

11   for more."

12   Q    And, sir, what is Mr. Verdejo's response?

13   A    "My love, only God knows the love that I have for your

14   daughter, and like you said, she's the love of my life.  I do

15   not want to lose her.  I'm willing to do whatever she tells me

16   to do" --

17          THE INTERPRETER:  Correction.

18          THE WITNESS:  "I'm willing to do whatever she tells

19   me to.  I don't want to lose her, from the bottom of my heart."

20   BY MR. GOTTFRIED:

21   Q    Okay.  And, sir, at what date and time does Mr. Verdejo

22   send that message to "father-in-law?"

23   A    April 29th, 2021, at 1:55 p.m.

24          MR. GOTTFRIED:  Your Honor, at this time, the

25   government would mark as Government IDs the following from the

 1    extraction report:  Government ID 58, Government ID 137 --

 2              THE COURT:  1 what?

 3              MR. GOTTFRIED:  137, 137, Government ID 63,

 4    Government ID 56, Government ID 57, Government ID 60,

 5    Government ID 62, Government ID 65, Government ID 67,

 6    Government ID 64, Government ID 66, and Government ID 151,

 7    which have been offered to defense counsel.  And I would ask

 8    the Court's permission to approach the witness.

 9              MR. GONZALEZ-DELGADO:  After we approach the bench,

10    Your Honor?

11        (Sidebar conference commenced.)

12              MS. CINTRON-COLON:  Your Honor, we have the same

13    objection for Government's ID 58, 137, 56, 63, 60, 65, 67, 64,

14    66, and 151.  We are renewing the objection that Counsel

15    Gonzalez specifically stated during our last sidebar as to the

16    message about someone, allegedly, called "Suegro."

17              And the main issue, again, just to add something,

18    there is no reliability of who this person is, in part because

19    we don't even know who the owner of that phone is.  We have no

20    subscriber information for these phone numbers.  We don't even

21    know who the user or the owner is.

22              These statements are, in fact, being brought for the

23    truth of the matter asserted.  And different from a witness

24    with personal knowledge who heard these statements, this

25    witness that we have right now testifying is someone who did a

1    phone extraction and is reading it.

2             He has no personal knowledge of this content, of who
3    wrote it, of who expressed the statement.  And it misleads the
4    jury to believe that what this witness is reading is true and
5    accurate, because this person has no personal knowledge, Your
6    Honor.

7             So under 403, we request, as well, that they be
8    excluded, and specifically --

9             65, I think?

10            I have it here.  Sorry.

11            Specifically as to Government's ID 65, Your Honor,
12   this is a conversation, an extraction, that they say is from,
13   that they say is from a person whose user name participant says
14   in this report that is, allegedly, called "Giorgie," with phone
15   number (787)948-3361.

16            Now, we have good-faith basis to believe that this
17   alleged Giorgie is exactly the person who he mentioned this
18   morning that they interviewed in May, we don't have the *Jencks,*
19   that they have subpoenaed and not presenting as a witness.  So
20   this is especially concerning to us that they do have a witness
21   to testify about this message that, supposedly, was sent by him
22   to Mr. Verdejo, but they're not bringing him.

23            So it's hearsay with even a concerning point that
24   they do have a witness for this, yet they're testifying through
25   a witness with no personal knowledge about this, which is what

```
1    I explained before.  So we object to all of them, and

2    especially to ID 65, Your Honor.

3              MR. GOTTFRIED:  Your Honor, we have nothing to add to

4    our previous comments.

5              THE COURT:  All right.  Objection overruled.  Point

6    preserved.

7         (Sidebar conference concluded.)

8              MR. GOTTFRIED:  Permission to approach the witness

9    with the IDs?

10             THE COURT:  Yes.  Granted.

11   BY MR. GOTTFRIED:

12   Q    Sir, I've handed you several IDs.  If you can just take a

13   look at each one just to familiarize yourself, and when you're

14   done, if you can look up so I know you're done.

15             Sir, have you had a chance to review those documents?

16   A    Yes.

17   Q    Do you recognize those documents?

18   A    Yes.  They belong to the extraction that I did.

19   Q    Okay.  And are each of those documents that I provided to

20   you true and correct copies of an extraction that you

21   performed?

22   A    Yes.

23   Q    And that was on Mr. Verdejo's phone; is that correct?

24   A    Yes.

25             MR. GOTTFRIED:  Your Honor, the government would move
```

1    to move into evidence Government IDs 58, 137, and 63, and 56,

2    and 57, and 60, and 62, and 65, and 67, and 64, and 66, and

3    151, into evidence as exhibits.

4                MS. CINTRON-COLON:  Same objection as sidebar, Your

5    Honor.

6                THE COURT:  Objection overruled.

7                Government's ID 58, 137, 63, 56, 57, 60, 62, 65, 67,

8    64, 66, 151, become Government's Exhibits 58, 137, 63, 56, 57,

9    60, 62, 65, 67, 64, 66, 151.

10        (Exhibit Nos. 56, 57, 58, 60, 62, 63, 64, 65, 66, 67, 137,

11            151 admitted into evidence.)

12                MR. GOTTFRIED:  Your Honor, permission to recover the

13    exhibits and to publish Exhibit 58.

14                THE COURT:  Granted.

15    BY MR. GOTTFRIED:

16    Q    Sir, based on your extraction in Exhibit 58, whom is this

17    a conversation between, based on your extraction?

18    A    Between the owner of the cell phone and Bryan Lil' Bro.

19    Q    Okay.  And what is the date and time of the first message

20    that you extracted from Mr. Verdejo?

21    A    April 30th, 2021, at 1:57.

22    Q    And what is the comment by Mr. Verdejo?

23    A    "My love, I can't talk about anything through the phone.

24    You already know, so I don't get into problems."

25    Q    The response to which is what?

```
1    A    "Okay."

2    Q    And then on the second page?  The comment is what, from

3    the person in the blue bubble?

4    A    "And where are you?"

5    Q    And the response by Mr. Verdejo on April 30th, at 1:58

6    p.m., is what?

7    A    "On my way to my mom's house."

8    Q    The response to which is what?

9    A    "Okay.  No problem.  Are you going to be there a long

10   time?"

11   Q    And then Mr. Verdejo responds what on April 30th, 2021, at

12   2:01 p.m.?

13   A    "Yes, you can come without telling anyone, my love."

14   Q    The response to which is what?

15   A    "Okay, my king.  I'll stop by."

16   Q    To which Mr. Verdejo responds on April 30th, 2021, at 2:02

17   p.m.?

18   A    "All set."

19   Q    Okay.  Sir, I'm going to show you now Government Exhibit

20   137.

21            MR. GOTTFRIED:  Now if we can please move up to the

22   header.

23   BY MR. GOTTFRIED:

24   Q    And this is a conversation between whom and whom?

25   A    Between Verdejo and a phone number that is (813)565-1727.
```

1    Q    And on April 30th, 2021, at 7:04 a.m., what does Mr.

2    Verdejo write?

3    A    "My love, tell them to come here please, that I can't talk

4    over the phone."

5    Q    And then what does Mr. Verdejo write on April 30th, 2021,

6    on -- at 7:05 a.m.?

7    A    "My mom's house."

8    Q    Okay.  And then at 2:20 p.m., there is an image sent to

9    him.  What is that image?

10   A    It's an image with specifications to enable the location

11   of a phone.

12   Q    Okay.  The next image?

13   A    It continues explaining the settings of the phone in order

14   to enable the location of the telephone.

15   Q    And then the next image on April 30th, at 2:20 p.m.?

16   A    It continues explaining step-by-step how to enable the

17   function.

18   Q    And what is the title that is sent from that image on

19   April 30th, 2021, at 2:20 p.m.?

20   A    "Follow these steps for your location.  That way you can

21   help saying what you did on Tuesday and Wednesday."

22   Q    To which Mr. Verdejo responds?

23   A    "I follow those steps and that comes up?"

24   Q    And Mr. Verdejo -- okay.  And then to which the response

25   is?

```
1    A    "Yes, the locations come out."

2    Q    And then?

3    A    "Where you've been."

4    Q    And then?

5    A    "Do it to see what comes out."

6    Q    And then?

7    A    "If it is of any help."

8    Q    And then?

9    A    "I don't see anything, but let's see if you have it turned

10   on.  I hope so.  Fuck."

11   Q    And what does Mr. Verdejo say on April 30th, 2021, at 2:24

12   p.m.?

13   A    "No, I always have it turned off."

14   Q    Sir, showing you Government Exhibit 63.  What do we have

15   here?

16   A    A contact that was stored in the cell phone.

17   Q    Okay.  And what's the name of the contact?

18   A    David.

19   Q    And are you able to make out the image next to David?

20   A    Like a bicycle.

21   Q    Sir, turning to the second page that we have here where it

22   says "Log Entries."

23   A    We have the log of a phone call.

24   Q    And what does the log tell us?

25   A    That an outgoing call was produced on April 27th, at 5:53
```

1     p.m.

2     Q     An outgoing call from whom?

3     A     The owner of the cell phone.

4     Q     Okay.  That's the phone you did the extraction on?

5     A     Yes.

6     Q     Okay.  And Verdejo calls whom?

7     A     The owner of the cell phone.

8     Q     Whom does Verdejo call?

9     A     Verdejo calls David.

10    Q     Okay.  At what time, on what date?

11    A     April 27th, 2021, at 5:53 p.m.

12    Q     Okay.  Sir, I'm showing you Government Exhibit 56.  And

13    this is a message between whom and whom?

14    A     This is a message that belongs to a WhatsApp chat between

15    the owner of the cell phone and a contact that reads "Vecino

16    Plomero (Neighbor Plumber)."

17    Q     Okay.  And at 9:00 a.m., on April 26th, what is the

18    message from the plumber?

19    A     "Neighbor, stop by in the afternoon.  Give me the keys and

20    the 50 percent, if you can, to start tomorrow."

21    Q     And what is the next message?

22    A     "Don't forget about me."

23    Q     And what is the date and time of that message?

24    A     April 29th, 2021, at 12:19 p.m.

25    Q     And what does Mr. Verdejo respond on April 29th, at 12:21

1    p.m.?

2    A    "No.  Forgive me.  I'm doing 80 things, man.  I haven't

3    had a break to go to the bank, but without fail, I'm going to

4    give them to you.  The money is there.  It's just a matter of

5    picking it up."

6    Q    Sir, I'm showing you Government Exhibit 57 now.  What do

7    we see in Government Exhibit 57?

8    A    We see a log from the Snapchat application.

9    Q    And what is the timestamp on that log?

10   A    5/2/2021.

11   Q    At what time?

12   A    At 12:55 p.m.

13   Q    Okay.  And so what does, what does that mean?

14   A    That the app is installed in that phone, and that the app

15   was used on that date.

16   Q    When you say "app," what application are you referring to?

17   A    Snapchat.

18   Q    Sir, showing you Government Exhibit 60.  That's a

19   conversation between whom and whom?

20   A    It's between the owner of the cell phone and a contact

21   "Bravea," through the WhatsApp app.

22   Q    And, again, what is the image that appears next to the

23   owner of the cell phone?  What is it?

24   A    I did not understand you.

25   Q    Can you describe in words what image appears to the left

1    of the word "owner?"

2    A    A diamond.

3    Q    Okay.  And April 2nd, 2021, what is the image?  What is

4    the message that is sent?

5    A    "Come down here if you're not busy so you can catch

6    something."

7    Q    Okay.  On April 2nd, 2021, where does Mr. Verdejo say that

8    he is?

9    A    "I'm by Mayaguez."

10    Q    Okay.  Sir, showing you Government Exhibit 65.  What do we

11    see here?

12    A    Another chat from the WhatsApp application between the

13    owner and a contact, Giorgie.

14    Q    And what does Mr. Verdejo tell Giorgie on April 26th,

15    2021, at 9:56 a.m.?

16    A    "I'm trying to conquer the world again."

17    Q    And what is the response to Mr. Verdejo's comment?

18    A    "Haha, don't try, MF.  Conquer it."

19    Q    To which Mr. Verdejo says what on April 26, at 9:57 p.m.?

20    A    "Well, first you have to try to be able to conquer it.

21    Don't you think?"

22    Q    Sir, showing you Government Exhibit 62.  What do we have

23    here?

24    A    We have the log of a call made by the owner of the cell

25    phone using a FaceTime video call.

 1    Q    Okay.  And this is a call on what date and time?

 2    A    April 27th, 2021, at 5:42 p.m.

 3    Q    Using what application?

 4    A    FaceTime.

 5    Q    Okay.  And that's a message from -- what kind of call,

 6    incoming or outgoing?

 7    A    Outgoing.

 8    Q    And so who is Mr. Verdejo calling on FaceTime on April

 9    27th, at 5:42 p.m.?

10    A    A contact, Rabbit.

11    Q    Okay.  Showing you, sir, Government Exhibit 67.  This is a

12    message between whom and whom?

13    A    Between the owner of the cell phone and a contact, Nino

14    Primo, using the WhatsApp application.

15    Q    And on April 25th, 2021, at 10:27 p.m., what is the

16    message that's sent to Mr. Verdejo?

17    A    "I'm going to see if in the summer I can go over there for

18    a while with the family.  If I go, I'll let you know, my

19    blood."

20    Q    What else?

21    A    "Or if you drop by here at Sister Yashira, let me know,

22    player, that the 'prii' is my neighbor."

23    Q    And what does Mr. Verdejo say on April 25th, 2021, at

24    10:28 p.m.?

25    A    "Okay.  It's all set, my love.  I hope I'm here.  I'm

1    going to Las Vegas on Friday to train, and I come back the

2    20-something of May, in God's favor.  I'll let you know, and

3    you let me know."

4    Q    Showing you Government Exhibit 64.  What is this?

5    A    This is the log of an image from the extraction that I

6    did.

7    Q    And on the second page, and what is that?

8    A    It's a photo from the cell phone of the owner.

9    Q    Okay.  Moving to Exhibit 66.

10          Okay.  If we can go to the left-hand column where it

11   says "Instant Message."  What does this information tell you

12   about this message?

13   A    This is an information from the Snapchat application where

14   the name of the owner of the cell phone is "dimenene9".

15   Q    What is the time and date of the Snapchat message that is

16   sent?

17   A    5/2/2021, at 12:55 p.m.

18   Q    And turning to the message itself.  What is the message

19   that Mr. Verdejo sends on May 2nd, 2021?

20          MR. GONZALEZ-DELGADO:  Objection, Your Honor.  That's

21   not what it says.  Misquoting the evidence.

22          THE COURT:  Mr. Gottfried?

23          MR. GOTTFRIED:  Your Honor, there has been ample

24   evidence about who the owner of the phone is.

25          MR. GONZALEZ-DELGADO:  No, Your Honor.  It says

1        "dimenene9."  That's what it says.

2               MR. GOTTFRIED:  And "owner."

3               THE COURT:  All right.

4               MR. GONZALEZ-DELGADO:  But, Your Honor, there is no

5        evidence that Mr. Verdejo is Mr. Dimenene9.

6               THE COURT:  Objection overruled.

7               Go on.

8        BY MR. GOTTFRIED:

9        Q    Sir, what does Mr. Verdejo write on May 2nd, 2021, at

10       12:55 p.m.?

11       A    "I texted you from another number."

12       Q    And, lastly, sir, showing you Exhibit 151.  What do we

13       have on these, if we can just briefly go through the three

14       pages?

15               What application is this from?

16       A    From the cell phone's "Notes" application.

17       Q    Going to the first.  What is the number in that note?

18       A    (787)340-7865.

19       Q    Okay.  And when was that note created on Mr. Verdejo's

20       phone?

21       A    4/30/2021.

22       Q    Turning to the second page, second note.  What does that

23       note say?

24       A    That note contains an address.

25       Q    And when was that note created?

```
1    A    7/20/2020.

2    Q    And showing the last page, the last note.  What does that

3    last note indicate?

4    A    It's related to an account that says "My travel account."

5    Q    Okay.  And the user name for that account?

6    A    The user is Felix.

7    Q    And the password?

8    A    Miranda.

9              MR. GOTTFRIED:  Okay.  No further questions at this

10   time, Your Honor.

11             MR. GONZALEZ-DELGADO:  Can we have a short break,

12   Your Honor?

13             THE COURT:  Yes.

14             MR. GONZALEZ-DELGADO:  Thank you.

15             THE COURT:  Ladies and gentlemen, let's take a short

16   break, say 10, 15 minutes.  Remember, do not talk about or

17   communicate with anybody about your impressions of the case or

18   the evidence in the case.  Do not view, read or hear reports,

19   comments or articles about the case.  Do not conduct any

20   research about the case, the matters in the case or the

21   individuals involved in the case.

22             I look forward to seeing you all back in the

23   courtroom in about 10 or 15 minutes.

24        (Whereupon the following proceedings were had in open court

25             without the presence of the jury.)
```

```
 1                    THE COURT:  Sir, we are going to be on a short break,
 2      10, 15 minutes.  You do not have to stay where you are.  You
 3      can step down, walk around and so forth.  Do not talk about
 4      your testimony with anybody.  Do not review documents related
 5      to this case.  Do not send out messages on social media related
 6      to this case.
 7                    Understood?
 8                    THE WITNESS:  I do.
 9                    THE COURT:  All right.  We'll be back in the
10      courtroom in about 10 or 15 minutes.
11          (Whereupon a recess was taken at 10:29 a.m., until 10:48
12            a.m.)
13          (Whereupon the following proceedings were had in open court
14            without the presence of the jury.)
15                    MR. GONZALEZ-DELGADO:  We're ready, Your Honor.
16                    MR. GOTTFRIED:  Yes, we're ready.
17                    THE COURT:  Let's call the jury in.
18          (Whereupon the following proceedings were had in open court
19            in the presence of the jury.)
20                    THE COURT:  Welcome back to the courtroom.  Please
21      take a seat.
22                    MR. GONZALEZ-DELGADO:  May it please the Court?
23                    THE COURT:  Yes.
24                    MR. GONZALEZ-DELGADO:  Ms. Otero, can I have access?
25                    Thank you.
```

```
 1                      CROSS-EXAMINATION

 2    BY MR. GONZALEZ-DELGADO:

 3    Q    Good morning, Mr. Diaz.

 4    A    Good morning.

 5    Q    Mr. Diaz, your responsibility in this case is, or was,

 6    extracting all of the information that was contained in Mr.

 7    Verdejo's phone call; is that correct?

 8    A    That's correct.

 9    Q    But you don't know if it's actually his phone because you

10    didn't take the phone from Mr. Verdejo; is that correct?

11    A    That's correct.

12    Q    Okay.  So you received a phone, and you make a cell phone

13    extraction?

14    A    That's correct.

15    Q    Of the full phone or just of the specific dates?

16    A    The full phone.

17    Q    So what you have shown the jury today is a summary of what

18    -- of the extraction that you made of the cell phone?

19    A    Yes.

20    Q    And we can agree that there are many other messages on

21    this phone?

22    A    Yes.

23    Q    Actually, in what was shown to the jury, there are days

24    that are missing messages between Ms. Eliz Santiago and Mr.

25    Verdejo; is that correct?
```

```
 1    A    The information that I have is validated by the exhibits

 2    that were provided to me, the agent of the case.

 3    Q    Okay.  But my question is:  The information that you

 4    provided to the jury today is missing days in between the

 5    messages; is that correct?

 6    A    Yes, that's correct.

 7    Q    Actually, as part of the extraction, you also extracted

 8    deleted messages from this phone?

 9    A    In this case, deleted messages can be recovered.

10    Q    My question was:  You did recover deleted messages from

11    this phone?

12    A    No, not in my extraction.

13    Q    Who else did an extraction of this phone?

14    A    Just me.

15    Q    So you're saying under oath that there are no deleted

16    messages extracted from this phone?

17    A    Deleted messages can be recovered using other forensic

18    software.

19    Q    My question is:  Under oath, you're saying that you did

20    not extract any deleted messages from this cell phone?

21    A    I only processed an image, and that image that I processed

22    extracted the corresponding information.

23    Q    So you're saying that only one image was extracted from

24    that phone that was deleted; is that correct?

25    A    No, no.  There are many images.
```

1    Q    So you can tell the jury that you extracted deleted

2    messages from this phone that have not been presented to the

3    jury?

4    A    The forensic software has the capability of recovering all

5    types of data, and can, it can recover that type of

6    information.

7    Q    Do you want me to make the question a little easier?  Are

8    you not understanding the question that I'm asking you?

9    A    Should I respond?

10   Q    I'm asking you.  You want the answer to be a little

11   simpler?

12   A    Yes.

13   Q    Okay.  Did you extract deleted messages from this phone?

14   That's the question.

15   A    When the forensic processes takes place, I extract all

16   types of data, including deleted and existing messages.

17   Q    So you're telling the jury that yes, you did extract

18   deleted messages from the cell phone?

19   A    Part of the process.  The forensic software is in charge

20   of that.

21   Q    You did the forensic process; is that correct?

22   A    Yes.

23   Q    Come on.  It's easy.  Just answer the question.  Tell the

24   jury:  I extracted deleted messages from the phone as part of

25   my work.

 1    A    Part of the forensic processes in the forensic tools can
 2    recover deleted data and existing data.
 3    Q    Was there something wrong with the program when you were
 4    extracting the evidence from the phone?
 5    A    No, no.  The image was not satisfactory.
 6    Q    Okay.  So what don't you understand?  Did you extract
 7    deleted texts from the cell phone?
 8    A    The forensic software has the capability of extracting
 9    deleted data and existing data from the cell phone.
10    Q    Did you review the report that you presented to the
11    prosecutors?
12    A    Yes.
13    Q    And did you miss that?  Did you miss seeing deleted texts
14    that were extracted from this phone?
15    A    No.  Because my function is to do the extraction, prepare
16    a report and give it to the agent, and he looks for what's
17    pertinent for the case.
18    Q    So what you're saying is that you mechanically took out
19    the information from the phone, and you, without checking it,
20    you just gave it to the prosecutors and let them choose what
21    they want to use?
22    A    No.  When the forensic extraction is done, all of the
23    information that is extracted is validated by a digital
24    signature that is authenticated as an accurate copy of the
25    electronic device.  I am not the agent of the case.  And that's

```
1    why I report all of the evidence to the agent of the case, and
2    the agent of the case then looks for the pertinent evidence.
3    Q    So basically what you do is you just put the phone onto
4    the Cellebrite machine and let it do its work?
5    A    I cannot go into the details of the forensic tools that
6    are used at the lab.  But, in our team, depending on the
7    investigation, in this case, we have a cell phone that had a
8    password, and the information couldn't be accessed.  And we
9    have the technology that allows us to access that information.
10   Q    That's not my question.
11         You have a phone, just like this one, that's provided
12   by the government.  And they say:  I need an extraction of this
13   phone.  All you have to do is sit in your computer with the
14   Cellebrite program, connect it.
15         THE COURT:  We get the point.
16         MR. GONZALEZ-DELGADO:  But I'd like to show him, Your
17   Honor, because it seems he doesn't understand my questions.
18   BY MR. GONZALEZ-DELGADO:
19   Q    You have a phone just like this one.  You sit in your
20   computer.  You have a cable that's connected to the program or
21   to the computer, and all you have to do is connect it like
22   this, or if I'm mistaken, let the jury know, and connect it,
23   just like I just did; is that correct?
24   A    It's part of the process to connect the cable or connect
25   the phone to the computer with a forensic software, but that
```

1      software has other functions.  And it can be connected to a

2      computer, but that computer is protected equipment that has a

3      read-blocker.

4              It allows me to access and read, but not to write

5      over.  It cannot be connected to just any computer directly.

6      Q    Agent, all I'm asking is what you did.  It's nothing else.

7      It's not what the program or if something else could have

8      happened.

9              I'm asking you:  When you received the phone from the

10     government, you took the phone, and you sat down in the

11     computer that you have the Cellebrite program.

12             Did that happen?

13     A    I cannot go into the details of the forensic tool, but the

14     electronic equipment is connected through the port that the

15     cell phone has.

16     Q    Is it different from what I just showed you, like

17     connecting the phone with this cable to the phone?  Is it a

18     different program or a different way of doing it?

19     A    The cell phone is connected.  A cable is indeed used to

20     connect to the forensic software.

21     Q    Just like I just showed you; is that correct?

22     A    Similar.

23     Q    You don't need to go to a course or have a certification

24     to do that; is that correct?

25     A    Yes.  We have all the certifications and trainings to use

1    and handle all of those equipments and tools, electronic

2    devices.

3    Q    So you're telling the jury that you need a certification

4    to connect the cable to a cell phone?

5    A    No.  Part of the procedure and part of the training that

6    we receive for each one of the forensic tools includes all of

7    the use of all of the cables and all of the components that are

8    required to connect the phone to that forensic tool.

9    Q    This program, Cellebrite, is so advanced that anything

10   that's on that phone, even if it's deleted, can be extracted

11   from it; is that correct?

12   A    Correct.

13   Q    Once again, did you extract deleted text messages from the

14   phone that you examined in this case?

15   A    Deleted text messages can exist, but I did not conduct the

16   data analysis of the information obtained in the extraction.

17   Q    Agent, when the Cellebrite report comes out, it says "text

18   messages," "phone calls," "thumbnails," "geographic location."

19   It comes out nicely divided and identified; is that correct?

20   A    In reference to Cellebrite, there are many more softwares.

21   In this case, the information produced can be seen and

22   recovered, but once the process takes place, you can see a

23   little bit more clearly all of the data can be recovered.  But

24   there are many more tools that related to the process of that

25   extraction of the phone.

1                MR. GONZALEZ-DELGADO:  Ms. Otero, please?

2    BY MR. GONZALEZ-DELGADO:

3    Q    Exhibit 51.  This is the Preliminary Device Report; is

4    that correct?

5    A    Yes.

6    Q    And it's very detailed as to the information regarding the

7    cell phone; is that correct?

8    A    Correct.

9    Q    You can see when it started; you can see the last time it

10   was used; you can see the last message that was sent; you can

11   see the size of the message; you can see how many phone calls

12   were made; is that correct?

13   A    That's correct.

14   Q    But from what you're saying, it seems that you used

15   additional programs to extract information from this phone; is

16   that correct?

17   A    That's correct.

18   Q    Where are those reports?

19   A    No.  In this case, I only did an extraction on the phone,

20   and I gave the officer a preliminary report because you cannot

21   see the cell phone.  You cannot -- I couldn't compare the data

22   because it has a password.  So I simply used one forensic tool

23   because I couldn't -- because the cell phone was blocked.

24                And depending on the need of the agent, then it is

25   determined if we have to use another tool.

1    Q    But you just --

2    A    So I used only one forensic tool.

3    Q    You just answered that other programs were used, and I

4    asked you:  Where are those reports?

5             My question still remains:  Where are the reports of

6    the other programs that were used to extract information from

7    this cell phone?

8    A    I gave one report with the image of the original

9    extraction to the FBI agent.

10   Q    Okay.  So do you know, or don't you know, if other

11   programs were used to extract information from this cell phone?

12   A    I am not aware of whether or not they used the image to

13   process it in other forensic software.

14   Q    So you're correcting your answer from four or five

15   questions back that another program was used to extract

16   information from this phone?

17   A    No.  I am only speaking about the process that I did.

18   Q    And since yesterday, you've been reading text messages,

19   correct?

20   A    Correct.

21   Q    That you extracted from the phone?

22   A    Correct.

23   Q    Okay.  And under oath, you've been saying that this

24   information that I'm referring to from Exhibit 56 was obtained

25   from the phone; is that correct?

1    A    That's correct.

2    Q    And you said that the blue was "Vecino Plomero," using

3    Exhibit 56, and the green is Verdejo; is that correct?

4    A    Correct.

5    Q    Okay.  Who is "Vecino Plomero?"

6    A    "Vecino Plomero" is, or "(Neighbor Plumber)," is the

7    contact that the owner, Felix Verdejo, has as a contact in his

8    cell phone.

9    Q    How do you know that Felix Verdejo was the one who wrote

10   that name on the cell phone?

11   A    Because the telephone number, all of the log information

12   that has been shown before the extraction, all of the messages,

13   all of the data that has been extracted, all of the information

14   about the owner has come out as Felix Verdejo.  And, in

15   addition to that, he always uses the diamond emoji.

16        As part of the configuration, he has the diamond.

17   That's something that is part of the characteristics of the

18   owner of the cell phone.

19   Q    Listen to my question, and if you don't understand it,

20   just let me know.  I'll make it simpler.  Okay?

21        How do you know that Mr. Verdejo wrote "Vecino

22   Plomero" as that contact name?

23   A    All I know it as the log that the owner of telephone

24   number (787)963-3693 has the logs that the telephone itself

25   says that the owner is Felix Verdejo.  I just follow that

1    reference.

2    Q    Listen to my question for the fourth time.  How do you

3    know that Mr. Verdejo was the one who wrote "Vecino Plomero"

4    for that contact number?

5    A    I am only following the log and the extraction that was

6    done in this chat in reference to that cell phone number and

7    "Vecino Plomero."

8    Q    So the answer is you don't know?

9    A    I do know.

10   Q    What do you know?

11   A    I know that all of the information that I have validated

12   that contains the logs that the user of the phone has as the

13   name Felix Verdejo.

14   Q    Those are two different things.  The phone can be under

15   somebody's name.  That doesn't have to be the actual person who

16   uses the phone; is that correct?

17   A    That's correct.

18   Q    I could have four phones under my name:  one for my

19   daughter, one for my son, and one for my girlfriend, wife,

20   ex-wife, whatever.  That doesn't mean that I'm the one who

21   wrote the information that is shown in this Exhibit 56 that

22   says "Vecino Plomero;" is that correct?

23   A    That is correct.  But in this case, one, when the phone

24   was given to me, one of the particular characteristics of the

25   cell phone was that, as a background, it had a picture of Felix

1    Verdejo.

2    Q    Agent, the background on my cell phone is of Luke

3    Skywalker.  Does that mean that Luke Skywalker is the owner of

4    the phone?

5    A    No.

6    Q    No.  Actually, my lock screen also is from Star Wars.

7    Would that validate that -- would that validate that Luke

8    Skywalker is the owner because the other background, the home

9    background, is from, of Luke Skywalker?

10   A    No.

11   Q    Okay.  Now, how do you know that the owner of the cell

12   phone actually wrote and sent these, these messages?

13   A    I only follow the reference and the extracted data from

14   that cell phone.

15   Q    So your answer is you don't know?

16   A    I validate the information that comes out in all of the

17   data from that phone and the phone number and the image of the

18   diamond and the photo that seems familiar and, and that phone

19   number, all of the logs belong to Felix Verdejo.

20   Q    You know that there are other people who use the nickname

21   "El Diamonte;" is that correct?

22   A    No.

23   Q    You know that in UFC, Dustin Poirier, P-O-I-R-I-E-R, is

24   also known as "The Diamond," "El Diamonte?"

25   A    No.

1    Q    Do you know that that's not an exclusive name?  It's not

2    copyrighted, correct?

3    A    That's correct.  But I only reference the evidence that

4    was analyzed with the term "El Diamonte," which is the name

5    that is registered in the telephone that I analyzed.

6    Q    So all you know is that a phone that is under the name of

7    "El Diamonte," these messages were contained there?

8    A    Exactly.

9    Q    If you go to phone number (787)299-7263 --

10              THE INTERPRETER:  I'm sorry, Counsel.  Can you go

11   slowly?

12              MR. GONZALEZ-DELGADO:  Yes.  It's the phone number

13   that's right here.

14   BY MR. GONZALEZ-DELGADO:

15   Q    (787)299-7263, did you go to that phone number and make an

16   extraction to see who is "Vecino Plomero?"

17   A    In the extraction, I verified that number.

18   Q    Do you have a report for that?

19   A    That's the result.

20   Q    That that's -- but, I mean, listen to my question:  Did

21   you do a phone extraction of phone number (787)299-7263 to see

22   who is "Vecino Plomero"?

23   A    No.  Because the cell phone that is being analyzed is

24   (787)963-3693.

25   Q    And since this phone number appeared in that phone number,

1    did you go and see who's the contractual owner of that phone

2    number or that account?

3    A    I am not the case officer.  My function is simply to do a

4    forensic extraction of the cell phone.  That is actually the

5    job of the case officer.

6    Q    That wasn't my question.

7         My question was:  Did you do a phone extraction of

8    phone number (787)299-7263 to see who appears as the owner of

9    that cell phone or that account?  Yes or no?

10   A    No.  Because the only phone number -- the only phone that

11   was analyzed was (787)963-3693.

12   Q    The -- making reference to Exhibit 57.  All you can see in

13   this document is that on May 2nd, 2021, somebody opened up

14   Snapchat?

15   A    That's a log of the use of the function.

16   Q    Let me repeat myself.  It seems that you're not

17   understanding my question.

18        Does this exhibit, Number 57, show that on May 2nd,

19   2021, four days after April 29th, 2021, somebody connected to

20   Snapchat?  Is that correct?

21   A    Yes, an activity exists.

22   Q    Activity.  You can't say who connected; is that correct?

23   A    No.

24   Q    Okay.  Exhibit 58.  Can you please tell the ladies and

25   gentlemen of the jury who is "Bryan Lil' Bro?"

1    A    A contact that he had stored with that name.

2    Q    What's his name, and last name?

3    A    "Bryan Lil' Bro."

4    Q    That's more like a nickname, correct?

5    A    You would have to ask that of your client.

6    Q    Listen to my question:  Does that sound more like a

7    nickname?

8    A    I can simply tell you that "Bryan Lil' Bro" is a contact.

9    Q    Do you know what the definition of a nickname is?

10            I'm asking you a question.  Do you know --

11    A    Yes.

12    Q    Okay.  My question is:  Does that sound more like a

13    nickname than anything else?

14    A    It could be.

15    Q    Did you search to see who is "Bryan Lil' Bro?"

16    A    No.

17    Q    Did you see or did you investigate who is the contractual

18    owner of (939)302-1967?

19    A    No.

20    Q    So you don't know who wrote those messages; is that

21    correct?

22    A    I only referenced the conversation between the owner of

23    the cell phone and Bryan Lil' Bro, only validating pertinent

24    information to the agent.

25    Q    Listen, all you can say from what you've shown to the jury

 1    is that from one phone that has the number (939)302-1967, a

 2    message was sent that was received on another phone that has

 3    the number (787)963-3693; is that correct?

 4    A    No.  Correct.

 5    Q    You don't know who is in possession of those phones that

 6    day and at that time; is that correct?

 7    A    No.  But the owner of the phone was from Verdejo to the

 8    other contact.

 9    Q    And we already addressed the fact that anybody -- that I

10    could have a phone that I could give to anybody, and that

11    doesn't mean that the message was sent by who is the

12    contractual owner of the phone; is that correct?

13    A    That's your opinion.

14    Q    I'm asking you your opinion.  You're the expert.

15    A    My opinion is that the user of that cell phone, all of the

16    messages that are validated, refer to the name of "El Diamonte"

17    and to Felix Verdejo.

18    Q    All you can actually say is that a phone that appears

19    under Felix Verdejo's name sent a message.  You have no

20    personal knowledge; is that correct?

21    A    My knowledge, that I validated all of the data.  I have

22    this knowledge because I worked, and I validated this with all

23    of the information that I extracted.

24    Q    Looking at Government's Exhibit 59.  Up to the left, it

25    says "Suegro?"

```
 1   A    Yes.
 2   Q    In the extraction that you made "father-in-law" isn't
 3   included; is that correct?
 4   A    Yes, that's correct.
 5   Q    That's added as a translation, correct?
 6   A    Correct.
 7   Q    Okay.  Whose father-in-law is he talking about, or the
 8   person who sent this message talking about?
 9   A    "Suegro" is just a name that he gave to that telephone
10   number.
11   Q    Who's "Suegro?"
12   A    Of "El Diamonte," the symbol.  I'm only referencing the
13   symbol that appears as a contact.
14   Q    My question is:  Who is "El Suegro?"
15   A    A name that he has for that contact.
16   Q    You don't know if it's Eliz Santiago's father, correct?
17   A    No.
18   Q    You don't know if it's Miguel Santiago-Laiz who he's
19   referring to, correct?
20   A    No.
21   Q    You don't know if it's Keishla Rodriguez's father that
22   he's referring to?
23   A    No.
24   Q    You don't know if he's talking about somebody else's
25   father-in-law, correct?
```

 1    A    No.

 2    Q    Okay.  Exhibit 60.  Who's "Bravea?"

 3    A    Another contact that he has saved in his cell phone.

 4    Q    Did you investigate to see who is the contractual owner of

 5    that phone account?

 6    A    No.

 7    Q    So, once again, you don't know who Bravea is?

 8    A    No.  Again, my only function is to extract and validate

 9    the information that the agent in this case has chosen.

10    Q    And when you say "chosen," is that they have chosen what

11    they want to show to the jury, correct?

12    A    I'm only validating the attachments that the government

13    has used as evidence in this case.

14    Q    But you can validate that there is other information

15    that's not been presented to the jury?

16    A    Correct.

17    Q    Now, who's Sammy?  This is Exhibit 61.

18    A    Another contact that the owner of the cell phone has

19    recorded as a contact of his.

20    Q    And another phone that you did not make a cell phone

21    extraction to see if this information is also contained in

22    their phone; is that correct?

23         THE INTERPRETER:  Counsel, this is the interpreter.

24    Can you repeat the question?

25         MR. GONZALEZ-DELGADO:  Yes, I can.

1    BY MR. GONZALEZ-DELGADO:

2    Q    And this is another phone for which you did not make a

3    cell phone extraction to see if this information was also in

4    their phone?

5    A    Correct.

6    Q    But if you have the number, you can -- and the person

7    provides the phone, you can actually do the extraction for that

8    other phone; is that correct?

9    A    In this case, we're only focusing on the evidence that I

10    am analyzing, which is phone number (787)963-3693.

11    Q    So we can agree that you only were interested in the phone

12    number (787)963-3693, correct?

13    A    Correct.  Because it belongs to a cell phone on which I

14    did the extraction.

15    Q    Exhibit 62.  The only information we can get from there is

16    that there was an outgoing phone call on April 27th, 2021, to

17    another phone number; is that correct?

18    A    Correct.

19    Q    But we can also find out if the phone call had been

20    deleted, correct?

21    A    That's correct.

22    Q    Because that's some of the information that the Cellebrite

23    program gives you, correct?

24    A    Those are part of the functions.

25    Q    That's what Column 9 is for, correct?

```
1    A    Correct.

2    Q    Anything that's deleted will show up in that line?

3    A    Correct.

4    Q    Okay.  Now, Exhibit 63, all that we can get from this

5    information is a name and the source and the date, basically.

6    A    Correct.

7    Q    But we don't know who David is, correct?

8    A    No.

9    Q    Exhibit 64.  This is basically what's called a

10   "thumbnail," correct?

11   A    That's correct.

12   Q    And a thumbnail is a picture that is used to identify the

13   person who makes the phone call or is associated with the phone

14   number?

15   A    No.

16   Q    What is it then?

17   A    A thumbnail is a fragment of an image that is stored in

18   the device.  That's why here it appears that that data is an

19   image.

20   Q    And those images are used to identify, when you receive a

21   phone call, it shows, the phone number shows up, and an image

22   can show up; is that correct?

23   A    No.

24   Q    Who, who downloaded that photo or that thumbnail?

25   A    All I can say is that if we go to "path," where you can
```

1   see "path," that image is registered to

2   verdejofelix936@yahoo.com.  And if we go to -- and that image

3   is backed up in iCloud.  That image has been shared using the

4   WhatsApp application, and it's also registered.  There is a

5   phone number.

6   Q    So the answer to my question is, you can't say who

7   downloaded that phone -- that picture, that thumbnail?

8              THE INTERPRETER:  I'm sorry, Counsel.  Did you say

9   you can or you cannot?

10             MR. GONZALEZ-DELGADO:  Can't, can't say.

11             THE WITNESS:  No.  I can simply say how that image

12  was transferred.

13  BY MR. GONZALEZ-DELGADO:

14  Q    Exhibit 65.  Once again, who's Giorgie?

15  A    Another user that he has registered in his cell phone.

16  Q    Did you examine Giorgie's phone?

17  A    No.

18  Q    You can't tell the jury who Giorgie is; is that correct?

19  A    That's correct.

20  Q    You can't tell the jury that Giorgie was actually the

21  person who wrote this message, correct?

22  A    I can only follow -- that's correct.

23  Q    Exhibit Number 66.  I'm not even going to read it, but

24  there is a serial number as the first participant in this text

25  exchange; is that correct?

1    A    That's correct.

2    Q    You have no idea who this person is?

3    A    Correct.

4    Q    You didn't even search in the cell phone companies to see

5    who is the owner of that serial number, correct?

6    A    The cell phone number, no, because that's a number.  It's

7    like a user ID.  But it's not my job.

8    Q    Exhibit 67.  Who's Nino Primo?

9    A    Another user that he has that he put into, that he stored

10    the name in the electronic device, in the cell phone.

11    Q    Regarding Nino Primo, did you do anything to find out who

12    this person is or who is the contractual owner of phone number

13    (939)402-6919?

14    A    No.

15    Q    And you can't say who actually wrote these text messages;

16    is that correct?

17    A    I only have as a reference the cell phone number and the

18    user contact.

19    Q    So your answer is no?

20    A    No.

21    Q    In this extraction report, same thing.  It's a phone

22    number, 1-813-565-1727, with an identifier, serial number.  Did

23    you do anything to find out who that person is?

24    A    No.

25    Q    Now, you can't tell the members of the jury if any of the

1    people who could be associated with these cell phone numbers

2    are witnesses in this case; is that correct?

3    A    That's correct.  My sole function was to extract the

4    information and to validate all of the evidence that was used

5    by the prosecution.

6    Q    These messages were redacted, correct?  Some?

7    A    No.

8    Q    Aren't these text messages longer?

9    A    No.  I'm only validating the evidence that was presented.

10   Q    But you made a thorough investigation of the cell phone,

11   and you certified a report.  And the report is a lot bigger

12   than this amount of paper; is that correct?

13             THE INTERPRETER:  Much bigger than?

14   BY MR. GONZALEZ-DELGADO:

15   Q    This amount of paper?

16   A    That's correct.  Each document is an accurate copy of the

17   extraction that I did.

18             MR. GONZALEZ-DELGADO:  And, Your Honor, just for the

19   record, the papers that I showed him have about one inch, are

20   about one-inch thick.

21   BY MR. GONZALEZ-DELGADO:

22   Q    Now, you did not corroborate any of the information that

23   was contained in these text messages; is that correct?

24   A    All of the information was corroborated, and all of the

25   information is an accurate copy of all of the exhibits that

1    were referenced --

2    Q    What I'm asking --

3    A    -- of the extraction that I made.

4    Q    Okay.  But the content of the message, you did not

5    corroborate that information anywhere?

6    A    All of the information was corroborated with the

7    extraction that I did.

8    Q    When you say "corroborate," it's that what you saw on the

9    screen of the phone was printed out here; is that correct?

10   A    When I say "corroborate," what I mean is that when I

11   process the, all of the digital evidence, all of the images,

12   all of the data was corroborated with the extraction that I

13   did.

14   Q    So it's correct to say that you looked at the cell phone

15   and you looked at the report, and you said:  What's here is

16   here?

17   A    The extraction done to the cell phone is the same

18   information that was corroborated on the evidence that was

19   analyzed.

20   Q    And we can agree is much more than what was shown to the

21   jury?

22   A    Yes.

23             MR. GONZALEZ-DELGADO:  No further questions, Your

24   Honor.

25             MR. GOTTFRIED:  Your Honor, if I can just have 15

1    seconds?

2              No redirect, Your Honor.

3              THE COURT:  All right.

4              Ladies and gentlemen, it's around noontime, so I

5    think this is a good point to take a lunch break.  We'll be

6    back in the courtroom at 1:15, 1:15.

7              Before we begin, remember, do not talk about or

8    communicate with anybody about your impressions of the evidence

9    or your impressions of the case.  Do not view, read or hear

10   reports, comments or articles about the case.  Do not conduct

11   any research about the case, the matters in the case or the

12   individuals involved in the case.

13             I look forward, ladies and gentlemen, to seeing you

14   back in the courtroom in about one hour and 15 minutes.  Thank

15   you for your patience.  Thank you for your attention.  Thank

16   you for having been here early, on time.

17        (Whereupon the following proceedings were had in open court

18        without the presence of the jury.)

19             THE COURT:  Sir, you are free to go.  Thank you for

20   your testimony.

21        (Witness excused.)

22             THE COURT:  We'll be back in the courtroom at 1:15

23   this afternoon.

24        (Whereupon a recess was taken at 12:02 p.m., until 1:23

25        p.m.)

1    UNITED STATES DISTRICT COURT )
                                 )  ss.
2    DISTRICT OF PUERTO RICO     )

3

4                    **REPORTER'S CERTIFICATE**

5

6           I, CINDY LEE BROWN, RPR, Federal Official Court

7    Reporter for the United States District Court for the District

8    of Puerto Rico, appointed pursuant to the provisions of Title

9    28, United States Code, Section 753, do hereby certify that the

10   foregoing is a true and correct computer-aided transcript of

11   proceedings had in the within-entitled and numbered cause on

12   the date herein set forth; and I do further certify that the

13   foregoing transcript has been prepared by me or under my

14   direction.

15

16          Dated this 4th day of July, 2023.

17

18

19                         /s/ Cindy Lee Brown

20                         _____
                           CINDY LEE BROWN, RPR, Federal
                           Official Court Reporter
21                         150 Carlos Chardon, Room 150
                           San Juan, PR  00918
22                         (787) 772-3478

23

24

25

                Cindy Lee Brown, RPR, Official Court Reporter
                 U.S. District Court, District of Puerto Rico
                              (787) 772-3478